IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLAUDE GENE LEE, SR., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) CASE NO. 1:06-CV-874-MHT |
| WESTPOINT HOME, INC., | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OF FACT AND LAW IN SUPPORT OF
WESTPOINT HOME, INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant WestPoint Home, Inc. ("WestPoint") respectfully submits this memorandum in support of its motion for summary judgment.

**I.   INTRODUCTION**

This action arises from WestPoint's decision to remove Plaintiff Claude Gene Lee, a black male, from a supervisory position because of his failure to adequately perform and Lee's subsequent refusal to accept a non-supervisory position.

Lee claims his removal from a supervisory position and his voluntary termination were acts of discrimination by WestPoint. He alleges that WestPoint acted because of his color and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, *et seq.*, and of 42 U.S.C. § 1981.[1]  Lee's claims fail as a matter of law because: (1) assuming, *arguendo*, that Lee can establish a prima facie case, WestPoint had legitimate, nondiscriminatory reasons for removing Lee from a supervisory position and for

---

[1] "Because Title VII and § 1981 'have the same requirements of proof and use the same analytical framework,'" this brief will "'explicitly address the Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well.'" *Pate v. West Publ'g Corp.*, 416 F. Supp. 2d 1275, 1281 (M.D. Ala. 2006) (quoting *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

181469.1

subsequently terminating his employment and (2) there is no evidence that WestPoint's stated reasons are pretextual. Additionally, because the Abbeville Plant, where Lee was employed, will close on August 31, 2007, Lee would not under any circumstances be entitled to any relief beyond that date.

## II. STATEMENT OF FACTS

### A. Background

Lee was continuously employed with WestPoint from February 7, 1977 until his voluntary termination.[2] (Declaration of Brendt Murphy at ¶ 1.) The Abbeville Plant, at which Lee worked, receives finished sheeting fabric from other company plants and cuts and sews the fabric into bed products such as flat and fitted sheets, pillowcases, and other related items. (*Id.* at ¶ 3). The finished products are then sold in the home fashions industry. (*Id.*) From 1974 through 2000 Lee held various hourly paid jobs. (*Id.* at ¶ 1.) He became Third Shift Supervisor of the Packaging Department in March 2000. (*Id.*)

### B. Changes at the Abbeville Plant

Following an asset sale in August 2005, WestPoint recognized that certain operational changes were necessary to make the company successful and to position it to become a stronger competitor in the industry. (Murphy Decl. at ¶ 4.) One of the changes, which directly affected the Abbeville Plant, was the transition of all fabrication and distribution functions to Abbeville. (*Id.*) Because of these changes, every aspect of the operations at Abbeville Plant came under very close scrutiny. (*Id.*) All manufacturing processes were reviewed, as well as the supervisors and managers who were responsible for implementing

---

[2] On August 8, 2005, the assets of WestPoint Stevens, Inc., Lee's original employer, were sold pursuant to section 363 of the bankruptcy code to a new company, WestPoint Home, Inc. (Murphy Decl. at ¶ 2.) Name changes on Company policies and other documents were ongoing at the relevant times involved herein. References in documents to WestPoint Stevens, Inc. should be taken to mean the same as WestPoint, Home, Inc. (*Id.*)

181469.1

changes to complete the transition. (*Id.*) New work methods were introduced and implementation of these new methods and the ability of the managers and supervisors to carry out the new vision of the company were crucial to positioning the company to move forward. (Murphy Decl. at ¶ 5.)

Raw production, while important, was not the sole focus. (Major at ¶ 3.) Instead, WestPoint needed strong, capable managers and supervisors who could swiftly and effectively implement the changes necessary to the transition and to push WestPoint to a higher level, making it a stronger industry competitor. (*Id.*)

Mr. Lee's removal from his supervisory position was only one of several changes that occurred at the Abbeville Plant during this transition. (*See* Murphy at ¶ 13.) To successfully effectuate the change, including WestPoint's vision for a stronger competitive edge, it was critical that all shifts and departments operate effectively with all supervisors and associates performing at a very high level. (*Id.*)

### C. Lee Failed to Perform as a Supervisor

In March 2000, Lee was made Third Shift Supervisor in the Packaging Department. By the end of 2005, however, Lee's performance had become unacceptable. (*See* Murphy Decl. at ¶ 1; Declaration of Frank Major at ¶ 4.) Along with other changes following the asset sale, new work methods were introduced into Lee's department. (Murphy Decl. at ¶¶ 4-5.) Lee failed, however, to consistently enforce the implementation and use of these new work methods. (*See id.* at ¶ 6.) In addition, Lee would not discipline the employees (associates) he supervised for failure to follow correct work procedures. (*Id.*) Lee also failed to properly manage his shift. (*Id.* at ¶¶ 6-9; Major Decl. at ¶¶ 3-5.) For example, he would not take charge of the line scheduling requirements. (Major Decl. at ¶ 3.) Every day, schedules were set for the order in which certain product lines are to be handled. (*Id.*) Lee

181469.1

3

would allow the Set Coordinator, one of his subordinates, to change the schedule without his knowledge or approval. (*Id.*) These line schedules were his responsibility as supervisor, and should not have been delegated. (*Id.*)

In addition, although Lee's shift was fairly efficient in terms of production, the daily production standards were but one small piece in the overall vision of WestPoint. (Major Decl. at ¶ 3.) In order to push the company forward and gain a competitive edge, leadership and hands-on management and supervision were crucial. (*Id.*) WestPoint needed managers and supervisors who were committed to making the transition work successfully.[3] (*Id.*) With Lee, there was a lack of leadership and refusal to enforce the new work methods. (*Id.*)

The seriousness of Lee's shortcomings as a supervisor were first addressed and documented on December 12, 2005. (Murphy Decl. at ¶ 6, Ex. 1.) That day, Packaging Department Manager Bob Turner gave Lee a personnel notice for failure to enforce correct work procedures, failure to discipline associates for poor performance, and failure to communicate with other supervisors and his Department Manager on work-related matters. (*Id.*) Mr. Turner's write-up noted Lee's failure to lead and manage effectively. (*Id.*)

Lee's poor performance and failure to manage his associates were addressed again on January 25, 2006. (Major Decl. at ¶ 4, Ex. 1; Murphy Decl. at ¶ 7.) Frank Major, a black male who was Acting Department Manager, completed and discussed with Lee his annual performance review for the preceding year. Mr. Major rated Lee as "fair." (Major Decl. at ¶ 4.) This low rating was due to poor performance in supervision/management skills, communication skills, and administration. (*Id.*) This assessment was due primarily to Lee's

---

[3] Unfortunately, after making efforts for nearly two years to successfully transition the company, and, particularly, the Abbeville Plant, WestPoint determined that it must close the Abbeville Plant entirely. As noted later is this brief, the Abbeville Plant operations will cease entirely on August 31, 2007.

181469.1

inability to properly carry out his supervisory role -- that is, to manage, support, and control the associates working on his shift. (*Id.*)

Even after he received these notices of poor performance, Lee's performance as a supervisor failed to improve. (*See* Major Decl. at ¶ 5.) On February 16, 2006, Lee received another personnel notice from Mr. Major based upon his continued poor job performance. (*Id.*, Ex. 2.) Mr. Major again noted and discussed with Lee his failure to monitor associates, enforce correct work procedures, and communicate with other Shift Supervisors concerning problems affecting the department. (*Id.*) Mr. Lee was warned that failure to improve could lead to removal from his supervisory position. (*Id.*)

Although Lee had been made aware more than once that his performance as a supervisor was not acceptable, he made no improvements. (*See* Murphy Decl. at ¶ 9.) Therefore, on March 8, 2006, then-Department Manager Michael Alford gave Lee a Corrective-Action Report. (*Id.*, Ex. 2.) This write-up again placed Lee on notice that immediate improvements were required or he could be removed from his position. (*Id.*)

On March 11, 2006, Mr. Alford determined that Lee was making no effort to correct the problems that had been repeatedly brought to his attention, and that immediate action was required. (Murphy Decl. at ¶ 10, Ex. 3.) Mr. Alford discussed this conclusion with the Plant's Human Resources Manager, Brendt Murphy. (*Id.*) Mr. Murphy then consulted with Company Director of Human Resources, Woodrow Sluss. (*Id.* at ¶ 11.) Murphy and Sluss decided that instead of outright termination, because of his long service with the Company Lee should be offered the opportunity to return to a non-supervisory job. (Murphy Decl. at ¶ 11.) Plant Manager James McCants agreed with the recommendation, and Lee was offered the job of Set Order Puller on March 11, 2006. (*Id.*)

However, on March 13, 2006, Lee decided that he was not interested in that position. (Murphy Decl. at ¶ 12, Ex. 4.) Because the Company had no other available positions at the time, Lee's decision to decline the Set Order Puller job was considered a voluntary termination. (*Id.*, Ex. 5.) Lee was allowed to use his accrued vacation time of four weeks, and his termination was therefore not effective until April 15, 2006. (*Id.*)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment pursuant to Fed. R. Civ. P. 56, is mandated when there is insubstantial evidence to establish a material issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The evidence offered by the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronics Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### IV. DISCUSSION

Lee alleges that WestPoint removed him from his supervisory position and ultimately terminated his employment based on his race and color. To WestPoint's understanding, Lee purports to establish this claim through circumstantial evidence. Accordingly, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), controls the Court's analysis. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Under the *McDonnell Douglas/Burdine* framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination and must show an inference of discriminatory intent. *McDonnell Douglas*, 411 U.S. at 802; *see Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997). Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802.

181469.1

If the defendant is able to meet its articulation burden, the plaintiff must then show by substantial evidence that the proffered reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 253.

In the present case, Lee's discrimination claims are due to be dismissed because, assuming *arguendo* that Lee can establish a prima facie case, WestPoint had legitimate, nondiscriminatory reasons for removing Lee from his supervisory position and for terminating Lee's employment; and there is no evidence that WestPoint's stated reasons are pretextual.

### A. WestPoint can articulate legitimate, nondiscriminatory reasons for removing Lee from his supervisory position and for terminating Lee's employment.

An employer's obligation to articulate a legitimate, nondiscriminatory reason for the challenged employment action carries an "exceedingly light burden." *Holifield*, 115 F.3d at 1564. It requires only that the employer produce evidence that would allow a reasonable fact-finder to conclude that the adverse employment action was not made for a discriminatory reason. *Davis v. Qualico Miscellaneous, Inc.*, 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001).

Three different supervisors determined that Lee's performance was inadequate. (*See* Murphy Decl. at ¶¶ 6-10, Exs. 1-3; Major Decl. at ¶¶ 4-5, Exs. 1-2.) Despite repeated documented notices and warnings regarding his failure to properly supervise and manage his associates and shift, Lee's performance did not improve. (*See id.*) Lee was, therefore, removed from his supervisory position. (*See id.*) Lee was simultaneously offered a non-supervisory job. (Murphy Decl. at ¶ 11.) It was Lee who declined this position. (*Id.* at ¶ 12.) WestPoint had no other position available to offer him. (*Id.*) Lee chose to leave the company, and accordingly, his departure was classified as a voluntary termination. (*Id.*)

181469.1

WestPoint recognized that Lee was a long-time employee and made its best efforts to avoid terminating him. (*Id.* at ¶ 11.) WestPoint has thus articulated a legitimate, nondiscriminatory reason for removing Lee from his supervisory position and for ultimately terminating his employment.

### B.  There is no evidence that WestPoint's stated reasons are pretextual.

After the defendant carries its burden of production by articulating a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must discredit the proffered reason. *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1528 (11th Cir. 1997). To show the proffered reason is merely a pretext, an employee must:

> demonstrate that the proffered reason was not the true reason for the employment decision . . . The plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Jackson v. State of Alabama State Tenure Comm.*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation omitted). The plaintiff must set forth "sufficient evidence to allow a reasonable finder of fact to conclude that the defendants' articulated reasons for its decision are not believable." *Id.* (quotation omitted). A plaintiff can accomplish this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation. *Id.* (quotation omitted). "[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). A plaintiff does not establish pretext "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

As explained above, Lee's performance as a supervisor was unacceptable in the new environment of the Plant. During the transition period following the asset sale, committed leadership was crucial. (Murphy at ¶ 4; Major at ¶ 3.) WestPoint needed supervisors who could not only meet and exceed production standards, but who, more importantly, were dedicated to providing effective leadership to implement the changes necessary to allow the Abbeville Plant and WestPoint to reach a new level in the industry. (*Id*.) Lee simply was unable or unwilling to do this. (*See* Murphy at ¶¶ 6-10, Exs. 1-3; Major Decl. at ¶¶ 1-3, Exs. 1-2.) Indeed, three different Department Managers, including Mr. Major -- a black male -- warned Lee that he was failing to provide the necessary leadership. (*Id*.) Lee was put on notice that his failure to perform could lead to his removal from the position and he simply failed to improve.

Lee without question demonstrated the least satisfactory supervisory performance and effort in the Packaging Department. (Major Decl. at ¶ 7.) The Packaging Department Second Shift Supervisor who replaced Lee, Billy Wayne Bedsole, and Mike Ethridge, the Packaging Department First Shift Supervisor who moved to the second shift in Mr. Bedsole's place, adequately performed their supervisory responsibilities. (*Id*.; *see also* Murphy Decl. at ¶ 14.) Like Lee, Bedsole and Ethridge had also been evaluated and revised by Mr. Major. (*Id*.) Importantly, however, unlike Lee, Supervisors Bedsole and Ethridge were rated as "Meets Requirements." (*Id*.; *see also* Murphy Decl. at ¶ 14.) In contrast to Lee, Bedsole and Ethridge did not receive repeated warnings and write-ups for failure to properly and adequately supervise and manage their associates. (*Id*.; *see also* Murphy Decl. at ¶¶ 6-10.) Despite three separate warnings and notices and a poor performance review, Lee failed to improve. (Major Decl. at ¶ 7; Murphy Decl. at ¶¶ 6-10.) Bedsole and Ethridge on the other

hand, did not receive similar repeated criticism because they corrected any identified problems. (*See id.*) WestPoint, moreover, made efforts to avoid terminating Lee outright. That Lee no longer desired to work in a non-supervisory role was his decision and thus it was his decision to ultimately leave the employ of WestPoint.

In addition, Lee was not the only employee during this transition period who was removed from a position. (Murphy Decl. at ¶ 13.) At the same time, there were other employees whose performance and leadership warranted promotion. (*Id.*) As stated above, in an effort to increase the company's competitive edge, senior management took a close look at all existing manufacturing processes and the supervisors and managers at the Abbeville Plant. (*Id.*) No member of Plant management was immune, and none was allowed to remain in their position if their performance was not acceptable. (*Id.*) None of management's decisions, however, was based on race or any factor other than performance. (*Id.*) For example, Mary Bradley, a black female, was promoted to department supervisor on December 16, 2006. (*Id.*) The Pillow Case Department Manager, a white male, was removed from that position on January 3, 2006, and replaced by William Feggins, a black male. (*Id.*) Significantly, the Plant Manager, a white male, was also removed from his position despite his long employment history with the company, where he had worked since 1976, and for whom he had been Abbeville Plant Manager since 1992. (*Id.*)

That Lee himself may disagree with WestPoint's conclusion that his performance as a supervisor was unacceptable is not relevant. "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient." *Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1030

(11th Cir. 2000) (en banc)). "[T]he ultimate burden of persuading the trier of fact that the defendant *intentionally discriminated* against the plaintiff remains at all times with the plaintiff." *Id.* (emphasis supplied); *see also Tolbert v. Briggs & Stratton Corp.*, No. 05-1149, 2007 U.S. Dist. LEXIS 9342, at * 17-18 (affirming summary judgment on plaintiff's discriminatory discharge claim where plaintiff was terminated for poor performance and noting, "There is obviously nothing unlawful, under Title VII, with firing supervisors who fail to improve problematic situations."); *Cuddeback v. Fla. Bd. Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004) (holding plaintiff failed to establish pretext where defendant terminated her for documented and repeated performance issues); *Jones v. United Space Alliance, L.L.C.*, No. 04-00078, 2006 U.S. App. LEXIS 2702, at * 13 (11th Cir. Feb. 3, 2006) (unpub.) (affirming summary judgment in favor of defendant-employer and noting "an analysis of pretext focuses on the employer's beliefs, not the employee's own perceptions of his performance."); *Holifield*, 115 F.3d at 1565 ("where the employer produces performance reviews and other documentary evidence . . . that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"). Here, Lee faces an especially "difficult burden" in proving intent to discriminate, because Mr. Major, who gave Lee two of his negative write-ups leading up to his removal from the supervisory position, is also black. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("Elrod faces a difficult burden here, because all of the primary players behind his termination—Rives, Malone and Merrill—were well over age forty and within the class of persons protected by the ADEA."); *Harris v. Delchamps, Inc.*, 5 F. Supp. 2d 1316, 1332 (M.D. Ala. 1998) ("However, the fact that the primary decision maker was the same race as the employee . . .

militates . . . against an inference of discriminatory animus."); *Holston v. Sports Authority, Inc.*, 136 F. Supp. 2d 1319, 1335 (N.D. Ga. 2000) ("[W]hen the decision makers are in the same protected class as the employee complaining about an adverse employment decision, the employee faces a more difficult burden in establishing that a discriminatory animus played a role in the decision complained about.").

Lee cannot establish that WestPoint's reasons for removing him from his supervisory position, or for his eventual outright voluntary termination when he refused a non-supervisory job, are pretextual.

### C. WestPoint is Entitled to Judgment As a Matter of Law on Lee's Claim of Damages (and Reinstatement) Beyond August 31, 2007.

On May 29, 2007, all employees of WestPoint's Abbeville Plant were given notice, pursuant to WARN, 29 U.S.C. § 2101, *et seq.*, of the Plant's imminent closing. (Murphy Decl. at ¶ 15.) On August 31, 2007 the Abbeville Plant will close entirely. (*Id.*) Accordingly, had Lee still been employed with WestPoint, his position would have been eliminated on August 31, 2007. Under no circumstances, therefore, can Lee recover damages beyond that date, nor can he be reinstated. *See Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1350 (11th Cir. 2000) ("This court has acknowledged that the elimination of a plaintiff's former position prior to trial may preclude the receipt of front pay. . . . Awarding front pay to a plaintiff who ultimately would have been terminated confers a windfall upon that plaintiff . . . ."); *accord Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1473 n.11 (1985) ("Thus, if the other inside sales representatives were laid off at the time the Atlanta sales office was closed, then defendant's period of liability . . . ended at the time of the closure.") WestPoint is entitled to judgment as a matter of law insofar as Lee seeks relief that

181469.1

contemplates that he might have been employed beyond August 31, 2007, the date on which Abbeville Plant will close.

## V.  CONCLUSION

For the foregoing reasons, WestPoint's motion for summary judgment is due to be granted.

Respectfully submitted this 7th day of June 2007.


/s/Kelly F. Pate
One of the Attorneys for Defendant WestPoint Home, Inc.

**OF COUNSEL:**
David R. Boyd (BOY005)
Kelly F. Pate (FIT014)
BALCH & BINGHAM LLP
P.O. Box 78
Montgomery, Alabama 36101
(334)834-6500 (OFFICE)
(334)269-3115 (FAX)

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing and/or that a copy of the foregoing has been served upon the following by United States Mail, properly addressed and postage prepaid to the following on this day 7th day of June, 2007:

Jay E. Tidwell, Esq.
Tidwell Law Group, LLC
2112 11th Avenue South, Suite 217
Birmingham, AL 35205

Stephen C. Wallace, Esq.
Dawson & Wallace, LLC
2229 Morris Avenue
Birmingham, AL 35203

Richard E. Crum, Esq.
M. Russ Goodman, Esq.
Shealy, Crum & Pike, P.C.
P.O. Box 6346
Dothan, AL 36302-6346

s/Kelly F. Pate
Of Counsel

181469.1