IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| CLAUDE GENE LEE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO: 1:06cv874-MHT |
| | ) | |
| WESTPOINT HOME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION AND BRIEF FOR SUMMARY JUDGMENT

Plaintiff files this brief in support of and with its opposition to Defendant's motion and brief for Summary Judgment. It should be noted Plaintiff has included certain facts in its Complaint as background and circumstantial evidence of discrimination. The Complaint filed in this matter is based primarily on the Plaintiff's EEOC charge filed May 5, 2006 addressing race and age discrimination, as a result of Plaintiff's termination as 3rd shift supervisor for WestPoint Home. The Plaintiff received his notice of right to sue on June 30, 2006 and timely filed the Complaint in this case addressing that charge.

The Defendant in its brief seeks to addresses Plaintiff's claims for color and race discrimination. It is important to note, the Declaration of Brendt Murphy is not first hand knowledge. Mr. Murphy was never Mr. Lee's supervisor, and Mr. Murphy never observed Mr. Lee's management skills. (Exh. A-Affidavit of Claude G. Lee ¶ 31). The only other declaration submitted by the defendant is that of Mr. Frank Major, who only supervised Mr. Lee for a very short period of time (at most two months). (Exh. A-Affidavit of Claude G. Lee ¶ 14). In addition, the defendant has submitted absolutely no evidence from the packing department

1

manager who terminated Mr. Lee, Mr. Mike Alford.  It is undisputed Mr. Lee was terminated by Mr. Alford.  (*Id.* at ¶ 31; *See* Brendt Murphy's declaration attached to Defendant's brief). Because the defendant has offered no testimony of Mr. Alford to support a legitimate reason for Mr. Alford's terminating Mr. Lee, the defendant's motion should be denied as the defendant can not establish a legitimate reason Mr. Lee was terminated.  Assuming Your Honor finds the defendant has articulated a legitimate reason for Mr. Lee's termination, this brief will show those reasons are contradictory and false.

## I    STATEMENT OF FACTS

### A.    Background

Claude G. Lee, Plaintiff, is black male over the age of 40. (Exh. A-Affidavit of Claude G. Lee ¶¶ 2 & 3).  Mr. Lee graduated from Abbeville High School in 1974.  (Exh. A-Affidavit of Claude G. Lee ¶ 4).  While in high school, he worked as an intern for WestPoint Home, Inc. (hereinafter referred to as WestPoint) in the warehouse department.  (Exh. A-Affidavit of Claude G. Lee ¶ 4).

In 1977, Mr. Lee began his long and accomplished career with WestPoint, in the packaging department. (Exh. A-Affidavit of Claude G. Lee ¶ 5).  Lee worked for WestPoint until March of 2006, when he was fired.  (*Id.* At ¶ 6).  During his 29 years of employment with WestPoint, he served in a variety of capacities, but primarily in the packaging department. (*Id.*). For many years, Lee served in hourly and labor intensive positions. (*Id.*).  As evidenced by Lee's evaluations, he was quite capable and received promotions and commendations based on his performance and outstanding attendance. (*Id.*; *see also* Exh B-Excerpts from Pl's personnel file).  In fact, Lee received numerous commendations for not missing a single day of work.

2

(Exh. A-Affidavit of Claude G. Lee ¶ 6). In total, he went over twenty years without missing a day of work. (*Id.*). Lee also received employee of the month in August, 1993. (*Id.*).

**B.    Lee's promotion to shift supervisor**

Because of Lee's dedication and hard work, on or about November, 2001, he was promoted to third shift supervisor in the packaging department. (*Id.* at ¶ 7). There are three packaging department shifts and third shift is the night shift (11:00 P.M. to 7:00 A.M.). (*Id.*). It should be noted, third shift is the most difficult shift to manage because of high turnover. (*Id.*). Few people remain on third shift because of the unusual hours. (*Id.*). Even with the turnover problem, Lee was still able to meet or exceed company production requirements. (*Id.*).

After receiving this promotion, Lee supervised on average between 35-40 employees. (*Id.* at ¶ 8). While serving in this supervisory position, until there was a change in ownership in 2005, Mr. Lee was never disciplined or counseled. (*Id.* at ¶ 9).

**C.    The racial discrimination by the new management of WestPoint**

On or about August 2005, there was a change in ownership at WestPoint. (*Id.* at ¶ 10). From August, 2005 to Lee's first personnel notice in December, 2005, Lee was not given any warning or indication that he was performing poorly. (*Id.*).

On or about December 16, 2005, Lee was given a "personnel notice" by Bob Turner and Brendt Murphy, both of whom are white. (*Id.* at ¶ 12). Lee was surprised to receive such, as Turner, who had been Lee's supervisor for a number of years had always been pleased with his performance, and Lee had always received good evaluations under his direction. (*Id.*). In fact, in this meeting, Turner restated his confidence in Lee and his ability to perform the job. (*Id.*). During this meeting was the first time, Lee had ever been notified his shift was required to meet 100% quota or output, which was not a problem for Lee's shift. (*Id.*). Lee disagreed with their

criticisms of his management skills, and asked but was never given any examples of how they had arrived at these conclusions or what he needed to do to address their concerns. (*Id.*). Lee was only given vague comments and was told that the new management team was simply going through the motions and all shift supervisors were being similarly counseled. (*Id.*).

Although Defendant would like you to believe this was a disciplinary notice to Lee, there was no indication on the notice as to what type it was. In addition, Lee was told that they were just going through the motions. (*Id.*). In any event, following this meeting, Turner resigned and Frank Major became Lee's new supervisor on or around December 15, 2005. (*Id.* at ¶ 13).

The Defendant seems to rely heavily on Major's evaluations of Lee. However, Major was Lee's supervisor for only a short period of time (at most two months). (*Id.* at ¶ 14). In addition, Lee had very little interaction with Major. (*Id.*). The Defendant admits Major first became Lee's supervisor around December 15, 2005, yet Major completed Lee's entire 2005 review without garnering any advice from Lee's former supervisor, Turner. (*Id.*). In addition, Major stated he had never completed a yearly review and was unclear why he had been instructed to complete the evaluation. (*Id.*)

**D.    Contradictions, inadequacies, and racial discrimination with regard to Lee's evaluation, personnel notices, and eventual termination**

The declaration of Major and the evaluation he performed are contradictory. In the declaration, Major stated Lee received one of the lowest ratings on the performance review because of Lee's "poor performance in supervision/management skills." (Major declaration with attached evaluation Exh. 1). Perhaps, he did not read his prior evaluation of Lee prior to signing this declaration, because in Major's evaluation he stated "**Claude has good management skills.**" He also commented in his evaluation that Lee does a good job keeping up with

4

priorities, has good knowledge of the job and job duties, and is able to adapt to changes. (Major affidavit w/ attached evaluation Exh. 1). Although there were some criticisms made in Lee's evaluation, Lee disagreed with these alleged deficiencies, especially since Major had only observed Lee's performance for less than one month, prior to performing Lee's evaluation. (Exh. A-Affidavit of Claude G. Lee ¶ 15).

In addition, in Lee's yearly evaluation for 2005, which was done by Major, it appears many of Lee's ratings have been altered by whiting out previous high marks and instead giving Lee lower marks. (*Id.* at ¶ 16). For example, it appears the supervision and management skills rating was previously meets requirements, but was changed to fair. (*Id.*). Other categories appear to have been similarly altered, including Lee's overall rating on this evaluation from meets requirements to fair. (*Id.*).

Prior to Lee's 2005 evaluation, Lee always received an overall grade of meets requirements or above requirements. (Exh. G-Plaintiff's personnel evaluations from 1998-2005). In all the evaluations prior to 2005, Lee never received anything less than meets requirements. (Exh. A-Affidavit of Claude G. Lee ¶ 17).

Finally, with regard to Lee's 2005 evaluation, Lee and Major discussed Lee's objectives for the upcoming year. (*Id.* at ¶ 18). Lee was never disciplined, counseled, or eventually terminated for failing to meet these planned goals for 2006 that are listed in the evaluation. (*Id.* at ¶18). Instead of looking at these objectives, defendants have tried to create a legitimate reason for Lee's termination.

By the time Lee received Major's second personnel notice on February 16, 2006, Lee was concerned a paper trail was being created to terminate him. (*Id.* at ¶19). Lee was surprised to receive this notice and again disagreed with these vague statements about his job performance.

(*Id.* at ¶ 18). Major made no effort to explain what specifically he was unhappy about or provide any examples of Lee's poor performance. (*Id.* at ¶ 18). In fact, Lee was making or exceeding the defendant's production quotas, unlike Mike Etheridge, a white supervisor on first shift, and Billy Wayne Bedsole, a white supervisor on second shift, who were not making their production quotas. (*Id.* at ¶ 18).

In addition to Lee, WestPoint issued personnel notices to Ethridge and Bedsole in February, 2006. They mirror the complaints made about Lee, except the notices add as an additional complaint against Ethridge and Bedsole that they were not meeting 100% production efficiency goals. (Exh. F-Personnel Notices for Bedsole & Ethridge dated Feb. 2006). Again, Lee was never counseled or given a notice for failing to meet production or quota requirements. After Etheridge and Bedsole were warned about low production efficiency, they still did not meet the 100% quota requirement. (*Id.* at ¶ 20). Shortly before Lee was terminated, Bedsole and Etheridge again failed to meet the 100% quota requirement, while Lee exceeded the 100% requirement. (Exh. H-Weekly reports for 3/5/06). It does not appear Bedsole and Etheridge were ever counseled or disciplined for their lack of performance, but the only black supervisor, Lee, was terminated.

Shortly after the February 2006 notice was given, Michael Alford, a white male, was first hired by WestPoint to take Majors position as packaging department supervisor. (Exh. A-Affidavit of Claude G. Lee ¶ 21). Alford was Lee's third supervisor in the course of three months. (*Id.* at ¶21). Alford's previous employment was managing a Movie Gallery store and he had no background managing people in this industry. (*Id.*). From the outset, Alford began using profanity towards Lee and was prone to outbursts. (*Id.*).

Although Alford had only acted as Lee's supervisor for approximately two weeks, he

gave Lee a new form labeled "corrective action report." (Murphy affidavit w/ attached Exhibit 2). This form was discussed on March 8, 2006, but referenced an incident that occurred on March 2, 2006. (Murphy affidavit w/ attached Exhibit 2).

The report claims some unknown employee was not working and Lee did not question the employee about it. (Exh. A-Affidavit of Claude G. Lee ¶ 24). This is incorrect and Lee explained such at the time of receiving the corrective action report. (*Id.*). Specifically, Lee was speaking with Alford when a black employee left his machine to go wash his hands. (*Id.*). It is important the line employees clean and wash their hands regularly to avoid soiling the sheets and other materials that are being packaged. (*Id.*). This is a quality control issue that Lee had been trained to be mindful of. (*Id.*). While the defendant's rely on this report to substantiate firing Lee, they have provided absolutely no evidence from Alford regarding the facts surrounding the alleged incident.

During Lee's conversation with Alford regarding the March 8, 2006 corrective action report, Alford stated Lee would be transferred to second shift starting March 13, 2006. (*Id.* at ¶ 26). Billy Wayne Bedsole, a white supervisor on second shift, would be transferred to Lee's shift. (*Id.*). Although Lee's shift, third shift, was meeting or exceeding its 100% quotas, second shift was not. (*Id.*). However, Lee was told he would need to raise the second shift quotas to 100 percent, even though Bedsole, the current white second shift supervisor, was not under the same scrutiny. (*Id.*).

In this same March 8, 2006, write-up, it was stated that "If not fully in control of his position as supervisor in the packaging department **within 2 weeks** including proper communication of progress with management Claude could be immediately removed from his current position as supervisor." (Murphy affidavit w/ attached exhibit 2).

7

Although the March 8, 2006 write-up clearly gave Lee two weeks to correct those perceived deficiencies, three days later on March 11, 2006, Alford fired Lee from his third shift supervisory position. (Murphy affidavit w/ attached exhibit 3). Lee, an employee of more than 29 years with WestPoint, was fired because of his race by Alford, who had been with WestPoint for less than a month. (Exh. A-Affidavit of Claude G. Lee ¶ 28). Alford's actions were extremely bold and clearly show the defendant's stated reasons are pretext.

Lee disagreed with the claims made in this notice and all others, and was stunned the company had not even given him the two weeks it promised to clear up any alleged performance problems. (*Id.*). This was further evidence of racial discrimination, since the white supervisors were not under the same scrutiny and were not being relieved of their supervisory positions, even though they were underperforming and not meeting their quotas. (*Id.*). Alford and others were not interested in giving Lee anytime to clear up their alleged concerns, but simply were out to fire him because he was black.

Again this corrective action report mentions some vague complaints without offering any specific examples. (*Id.* at ¶ 29).  Lee disagreed at the time with these complaints and others, but was told he simply had two options: he could either be fired be paid for his accrued vacation time or he could accept a forklift driver position making $10.00 per hour. (*Id.*). The forklift driver was a substantial decrease in pay, since Lee was a salaried employee making approximately $32,000.00 per year. (*Id.*). These options were given to Lee in an attempt to embarrass and demean him. (*Id.*). At Lee's age, he was not even physically able to perform the forklift driver position, and WestPoint knew that. (*Id.*).

After Lee was fired, he was replaced by Billy Wayne Bedsole, a white male. (*Id.* at ¶ 30). Currently, there are no blacks in permanent supervisory positions in the packaging department.

In addition to Lee's termination based on race, two black females in the packaging department, Lottie Benson and Claira Thomas, were demoted because of their race. (*Id.*). Benson was replaced by a white female employee.   Thomas was first shift co-supervisor along with Etheridge; however, WestPoint demoted Thomas while leaving Etheridge as the supervisor. Defendant would like you to believe the company has not discriminated based on race and they cite to examples where black people were promoted to supervisory positions; however, the defendant only cites to employees in other departments.  The defendant can not cite to any black employee in the packaging department who were promoted or hired into supervisory positions. In addition to Lee, there are at least two other black employees in the packaging department who were discriminated against based on there race. (*Id.*).

In the declarations filed by the Defendant, they state Lee failed to consistently enforce the implementation of new work methods.  This is flawed for two reasons.  First, there were very few changes made, and Lee was able to implement those changes.  (*Id.* at ¶ 33).    In fact, the biggest change made was WestPoint installed a boxing machine to package certain items; however, the machine was taken out because it reduced output.  (*Id.*).  Second, contrary to the declarations attached to defendant's brief, Major's evaluation of Lee states Lee was **"able to adapt to changes."**  (*Id.*).  This is yet another example of the defendant contradicting itself in an attempt to create a legitimate reason for Lee's termination.

Defendant has also referenced Lee would not discipline the employees he supervised for failure to follow correct work procedures.  Lee corrected all of his employees on a number of occasions regarding work procedures and other items. (*Id.* at 34).   According to the defendants own documents, Lee counseled and disciplined the employees on his shift far more then the white supervisor did for the employees on their shift. (Exh. D-Abbeville Plant Employee

9

Relations Report). As an example, as of October, 2005, Lee counseled his employees thirteen times compared to Bedsole counseling his employees three times and Ethridge none. (*Id.*). Lee also issued thirteen warnings in the same time period compared to Bedsole's eleven times and Ethridge's none. (*Id.*).    Again, defendant is making false accusations in an attempt to create a legitimate reason for terminating Lee.

Yet another example of defendant's contradiction is where Major states in his declaration that Lee failed to properly manage the shift. (Major's declaration). This is in stark contrast to Major's statement in Lee's evaluation where he stated Lee had "**good management skills.**" (Major's declaration w/ attached Exhibit 1). The only example Major gives is he states Lee failed to take charge of the line scheduling requirements. (Major's declaration). This is false for several reasons. First, Lee was never counseled about this and there is no write-up even mentioning this. (Exh. A-Affidavit of Claude G. Lee ¶ 35). Second, this was not even part of Lee's job duties as a supervisor. (Exhibit E-Job Description). Scheduling the line had always been performed by other personnel and Lee did not delegate it, as Lee was not responsible. (Exh. A-Affidavit of Claude G. Lee ¶ 35). It is not even plausible for Major to try to hold Lee responsible for something Lee was not told to do or trained to do.

Major claims in his affidavit some equipment was not functioning. Lee disputes this claim and again it is so vague that Lee is unaware of what Major is even referring to. (*Id.* at ¶ 36). Again, the first time this has ever been mentioned is in Major's declaration. It was never mentioned to Lee prior to his termination, nor was it in any of Lee's evaluations or personnel notices. (*Id.*). Even if this had been a problem, Lee was still meeting or exceeding my quota demands and my shift was out producing both shifts one and two. (*Id.*).

Major also states in his declaration Lee was unable to answer his questions and Lee's

lead person had to respond for him  Again, this is an attempt to create a legitimate reason for firing Lee. This was never mentioned to Lee nor was he ever written-up for this. (*Id.* at ¶37). In fact, Lee vehemently denies this false statement. (*Id.*).

Again, many of the defendant's stated reasons for terminating Lee are false and contradict previous statements made by the defendant. Lee disputes these false claims. It seems the defendant has expounded a great deal of effort into making these false reasons to justify firing Lee.

The discriminatory actions taken by WestPoint were devastating to Lee and his family. (*Id.* at ¶ 40). Lee had worked for WestPoint for his entire professional career and to have it taken away was extremely difficult to handle. (*Id.*). Also, it took a significant amount of time for Lee to find other employment. (*Id.*). The employment Lee eventually found pays far less than his salary as a supervisor at WestPoint. (*Id.*).

## II    STANDARD OF REVIEW

As noted by Defendant, summary judgment is proper if there is no genuine issue as to any material fact.  Plaintiff has shown there to be substantial issues of fact and the Defendant has not proffered legitimate, non-discriminatory reasons for the challenged action. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Moreover, the Defendant's stated reasons for terminating Plaintiff were pre-textual, and summary judgment is not proper.  A Title VII claim may be established through circumstantial evidence which creates an inference of discrimination. Bass v. Bd. of County Commissioners, 256 F.3d 1095 (11th Cir. 2001).  Here, there is a wealth of evidence to support Plaintiff's claim, and material issues of fact remain to be decided.

## III.    PLAINTIFF CLEARLY ESTABLISHES A PRIMA FACIE CASE OF RACE DISCRIMINATION

The Plaintiff has clearly established a prima facie case of race discrimination.  As stated

in more detail in the fact section of this brief, Lee is a black male over the age of 40. He had been working in various capacities at WestPoint Home and its successors for 29 years. He had been the third shift supervisor for approximately 5 years. He was terminated from his position as third shift supervisor by a white supervisor, Alford, who had been with the company for less than one month. The first shift supervisor and the second shift supervisor, Etheridge and Bedsole (both white male employees), were treated significantly better than Lee. For example, in February, 2006, WestPoint issued personnel notices to Lee, Ethridge and Bedsole. The notices to Etheridge and Bedsole mirrored the complaints made about Lee, except the notices add as an additional complaint against Ethridge and Bedsole that they were not meeting 100% production efficiency goals. (Exh. F-Personnel Notices for Bedsole & Ethridge dated Feb, 2006). Again, Lee was never counseled or given a notice for failing to meet production or quota requirements. After Etheridge and Bedsole were warned about low production efficiency, they still did not meet the 100% quota requirement. (Id. at ¶ 20). Shortly before Lee was terminated, Bedsole and Etheridge again failed to meet the 100% quota requirement, while Lee exceeded the 100% requirement. (Exh. H-Weekly reports for 3/5/06). It does not appear Bedsole and Etheridge were ever counseled or disciplined for their lack of performance, but the only black supervisor, Lee, was terminated. Plaintiff clearly satisfies the four prong test of <u>McDonnell Douglas Corp v.</u> <u>Green</u>, 411 U.S. 792 (1973) by raising the inference of discrimination through his prima facie case

## IV.    **DEFENDANT HAS PRODUCED NO EVIDENCE REGARDING THE DECISION-MAKER'S ACTUAL MOTIVES FOR TERMINATING THE PLAINTIFF**

Although the defendant offers testimony via the declarations of Murphy and Major, the defendant has failed to produce evidence from the true decision-maker, Mike Alford. It is

undisputed Alford fired Lee. It is also undisputed Alford was Lee's direct supervisor for less than one month when Alford made the decision to fire Lee. The defendant has submitted no evidence as to the basis of Alford's decision for terminating Lee. They have not provided any testimony of Alford. In addition, defendant's brief relies on Lee's evaluations and notices as the basis for Lee's termination; however, the defendant has submitted no evidence Alford looked at or even considered those evaluations or notices prior to his termination of Lee. The Middle District of Alabama in <u>Snellgrove v. Teledyne Abbeville</u> clearly holds the employer must present evidence the **decision-maker** [Alford] actually relied on the reasons advanced for an employee's termination. 117 F. Supp 2d 1218, 1234 (M.D. Ala. 1999); citing <u>Walker v. Mortham</u>, 158 F.3d 1177, 1181 n. 8 (11th Cir.1998)( "The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision. Likewise, a court may not assume, based on its own perusal of the record, that the decision-maker in a particular case was motivated by a legitimate reason when the defendant has offered none.").

Because the defendant has offered no evidence regarding Alford's actual motivation regarding his termination of Lee, the defendant's motion should be denied.

## V.    PLAINTIFF HAS PRODUCED SUFFICIENT EVIDENCE OF COLOR AND RACE DISCRIMINATION AND DEFENDANT HAS FAILED TO ESTABLISH A LEGITIMATE NONDISCRIMINATORY REASON FOR TERMINATING PLAINTIFF

Assuming Your Honor finds the defendant has produced evidence of Alford's motives in firing Lee, the defendant's motion should still be denied because Plaintiff has clearly established a prima facie case of discrimination and the proffered reasons for Plaintiff's termination are pre-textual.

The Plaintiff's burden may be met in one of two ways. First, a plaintiff may persuade the

13

court that the employment decision more likely than not was motivated by a discriminatory

reason. Postal Serv. Bd. Of Govenors v. Aikens, 460 U.S. 711, 714, 716, & 717 (1983). Second,

the Plaintiff may also prove this burden by showing "that the employer's proffered explanation is

unworthy of credence." McDonnell Douglas Corp v. Green, 411 U.S. 792, 804-805 (1973). In

establishing Plaintiff's burden or in showing the employer's proffered explanation is unworthy of

credence, circumstantial or direct evidence may be used. Reeves v. Sanderson Plumbing

Products, Inc., 530 U.S. 133, 147 (2000). In fact, "circumstantial evidence is not only sufficient,

but may also be more certain, satisfying, and persuasive than direct evidence." Rogers v.

Missouri Pacific R. Co., 352 U.S. 500, 508 (1957). Not only can Lee establish his termination

was motivated by the fact that he was black, Lee can also establish WestPoint's proffered reasons

are false.

The defendant would like this Court to believe they had a legitimate nondiscriminatory

reason for terminating Lee; however, that is not the case. As indicated in the fact section of this

brief, Lee worked for WestPoint for 29 years, working his way up to third shift supervisor. (Exh.

A-Affidavit of Claude G. Lee ¶¶ 2 & 3). Lee was promoted to third shift manager in 2001, and

he worked in that capacity until he was terminated in March, 2006. Prior to the new

management taking effect in 2005, Lee's career with WestPoint was full of good evaluations and

commendations. Prior to Lee's 2005 evaluation, Lee always received an overall grade of meets

requirements or above requirements. (Exh. G-Plaintiff's personnel evaluations from 1998-2005).

The defendant claims Lee was terminated because Lee did not possess the requisite

managerial skills. However, Lee had been a manager for at least four years prior to his

termination and no one had ever questioned or discussed deficiencies in his managerial skills. In

fact, it is undisputed that Lee's shift was the only shift consistently meeting or exceeding

WestPoint's required production quotas. How can Lee be an ineffective manager and yet met or exceeded WestPoint's production quotas? Also, why weren't the two white shift supervisors fired for repeatedly failing to meet WestPoint production quotas? The only possible answer is Lee was not fired because of his managerial skills...he was fired because he was black.

The defendants state three different supervisor determined Lee's performance was inadequate. However, they appear to only rely on testimony from one of the three supervisors, current employee Frank Major.

Lee's first supervisor was Bob Turner. Lee worked for Turner for numerous years. Turner was Lee's manager from 2001 until December 2005. During that time frame, Lee always received an overall grade of meets requirements or above requirements on his yearly evaluations. (Exh. G-Plaintiff's personnel evaluations from 1998-2005).

In fact, out of all the years Lee was a manager, he was never questioned or consulted about his performance as a manager, until December 16, 2005. (Exh. A-Affidavit of Claude G. Lee ¶ 11). From August, 2005 to Lee's first personnel notice in December, 2005, Lee was not given any warning or indication that he was performing poorly. (*Id.*). However, to support the defendant's alleged legitimate reason for terminating Lee, they rely heavily on Major's 2005 evaluation of Lee. However, it is important to note Major was Lee's supervisor for only a short period of time (at most two months). (*Id.* at ¶ 14). In addition, Lee had very little interaction with Major. (*Id.*). The Defendant admits Major first became Lee's supervisor around December 15, 2005, yet Major completed Lee's entire 2005 review without garnering any advice from Lee's former supervisor, Bob Turner. (*Id.*). In addition, Major stated he had never completed a yearly review and was unclear why he had been instructed to complete the evaluation. (*Id.*)

Even so, the declaration of Major and the evaluation he performed are contradictory. In

15

the declaration, Major stated Lee received one of the lowest ratings on the performance review because of Lee's "poor performance in supervision/management skills." (Major declaration with attached evaluation Exh. 1). Perhaps, he did not read his prior evaluation of Lee prior to signing this declaration, because in the evaluation he stated "**Claude has good management skills.**" He also commented in his evaluation that Lee does a good job keeping up with priorities, has good knowledge of the job and job duties, and is able to adapt to changes. (Major affidavit w/ attached evaluation Exh. 1). Although there were some criticisms made in Lee's evaluation, Lee disagreed with these alleged deficiencies, especially since Major had only observed Lee's performance for less than one month, prior to performing Lee's evaluation. (Exh. A-Affidavit of Claude G. Lee ¶ 15).

Finally, with regard to Lee's 2005 evaluation, Lee and Major discussed Lee's objectives for the upcoming year. (*Id.* at ¶ 18). Lee was never disciplined, counseled, or eventually terminated for failing to meet these planned goals for 2006 that are listed in the evaluation. (*Id.* at ¶ 18). Instead of looking at these objectives for the 2006 year, defendants have tried to create a legitimate reason for Lee's termination.

The third manager the defendant refers to is Michael Alford. Michael Alford, a white male, was hired by WestPoint to take Majors position as packaging department supervisor sometime after February 16, 2006. (Exh. A-Affidavit of Claude G. Lee ¶ 21). Alford was Lee's third supervisor in the course of three months. (*Id.* at ¶21). Alford's previous employment was managing a Movie Gallery store and he had no background managing people in this industry. (*Id*). From the outset, Alford began using profanity towards Lee and was prone to outbursts. (*Id*)

Although Alford had only acted as Lee's supervisor for approximately two weeks, he

gave Lee a new form labeled "corrective action report." (Murphy affidavit w/ attached Exhibit 2). This form was discussed on March 8, 2006, but referenced an incident that occurred on March 2, 2006. (Murphy affidavit w/ attached Exhibit 2).

The report claims some unknown employee was not working and Lee did not question the employee about it. (Exh. A-Affidavit of Claude G. Lee ¶ 24). This is incorrect and Lee explained such at the time of receiving the corrective action report. (*Id.*). Specifically, Lee was speaking with Alford when a black employee left his machine to go wash his hands. (*Id.*). It is important the line employees clean and wash their hands regularly to avoid soiling the sheets and other materials that are being packaged. (*Id.*). This is a quality control issue that Lee had been trained to be mindful of. (*Id.*). While the defendant's rely on this report to substantiate firing Lee, they have provided absolutely no evidence from Alford regarding the facts surrounding the alleged incident.

During Lee's conversation with Alford regarding the March 8, 2006 corrective action report, Alford stated Lee would be transferred to second shift starting March 13, 2006. (*Id.* at ¶ 26). Billy Wayne Bedsole, a white supervisor on second shift, would be transferred to Lee's shift. (*Id.*). Although Lee's shift, third shift, was meeting or exceeding its 100% quotas, second shift was not. (*Id.*). However, Lee was told he would need to raise the second shift quotas to 100 percent, even though Bedsole, the current white second shift supervisor, was not under the same scrutiny. (*Id.*).

In this same March 8, 2006, write-up, it was stated that "If not fully in control of his position as supervisor in the packaging department **within 2 weeks** including proper communication of progress with management Claude could be immediately removed from his current position as supervisor." (Murphy affidavit w/ attached exhibit 2).

Although the March 8, 2006 write-up clearly gave Lee two weeks to correct those perceived deficiencies, three days later on March 11, 2006, Alford fired Lee from his third shift supervisory position. (Murphy affidavit w/ attached exhibit 3). Lee, an employee of more than 29 years with WestPoint, was fired because of his race by Alford, who had been with WestPoint for less than a month. (Exh. A-Affidavit of Claude G. Lee ¶ 28). Alford's actions were extremely bold and clearly show the defendant's stated reasons are pre-textual.

Lee disagreed with the claims made in this notice and all others, and was stunned the company had not even given him the two weeks it promised to clear up any alleged performance problems. (*Id.*). This was further evidence of racial discrimination, since the white supervisors were not under the same scrutiny and were not being relieved of their supervisory positions, even though they were underperforming and not meeting their quotas. (*Id.*). Alford and others were not interested in giving Lee anytime to clear up their alleged concerns, but simply were out to fire him because he was black.

Again this corrective action report as well as the evaluation and other notices given to Lee are extremely vague complaints without offering any specific examples. (*Id.* at ¶ 29).    Lee disagreed at the time with these complaints and others, but was told he simply had two options: he could either be fired be paid for his accrued vacation time or he could accept a forklift driver position making $10.00 per hour. (*Id.*). The forklift driver was a substantial decrease in pay, since Lee was a salaried employee making approximately $32,000.00 per year. (*Id.*). These options were given to Lee in an attempt to embarrass and demean him. (*Id.*). At Lee's age, he was not even physically able to perform the forklift driver position, and WestPoint knew that. (*Id.*).

As for Lee's 2005 evaluation done by Major, an examination reveals than many of Lee's

18

ratings have been altered by whiting out previous high marks and instead giving Lee lower marks. (*Id.* at ¶ 16; see also Exhibit 1 to Major's declaration ). For example, it appears the supervision and management skills rating was previously meets requirements, but was changed to fair. (*Id.*). Other categories appear to have been similarly altered, including Lee's overall rating on this evaluation from meets requirements to fair. (*Id.*).

In the declarations filed by the Defendant, they state Lee failed to consistently enforce the implementation of new work methods. This is flawed for two reasons. First, there were very few changes made, and Lee was able to implement those changes. (*Id.* at ¶ 33). In fact, the biggest change made was WestPoint installed a boxing machine to package certain items; however, the machine was taken out because it reduced output. (*Id.*). Second, contrary to the declarations attached to defendant's brief. Major's evaluation of Lee states Lee was **"able to adapt to changes."** (*Id.*). This is yet another example of the defendant contradicting itself in an attempt to create a legitimate reason for Lee's termination.

Defendant has also referenced Lee would not discipline the employees he supervised for failure to follow correct work procedures. Lee corrected all of his employees on a number of occasions regarding work procedures and other items. (*Id.* at 34). According to the defendants own documents, Lee counseled and disciplined the employees on his shift far more then the white supervisor did for the employees on their shift. (Exh. D-Abbeville Plant Employee Relations Report). As an example, as of October, 2005, Lee counseled his employees thirteen times compared to Bedsole counseling his employees three times and Ethridge none. (*Id.*). Lee also issued thirteen warnings in the same time period compared to Bedsole's eleven times and Ethridge's none. (*Id.*). Again, defendant is making false accusations in an attempt to create a legitimate reason for terminating Lee.

Yet another example of defendant's contradiction is where Major states in his declaration that Lee failed to properly manage the shift. (Major's declaration). This is in stark contrast to Major's statement in Lee's evaluation where he stated Lee had "**good management skills.**" (Major's declaration w/ attached Exhibit 1). The only example Major gives is he states Lee failed to take charge of the line scheduling requirements. (Major's declaration). This is false for several reasons. First, Lee was never counseled about this and there is no write-up even mentioning this. (Exh. A-Affidavit of Claude G. Lee ¶ 35). Second, this was not even part of Lee's job duties as a supervisor. (Exhibit E-Job Description). Scheduling the line had always been performed by other personnel and Lee did not delegate it, as Lee was not responsible. (Exh. A-Affidavit of Claude G. Lee ¶ 35). It is not even plausible for Major to try to hold Lee responsible for something Lee was not told to do or trained to do.

Major claims in his affidavit some equipment was not functioning. Lee disputes this claim and again it is so vague that Lee is unaware of what Major is even referring to. (*Id.* at ¶ 36). Again, the first time this has ever been mentioned is in Major's declaration. It was never mentioned to Lee prior to his termination, nor was it in any of Lee's evaluations or personnel notices. (*Id.*). Even if this had been a problem, Lee was still meeting or exceeding my quota demands and my shift was out producing both shifts one and two. (*Id.*).

Major also states in his declaration Lee was unable to answer his questions and Lee's lead person had to respond for him Again, this is an attempt to create a legitimate reason for firing Lee. This was never mentioned to Lee nor was he ever written-up for this. (*Id.* at ¶37). In fact, Lee vehemently denies this false statement. (*Id.*).

Again, many of the defendant's stated reasons for terminating Lee are false and contradict previous statements made by the defendant. Lee disputes these false claims. It seems

20

the defendant has expounded a great deal of effort into making these false reasons to justify firing Lee. The United States Supreme Court in <u>Wright v. Wright</u> stated that the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. 505 U.S. 277, 296. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation. <u>Furnco Constr. Corp. v. Waters,</u> 438 U.S. 567, 577.

Other evidence of defendant's racial discrimination is after Lee was fired, he was replaced by Billy Wayne Bedsole, a white male. (*Id.* at ¶ 30).    In addition, there are no black people currently in supervisory positions in the packaging department. Also, two black females in the packaging department, Lottie Benson and Claira Thomas, were demoted because of their race, around the same time Lee was terminated. (*Id.*). Benson, who was second shift leader, was replaced by a white female employee. Thomas was first shift co-supervisor along with Etheridge was demoted while Etheridge, a white male, remained as supervisor.

Defendant would like you to believe the company has not discriminated based on race and they cite to examples where black people were promoted to supervisory positions; however, the defendant only cites to employees in other departments. The defendant can not cite to any black employee in the packaging department who were promoted or hired into supervisory positions. In addition to Lee, there are at least two other black employees in the packaging department who were discriminated against based on there race. (*Id.*).

The discriminatory actions taken by WestPoint were devastating to Lee and his family. (*Id.* at ¶ 40). Lee had worked for WestPoint for his entire professional career and to have it taken away was extremely difficult to handle. (*Id.*). Also, it took a significant amount of time for Lee to find other employment. (*Id.*). The employment Lee eventually found pays far less than his

salary as a supervisor at WestPoint. (*Id.*).

Assuming Your Honor finds the defendant has articulated a legitimate reason for Lee's termination, the reasons articulated are merely pretext.

VI.    **CONCLUSION**

Plaintiff asserts that the defendant is not due summary judgment, as Plaintiff has produced sufficient evidence and legal authority to justify the matter proceeding to trial

Here, Plaintiff established that he was terminated solely because he was black. The defendants have failed to rebut that showing by sufficient evidence. A reasonable jury could certainly hear this evidence and rule for Plaintiff on all claims.

s/ Jay Tidwell
JAY TIDWELL
Attorney for Plaintiff
2112 11th Avenue South, Suite 217
Birmingham, AL 35205
(205) 322-6060

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing BRIEF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT has been served on counsel for all parties, by E-FILE this 6th day of July, 2006.

s/ Jay E.Tidwell