# EXHIBITS "A"

Case 1:06-cv-00874-MHT-TFM    Document 27    Filed 07/07/2007    Page 1 of 13



EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLAUDE GENE LEE, | ) |
| PLAINTIFF, | ) |
| vs. | ) CV-06-CV-874-MHT |
| WESTPOINT HOME, INC., | ) |
| DEFENDANTS. | ) |

### AFFIDAVIT OF CLAUDE GENE LEE

| | |
|---|---|
| STATE OF ALABAMA | ) |
| COUNTY OF JEFFERSON | ) |

Before me, the undersigned notary public, in and for said State and in said County, personally appeared Claude G. Lee, who being known to me, upon oath duly administered, deposes and testifies that he has personal knowledge of the following:

1. I am Claude G. Lee. I am over 19 years of age and I live at 100 Murry Street, Abbeville, AL 36310.

2. I am the Plaintiff in the above styled action.

3. I am a black male over the age of forty.

4. In 1974, I graduated from Abbeville High School. While in high school, I interned with WestPoint Home, Inc. (hereinafter referred to as WestPoint) in the warehouse department.

5. In 1977, I started my career fulltime with WestPoint, in the packaging department.

6. During my 29 years of employment with WestPoint, I have served in a variety of capacities, but primarily in the packaging department. For many years, I served in hourly and labor intensive positions. I was quite capable and received promotions based on my performance and outstanding attendance. In fact, I received numerous commendations for not missing a single day of work. (Exh. B-Excerpts from Pl's personnel file). In total, I went over 20 years without missing a day of work. In August, 1993, I was made employee of the month.

7. On or about November, 2001, I was promoted to third shift supervisor in the packaging department. There are three packaging department shifts and third shift is the night shift (11:00 P.M. to 7:00 A.M.). Third shift is the most difficult shift to manage because of the high turnover, given the unusual hours. Even with the turnover problem, I was still able to meet or exceed company production requirements.

8. After receiving this promotion, I supervised on average between 35-40 employees. Despite the fact I supervised a number of individuals from March, 2000 to October, 2004, I was not given another supervisor or lead person to assist me. Other shift supervisors were given these additional personnel, but I

was not. Nevertheless, I performed well regarding my performance and quota requirements.

9. While serving in this supervisory position, until there was a change in ownership in 2005, I was never disciplined or counseled about my management skills.

10. On or about August, 2005, there was a change in ownership at WestPoint.

11. From August, 2005 to my first personnel notice in December, 2005, I was not given any warning or indication that I was performing poorly.

12. On or about December 16, 2005, I was given a "personnel notice" by Bob Turner and Brendt Murphy, both of whom are white. I was surprised to receive such, as Turner, who had been my supervisor for a number of years had always been pleased with my performance and I had received good evaluations under his direction. In fact, in this meeting, Turner restated his confidence in me and my ability to perform the job. Murphy indicated that my shift needed to meet 100% quota or output, which we did. I disagreed with their criticisms of my work and management skills, and asked but was never given any examples of how they had arrived at these conclusions or what I needed to do to address their concerns. I was only given these vague comments and was told that the new management team was simply going through the motions and all shift supervisors were being similarly counseled.

13. After reviewing the personnel notice, which is attached to Murphy's affidavit, I noticed that there is not even any indication as to the type of notice.

In any event, following this meeting, Turner resigned and Frank Majors became my new supervisor on or around December 15, 2005.

14.     Although Frank Major states in his affidavit that he was my supervisor from December 15, 2005 to February 20, 2006, I had very little interaction with Major until January, 2006 or thereafter.  Regardless, he had very little time to observe my performance, yet he completed my 2005 yearly evaluation.  He also stated that he had never completed a yearly review and was unclear why he had been tasked with this.

15.     I note in Major's affidavit submitted to this Court he stated I received one of the lowest ratings on the performance review because of my "poor performance in supervision/management skills." (Major affidavit w/ attached evaluation Exh. 1).  Perhaps, he did not read the evaluation prior to signing this affidavit, because in the evaluation he stated that "Claude has good management skills."  He also commented in his evaluation that I do a good job keeping up with priorities, has good knowledge of the job and job duties, and is able to adapt to changes.  (Major affidavit w/ attached evaluation Exh. 1).  There were some criticisms made in his evaluation, but I disagreed with these alleged deficiencies, especially since Major had only observed my performance for less than one month.  There was also never any indication that he discussed his evaluation ratings with my former supervisor, Bob Turner.

16.     I have reviewed Exhibit 1 to Major's affidavit and it appears many of my ratings have been altered by whiting out previous high marks and instead giving me lower marks.  For example, it appears the supervision and

management skills rating was previously meets requirements, but was changed to fair. Other categories appear to have been similarly altered, including my overall rating on this evaluation from meets requirements to fair.

17. Regardless, prior to this evaluation, I always received an overall grade of meets requirements or above requirements. (Exh. G-Plaintiff's personnel evaluations from 1998-2005).

18. Finally, in my evaluation, we discussed my objectives for the upcoming year. I was never disciplined, counseled, or eventually terminated for failing to meet these planned goals for 2006 that are listed in the evaluation.

19. By the time I received Major's second personnel notice on February 16, 2006, I was concerned a paper trail was being created to terminate me. I was surprised to receive this and again disagreed with these vague statements about my job performance. Major made no effort to explain what specifically he was unhappy about or provide any examples of my poor performance. In fact, I was making or exceeding my production quotas, unlike Mike Etheridge, a white supervisor on first shift, and Billy Wayne Bedsole, a white supervisor on second shift, who were not making their production quotas.

20. I have read over Ethridge and Bedsole's write ups from February, 2006. They mirror the complaints made about me, except they add as an additional complaint they were not meeting 100% production efficiency goals. (Exh. F-Personnel Notices for Bedsole & Ethridge dated Feb, 2006). After they were warned, they still did not meet the 100% quota requirement. I have enclosed a weekly report for March 5, 2006, shortly before I was terminated. I

exceeded the 100% quota requirement, but Bedsole and Ethridge again fell short. (Exh. H-Weekly reports for 3/5/06). It does not appear they were ever counseled or disciplined for their lack of performance, but I would soon be terminated.

21. Shortly after this notice was given, Major left this position and Michael Alford, a white male, was first hired by WestPoint. Alford was my third supervisor in the course of three months.

22. It is my understanding Alford's previous employment was managing a Movie Gallery store and he had no background managing people in this industry. From the outset, Alford began using profanity towards me and was prone to outbursts.

23. Although he had only acted as my supervisor for approximately two weeks, he gave me a new form labeled "corrective action report." (Murphy affidavit w/ attached Exhibit 2). This form was discussed on March 8, 2006, but referenced an incident that occurred on March 2, 2006. (Murphy affidavit w/ attached Exhibit 2).

24. The complaint claims some unknown employee was not working and I did not question the employee about it. This is incorrect and I explained such at the time of receiving the corrective action report. Specifically, I was speaking with Alford when a black employee left his machine to go wash his hands. It is important the line employees clean and wash their hands regularly to avoid soiling the sheets and other materials that are being packaged. This is a quality control issue that I had been trained to be mindful of.

25. Alford told me to fire the employee for this misinterpreted infraction. I explained to Alford he was simply washing his hands as is required. After my explanation, Alford then stated the employee should have been fired a long time ago. I explained to Alford company policy requires warnings before terminating an employee, yet Alford knew nothing of this man's disciplinary history or company policy. Interestingly, this same employee had been recently transferred to me from the other shifts run by the two white supervisors. This seemed to be more of an effort to hurt my performance.

26. Afterwards, I was written up as discussed and I was to be transferred to second shift starting March 13, 2006. Billy Wayne Bedsole, a white supervisor on second shift, would supervise my shift. Second shift was underperforming, but I was told I would need to raise its quotas to 100 percent, as I was doing with my shift.

27. In this same March 8, 2006, write-up, it was stated that "If not fully in control of his position as supervisor in the packaging department within 2 weeks including proper communication of progress with management Claude could be immediately removed from his current position as supervisor." (Murphy affidavit w/ attached exhibit 2).

28. Although I was given according to WestPoint's own write-up two weeks to correct these perceived deficiencies, three days later on March 11, 2006, Alford fired me from my third shift supervisory position. (Murphy affidavit w/ attached exhibit 3). I had been employed with WestPoint for 29 years and Alford, who had been there less than a month, fired me. I disagreed with the

claims made in this notice and all others, and I was stunned the company had not even given me the two weeks it promised to clear up any alleged performance problems. This was further evidence of racial discrimination, since the white supervisors were not under the same scrutiny and were not being relieved of their supervisory positions, even though they were underperforming and not meeting their quotas. Alford and others were not interested in giving me anytime to clear up their alleged concerns, but simply were out to fire me.

29. Again this corrective action report mentions some vague complaints without offering any specific examples. I disagreed at the time with these complaints and others, but was told I simply had two options. I could either leave my employment and be paid for my remaining vacation time or I could accept a forklift driver position making $10.00 per hour. This would have been a substantial decrease in pay, since I was a salaried employee making approximately $32,000.00 per year. These options were given to me in an attempt to embarrass and demean me. At my age, I doubted I could even physically do the job. These were not options, but a way of terminating me.

30. I later learned Billy Wayne Bedsole, a white male, replaced me as third shift supervisor. It is my understanding there are no blacks in permanent supervisory positions in the packaging department. It is also my understanding two black females in the packaging department, Lottie Benson and Claira Thomas were demoted during this same time period I was fired, after the change in ownership.

31. I note Murphy has signed an affidavit in this case, yet Murphy would have no first hand knowledge of my performance, since he never supervised me. I am not sure how he is able to make some of the statements he makes in his affidavit. He also stated to me when I was terminated from my supervisory position Alford made the decision and it was Alford's "doing."

32. I would point out there is a difference between personnel notices that I received and a pink slip which leads to termination. I never received a pink slip. I only received these few personnel notices.

33. I note from the affidavits it was claimed I failed to consistently enforce the implementation of new work methods. First, there were very few changes made, and I dispute I was unable to make the few that were implemented. In fact, the biggest change I recall being made was WestPoint installed a boxing machine to package certain items; however, the machine was taken out because it reduced output. Contrary to the Declarations attached to Defendant's brief, Major's evaluation stated I was "able to adapt to changes."

34. Also, there is some reference that I would not discipline the employees I supervised for failure to follow correct work procedures. I corrected all of my employees on a number of occasions regarding work procedures and other items. I have attached as evidence an October, 2005 report listing the number of times I counseled and warned my employees compared to the other shifts. (Exh. D-Abbeville Plant Employee Relations Report). In the year to date for 2005, I counseled my employees thirteen times compared to Bedsole counseling his employees three times and Ethridge none. I also gave out

thirteen warnings in the same time period compared to Bedsole's eleven times and Ethridge's none.

35. There is some statement by Major that I failed to properly manage the shift. This is in stark contrast to his statement in my evaluation where he stated I had "good management skills." (Major's Affidavit w/ attached Exhibit 1). The only example he gives is I failed to take charge of the line scheduling requirements. First, I was never counseled about this and there is no write-up even mentioning this. His declaration to defendant's motion is the first time I even recall this claim being made. This is not part of my job duties. (Exhibit E- Job Description). Scheduling the line had always been performed by other personnel and I did not delegate it, as I was not responsible. I am not sure how Major can even try to hold me responsible for something I was not told to do or trained to do.

36. Major claims in his affidavit some equipment was not functioning. I dispute this claim and again I am not sure what he is talking about. I do not believe there is any mention of this in any of my write-ups. Even if this had been a problem, I still was meeting or exceeding my quota demands and my shift was out producing both shifts one and two.

37. I understand Major states I was unable to answer his questions and my lead person had to respond for me, this is simply not true and was never even mentioned or discussed by him to me at any time.

38. Again, I only learned of many of the complaints made by Major and Murphy, when I read for the first time the declarations attached to defendant's motion. I dispute their claims and it seems clear a great deal of effort has gone into making up false reasons to justify firing me.

39. On May 5, 2006, I filed an EEOC charge of race and age discrimination based on being harassed, treated unfairly, and finally being terminated from my employment. (Exh. C-EEOC charge). This lawsuit was then timely filed after receiving my notice of right to sue.

40. The actions taken here were devastating to me and my family. I had worked for WestPoint for my entire professional career and to have it taken away was extremely difficult to handle. Also, it took a significant amount of time to find other employment. The employment I eventually found pays far less than my salary as a supervisor at WestPoint.

41. In addition to the financial problems WestPoint created by wrongfully terminating me, I became severely depressed. My depression was a direct result of WestPoint terminating me.

*Claude Lee*
**Claude Lee**

Sworn to and subscribed before me on this the 6th day July, 2007.

*Catherine A. Sellers*
Notary Public

MY COMMISSION EXPIRES: 10-15-08