## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CLAUDE GENE LEE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:06-CV-874-MHT |
| | ) | |
| WESTPOINT HOME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### WESTPOINT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO WESTPOINT'S MOTION FOR SUMMARY JUDGMENT

Defendant WestPoint Home, Inc. ("WestPoint") respectfully submits this reply to Plaintiff's brief in opposition to WestPoint's motion for summary judgment.

**I.      INTRODUCTION**

Lee seeks to defeat WestPoint's motion for summary judgment by (i) submitting his own self-serving affidavit, (ii) claiming, incorrectly, that WestPoint "has submitted absolutely no evidence from the packing department manager who terminated Lee, Mike Alford[;]" and (iii) disagreeing with the criticisms of his performance as a supervisor, which Bob Turner, Frank Major, and Michael Alford all brought to his attention.  Lee's theory is that because the third shift as a whole had relatively high production efficiency, he simply could not have been a poor supervisor.

Lee cannot survive WestPoint's summary judgment motion on these arguments. WestPoint had a legitimate, nondiscriminatory reason for removing Lee from his supervisory position and for subsequently terminating his employment: his poor performance as a supervisor.

Lee has not shown that this reason is pretextual.[1]    Consequently, WestPoint is entitled to summary judgment.

## II.    DISCUSSION

### A.    <u>Lee Cannot Create a Genuine Issue of Material Fact With His Affidavit</u>

Before Lee was removed from his supervisory position for poor performance in March, 2006, Lee received four written documents (two personnel notices, a performance review, and a corrective action report) critical of his performance as a supervisor.  Lee disagrees with these written criticisms.  As discussed in detail below, Lee's disagreement is insufficient to survive summary judgment.

1.    <u>Lee's disagreement with the criticisms of his performance cannot establish pretext</u>

a.    The December 16, 2005 Personnel Notice[2]

On or about December 16, 2005, Lee acknowledges receiving a "personnel notice" from Bob Turner.  (doc. no. 27, Lee affidavit at ¶¶ 12-13.)  In Lee's affidavit he says that the personnel notice gives "vague comments" and criticisms with which he disagrees.  (*Id.*)  However, in Lee's deposition on July 17, 2007, after WestPoint's motion for summary judgment was filed, Lee denied that the December 2005 personnel notice attached to Brendt Murphy's declaration is the actual, complete December 2005 personnel notice.  Instead, Lee, contrary to his affidavit, claimed in his deposition that the personnel notice he received from Bob Turner in December 2005 was **two** pages, not the one page document attached to Murphy's declaration.

---

[1]    Lee's affidavit and brief in opposition to WestPoint's motion for summary judgment mention that in his EEOC charge, Lee alleged that WestPoint discriminated against him on the basis of his race and age.  However, Lee did not allege age discrimination in his complaint (*see* Doc. no. 1), and for good reason.  Billy Wayne Bedsole, who took Lee's place, is more than two years older than  Lee.

[2]    The notice is Tab 1 to this reply brief; *see also* no. 14, Murphy declaration, Ex. 1.

(Deposition of Claude Lee (attached as Tab 6) at 53:12-23.) Lee acknowledged that he signed the personnel notice and that it has no page numbers indicating the existence of a second page; yet, Lee claimed there was a second page which mentioned "something about efficiency and doing 100 percent [production]." (Lee depo. at 54:21-56:16.)

Nevertheless, Lee admitted that the purpose of this personnel notice was to alert him to problems with his performance that required improvement. (Lee depo. at 56:17-58-15; 60:3-13.) The point of Lee's argument is that he disagrees with these criticisms, which mirror those Michael Alford expressed three months later in the corrective action report issued just before Lee was removed from his supervisory position. (*Id*. at 58:16-19; doc. no. 27, Lee aff. at ¶ 12; *see also* Doc. no. 14, Murphy decl. at Ex. 2-3.)

Lee's disagreement with his supervisor's assessment of his work cannot establish that WestPoint's legitimate, nondiscriminatory reason for removing Lee as a supervisor -- poor performance -- is pretextual by claiming he was performing well or disagreeing with his supervisor's criticism of his performance. *See Wilson v. B/E Aero., Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Quarreling with that reason is not sufficient.") (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). Lee has come forth with no evidence that WestPoint did not truly believe his performance was poor, or that WestPoint intended to discriminate against him because of his race.

b.      The January 25, 2006 Performance Review[3]

A month after Lee received the December personnel notice, he received his annual performance review in January 2006. His supervisor, Major, was critical of Lee's performance as a supervisor. (*see* doc. no. 14, Major decl. ¶ 4, Ex. 1.) In Lee's affidavit, he disagrees with Major's assessment. (doc. no. 27, Lee aff. at ¶ 14.) Again, Lee's disagreement that his performance was poor cannot establish that WestPoint's proffered reason for terminating him is pretextual. *See, e.g., Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1138 (M.D. Ala. 2003) ("the inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance . . . when the employer produces performance reviews . . . that demonstrate poor performance, an employee's assertions [alone] of his own good performance are insufficient to defeat summary judgment.") (quotation omitted).[4] In fact, Major's criticisms of Lee's performance were consistent with Alford's who succeeded Major as Lee's supervisor.

Lee's affidavit claims that some of his ratings had "been altered by whiting out previous high marks and instead giving [him] lower marks." (doc. no. 27, Lee aff. at ¶ 16.) In his deposition, Lee admitted that he signed the performance review, but he denied that Major's January 2006 performance review rated him as "fair," and argued instead that on the

---

[3] This performance review is Tab 2 to this reply brief; *see also* doc. no. 14, Major decl. at Ex. 1.

[4] Lee contends that Major's declaration is somehow contradictory to the January 2006 performance review. Major's declaration states that Lee was rated "fair" on his January 2006 performance review due to "poor performance in supervision/management skills, communication skills and administration areas." (doc. no. 14, Major decl. at ¶ 4.) There is no contradiction. Major's January 2006 performance review of Lee clearly shows the lowest ratings given were in these three categories: "supervision/management skills, communication skills and administration areas." (*Id.* at Exhibit 1.) Moreover, the fact that after the January 2006 performance review, Major continued to observe Lee and found additional inadequacies in his performance (as expressed in his declaration and in the February 2006 personnel notice he gave Lee) does not create a contradiction.

performance review he saw, he had been rated "average" by Major before the review was changed. (Lee depo. at 66:6-68-11.)

This new argument does not show pretext or even a disputed issue of material fact. First, there is no "average" rating possible for the performance review. (*See* doc. no. 14, Major decl. at Ex. 1.) The ratings are: marginal, fair, meets requirements, above requirements, and superior. (*Id.*) Second, Major changed Lee's performance review after he discussed Lee's performance with the plant manager, Glen McCants. (*See* attached supplemental declaration of Frank Major at ¶¶ 2-3 (attached as Tab 7); Deposition of Frank Major (attached as Tab 8) at 101:15-103:22.) Major made these changes before Major met with Lee to discuss the review. (*Id.* at ¶ 3; Major depo. at 102:3-22.) Moreover, after talking with the plant manager, Major also made similar changes to the performance reviews he completed for the other shift supervisors, Billy Wayne Bedsole and Mike Etheridge. (Major depo. at 160:3-161:14; Major at ¶ 2-3.)

c.    The February 16, 2006 Personnel Notice[5]

Lee's affidavit acknowledges receiving a personnel notice from Major on February 16, 2006. (*See* doc. no. 27, Lee aff. at ¶¶ 19-20.) In his deposition, Lee acknowledged his signature appears on the bottom of the February 2006 personnel notice. (Lee depo. at 69:18-23.) However, Lee also denied having seen *this* document, and instead, contended that despite the presence of his signature on the personnel notice, the notice he saw in February 2006 said something entirely different when he signed it. (*Id.* at 69:5-74:12.) Again, going back to Lee's theory that he could not have been underperforming as a supervisor if he was meeting production efficiency quotas (*see* Lee depo. at 166:6-19), Lee contends that the personnel notice he signed

---

[5] This notice is Tab 3 to this reply; *see also* doc. no. 14, Major decl. at Ex. 2.

on February 16, 2006 was for the sole purpose of stating that he must reach 100% production efficiency. (Lee depo. at 69:5-72:2.)[6]

Once more, Lee's argument is nothing more than disagreement with Major's criticisms of his performance (doc. no. 27, Lee aff. at ¶ 19; Lee depo. at 72:3-6.)  Major had had the opportunity to observe Lee as a supervisor even before Major became Lee's direct supervisor. (Major depo. at 94:23-100:8.)   Major unquestionably had problems and concerns with Lee's performance. (doc. no. 14, Major decl.; *see also* Major depo. at 53:8-54:9; 63:15-64:21; 82:2-83:23.)  Lee's own opinion that he was performing adequately is insufficient to establish pretext. *See, e.g., Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (noting that a court "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.  The factual issue to be resolved is not the wisdom or accuracy of [the employer's] conclusion that [the plaintiff] was an unsatisfactory employee.").

   d.   The March 8, 2006 Corrective Action Report[7]

Lee acknowledges receiving a corrective action report from Michael Alford on March 8, 2006 that was critical of his performance. (doc. no. 27, Lee aff. at ¶¶ 23-27.)  Lee even *cites to* and *quotes from* the corrective action report. (*Id*. at ¶¶ 23, 27 (quoting doc. no. 14, Murphy decl. at Ex. 2.))  However, in his deposition, Lee contended otherwise.  Initially, Lee acknowledged his signature on the March 8, 2006 corrective action report but later he denied that the signature

---

[6] Lee's shift production efficiency was unrelated to the written criticisms he received from Turner, Major, and Alford.  In any event, "efficiency production" numbers reflect only the time during which *a machine is running*. (Major depo. at 47:10-48:13.)  All machines and all associates are expected to run and work, respectively, for the full eight hour shift. (*Id*. at 67:10-68:18; *see also* 47:10-48:13; 50:14-51:11; 52:19-54:9; 65:11-66:11.)  There were times when Lee's associates were seen standing around not working and not running the machines; this time is not reflected in the production efficiency reports. (Major depo. at 53:8-54:9; 63:15-64:21; 82:2-83:23.)  Moreover, Lee often could not explain to his supervisor why his associates were wasting time and not working. (*Id*.)

[7] This report is Tab 4 to this reply brief; *see also* Murphy decl. at Ex. 2.

is his. (Lee depo. at 79:10-20; 88:1-89:7.) Even though he clearly acknowledged he received a "new form labeled 'corrective action report'" (doc. no. 27, Lee aff. at ¶ 23[8]), when deposed, Lee denied altogether ever having received this corrective action report. (Lee depo. at 93:15-96:16.)[9]

Lee cannot defeat WestPoint's motion for summary judgment with his affidavit and his contention that he performed adequately, when the evidence establishes that three different supervisors had very similar problems and concerns with Lee's inability to perform as a supervisor. *See, e.g., Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987) ("conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [defendant] has offered such extensive evidence of legitimate, nondiscriminatory reasons for its actions."); *see also Tolbert v. Briggs & Stratton Corp.*, No. 05-1149, 2007 U.S. Dist. LEXIS 9342 (M.D. Ala. February 8, 2007) (stating that "[t]here is obviously nothing unlawful, under Title VII, with firing supervisors who fail to improve problematic situations[;]" and holding plaintiff failed to show that the reason for his termination -- poor performance -- was a pretext for termination based on race).

e.    The March 11, 2006 Corrective Action Report[10]

Later in March 2006, Alford determined that Lee's performance was not improving appropriately, and that it was necessary to remove Lee from his supervisory position. (*See* doc. no. 14, Murphy decl. at Ex. 3.) In his affidavit, Lee acknowledges receipt of this March 2006

---

[8] Lee's affidavit states: "Although he had only acted as my supervisor for approximately two weeks, he gave me a new form labeled 'corrective action report.'" (doc. no. 27, Lee aff. at ¶ 23.)

[9] Lee also claims in his affidavit that the March 8, 2006 corrective action report "g[a]ve [him] two weeks to correct these perceived deficiencies"-- this too is incorrect. (doc. no. 27, Lee aff. at ¶ 28.) The report itself states that he was required to correct the problems *within* two weeks and notes that the "Follow-up conference date [is] *2 weeks or less*." (Murphy decl. at Ex. 2 (emphasis added).)

[10] This report is Tab 5 to this reply brief; *see also* doc. no. 14, Murphy decl. at Ex. 2.

corrective action report removing him from his supervisory position. (doc. no. 27, Lee aff. at ¶¶ 28-29.)  However, again, Lee contradicts this acknowledgement in his deposition.  Lee admits that his signature is on the March 11, 2006 corrective action report and that he signed the report acknowledging he had seen it.  (Lee depo. at 102:12-21.)  Yet, in his deposition, Lee denies ever having seen this corrective action report and claims instead that the report he read and signed on that day was different from the document bearing his signature.  (Lee depo. at 102:5-109:2.)

Alford clearly set forth in this corrective action report his reasons for removing Lee from a supervisory role: "Claude has failed to aggressively implement changes in production processes, associate training and monitoring and communication.  These deficiencies have resulted in poor job performance."  (doc. no. 14, Murphy decl. at Exhibit 3.)  Lee cannot establish pretext simply by disagreeing with  Alford's criticisms, which led to Lee being removed from his supervisory position.  *See, e.g., Pennington v. City of Huntsville*, 261 F.3d 1262,1267 (11th Cir. 2001) ("'[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as 'the reason is one that might motivate a reasonable employer.'"); *see also Bojd v. Golder Assocs.*, No. 06-12209, 2006 U.S. App. LEXIS 31805, at * 5 (11th Cir. Dec. 26, 2006) ("[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.") (quotation omitted).  Lee acknowledged in his deposition that in 2005 when the new management came in, all employees were under close scrutiny.  (Lee depo. at 34:10-13.)  Significantly, in the eyes of three different supervisors -- Bob Turner, Frank Major, and Michael Alford -- Lee simply did not meet the required standards.

2.     <u>Miscellaneous Claims in Lee's Affidavit Do Not Establish that</u>
<u>WestPoint's Legitimate, Nondiscriminatory Reason for Terminating His</u>
<u>Employment is a Pretext</u>

Lee's disagreement with the criticisms in the personnel notices and corrective action reports he received is insufficient to defeat WestPoint's motion for summary judgment. Similarly, other contentions in Lee's affidavit provide no support for his contention that WestPoint's legitimate, nondiscriminatory reason for terminating his employment is a pretext.

Lee complains in his affidavit that "other shift supervisors" were given lead personnel, but that he was not given lead personnel between 2000 and 2004 implying that this was somehow an attempt to hinder his performance. (Lee aff. at ¶ 8.) However, in his deposition Lee admits that he did not need a lead person at that time and that subsequently he was in fact provided a lead person.

> Q.     After the Clemson plant closed, your shift was doing more work?
> A.     Uh-huh (Positive response.)
>
> Q.     And need more employees?
> A.     Uh-huh. (Positive response.)
>
> Q.     Is that yes?
> **A.**     That's when the lead person -- they get somebody to help me then. I was by myself from 2001 to 2004. That's when they had something like 35 employees. **I didn't need no help with them.** Like I said, when they closed down Clemson and got more workers, **that's when they give me a lead person to help me.**

(Lee depo. at 47:6-19 (emphasis added).)

Lee claims in his affidavit that "[f]rom the outset, Alford began using profanity towards me and was prone to outbursts." (Lee aff. at ¶ 22.) Lee, however, admits that Alford exhibited a temper towards all employees -- black and white. (Lee depo. 77:2-78:22; 167:12-168:2.)

Lee also claims in his affidavit that an "employee had been recently transferred to [his shift] from the two other shifts run by white supervisors" which he contends "seemed to be more of an effort to hurt my performance." (Lee aff. at ¶ 25.) Lee contends that this employee had a "sickness" that hindered his ability to perform. (Lee depo. at 99:3-21.) However, Lee admits in his deposition that this employee *requested* a transfer to Lee's third shift -- no one unilaterally transferred this employee to third shift. (Lee depo. at 96:17-100:23.) In Lee's deposition, he changed this contention and claimed, instead, that the employee sought transfer <u>off</u> of the third shift and that because the transfer was not effectuated, this "could" have been in an effort to hurt Lee's performance. (*Id.* at 99:22-100:23.) Lee's conclusory allegation is insufficient to overcome summary judgment. *See, e.g. Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (noting that conclusory allegations of discrimination by the plaintiff are not sufficient to raise an inference of pretext). Further, undoubtedly, if Lee had a problem with an associate on his shift, it was his responsibility as the supervisor to handle it. Indeed, Lee's failure to monitor and discipline his associates was a criticism Bob Turner, Frank Major, and Michael Alford had of Lee's performance. (*See* doc. no. 14, Murphy decl. exs. 1-3; Major decl., Exs. 1-2.)

As "evidence" that Lee was properly supervising and disciplining his employees, he attaches to his affidavit an October 2005 employee relations report. (*See* doc. no. 27, Lee aff. at ¶ 34.) This report, however, covers a period of time *before* Lee received the first personnel

notice from Bob Turner in 2006, *before* he received the personnel notice from Frank Major, and *before* he received the corrective action reports from Michael Alford. It is wholly irrelevant.[11]

### B.    **Change in Plant Closing**

At the time WestPoint filed its motion for summary judgment, the company had made the decision to close the Abbeville Plant entirely as of August 31, 2007. (doc. no. 14, Murphy decl. at ¶ 15; Major supp. decl. at ¶ 4.) However, since that time, WestPoint has determined that it will leave the distribution operations open and running at Abbeville. (*Id.*; Major depo. at 144:1-15.) This, however, does not change the fact that the department for which Lee worked -- packaging -- has already closed. (*Id.*; Major depo at 144:3-11.) Employees in that department completed their last day of work on August 9, 2007. (*Id.*) Accordingly, even if Lee had not been removed from his supervisory position for poor performance, his job with WestPoint would have ended on August 9, 2007 and WestPoint is entitled to judgment as a matter of law on Lee's claim for damages/reinstatement beyond August 9, 2007.

### III.    **CONCLUSION**

Lee cannot establish that WestPoint's legitimate, nondiscriminatory reason for terminating his employment is a pretext for discrimination. Alford's ultimate decision to remove Lee from his supervisory position because of his poor performance,[12] as noted in the March 11, 2006 corrective action report, is consistent with the criticisms both Bob Turner and Frank Major

---

[11] Similarly irrelevant is Lee's contention that two black female employees were demoted around the time that Lee was removed from his supervisory position. Further, Lee's claim is simply inaccurate. For example, Clara Thomas, one of the black females to whom Lee refers, was offered a position as a third shift supervisor, but she declined the job and instead accepted an hourly position in order to remain on the same shift on which she had been working. (Major supp. decl. at ¶ 5.)

[12] WestPoint took efforts to avoid terminating Lee, and it was Lee's decision to decline the set order puller (forklift operator) position, which he was offered and for which he began training. (*See* Major depo. at 131:15-132:23; 162:21-164:10.)

had expressed regarding Lee's performance. That Lee believes he was adequately performing, despite the repeated notices otherwise, does not establish that WestPoint's reason for terminating his employment is a pretext. *See, e.g., Jones v. United Space Alliance, L.L.C.*, No. 05-13001, 2006 U.S. App. LEXIS 2702, at * 13 (11th Cir. Feb. 3, 2006) (noting "an analysis of pretext focuses on the employer's beliefs, 'not the employee's own perceptions of his performance'" and affirming summary judgment in favor of defendant-employer where plaintiff "did not produce any evidence to indicate [employer's] motivation for [plaintiff's] discharge was for any reason other than his poor performance.") (quoting *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997)). Based on the foregoing, WestPoint's motion for summary judgment is due to be granted.

Respectfully submitted this 12th day of September, 2007.

/s/Kelly F. Pate
One of the Attorneys for Defendant WestPoint Home, Inc.

**OF COUNSEL:**
David R. Boyd (BOY005)
dboyd@balch.com
Dorman Walker (WAL086)
dwalker@balch.com
Kelly F. Pate (FIT014)
kpate@balch.com
BALCH & BINGHAM LLP
 Post Office Box 78
Montgomery, AL 36101-0078
Telephone: (334) 834-6500
 Facsimile: (334) 269-3115

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing and/or that a copy of the foregoing has been served upon the following by placing a copy of same in the United States mail, properly addressed and postage prepaid, on this 12th day of September, 2007:

Jay E. Tidwell, Esq.
Veal Cloud & Tidwell, LLC
2112 11th Avenue South, Suite 217
Birmingham, AL 35205

Stephen C. Wallace, Esq.
William M. Dawson, Esq.
Dawson & Wallace, LLC
2229 Morris Avenue
Birmingham, AL 35203

Richard E. Crum, Esq.
M. Russ Goodman, Esq.
Cobb, Shealy, Crum, Derrick & Pike, P.A.
206 North Lena Street
Dothan, AL 36303

/s/Kelly F. Pate
Of Counsel

# TAB 1

_ATT # 1_

## PERSONNEL NOTICE

WESTPOINT.STEVENS

INITIATED BY COMPANY ☐   AT REQUEST OF ASSOCIATE

| SSOCIATE | | ASSOCIATE NUMBER | TYPE OF NOTICE |
|---|---|---|---|
| _Claude Lee_ | | | 1 - ASSOCIATE PROBLEM |
| ACILITY _044_ | DEPARTMENT _65_ | SHIFT _3_ | 2 - ASSOCIATE COMPLAINT |
| | | | 3 - NOTICE OF CHANGE |
| SUPERVISOR _B. Turner_ | | NOTICE DATE _12-12-05_ | 4 - REQUEST FOR CHANGE |
| EFFECTIVE DATE OF CHANGE | | | 5 - ASSOCIATE REQUEST |
| | | | 6 - COMMENDATION |
| | | | 7 - MISCELLANEOUS NOTICE |

ITUATION IN BRIEF    _JOB PERFORMANCE_

DETAILS

_Bob: I talked to Claude about concerns for his ability to properly & efficiently lead and supervise packing on 3rd shift._

_"Are you Able?" Claude says he has the ability & is The man to run 3rd shift, exceed standards, & look for improvements & ways to cut cost._

_"Are you willing to accept responsibility & be hold ACCOUNTABLE for expectations of 3rd shift as listed above. Yes Sir._

_Could you run it without Michael's Help - Yes Sir._

_If Bob says you are the man for the Job, you are not going to let the company down. No Sir_

ACTION TAKEN

_Told Claude that his performance & inability to lead his people made him an inefficient supervisor. This area must improve. He is required to enforce incorrect work procedures, discipline situations & communicate with other supervisors & Dept Mgr. to solve all obstacles_ (Attach additional sheets as necessary)

| DISTRIBUTION | | RECOMMENDED BY | |
|---|---|---|---|
| ☐ COST DEPT. | ☐ VICE-PRESIDENT | _Claude Lee_ | _12-16-06_ |
| ☐ DEPT. FILES | ☐ GENERAL MANAGER | DEPARTMENT MANAGER | |
| ☐ DIVISION HUMAN RESOURCES | ☐ MANAGER | _Bob Turner_ | _12-12-05_ |
| ☐ OFFICE MANAGER | ☐ ASST. MANAGER | ASSOCIATE (If necessary) | |
| ☐ PAYROLL DEPT. | ☐ DEPT. MANAGER | | |
| ☐ HUMAN RESOURCES DEPT. | ☐ PRODUCTION DEPT. | | |
| | ☐ SUPPLY ROOM | OTHER ( ) | |

Lee/WPH - 0004

# TAB 2



**CONFIDENTIAL**



### WESTPOINT HOME

## SALARIED-EXEMPT
## PERFORMANCE REVIEW

NAME _Claude Lee_

DEPARTMENT/POSITION TITLE _Wrap and Pack - Supervisor_

FACILITY _044 - Abbeville_

DIVISION and/or BUSINESS UNIT _Bed Products / Sheets_

DATE LAST REVIEWED _____

JSD _____

RATING PERIOD _____

PERFORMANCE RATING _F_

DATE COMPLETED _1-25-06_

## GENERAL INSTRUCTIONS

| | |
|---|---|
| **Timing:** | A performance review is to be completed for each salaried-exempt associate annually between January 1 and January 31. It is the responsibility of each supervisor to prepare the performance review. |
| **Procedure:** | The associate's performance of assigned tasks and accountabilities should be rated with respect to the performance factors below, utilizing the following scale:<br><br>**S – Superior:** Consistently and substantially exceeds major job requirements. Accomplishments are extraordinary as demonstrated by job results.<br><br>**AR – Above Requirements:** Exceeds most job requirements. Job results are measurably higher than job requirements.<br><br>**MR – Meets Requirements:** Meets major job requirements. Performance is fully acceptable as demonstrated by job results.<br><br>**F – Fair:** Performance is slightly below what is expected in the position. Performance needs improvement.<br><br>**M – Marginal:** Fails to meet most job requirements. Performance requires immediate, substantial and sustained improvement. |
| **Acknowledgement:** | This appraisal has been reviewed with the associate. It is understood that the signature does not necessarily indicate agreement with the content of the review. |

Return to Table of Contents

# I.  MANAGEMENT SKILLS EVALUATION

After carefully evaluating individual's work performance in relation to current job requirements, check the appropriate box to indicate the associate's performance.  Explanations of terms appear at the bottom of this page.  If not applicable, indicate N/A.

| Management Skills (Evaluate the first two skills categories only if the associate has supervisory responsibility.) | SUPERIOR | ABOVE REQUIREMENTS | MEETS REQUIREMENTS | FAIR | MARGINAL | Comments or Supportive Details — This section *must* be completed for each rating. |
|---|---|---|---|---|---|---|
| DEVELOPMENT OF SUBORDINATES Ability to prepare subordinates for current positions, as well as for positions of greater responsibility. | ☐ | ☐ | ☒ | ☐ | ☐ | Associates are cross trained on several different jobs. |
| SUPERVISION/MANAGEMENT SKILLS Ability to direct and control subordinates; ability to motivate and effectively coordinate the efforts of work groups. | ☐ | ☐ | ☐ | ☒ | ☐ | Claude has good management skills. Needs to work a little harder motivating associates |
| STRATEGIC PLANNING/ORGANIZING Ability to establish courses of action to accomplish specific goals. Allocation of resources, including setting priorities, meeting deadlines, anticipating problems. | ☐ | ☐ | ☒ | ☐ | ☐ | Claude does a good job keeping up with priority. |
| JOB KNOWLEDGE Technical knowledge and the level of competence required to be successful in the incumbent position. | ☐ | ☐ | ☒ | ☐ | ☐ | Has good knowledge of the job and job duties |
| QUALITY Conformance to requirements re:accuracy, thoroughness, acceptability of work performed | ☐ | ☐ | ☒ | ☐ | ☐ | Quality is good. Needs to pay closer attention to lines |
| COMMUNICATION SKILLS Ability to clearly and persuasively express concepts, both orally and in writing; also, ability to listen effectively, grasp ideas and instructions. | ☐ | ☐ | ☐ | ☒ | ☐ | Does not communicate well with associates |
| INTERPERSONAL SKILLS Ability to work cooperatively with subordinates, peers, superiors, and external contacts; ability to influence others without direct authority. | ☐ | ☐ | ☒ | ☐ | ☐ | Works well with associates |
| ADMINISTRATIVE Ability to satisfy all administrative components of position (i.e. timeliness, completeness, accuracy, documentation). | ☐ | ☐ | ☐ | ☒ | ☐ | Does not complete paperwork in timely manner |
| LEARNING CAPABILITIES, OTHER RELEVANT SKILLS | ☐ | ☐ | ☒ | ☐ | ☐ | Able to adapt to changes. Has worked many years in Packaging |

## PERFORMANCE EVALUATION RATING

| | |
|---|---|
| Superior | Consistently and substantially exceeds major job requirements. Accomplishments are extraordinary as demonstrated by job results. |
| Above Requirements | Exceeds most job requirements. Job results are measurably higher than job requirements. |
| Meets Requirements | Meets major job requirements. Performance is fully acceptable as demonstrated by job results. |
| Fair | Performance is slightly below what is expected in the position. Performance needs improvement. |
| Marginal | Fails to meet most job requirements. Performance requires immediate, substantial and sustained improvement. |

Return to Table of Contents

## II. ANNUAL ACCOMPLISHMENT SUMMARY DEVELOPMENT REVIEW
(This page to be completed by immediate manager)

**A. PERFORMANCE SUMMARY AND TREND** (Summarize your view of associate's accomplishments versus goals in the past year and indicate performance.)

Zero lost time accidents
~~Zero~~ 9 recordable cases for department
Incident rate for department 4.02

**B. STRENGTHS/GROWTH** (Describe associates strengths and how they changed in the past year.)

Claude's strength is experience in the Packaging department and his ability to adapt to changes.

**C. DEVELOPMENTAL RECOMMENDATIONS**
1. List Developmental Objectives and/or Skills To Improve based on overall performance rating and evaluation of management skills.
2. For any deficiencies noted on Management Skill Evaluation, planned development activity must be detailed here.
3. Developmental Objectives or Skills To Improve should be directly transferred onto next year's Objective Setting page.

| Developmental Objectives/Skills To Improve | Planned Developmental Activity |
|---|---|
| House keeping | Continue to monitor |
| Associate Training | Continue to observe associates for areas of improvement |
| | |
| | |
| | |

**D. FUTURE CAREER DISCUSSION**
Discuss associate's career goals and objectives. List any positions in which the associate expresses an interest. Refer to Human Resources Manager if indicated.

Claude loves his job and is willing to take any opportunity for advancement.

**E. OVERALL PERFORMANCE RATING**
☐ Superior     ☐ Above Requirements     ☐ Meets Requirements     ☒ Fair     ☐ Marginal

**F. ASSOCIATE'S COMMENTS**

**G. SIGNATURES**

☐ Check if additional comments attached

_____
Immediate Manager

Date _____

_____
Reviewing Manager

Date 1-25-06

C.L.
_____
Associate's Initials
Indicates that he/she has read
this appraisal and it has been
discussed with him/her.

Date _____

| Return to Table of Contents |

ANNUAL ACCOMPLISHMENT SUMMARY DEVELOPMENT REVIEW                    **Strictly Private**

(This page to be completed by associate)

A.  ACCOMPLISHMENT SUMMARY (Summarize your accomplishments versus goals in the past year.)

Brought Percentages to 100%. Some work days more than 100%. Employees work together well. work Along with Mechanics to make Sure machines Are kept Running.

B.  STRENGTHS/GROWTH (Describe your strengths and how they changed in the past year.)

I make Sure each employee is working to their Full Potential. IF I AM Strong At this. My Employees will be Strong And know they must do their Jobs well. I Can help my employee to be the best they CAN be.

C.  IMPROVEMENT/DEVELOPMENT NEEDS/PLANS (Identify most critical needs and responsive action plans.)

Make Sure every Employee Receives the best TRAINing Possible For old And New Jobs

D.  JOB/CAREER INTEREST (If interested in a job change, list preference including position title, business unit, location. Specify any geographic limitations, desired timing, etc. Also describe long-term interest.)

I Like being Supervisor And I Love My Job.

Claude Lee
Associate's Signature

1-25-06
Date

> Return to Table of Contents

Lee/WPH - 0039



## WESTPOINT HOME

### PLANNED PERSONAL OBJECTIVES AND ACCOMPLISHMENTS FOR SALARIED-EXEMPT ASSOCIATES

_Lee  ClAude  G._
Associate's Name (last, first, middle initial)

_SupeRViSoR_
Title

Date _____

_Bed PRoducts Sheets_
Division and/or Business Unit

Planned Personal Objective Form  _1·61·06_      to      _12-31-06_

---

1. Efficency Goal 95% end of 1st Qtr.  100% for 2nd, 3rd, 4th
2. Incident Rate of 2% or less for Dept.
3. Reduce Lost PER DOZ by .13¢ by the end of 4th Qtr.
   *Goalsof .16¢ end of 1st Qtr, .16¢ end of 2nd, .16¢ end of 3rd, .16¢ end of 4th
4. Zero lost time Accidents in 2006

---

_Claude Lee_
Associate's Signature

Supervisor/Manager

_1-25-06_
Date

_1.25.06_
Date

(Note: All salaried-exempt associates supervising others must include in their goals their efforts in meeting EEO/AAP expectations.)

Please indicate target date for meeting each goal (1st, 2nd, 3rd and 4th quarter).

*Signatures above indicate agreement on goals and objectives at beginning of evaluation period.

| Return to Table of Contents |

# TAB 3

*ATTACH #2*

## PERSONNEL NOTICE

### WESTPOINT STEVENS

[X] INITIATED BY COMPANY    [ ] AT REQUEST OF ASSOCIATE

| ASSOCIATE | | ASSOCIATE NUMBER | |
|---|---|---|---|
| *Claude Lee* | | | 1 - ASSOCIATE PROBLEM |
| FACILITY 044 | DEPARTMENT Packaging | SHIFT *2nd* | 2 - ASSOCIATE COMPLAINT |
| | | | 3 - NOTICE OF CHANGE |
| SUPERVISOR | | NOTICE DATE *2·16·06* | 4 - REQUEST FOR CHANGE |
| | | | 5 - ASSOCIATE REQUEST |
| EFFECTIVE DATE OF CHANGE ASAP | | | 6 - COMMENDATION |
| | | | 7 - MISCELLANEOUS NOTICE |

SITUATION IN BRIEF
Poor Job Performance

DETAILS
This Personnel Notice is to inform you of the need to increase the montoring of your associates. There is an excessive

waste of time and motion. You associates continue to use improper job methods even after the correct method has

been given or even shown to them. There also needs to be an immediate increase in your problem solving of incorrect

work flow through out the department. There also needs to be an improvement in the communication with the

previous Supervisor for potential problems that may have occurred during the shift or even issues that you find during

your walk through, these need to be addressed immediately. You are being issued a Personnel Notice for

Poor Job Performance.

ACTION TAKEN
Covered the above with Claude. Asked him if he needed any other guidance or assistance. Failure to meet

these goals and guidelines immediately will result in Corrective Action which may include removal from your job.

| DISTRIBUTION | | RECOMMENDED BY | |
|---|---|---|---|
| [ ] COST DEPT. | [ ] VICE PRESIDENT | | |
| [ ] DEPT. FILES | [ ] GENERAL MANAGER | DEPARTMENT MANAGER | *2·16·06* |
| [ ] INDUSTRIAL RELATIONS | [ ] MANAGER | | |
| [ ] OFFICE MANAGER | [ ] ASST. MANAGER | ASSOCIATE (If necessary) *Claude Lee* | *2·16·06* |
| [ ] PAYROLL DEPT. | [ ] DEPT. MANAGER | OTHER | |
| [ ] HUMAN RESOURCES DEPT. | [ ] SUPPLY ROOM | | |
| | | SIGNATURE | DATES |

# TAB 4

*ATT. # 3*

# WESTPOINT HOME

**CORRECTIVE-ACTION REPORT - SALARIED (EXEMPT AND NONEXEMPT) PERSONNEL**

| ASSOCIATE *Claude Lee* | ASSOCIATE # | JOB TITLE *Supervisor* | DATE *3-8-06* |
|---|---|---|---|
| FACILITY *44* | | DEPARTMENT *Packaging* | SHIFT *3rd* |

**Performance/Conduct Description** (Fully describe the unacceptable performance/conduct, including details concerning place, date, time, persons involved, outcome and relevant conditions or circumstances.)

*Claude is not performing his duties as a supervisor. When working last Thursday (3-2-06) Claude was questioned about an employee not working. He answered he did not know why, and did not question the employee about it. We have discussed this on several occasions and in great detail.*

**Disciplinary Action Taken** (including discharge): *Claude is being issued a written corrective action for poor job performance.*

**Corrective-Action Plan:** (Describe any special assistance, in the form of job change, training, counseling, extra supervision or other action required to prevent recurrence. Identify all individuals responsible for implementation and follow-up of action plan.)

*Claude must immediately identify, address, correct and follow up on all issues relating to his responsibility as a supervisor within the packaging dept. If not fully in control of his position as a supervisor in the packaging department within 2 weeks including proper communications of progress with management Claude could be immediately removed from his current position as supervisor.*

**Comments:** (Describe associate's attitude and/or reactions and any special circumstances or consideration concerning the unsatisfactory performance.)

Follow-up conference date: *2 weeks or less* Comments (Describe status of action plan):

| *Claude Lee* | | *Michael W. Alford* | *3-8-06* |
|---|---|---|---|
| ASSOCIATE'S SIGNATURE | DATE *3.8.06* | IMMEDIATE SUPERVISOR | DATE |
| HUMAN RESOURCES MANAGER | DATE | FACILITY MANAGER/CORPORATE OR DIVISION DEPARTMENT MANAGER | DATE |
| WITNESS | DATE | | |

CC-062503-CAR

# TAB 5

*ATT 4*

# WESTPOINT HOME
**CORRECTIVE-ACTION REPORT - SALARIED (EXEMPT AND NONEXEMPT) PERSONNEL**

| ASSOCIATE *Claude Lee* | ASSOCIATE # | JOB TITLE *Supervisor* | DATE *3-11-06* |
|---|---|---|---|
| FACILITY *44* | DEPARTMENT *Packing* | | SHIFT *3rd* |

**Performance/Conduct Description** (Fully describe the unacceptable performance/conduct, including details concerning place, date, time, persons involved, outcome and relevant conditions or circumstances.)

*Claude has failed to aggressively implement changes in production processes, associate training and monitoring, and communication. These deficiencies have resulted in poor job performance.*

**Disciplinary Action Taken** (including discharge): *Claude is immediately removed from his current position as a supervisor in the packaging dept.*

**Corrective-Action Plan:** (Describe any special assistance, in the form of job change, training, counseling, extra supervision or other action required to prevent recurrence. Identify all individuals responsible for implementation and follow-up of action plan.)

*N/A*

**Comments:** (Describe associate's attitude and/or reactions and any special circumstances or consideration concerning the unsatisfactory performance.)

Follow-up conference date: *N/A*    Comments (Describe status of action plan):

| *Claude Lee* | | *Michael W. Alford* | *3-11-06* |
|---|---|---|---|
| ASSOCIATE'S SIGNATURE | DATE *3-11-06* | IMMEDIATE SUPERVISOR | DATE |
| HUMAN RESOURCES MANAGER | DATE | FACILITY MANAGER/CORPORATE OR DIVISION DEPARTMENT MANAGER | DATE |
| WITNESS | DATE | | CC-062505-CAR |

# TAB 6

# DEPOSITION OF CLAUDE GENE LEE, SR.

## July 17, 2007

## Pages 1 through 203

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  SOUTHERN DIVISION
 4
 5   CLAUDE GENE LEE, SR.,
 6       Plaintiff,
 7   Vs.           CASE NO. 1:06-CV-874-MHT
 8   WESTPOINT HOME, INC.,
 9       Defendant.
10
11         * * * * * * * * * * * *
12
13
14        DEPOSITION OF CLAUDE GENE LEE, SR., taken
15   pursuant to stipulation and agreement before Lisa
16   J. Nix, Registered Professional Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of Jay E. Tidwell, Tidwell Law
19   Group, Suite 217, 2112 11th Avenue South,
20   Birmingham, Alabama, on Tuesday, July 17, 2007,
21   commencing at approximately 12:15 p.m.
22
23         * * * * * * * * * * * *
```

Page 2

```
 1               APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. Jay E. Tidwell
     Tidwell Law Group LLC
 5   Suite 217
     2112 11th Avenue South
 6   Birmingham, AL 35205
 7
 8
 9   FOR THE DEFENDANT:
10   Ms. Kelly F. Pate
     BALCH & BINGHAM
11   Attorneys at Law
     Suite 200
12   105 Tallapoosa Street
     Montgomery, Alabama  36104
13
14
15   ALSO PRESENT:
16   Mr. Lawrence Williams
17
18
19
20
21
22
23
```

Page 3

```
 1                EXAMINATION INDEX
 2
     CLAUDE GENE LEE, SR.
 3     BY MS. PATE . . . . . . . . . . 6
 4
 5
 6               EXHIBIT INDEX
                                        MAR
 7   DEFENDANT'S EXHIBIT
     1   Document entitled What To Do If You Have    17
 8       a Complaint or Problem (Lee/WPH 0245)
 9   2   A Guidebook for Salaried Associates         18
         (Lee/WPH 0246 - 0248)
10
     3   Acknowledgment page for having read         19
11       Guidebook for Salaried Associates
         Booklet (Lee/WPH 0011)
12
13   4   Equal Employment Opportunity,               22
         Anti-harassment/retaliation policy
         (Lee/WPH 0326)
14
15   5   Guidebook for Salaried Associates           24
         Booklet acknowledgment and disclaimer
         (Lee/WPH 0012)
16
17   6   Complaints policy (Lee/WPH 0336 - 0338)     26
18   7   Corrective action policy (Lee/WPH 0427 -    27
         0428)
19   8   Complaint                                   29
20   9   Affidavit of Claude Gene Lee                43
21   10  December 2005 Personnel Notice (Lee/WPH     53
         0036)
22
23
```

Page 4

```
 1
 2
 3
     11  January 2006 Salaried-Exempt Performance    65
 4       Review (Lee/WPH 0036 - 0040)
 5   12  February 2006 Personnel Notice (Lee/WPH     69
         0005)
 6
     13  March 2006 Correction Action Report         79
 7       (Lee/WPH 0006)
 8   14  March 2006 Corrective Action Report         102
         (Lee/WPH 0007)
 9
     15  3/15/06 Personnel Notice (Lee/WPH 0009)     124
10
     16  List of choices (From Lee 0026)             127
11
     17  Recap of events prepared by Claude Lee,     148
12       Sr. (From Lee 0001 - 0013)
13   18  7/7/06 Psychological consultation (From     139
         Lee -137 - 0138)
14
     19  Declaration of Brendt Murphy                91
15
16
17
18
19
20
21
22
23
```

Page 5

1    STIPULATION
2    It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of CLAUDE GENE LEE, SR. is taken
5  pursuant to the Federal Rules of Civil Procedure
6  and that said deposition may be taken before Lisa
7  J. Nix, Registered Professional Reporter and
8  Commissioner for the State of Alabama at Large,
9  without the formality of a commission, that
10  objections to questions other than objections as to
11  the form of the question need not be made at this
12  time but may be reserved for a ruling at such time
13  as the said deposition may be offered in evidence
14  or used for any other purpose by either party
15  provided for by the Statute.
16    It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23    It is further stipulated and agreed by and

Page 6

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby waived.
4
5    * * * * * * * * * * * * *
6
7    CLAUDE GENE LEE, SR.
8    The witness, after having first been duly
9  sworn to speak the truth, the whole truth and
10  nothing but the truth testified as follows:
11    EXAMINATION
12  BY MS. PATE:
13  Q.  Mr. Lee, I'm Kelly Pate. We met earlier.
14    I'm here today representing WestPoint.
15    With me is Mr. Lawrence Williams.
16    Do you understand today that you'll be
17    answering questions under oath?
18  A.  Yes.
19  Q.  And if you don't understand a question that
20    I ask, if you'll just let me know, I'll do
21    my very best to rephrase it so that we
22    understand each other.
23  A.  Okay.

Page 7

1  Q.  If you answer my question, I'll assume that
2    you understood it. Is that fair?
3  A.  Yes.
4  Q.  Okay. And if you would, please try to
5    answer out verbally instead of nodding your
6    head. That way the court reporter can take
7    everything down for us.
8  A.  Okay.
9  Q.  Like Jay said, if at any time you need a
10    break, just let me know and we can do that.
11  A.  Okay.
12  Q.  Are you currently taking any medication?
13  A.  Yes.
14  Q.  What are you taking?
15  A.  High blood pressure medicine.
16  Q.  A blood pressure medicine?
17  A.  Uh-huh. (Positive response.)
18  Q.  And is that it?
19  A.  Yes.
20  Q.  And that medication wouldn't affect your
21    ability to testify truthfully to the
22    fullest extent of your knowledge today,
23    would it?

Page 8

1  A.  No.
2  Q.  Wouldn't affect your memory in any way?
3  A.  No.
4  Q.  Do you have any sort of physical problems
5    that would prevent you from testifying
6    today to the fullest extent of your
7    knowledge?
8  A.  No.
9  Q.  Mr. Lee, when I refer to WestPoint today,
10    I'm referring to the company for whom you
11    worked, even though we understand that the
12    name changed a couple of times while you
13    were there and most recently with an asset
14    sale in 2005. Is that okay with you?
15  A.  Yes.
16  Q.  Have you ever been deposed before?
17  A.  Say what, now?
18  Q.  Have you ever been deposed before in a
19    deposition like this?
20  A.  No.
21  Q.  Have you ever testified in court?
22  A.  No.
23  Q.  Have you ever been arrested or charged with

Page 9

1  any sort of crime?
2  A.  No.
3  Q.  Tell me for the record what your full legal
4     name is.
5  A.  Claude Gene Lee, Sr.
6  Q.  And have you ever gone by any other name?
7  A.  No.
8  Q.  How old are you, Mr. Lee?
9  A.  51.
10  Q.  What's your date of birth?
11  A.  December the 15th, 1955.
12  Q.  What's your current address?
13  A.  100 Murry Street, Abbeville, Alabama 36310.
14  Q.  How long have you been at that address?
15  A.  25 years.
16  Q.  Is that a house?
17  A.  Right.  House.
18  Q.  You own it or rent it?
19  A.  Own it.
20  Q.  Does anybody live with you?
21  A.  My wife and son.
22  Q.  And what are their names?
23  A.  My wife is named Joanne Lee.

Page 10

1  Q.  What's your son's name?
2  A.  Claude Gene Lee, Jr.
3  Q.  How old is he?
4  A.  22.
5  Q.  Is he in school down there in Abbeville?
6  A.  No.  He's working.
7  Q.  Where is he working?
8  A.  U.S. Postal Service.
9  Q.  What about your wife?  Does she work?
10  A.  Yes.
11  Q.  Where does she work?
12  A.  U.S. Postal Service.
13  Q.  And what's her position?
14  A.  Postal clerk.
15  Q.  And does your son do the same thing?
16  A.  No, he's a mail carrier.
17  Q.  Where did your wife work before the post
18     office?
19  A.  WestPoint Stevens -- Homes.
20  Q.  What was her position there?
21  A.  She was a flat sheet hemmer.  Flat sheet,
22     sewing machine.
23  Q.  How long was she with WestPoint?

Page 11

1  A.  About 13 years.
2  Q.  Why did she leave WestPoint?
3  A.  She went to the post office after she --
4     when she left.
5  Q.  Was it a better job?
6  A.  Better job.
7  Q.  More pay?
8  A.  Uh-huh.  (Positive response.)
9  Q.  Where did you live before Murry Street?
10  A.  I stayed at 206 Pine Street.
11  Q.  And how long were you at that address?
12  A.  I think from '75 to '82.  '82, I think.
13     From '75 to '82.
14  Q.  Did you own or rent that home?
15  A.  Rent.
16  Q.  How long have you been married?
17  A.  30 years.
18  Q.  So your wife was living with you at that
19     address?
20  A.  Yes.
21  Q.  Anybody else other than your son living
22     with you then?
23  A.  We had three kids.

Page 12

1  Q.  And what are their names?
2  A.  Claude Lee, Jr., Katrina Lee, and Tamela
3     Lee.
4  Q.  And what are their ages?
5  A.  Tamela is 31, and Katrina is 25, and
6     Claude, Junior is 22.
7  Q.  Where do Katrina and Tamela live?
8  A.  Tamela is staying at Headland, Alabama.
9     Katrina stay in Atlanta, Georgia.
10  Q.  Mr. Lee, where did you go to high school?
11  A.  Abbeville High School.
12  Q.  And did you graduate?
13  A.  Yes.
14  Q.  What year did you graduate?
15  A.  1974.
16  Q.  Did you do any other education after high
17     school?
18  A.  No.
19  Q.  Other than the job that we're here to talk
20     about today, have you ever been laid off or
21     terminated, fired from a job?
22  A.  No.
23  Q.  Tell me all of the positions you held while

Page 13

1    you were with WestPoint.
2    A.   WestPoint, they had -- when I first
3         started, they had something like almost 25
4         different kind of jobs.  Mostly I done
5         probably 20 different jobs.  Probably
6         five -- five jobs I probably didn't never
7         do, but I done about 20 of them.
8    Q.   You think you did about 20 different jobs?
9    A.   Uh-huh.  (Positive response.)
10   Q.   Do you remember the names of those
11        positions?
12   A.   You had -- well, you had machine operator.
13        You had automatic machine operator.  You
14        had a pillow case machine operator.  You
15        had a half a dozen packer.  You had a
16        strapper, a running strapper.
17   Q.   What's a strapper?
18   A.   That's when you -- like boxes, you put the
19        straps around it to hold it down.
20        You had palletizer.
21   Q.   And these were all jobs that you held?
22   A.   Uh-huh.  (Positive response.)  I learned to
23        do, you know.

Page 14

1    Q.   Do you remember about how long you did each
2         of those jobs?
3    A.   Some of the jobs, you know, where people
4         stay out -- they ask you to do them when
5         they stay out.  That's when you learn how
6         to do them.
7    Q.   You're talking about if somebody is out
8         sick, you would fill in for different
9         positions?
10   A.   Uh-huh.  (Positive response.)
11   Q.   What department did you work in during the
12        course of the time you were there?
13   A.   The same.  I was in the same department all
14        29 years, one department.
15   Q.   And what department was that?
16   A.   Wrapping, packing department.
17   Q.   So all of these jobs that you just
18        mentioned -- the machine operator and
19        strapper -- those were all in the packaging
20        department?
21   A.   Uh-huh.  (Positive response.)  Packaging
22        department.
23   Q.   Mr. Lee, have you ever filed a lawsuit

Page 15

1         against anyone?
2    A.   No.
3    Q.   Have you ever been involved in other
4         litigation, not necessarily as a party, but
5         involved maybe as a witness in any way?
6    A.   No.
7    Q.   Have you ever had to declare bankruptcy?
8    A.   Yes.
9    Q.   When did you declare bankruptcy?
10   A.   Last month.
11   Q.   Tell me about those circumstances.
12   A.   I don't understand what you're talking
13        about, tell you.
14   Q.   Okay.  Let me just back up and try to take
15        it a step at a time.  Have you filed in
16        court for bankruptcy?
17   A.   No, I went to a lawyer.
18   Q.   What's the lawyer that you saw, what's his
19        name?
20   A.   Michael -- let's see.  I have it right
21        here.  Michael Brock, B-R-O-C-K.
22   Q.   Is he in Abbeville?
23   A.   Dothan.

Page 16

1    Q.   Dothan?
2    A.   Uh-huh.  (Positive response.)
3    Q.   Did you fill out paperwork when you went to
4         see Mr. Brock?
5    A.   Yes.
6    Q.   And did you fill out bankruptcy papers?
7    A.   Yes.
8    Q.   Do you think those have been filed with the
9         court yet?
10   A.   We're supposed to go to court the 21st of
11        August.
12   Q.   And do you know what court --
13   A.   They give us the case number already.
14   Q.   Do you know the case number?
15   A.   07-10874.
16   Q.   And what court is that?
17   A.   Federal court in Dothan.
18   Q.   You and your wife filed jointly?
19   A.   Yeah, jointly.
20   Q.   Is your wife still employed at the post
21        office?
22   A.   Yes.
23   Q.   Do you remember while you were at WestPoint

Page 17

1    receiving any training on harassment or
2    discrimination?
3    A.  Yes.
4    Q.  When do you remember receiving training?
5    A.  A man come out -- I think, come out of
6        WestPoint, Georgia about every year and go
7        over about the same thing:  Race, sex
8        discrimination, all that.
9    Q.  Do you remember any details of what was
10       said?
11   A.  He always say, you know -- he talk about,
12       you know -- all the supervisors had to go
13       in out there.  And he always said -- he
14       asked everybody the question, do you think
15       the supervisor is equal, white and black,
16       and everybody said yes, you know, it was
17       pretty equal.
18   Q.  Do you remember receiving any company
19       policies on harassment and discrimination?
20   A.  He had paperwork, you know, that we can
21       take with us.
22           (Defendant's Exhibit 1 was marked
23           for identification.)

Page 18

1    Q.  Let me show you what I've marked as
2        Defendant's Exhibit 1.  Have you ever seen
3        this policy before?
4    A.  Yes.
5    Q.  Did you receive a copy of it?
6    A.  Yes.
7    Q.  Did you read this policy?
8    A.  Yes.
9    Q.  Do you remember seeing this policy posted
10       at WestPoint?
11   A.  Yes.
12   Q.  And this policy is titled what to do if you
13       have a complaint or problem, right?
14   A.  Yes.
15   Q.  And it gives you six steps to follow if you
16       have a problem?
17   A.  Yes.
18   Q.  Did you understand those six steps?
19   A.  Yes.
20           (Defendant's Exhibit 2 was marked
21           for identification.)
22   Q.  Let me show you what I marked as
23       Defendant's Exhibit 2, and it's Bates

Page 19

1    stamped Lee/WPH 0246 through 0248, A
2    Guidebook for Salaried Associates.  Have
3    you seen this policy before?
4    A.  No, not really.
5    Q.  You don't remember receiving a copy of this
6        policy?
7    A.  No, ma'am.
8    Q.  You don't remember ever reading this
9        policy?
10   A.  No.
11   Q.  Do you remember seeing this policy posted
12       up at WestPoint?
13   A.  No.
14           (Defendant's Exhibit 3 was marked
15           for identification.)
16   Q.  Let me show you what I've marked as
17       Defendant's Exhibit 3, and it's Bates
18       stamped Lee/WPH 0011.  Is that your
19       signature at the bottom of the page?
20   A.  Yes.
21   Q.  And it's dated August 3rd of 2005?
22   A.  Yes.
23   Q.  Read out loud the paragraph above your

Page 20

1    signature line.
2    A.  I have read the disclaimer written above,
3        and I understand it.  I acknowledge that
4        the guidebook is not an employee contract.
5    Q.  That's fine.  Do you agree with me that you
6        signed, acknowledging that you had read the
7        Guidebook for Salaried Associates?
8           MR. TIDWELL:  Object to the form.
9    A.  When they got this right here, they didn't
10       have all the information.  They said they
11       were going to get it to us later, but we
12       never received any stuff like this right
13       here.
14   Q.  Tell me what you mean.
15   A.  They didn't have all the guidebooks ready
16       when we signed this right here.
17   Q.  Do you remember receiving a guidebook every
18       year or so?
19   A.  Yeah, we received one every year.
20   Q.  So at some point during your career, you
21       saw the guidebook more than once?
22   A.  Uh-huh.  (Positive response.)
23   Q.  And you read the guidebook?

Page 21

1      MR. TIDWELL:  Object to the form.
2   Q.  Was that a yes?
3   A.  Yes.
4      MR. TIDWELL:  She's talking about
5         this guidebook that you've
6         seen and read.
7   A.  It's a little different, I reckon,
8      but ... but they have give us some
9      guidebooks.
10  Q.  Have you seen a Guidebook for Salaried
11     Associates that's like the one that's
12     marked Defendant's Exhibit 2, seen one like
13     that?
14      MR. TIDWELL:  Like this one.
15  A.  I haven't seen one like that.
16  Q.  Look with me on Defendant's Exhibit 3.  The
17     title at the top is Guidebook for Salaried
18     Associates Booklet.
19      The first paragraph -- make sure I read
20     this right.  It says:  On or after July 1,
21     2004, you received a copy of the WestPoint
22     Stevens booklet entitled Guidebook for
23     Salaried Associates, revised 07-01-04.

Page 22

1      Look at Defendant's Exhibit 2 and tell
2   me, is that the guidebook that's marked as
3   revised 07-01-04?
4   A.  I don't know.
5      (Defendant's Exhibit 4 was marked
6         for identification.)
7   Q.  Let me show you what's marked as
8      Defendant's Exhibit 4.  And this is a part
9      of the WestPoint Home human resources
10     policy manual.  Have you ever seen a copy
11     of this?
12  A.  No.
13  Q.  Never seen this policy on equal employment
14     opportunity, anti-harassment or
15     retaliation?
16  A.  No.
17  Q.  Do you remember receiving a copy of this
18     policy?
19  A.  No.
20  Q.  Do you remember seeing this policy posted
21     anywhere at WestPoint?
22  A.  They had something like -- about
23     discrimination on the front when you walk

Page 23

1   in the front door.
2   Q.  Tell me what you remember about that.
3   A.  It just say, you know, like WestPoint don't
4      discriminate.  That's the only thing I can
5      tell you.
6   Q.  Did it tell you what to do if you had a
7      complaint or a problem?
8   A.  I really don't know.
9   Q.  So you don't remember ever reading this
10     policy that's marked as Defendant's Exhibit
11     4?
12  A.  No, but I know they had something about
13     discrimination on the front -- when you
14     walk in the front door.
15  Q.  Do you ever remember receiving a policy
16     like this one in Defendant's Exhibit 4?
17  A.  No.
18  Q.  Do you not remember ever receiving one or
19     you don't think you ever did receive one?
20  A.  I don't think --
21  Q.  There's a difference.
22  A.  Never seen -- don't remember a
23     discrimination policy.

Page 24

1   Q.  Never seen one?
2      MR. TIDWELL:  I think he said he
3         doesn't remember ever getting
4         one.
5   Q.  Is that right?
6   A.  Uh-huh.  (Positive response.)
7   Q.  Is that a yes?  That will help her if you
8      say yes or no.
9      MR. TIDWELL:  Answer yes or no,
10        not uh-huh or huh-uh.
11  A.  No, I don't remember receiving one.
12  Q.  Fair enough.
13     (Defendant's Exhibit 5 was marked
14        for identification.)
15  Q.  Let me show you what I've marked as
16     Defendant's Exhibit 5.  And at the top, the
17     title is WestPoint Stevens Guidebook for
18     Salaried Associates booklet.  And this is
19     Bates stamped 0012.  Is that your signature
20     that appears on this page twice?
21  A.  Yes.
22  Q.  Okay.  Look in the top section under the
23     title Acknowledgment.  That says:  My

Page 25

1  signature below acknowledges receipt of the
2  new guidebook which takes effect
3  immediately. I have read the disclaimer
4  written above, and I understand it and
5  acknowledge that the guidebook is not an
6  employment contract.
7      Did you understand that you were
8  signing, saying that you had received the
9  Guidebook for Salaried Associates?
10  A.  Uh-huh. (Positive response.)
11  Q.  Is that a yes?
12  A.  Yes.
13  Q.  Look with me at the second section of this
14  page. It's titled human resources policy
15  manual. And towards the bottom above your
16  signature, there's an acknowledgment
17  section. It says: My signature below
18  acknowledges the publication of the new
19  WestPoint Stevens human resources policy
20  manual which takes effect immediately. Do
21  you see that?
22  A.  Yes.
23  Q.  Do you agree with me that you signed,

Page 26

1  acknowledging that you had received the new
2  human resources manual?
3  A.  Yes.
4      (Defendant's Exhibit 6 was marked
5      for identification.)
6  Q.  Let me show you what I've marked as
7  Defendant's Exhibit 6. This is another
8  section of the human resources policy
9  manual, and it's titled complaints covering
10  all associates. And it's Bates stamped
11  Lee/WPH 003 through -- I'm sorry. It's
12  Bates stamped 0336 through 0338.
13      Have you ever seen this policy before?
14  A.  No.
15  Q.  Do you ever remember seeing this policy
16  posted anywhere at WestPoint?
17  A.  No.
18  Q.  Ever remember reading this policy?
19  A.  No.
20  Q.  Do you ever remember receiving a policy
21  like this, a policy covering complaints for
22  what to do if you have a complaint?
23  A.  No.

Page 27

1  Q.  Look with me at Defendant's Exhibit 7.
2      (Defendant's Exhibit 7 was marked
3      for identification.)
4  Q.  I've got one more policy to show you. This
5  is Bates stamped Lee/WPH 0427 through
6  0428. It's a section from the WestPoint
7  human resources policy manual on corrective
8  action covering salaried associates. Have
9  you ever seen this policy before?
10  A.  Yes, they gave the salaried, exemption and
11  non-exemption, associates, you know, the
12  policy book.
13  Q.  So you remember receiving a policy manual?
14  A.  Yes.
15  Q.  And you remember this being a section in
16  the policy manual?
17  A.  Yes.
18  Q.  Do you remember reading this policy?
19  A.  Yes.
20  Q.  Did you understand from this policy that
21  supervisors could write corrective actions
22  to address performance issues?
23      MR. TIDWELL: Object to the form.

Page 28

1  A.  Do I what, now?
2  Q.  Did you understand from this policy that a
3  supervisor could write a corrective action
4  report to address performance issues for
5  his or her employees?
6      MR. TIDWELL: Object to the form.
7  A.  Yes.
8  Q.  Mr. Lee, did you understand based on these
9  policies that you do remember receiving,
10  did you understand that if you had a
11  complaint or a problem, there was a
12  procedure that you could go through to
13  address that problem?
14      MR. TIDWELL: Object to the form.
15  A.  Yes.
16  Q.  You understood that if you felt like you
17  were being harassed or discriminated, there
18  was someone you could go to to report that?
19      MR. TIDWELL: Object to the form.
20  A.  No, not really.
21  Q.  All right. Tell me what you understood
22  about making a report.
23  A.  Well, first of all, if you've got a

Page 29

1    complaint, your supervisor; next, your
2    manager; the next is human resource. When
3    you go through all three of them there and
4    ain't nothing done about it, just --
5    nothing else I can do.
6    Q.  Do you remember seeing a hotline that you
7        could call?
8    A.  Yes.
9    Q.  So you could call that hotline after you
10       went up through the chain like you just
11       described?
12   A.  Uh-huh.  (Positive response.)
13   Q.  Is that a yes?
14   A.  Yes.
15   Q.  Let me show you what I've marked as
16       Defendant's Exhibit 8.
17           (Defendant's Exhibit 8 was marked
18            for identification.)
19   Q.  This is a copy of the complaint you filed
20       in federal district court against
21       WestPoint.  Have you seen this document
22       before?
23   A.  Yes.

Page 30

1    Q.  Have you read it?
2    A.  Yes.
3    Q.  Who prepared it for you?
4    A.  My lawyer.
5    Q.  And do you remember who that was?
6    A.  I started with Russ Goodman.
7    Q.  Russ Goodman?
8    A.  Uh-huh.  (Positive response.)
9    Q.  Do you remember when you decided to sue
10       WestPoint?
11   A.  It was sometime in March.
12   Q.  March of what year?
13   A.  2006.
14   Q.  When did you first go see Mr. Goodman?
15       Did he help you with your EEOC charge?
16   A.  Yes.
17   Q.  Do you remember when you first went to see
18       him?
19   A.  Yes.
20   Q.  When was that?
21   A.  It was March -- probably March the --
22       around March the 20th -- I can't remember
23       the date.

Page 31

1    Q.  Sometime in March?
2    A.  March the 20th, somewhere around there.
3    Q.  That's fine.
4        Look over to the second page of your
5    complaint, paragraph five.  It says that
6    you directed the work of anywhere between
7    65 and 80 subordinate employees.  Is that
8    right?
9    A.  Yes.
10   Q.  Look at the next paragraph, paragraph six,
11       and I want to break this up a little bit.
12       First you say that WestPoint, quote,
13       discriminated against plaintiff in his
14       employment on the basis of -- I think that
15       should be his color, paren black, and race,
16       paren African-American, in that the
17       plaintiff was unfairly written up for lack
18       of efficiency while his shift was the only
19       shift to meet certain production goals.
20       Tell me every basis you have for that
21       allegation.
22           MR. TIDWELL:  Object to the form.
23   A.  Well, the first write-up in December, I

Page 32

1    come to work.  Got to work about 10:30.  So
2    my manager told me, said, we going to
3    personnel.
4    Q.  Who was your manager?
5    A.  Bob Turner.
6        And he told me, said -- on the way up
7    there, he said, we done talked to the first
8    shift and second shift supervisor, Mike and
9    Billy Wayne Bedsole, who's white.  And he
10   said the plant manager wants something on
11   paper showing that -- we got a new
12   ownership coming in.  We need something
13   showing that y'all are going to do a better
14   job supervising.  I said, okay, I'll go
15   along with that.  So they took me in
16   personnel.  That's when they wrote up the
17   first write-up.
18           MR. TIDWELL:  Claude, let me stop
19           you.  She's talking about this
20           paragraph right here which
21           says that you were making the
22           production goals while the
23           other two supervisors weren't,

Page 33

1       and I think her question was
2       directed at, what evidence do
3       you have that shows that the
4       other two were not making
5       their -- meeting production
6       requirements?
7          Is that what you were
8       asking?
9       MS. PATE: Well, that's part of
10      it. You can answer that
11      when --
12 Q. Let me see if I can rephrase it and maybe
13    that will help.
14     The first part of that -- and I think
15    maybe this is where you were going. You
16    allege that you were discriminated against
17    based on your race and your color, and you
18    say because you were unfairly written up
19    for lack of efficiency. Tell me what the
20    basis is for that allegation. Tell me what
21    you mean by that.
22 A. I think I was wrongfully written up because
23    I was black.

Page 34

1 Q. You think Bob Turner wrongfully wrote you
2    up?
3 A. Yes. But, see, like I said, when Bob --
4    that write-up with Bob before he resigned,
5    like I say, he say he talked to all three
6    of the supervisors, and all three of the
7    supervisors got the same thing. I don't
8    know whether all three of the supervisors
9    got the same thing or not.
10 Q. Did you understand from Bob Turner that
11    with the new management coming in,
12    everybody was under pretty close scrutiny?
13 A. Yes.
14 Q. All right. When you say lack of efficiency
15    in that paragraph, tell me what you mean by
16    that.
17 A. My efficiency was higher than the first and
18    second shift. They had -- Second shift and
19    first shift had a lack of efficiency.
20    Every week, we come out on top, the third
21    shift. Really, third shift, we had
22    probably 20 people less and we were still
23    making -- running just as much as they was.

Page 35

1 Q. What does efficiency mean? Does that mean
2    how much you're producing?
3 A. How much you're producing.
4 Q. And so you contend that you were producing
5    more?
6 A. With lesser people.
7 Q. Did you ever complain to anyone that you
8    were producing more and they were producing
9    less?
10 A. Well, when I talked to -- only thing about
11    third shift, it's a big turnover. Like
12    they have an opening on first or second
13    shift, the people that got seniority have a
14    chance to go to first shift. And, really,
15    I lose all the seniority on third shift.
16    Like the people I had when I left, they
17    had some that had been there 90 days, 60
18    days, a year. The most people I had out of
19    them -- I had about 65 I think when I left,
20    and I think I had about 10 employees that
21    probably had 15 or 20 years out of them
22    60. The rest of them was new people, but I
23    still making my percentage, what I was

Page 36

1    supposed to make.
2 Q. Would you agree with me that because you
3    had so much turnover, new people coming in
4    all the time, it was important to monitor
5    your associates?
6    MR. TIDWELL: Object to the form.
7 A. Really, you have to -- if you got new
8    people, you have to, you know, train them
9    and -- where they can do good efficiency,
10    you know.
11    Like the night I talked to Mike Alford,
12    we had some Manpower people there. First
13    shift had about 30 Manpower people and I
14    didn't have but about ten. So he said --
15    really, I didn't have enough people to run
16    the machines.
17    And so he said, I'm going to get ten
18    people from first shift. And so I said,
19    okay. He said, I'm going to see can I get
20    them today -- in the morning and send them
21    to third shift, but he couldn't do it.
22    Then he told me the next day, say, I'm
23    going to have to hire you ten -- send you

Deposition of Claude Gene Lee, Sr.

July 17, 2007

Page 37

1    ten people this week. Right before I left
2    that Thursday night, I had ten people come
3    in from Manpower, bring in new people to be
4    trained. Then that Saturday, they told me
5    I was terminated.
6    Q.   So you have a lot of turnover on third
7         shift, new people coming in all the time?
8    A.   Yes.
9    Q.   With new people coming in all the time, it
10        was important for you to make sure they
11        understood the work procedures?
12   A.   Yes.
13   Q.   Monitor their work processes?
14   A.   Yes.
15   Q.   Let's look back at paragraph six, and you
16        may have already answered this, but I want
17        to make sure I understand you.  In
18        paragraph six of the complaint, you say:
19        The white shift supervisors received no
20        disciplinary action, while their shifts
21        performed inadequately compared to the
22        plaintiff's shift.
23             Who are the white supervisors you're

Page 38

1    talking about?
2    A.   Billy Wayne Bedsole and Mike Etheridge.
3    Q.   And you contend that your -- how do you
4         believe that they were performing
5         inadequately compared to you?  Is that just
6         in terms of --
7    A.   They give us an efficiency paper for all
8         three shifts.
9    Q.   So just in --
10   A.   See, they had -- they had a big bulletin
11        thing outside the door, and they tell what
12        each shift done done every day.  And they
13        tell a total, a percentage, what shift done
14        100 percent and what shift didn't do 100
15        percent.
16   Q.   So you contend that Mr. Bedsole, Mr.
17        Etheridge were performing inadequately
18        compared to you based on production
19        numbers?
20   A.   Uh-huh. (Positive response.)
21   Q.   Anything else?
22   A.   No.
23   Q.   When you say that they received no

Page 39

1    disciplinary action, is that -- are you
2    talking just about written notices?
3    A.   They received one written write-up in
4         February, but still -- I had made 100
5         percent, but still I got wrote up, too,
6         again.
7    Q.   So Mr. Bedsole and Mr. Etheridge did
8         receive a write-up?
9    A.   Uh-huh. (Positive response.)  In February.
10   Q.   And do you consider that write-up as
11        disciplinary action?
12   A.   The supervisor had told us that in two
13        weeks, if you ain't got 100 percent, your
14        shift get wrote up and the people get wrote
15        up. In them two weeks, my line had 100
16        percent.
17             So I got there on second shift that
18        night going to my work -- job, second shift
19        supervisor said, Billy Wayne, me and Mike
20        got wrote up -- first shift.  He said, you
21        ain't getting wrote up because you've got
22        100 percent.
23             But the next morning when the manager

Page 40

1    got there, he called me in there and he had
2    wrote me up about I need to take care of my
3    lines. How I don't take care of my lines
4    when I have 100 percent?  He said you need
5    to do better taking care of my lines.
6    Well, all my lines had 100 percent.
7    Q.   I want to talk about that in more detail in
8         just a minute.
9             In paragraph seven of the complaint,
10        you say: The plaintiff was eventually
11        removed from his supervisory position and
12        replaced by a less qualified Caucasian.
13             Who were you talking about there?
14   A.   That's when Billy Wayne Bedsole, they had
15        told him to come to third shift in my
16        place. He was white.
17   Q.   Why do you believe he was less qualified?
18   A.   Because he wasn't making his hundred
19        percent on his -- on second shift, and they
20        sent him on my job where I was making 100
21        percent.
22   Q.   So you believe that Mr. Bedsole was less
23        qualified because he was -- his production

Page 41

1    numbers were lower than yours?
2    A.  Right.
3    Q.  Look under count one of the complaint.
4        This is the only count in the complaint.
5        Paragraph ten says:  Defendant's employment
6        practices discriminated against the
7        plaintiff on the basis of his race.
8            Tell me every basis you have for this
9        allegation.
10   A.  Like I said, I was discriminated against
11       because they had told me that all three of
12       us was getting wrote up in December,
13       starting in December.
14   Q.  When you say they, are you talking about
15       Bob Turner?
16   A.  Bob Turner, yeah.  Bob Turner the one told
17       me that.
18           And then January come.  I supposed to
19       have a yearly evaluation.  On my
20       evaluation, Bob Turner was gone.  He had
21       been there all the whole year, and they had
22       Frank there.  They give him the papers to
23       write my evaluation, and he didn't know

Page 42

1    about writing my evaluation because he had
2    been there less than a month.
3        Some of the evaluation, like, had been
4    changed on my paperwork from where I was
5    making, like, average or above.
6    Q.  You think Frank changed your papers?
7    A.  I don't know who changed the paperwork.
8    Q.  You disagree with Frank's evaluation?
9    A.  I disagree with it.
10   Q.  What do you mean when you said that you
11       didn't know -- that Frank didn't know about
12       writing your evaluation?
13   A.  He just had stepped in Bob Turner's place
14       about three weeks when we're supposed to do
15       the yearly review in January.
16   Q.  And you don't think he knew how to do an
17       evaluation?
18   A.  He said he didn't know how to do it.  He
19       said, I haven't never done one of these
20       before.
21   Q.  What position was Frank in before he became
22       your supervisor?
23   A.  They had him something like -- what they

Page 43

1    put on the board was project manager, I
2    think.
3    Q.  So he was in a management position before?
4    A.  Project manager.
5    Q.  Anything else you contend is evidence of
6    this paragraph ten under count one?
7            MR. TIDWELL:  What other ways they
8                discriminated against you.
9    A.  Not writing the two white supervisors and
10       writing me up.
11   Q.  Talking about Bob Turner?
12   A.  That was Frank and Mike Alford.
13   Q.  Look at paragraph 11.  It says:
14       Defendant's actions were flagrant and
15       intentional and in conscious disregard of
16       the plaintiff's right to be free of racial
17       discrimination in employment.  Tell me the
18       basis that you have for this allegation.
19   A.  I really don't understand it.
20           (Defendant's Exhibit 9 was marked
21           for identification.)
22   Q.  Let me show you what I've marked as
23       Defendant's Exhibit 9.  This is the

Page 44

1    affidavit that you filed in opposition to
2    WestPoint's motion for summary judgment.
3        Is that your signature on the last
4    page?
5    A.  Yes.
6    Q.  Flip with me to the second page, paragraph
7    seven.  And I think you touched on this a
8    little bit earlier, but you say that the
9    third shift was the most difficult to
10   manage because of high turnover, given the
11   unusual hours.
12   A.  Uh-huh.  (Positive response.)
13   Q.  What were the hours?
14   A.  From 11:00 to 7:00 p.m.
15   Q.  11:00 a.m. to 7:00 p.m.?
16   A.  Yeah.  11:00 p.m. to 7:00 p.m. -- 7:00 a.m.
17       I mean.
18   Q.  11:00 p.m. to 7:00 a.m.?
19   A.  Uh-huh.  (Positive response.)
20   Q.  All right.  I think we got that straight.
21           You may have said this earlier, but I
22       want to make sure I understand.  About how
23       many new employees did you have coming in

Page 45

1  regularly?
2  A.  In 2005, I had about 60 regular workers,
3     and they hired some Manpower people. I had
4     about 30 Manpower people.
5  Q.  And the Manpower people are the new people
6     you're talking about coming in?
7  A.  Uh-huh. (Positive response.)
8  Q.  Is that a yes?
9  A.  Yes. They started hiring just the Manpower
10    people.
11 Q.  And how often did you get new people from
12    Manpower?
13 A.  If Manpower -- some of them didn't work
14    that good, we would call Manpower, and they
15    would change and get somebody else.
16 Q.  About how long, would you say, were the
17    Manpower people there? Every two weeks,
18    you'd get a new person or --
19 A.  It could, according to how they work. If
20    they weren't working good, they would
21    change over and get somebody else.
22 Q.  And then sometimes you'd have some of your,
23    what you call, regular workers move from

Page 46

1  third shift to another shift?
2  A.  Right. If a job come open on first or
3     second shift, if they want to go, they had
4     an opportunity to go.
5  Q.  All right. Look in paragraph eight of your
6     affidavit. You say that you supervised on
7     average between 35 and 40 employees; is
8     that right?
9  A.  Yes.
10 Q.  Tell me. Before, you said there were 65 to
11    80 employees. Is there a difference
12    between --
13       MR. TIDWELL: Object to the form.
14 Q.  -- the number that you supervised?
15       MR. TIDWELL: Object to the form.
16 A.  If you got two supervisors, more people --
17    that's when they got me a lead person to
18    help me. As long as I had 30, 35, 40
19    people, I supervised that by myself until
20    they start bringing more Manpower people.
21 Q.  Were Manpower people brought in because you
22    requested some more help?
23 A.  When they closed down the Clemson plant in

Page 47

1     2005, they sent everything down to
2     Abbeville, WestPoint plant.
3  Q.  So you were doing more work?
4  A.  Doing more work, and they hired more
5     people. Mostly Manpower people.
6  Q.  After the Clemson plant closed, your shift
7     was doing more work?
8  A.  Uh-huh. (Positive response.)
9  Q.  And needed more employees?
10 A.  Uh-huh. (Positive response.)
11 Q.  Is that yes?
12 A.  That's when the lead person -- they get
13    somebody to help me then. I was by myself
14    from 2001 to 2004. That's when they had
15    something like 35 employees. I didn't need
16    no help with them. Like I said, when they
17    closed down Clemson and got more workers,
18    that's when they give me a lead person to
19    help me.
20 Q.  So this in paragraph four is what you're
21    talking about where you say that from March
22    2000 to October 2004, you didn't have a
23    lead person?

Page 48

1  A.  Huh-uh. (Negative response.)
2  Q.  And then the Clemson plant closed?
3  A.  Uh-huh. (Positive response.)
4  Q.  You were handling more work?
5  A.  Uh-huh. (Positive response.)
6  Q.  Is that a yes?
7  A.  Yes.
8  Q.  And then they gave you a lead person?
9  A.  Right.
10 Q.  Who was that lead person?
11 A.  Michael Lingo.
12 Q.  What's Michael Lingo's race?
13 A.  What was his raise? When he first come
14    there, he was making 11.42.
15 Q.  I'm sorry. What's his race?
16 A.  He's black.
17 Q.  So from December 2005 through March 2006,
18    you had a lead person working for you?
19 A.  Uh-huh. (Positive response.)
20 Q.  Is that a yes?
21 A.  Yes.
22 Q.  And that was Michael Lingo?
23 A.  Right.

Page 49

1   Q.  So Michael Lingo's job from at least
2       December 2005 through March 2006 was to
3       assist you?
4   A.  Yes.
5   Q.  Let's look on the next page at paragraph
6       ten. You say on or about August 2005,
7       there was a change in ownership at
8       WestPoint.
9   A.  Uh-huh. (Positive response.)
10  Q.  Is that right?
11  A.  Yes.
12  Q.  You'd agree with me that with the change in
13      ownership, there were operational changes;
14      some you've mentioned. Is that right?
15  A.  Operational changes? Yes.
16  Q.  Tell me about some of the changes that you
17      remember happening after that sale in 2005.
18  A.  After that, like I say, they brought in
19      more people to work. They brought in some
20      machines to make up a box which didn't
21      halfway work. And that throwed, you know,
22      the percentage and stuff down, efficiency
23      down, slowed everything down.

Page 50

1       They changed out, like, some belts,
2       made a belt longer. Got more people on the
3       line. Where you had something like five
4       people on the line, they had, like, ten or
5       11 people on two lines. They changed it
6       out, made more people on the line.
7   Q.  So you remember some changes in work
8       methods?
9   A.  Uh-huh. (Positive response.)
10  Q.  Is that a yes?
11  A.  Yes.
12  Q.  And you remember some distribution
13      functions being changed?
14  A.  Yes.
15  Q.  And new work processes --
16  A.  Yes.
17  Q.  -- being implemented?
18      Yes?
19  A.  Yes.
20  Q.  And you'd agree with me that while all
21      these changes were happening, everyone --
22      supervisors, management and all of the
23      processes were under pretty close scrutiny;

Page 51

1       is that right?
2           MR. TIDWELL: Object to the form.
3   A.  No, I -- no.
4   Q.  Would you agree with me that with the new
5       changes, that personnel were looked at
6       pretty closely to make sure the new
7       processes were being implemented?
8           MR. TIDWELL: Object to the form.
9   A.  No, not really.
10  Q.  Did you believe that the new changes that
11      were being implemented were being reviewed
12      by anyone?
13          MR. TIDWELL: Object to the form.
14  A.  It was reviewed, but some of the changes
15      didn't work that good.
16  Q.  Look at paragraph 12 of your affidavit.
17      You say that you were given a personnel
18      notice in December 2005 by Bob Turner who
19      was your supervisor at that time; is that
20      right?
21  A.  Yes.
22  Q.  And Brendt Murphy.
23  A.  Yes.

Page 52

1   Q.  What was Brendt Murphy's role that you
2       remember?
3   A.  He was human resource.
4   Q.  Human resources?
5   A.  Manager. Uh-huh. (Positive response.)
6   Q.  You say in that paragraph 12 that during a
7       meeting, quote, Turner restated his
8       confidence in me and my ability to perform
9       the job. Do you see that?
10  A.  Yes.
11  Q.  What meeting was that that that was said?
12  A.  After we -- after they had wrote this
13      personnel notice, me and him was on the way
14      back to the wrapping, packing department.
15      He told me, said -- he said, I'd rather
16      have you the -- run the packing department
17      instead of Michael Lingo because you can
18      handle the people better.
19  Q.  Now, Michael Lingo wasn't running the
20      packing department, was he?
21  A.  Huh-uh. (Negative response.) He was
22      helping. He was a helper.
23  Q.  He was your subordinate?

Page 53

```
 1    A.  Uh-huh.  (Positive response.)
 2    Q.  Is that a yes?
 3    A.  Yes.
 4    Q.  And Michael Lingo reported directly to you?
 5    A.  Yes.
 6    Q.  In that same paragraph, you say that Turner
 7        had always been pleased with my
 8        performance; is that right?
 9    A.  Yes.
10            (Defendant's Exhibit 10 was marked
11            for identification.)
12    Q.  Let me show you Defendant's Exhibit 10, and
13        hang on to that affidavit because I want to
14        go back to it in a minute.
15            Is that your signature at the bottom of
16        Defendant's Exhibit 10?
17    A.  Yes.
18    Q.  And is this the December 2005 personnel
19        notice that you were referring to in
20        paragraph 12?
21    A.  Yes, but all of it is not there.  It was
22        two pages.  Another page -- it was another
23        half a page.
```

Page 54

```
 1    Q.  There was another page you think?
 2    A.  Half a page.
 3    Q.  And what do you think was on the other
 4        page?
 5    A.  I don't know.  Probably about my
 6        percentage.
 7    Q.  What percentage?
 8    A.  Efficiency, what you do, you know.  They
 9        talked about percentages, too, that night.
10    Q.  So you think there's a second page to this
11        personnel notice?
12    A.  There's a second page.
13    Q.  Were personnel notices usually one page or
14        two pages?
15    A.  It's according to how much -- you know, if
16        you run out of room, you put it on
17        another -- another second page.
18    Q.  Did you receive a copy of it?
19    A.  No.  If I remember, it was a page and a
20        half.
21    Q.  And tell me specifically what you believe
22        was on a second page that --
23            MR. TIDWELL:  Object to the form.
```

Page 55

```
 1    Q.  -- that we don't have here.
 2    A.  It mentioned something about efficiency and
 3        doing 100 percent, what they want us to do
 4        that night that they talked to us.
 5    Q.  And you believe that was written --
 6    A.  That's the reason they was telling me keep
 7        getting on your workers, make sure your
 8        workers are working where they can make the
 9        efficiency every day -- every night.
10    Q.  And you believe that was a written
11        document?
12    A.  This right here?
13    Q.  What you're talking about, you believe that
14        there was a separate --
15    A.  It's another page, yeah.
16    Q.  Do you agree with me on this personnel
17        notice there are no page numbers other than
18        my Bates stamp number at the bottom?
19    A.  Yes.
20    Q.  So there's not anything indicating that
21        there's more than one page to this; is that
22        right?
23    A.  Huh-uh.  (Negative response.)
```

Page 56

```
 1    Q.  Look with me towards the bottom.
 2    A.  See, when I signed this right here, I
 3        signed the front page.  Didn't sign nothing
 4        on the back page.  Once you got a
 5        signature -- you don't sign the back page
 6        at all.
 7    Q.  What does the back page look like?
 8    A.  Another page like this right here, same
 9        thing as it had right here.
10    Q.  But you wouldn't have signed at the end of
11        that page?
12    A.  Huh-uh.  (Negative response.)  Just the top
13        page is all.  One signature.
14    Q.  And you would have signed before the second
15        page, not at the end of it?
16    A.  No.  Signed the top page here.
17    Q.  Look with me under action taken.  It says,
18        quote:  Told Claude that his performance
19        and inability to lead his people made him
20        an inefficient supervisor.  This area must
21        improve.  He is required to enforce and
22        correct work procedures, discipline
23        situations, and communicate with other
```

Page 57

1    supervisors and department manager to solve
2    all obstacles, closed quote.
3        Now, you'd agree with me, then, that in
4    December of 2005, Mr. Turner was not
5    pleased with your performance?
6        MR. TIDWELL: Object to the form.
7    A.   What he was saying here, they had told the
8    first and second shift supervisor that we
9    got to start working with each other and
10   telling each other and coming in early,
11   coming in an hour early and get with the
12   supervisor and make sure that everything is
13   all right before they start my shift. Each
14   supervisor had to do that. That's what
15   they was telling right here. You know,
16   make sure your performance do better than
17   it was.
18   Q.   Communicating with –
19   A.   Yeah.
20   Q.   -- supervisors?
21   A.   Said all three supervisors, they told them
22   the same thing: We got to start working
23   with each other. We started having to come

Page 58

1    in at ten o'clock at night. I had to go
2    out there on the floor and find out from
3    Billy Wayne -- he was on second shift -- to
4    see is anything -- everything all right for
5    my shift to start.
6    Q.   Make sure that everything was --
7    A.   We had to start communicating with each
8    other then.
9    Q.   And he said that you're required to enforce
10   work procedures. What did you think that
11   meant?
12   A.   Like I say, he wanted me to start -- make
13   sure that my workers is doing their job,
14   make sure the machines is running and all
15   that.
16   Q.   Did you disagree with Mr. Turner's
17   criticism of your performance?
18       MR. TIDWELL: Object to the form.
19   A.   Yes.
20   Q.   Look back with me at your affidavit. In
21   paragraph 13, you say that you noticed
22   there was not any indication as to the type
23   of notice on the December 2005 personnel

Page 59

1    notice that you received.
2    A.   (Witness nods head up and down.)
3    Q.   Tell me what that means.
4    A.   Well, the only thing, you know -- like my
5    employees, if I got to write them a
6    commendation, you would -- you would put a
7    six in this block. If I got to write them
8    a miscellaneous the first time, I would put
9    a seven in that block. And a pink slip is
10   different. A pink slip has got a
11   counseling on the pink slip.
12   Q.   A what?
13   A.   You get a counseling first on the pink
14   slip. You get three warnings. You have to
15   mark -- check first warning, second
16   warning, third warning on the pink slip.
17       This here is just a personnel notice.
18   This paper right here -- what I was using
19   for my workers is not a write-up. It's
20   just a commendation, notice of change --
21   that would be something like a change of
22   job pay or something like that.
23       And this spot -- only three we use,

Page 60

1    notice of change, a commendation, and
2    miscellaneous.
3    Q.   Look with me on that Exhibit 10 under
4    situation in brief towards the top. That
5    says job performance, right?
6    A.   Uh-huh. (Positive response.)
7    Q.   Is that a yes?
8    A.   Yes.
9    Q.   So you understood that personnel notice to
10   be a write-up about job performance; is
11   that right?
12       MR. TIDWELL: Object to the form.
13   A.   Yes.
14   Q.   Okay.
15   A.   But, see, you can write up like a
16   miscellaneous. If some of my workers doing
17   a poor job performance and I write a
18   miscellaneous, I check a seven up there and
19   turn this in. The next time, if they doing
20   bad and ain't doing their job performance,
21   they get a counseling. That's a pink slip.
22   Q.   That's how you do it?
23   A.   That's how we done it.

Deposition of Claude Gene Lee, Sr.

July 17, 2007

Page 61

1  Q.  Okay.  Look back with me at the affidavit.
2      After Bob Turner left WestPoint, Frank
3      Major became your supervisor; is that
4      right?
5  A.  Yes.
6  Q.  And Mr. Major is an African-American?
7  A.  Yes.
8  Q.  In paragraph 14 of your affidavit -- that's
9      page five -- you say that you had very
10     little interaction with Mr. Major.
11 A.  Uh-huh.  (Positive response.)
12 Q.  Tell me all the interaction that you had
13     with him.
14 A.  Onliest time -- Frank, sometime he come in
15     from 6:00 to 7:00 or 6:30 to 7:00.  And
16     when he come in, he'll come in.  He'll come
17     straight to me out on the floor.  Only
18     thing he'll do is shake my hand and ask me
19     how everything was going.  That's about all
20     he tell me.  He never asked me any kind of
21     questions or nothing like that.
22 Q.  You never had any conversations with
23     Mr. Major?

Page 62

1  A.  Not many conversations.  Huh-uh.  (Negative
2      response.)
3  Q.  Every morning when he came in and said good
4      morning to you, you-all didn't have any
5      sort of conversation?
6  A.  Nothing but asked how everything was
7      going.  That's about it.
8  Q.  And you don't remember him ever coming back
9      to you throughout the course of your shift
10     to talk to you?
11 A.  No, ma'am.
12 Q.  Ever?
13 A.  No.
14 Q.  So the only interaction you ever remember
15     having with Mr. Major is him coming in
16     first thing -- first start of the shift?
17 A.  Uh-huh.  (Positive response.)
18 Q.  Is that a yes?
19 A.  Yes.
20 Q.  And that's the only interaction --
21     MR. TIDWELL:  Object to the form.
22     Are you talking about during
23     work or write-ups or

Page 63

1      anything?  What are you
2      talking about?
3      MS. PATE:  I'm talking about
4      anytime.
5  A.  Well, if a write-up -- he just said, you
6      the supervisor.  Write it up.  He said, I
7      ain't got nothing to do with it.  He said,
8      you ain't got to come to me to write nobody
9      up.
10 Q.  I don't understand what you mean.
11 A.  If I had to write a miscellaneous or pink
12     slip --
13 Q.  For one of your employees?
14 A.  Uh-huh.  (Positive response.)
15 Q.  He would let you do that?
16 A.  You had to do that on your own.
17 Q.  Did you disagree with him letting you write
18     your employees up?
19 A.  When Bob Turner was there, he always say,
20     you know, you come to me before you write
21     anybody up and I'll verify it.  But with
22     Frank, he just said, you do it on your
23     own.  He said, you know what to do, just go

Page 64

1      ahead and write them up.
2  Q.  Did you feel like that was part of your job
3      responsibility as a supervisor, to
4      review --
5  A.  Onliest thing, when Brendt Murphy -- Bob
6      told me, said, they got to make sure that
7      you have all the write-ups before you fire
8      anybody, take anybody outside.  Make sure
9      they got enough write-ups.  If they ain't
10     got enough write-ups, you can go up under a
11     lawsuit.
12 Q.  You understood that part of your job as a
13     supervisor was to monitor your employees
14     and write them up if necessary?
15 A.  Yes.
16 Q.  The only interaction that you contend you
17     had with Mr. Majors was just the first part
18     of your shift?
19 A.  Uh-huh.  (Positive response.)
20 Q.  Is that a yes?
21 A.  Yes.  Like that Saturday morning when they
22     fired me, only thing he done that Saturday
23     morning, he come to me and just shook my

16 (Pages 61 to 64)

Page 65

1    hand.
2    Q.  You don't remember having any other
3        conversations with Mr. Major --
4    A.  No.
5    Q.  Mr. Major completed a performance review
6        for you in January of 2006, correct?
7    A.  Yes.
8    Q.  Let me show you what I've marked as
9        Defendant's Exhibit 11.
10            (Defendant's Exhibit 11 was marked
11                for identification.)
12   Q.  And it's Bates stamped Lee/WPH 0036 through
13       0040.  Is that your signature on the last
14       two pages of that document?
15   A.  Yes.
16   Q.  And is this the performance review that
17       Frank Major completed in January of 2006
18       for you?
19   A.  This doesn't look like the same thing.
20   Q.  Tell me what you mean.  It doesn't look
21       like the same thing, what?
22   A.  These papers that I had.  This paper, this
23       right here, this is not my handwriting

Page 66

1    here.
2    Q.  On the front where it says your name and
3        department, facility, that's not your
4        handwriting?
5    A.  Huh-uh.  (Negative response.)
6    Q.  Tell me at the back, the last two pages, is
7        that your signature?
8    A.  That's my signature.
9    Q.  Did you see this performance review?
10   A.  Yes, but it didn't look like this right
11       here.  It's whited out, all this stuff
12       right here.
13   Q.  Did you get a copy of it?
14   A.  No.  Your performance review when you turn
15       it in, it don't look like this right here.
16       Everything is fully ...
17   Q.  Tell me this.  When you signed this
18       document, Mr. Major had recorded on the
19       page Bates stamped Lee/WPH 0038 -- look
20       on -- look in Section E where it says
21       overall performance rating.  There's a
22       checkmark under the fair box.  Do you see
23       that?

Page 67

1    A.  Yes.
2    Q.  You disagreed with Mr. Major's critiques of
3        your job performance?
4    A.  Yes.
5    Q.  Look back at --
6    A.  This right here where it says meet job
7        requirements, that stuff is supposed to be
8        fully -- we don't turn it in like this
9        right here.
10   Q.  You remember when you met with Mr. Major to
11       talk about this job performance, you
12       remember that he had rated you fair; is
13       that right?
14            MR. TIDWELL:  Object to the form.
15   A.  No.
16   Q.  What do you remember?
17   A.  It wasn't no fair on there.
18   Q.  What do you remember was on there?
19   A.  Average.
20   Q.  Average?
21   A.  Uh-huh.  (Positive response.)
22   Q.  You think it was more -- average when you
23       signed it?

Page 68

1    A.  Yes.
2            MR. TIDWELL:  Are you talking
3            about the overall rating or
4            what?
5            MS. PATE:  Yeah, I'm talking about
6            the overall rating, the
7            performance rating that
8            appears on the first page and
9            the third page.
10   Q.  And you think it was marked average?
11   A.  Yes.
12   Q.  Mr. Lee, go back to your affidavit.  Look
13       at paragraph 19 on page six of your
14       affidavit.  You say in paragraph 19 that
15       you disagreed with Mr. Major's criticisms
16       of your job performance and that you were
17       making or exceeding production quotas; is
18       that right?
19   A.  Yes.
20   Q.  Look back with me at the job performance
21       review.
22            MR. TIDWELL:  Talking about Frank
23            Majors?

Page 69

1        MS. PATE: Yes. Sorry. 2006,
2          Defendant's Exhibit 11.
3       (Defendant's Exhibit 12 was marked
4          for identification.)
5   Q. Actually, let me do this. Let me show you
6      Defendant's Exhibit 12. Is this the
7      February 2006 personnel notice that
8      Mr. Major gave you?
9   A. This is not what he had told me. Only
10     thing -- only thing, what I signed was
11     talking about my lines, I needed to do
12     better on my lines. But I had made 100
13     percent them two weeks.
14   Q. You're talking about production quotas?
15   A. Uh-huh. (Positive response.) This right
16     here, I haven't read nothing like this
17     right here.
18   Q. Look at the bottom. Is that your
19     signature?
20   A. That's my signature.
21   Q. And it's dated February 16th, 2006 next to
22     your signature?
23   A. Yes.

Page 70

1   Q. And this personnel notice at the top is
2     dated February 2006, the 16th of --
3   A. Yes. Like I said, it's the same one when
4     first and second shift did not make their
5     quota, and he wrote me up, too.
6   Q. Do you contend that you've never seen this
7     personnel notice before?
8   A. Like I say, he give me a job performance,
9     but it didn't read this right here.
10   Q. But that's your signature at the bottom of
11     the page?
12   A. That's my signature.
13   Q. All right. Look where it says details in
14     the middle of the page. It says: This
15     personnel notice is to inform you of the
16     need to increase the monitoring of your
17     associates. There is an excessive waste of
18     time and motion. I think this should be --
19     your associates continue to use improper
20     job methods even after the correct method
21     has been given or even shown to them.
22     There also needs to be an immediate
23     increase in your problem solving, of

Page 71

1     incorrect work flow throughout the
2     department.
3       That doesn't say anything about
4     production quotas, does it?
5   A. Like I say, I ain't never seen this, not
6     this right here.
7   Q. This first part under details, it doesn't
8     say anything about production quotas, does
9     it?
10   A. Huh-uh. (Negative response.)
11   Q. Is that a no?
12   A. No.
13   Q. The last part reads: There also needs to
14     be an improvement in communication with the
15     previous supervisor for potential problems
16     that may have occurred during the shift or
17     even issues that you find during your walk-
18     through. These need to be addressed
19     immediately. You're being issued a
20     personnel notice for poor job performance.
21       That second part doesn't say anything
22     about production quotas, does it?
23   A. Huh-uh. (Negative response.)

Page 72

1   Q. Is that a no?
2   A. No.
3   Q. Now, did you disagree with Mr. Major's
4     criticism of your performance here that we
5     just went over?
6   A. Yes.
7   Q. Look with me at the bottom of that
8     personnel notice, Defendant's Exhibit 12,
9     under action taken. It says: Covered the
10     above with Claude. Asked him if he needed
11     any other guidance or assistance. Failure
12     to meet these goals and guidelines
13     immediately will result in corrective
14     action which may include removal from your
15     job.
16       Did you understand that?
17   A. This right here, this writing on these -- I
18     never seen -- he never said anything to me
19     like that.
20   Q. You never saw that writing?
21   A. Huh-uh. (Negative response.)
22       MR. TIDWELL: Object to the form.
23       He's already answered that

Page 73

1      about ten times.
2    Q.  So this document, everything on this
3         document but your signature you've never
4         seen before?
5    A.  (Shakes head from side to side.)
6    Q.  Is that right?
7    A.  Right.
8    Q.  What do you contend that you signed on
9         February 16th, 2006?
10   A.  He was just telling me that I needed to see
11        about my lines more, better.  But I had
12        made 100 percent.  It wasn't but a few --
13        few lines what he had wrote.
14   Q.  And none of these lines that we've just
15        gone over were the ones that you contend
16        you saw?
17   A.  Huh-uh.  (Negative response.)  Unless he
18        changed it after I walked out.
19   Q.  Unless what?
20   A.  He changed it after I walked out.
21   Q.  The document that you contend that you
22        signed on February 16th, 2006, was it
23        typewritten?

Page 74

1    A.  No, it was computer, on the computer.
2    Q.  It was like this?
3    A.  Uh-huh.  (Positive response.)
4    Q.  It wasn't handwritten?
5    A.  Huh-uh.  (Negative response.)
6    Q.  It was just like this one?
7    A.  Uh-huh.  (Positive response.)  Unless he
8         changed his computer after I left out.
9    Q.  Okay.
10   A.  That's not what I read February 16th.
11   Q.  But that's your signature at the bottom?
12   A.  Right.  That's my signature.
13   Q.  In late February -- sometime in February
14        2006, Michael Alford became your
15        supervisor?
16   A.  Yes.
17   Q.  He took Frank Major's place?
18   A.  Yes.
19   Q.  And Mr. Major was promoted, wasn't he?
20   A.  He was still there training Mike Alford.
21   Q.  He was still at WestPoint, but he was given
22        a higher position, right?
23   A.  Only thing I know, he was still there with

Page 75

1         Mike Alford, training him when he got
2         there.
3    Q.  Do you remember Mr. Majors being promoted
4         to a higher position at all?
5    A.  Only thing I heard, he went to another
6         position.  He went to supervisor after I
7         left -- on first shift.
8    Q.  I'm talking about while you were there when
9         Mr. Alford came in.  Do you remember
10        Mr. Majors being promoted?
11   A.  He was still there in the packing, training
12        Mike Alford.
13   Q.  After he trained Mike Alford, do you
14        remember him being promoted?
15   A.  That's after I left, you know.  They made
16        them changes.  He went -- he went to first
17        shift to be a supervisor.
18   Q.  Okay.
19   A.  When I left, he went to a supervisor on
20        first shift.  Mike Etheridge went to second
21        shift, and Billy Wayne Bedsole took my
22        place on third shift.
23   Q.  Look at your affidavit on the seventh

Page 76

1         page.
2    A.  Seven?
3    Q.  Seven, paragraph 22.  You say:  It is my
4         understanding Alford's previous employment
5         was managing a Movie Gallery store and that
6         he had no background managing people in the
7         industry.
8             Tell me what the basis of your
9         knowledge is.
10   A.  He be out there on the floor, you know,
11        hollering at people and stuff, which he
12        shouldn't be doing out there on the floor.
13        If he got any kind of problem with any
14        employee, you know, you supposed to call
15        them in the office and tell them about that
16        problem instead of out there on the floor,
17        what he was doing.
18            MR. TIDWELL:  She's just asking
19             you about how you understood
20             he was a manager of Movie
21             Gallery before he came to
22             WestPoint.
23   Q.  Right.

Deposition of Claude Gene Lee, Sr.

Page 77

1  A.  He said he was.  He told me he was.
2  Q.  I think you started to explain the second
3      part of that paragraph where you say he was
4      using profanity and prone to outbursts.
5      Tell me about that.
6  A.  If he get upset, that's what he do.  He
7      outburst and holler at you on the floor.
8  Q.  Everybody on the floor?
9  A.  Yeah, anybody he can holler at.
10 Q.  All the employees?
11 A.  Uh-huh.  (Positive response.)  First,
12     second and third shift was talking about
13     it.
14 Q.  So all the employees on all of those shifts
15     experienced that?
16 A.  Yes.
17 Q.  Black and white, young and old?
18 A.  Yes.
19 Q.  What sorts of thing would he say?
20 A.  What y'all waiting on?  This machine don't
21     supposed to be stopped.  This machine -- go
22     to another machine, stuff like that, you
23     know.

Page 78

1  Q.  You contend when he said those sorts of
2      things he was hollering?
3  A.  Hollering, real loud.
4  Q.  Real loud?
5  A.  Uh-huh.  (Positive response.)
6  Q.  Is that a yes?
7  A.  Yes.
8  Q.  And when he said those sorts of things to
9      all of the employees on the shift, you
10     contend that he used profanity?
11 A.  Yes.
12 Q.  And he would say those things to everybody
13     on the third shift?
14 A.  Yes.
15 Q.  Everybody on the second shift?
16     MR. TIDWELL:  Object to the form.
17 A.  No.  He would say the things to some
18     people.
19 Q.  On all the shifts?
20 A.  I don't know about all the shifts, but the
21     other shift was talking about how he keep a
22     rage up on the shift.
23 Q.  Okay.  Did you ever complain to anybody

Page 79

1      about him raising his voice or using
2      profanity?
3  A.  No.  Huh-uh.  (Negative response.)
4  Q.  No?
5  A.  No.
6  Q.  That helps her get it down.  She has a hard
7      time getting uh-huh or huh-uh.
8          (Defendant's Exhibit 13 was marked
9          for identification.)
10 Q.  Let's look at Defendant's Exhibit 13.  Is
11     this the corrective action report that
12     Mr. Alford completed for you?
13 A.  It wasn't in no handwriting here.
14 Q.  What do you mean?
15 A.  He had it on computer.
16 Q.  Who had it -- who had what on computer?
17 A.  My March the 8th.
18 Q.  Is that your signature at the bottom of the
19     page, Mr. Lee?
20 A.  Yes.
21 Q.  And is it -- this document at the top, is
22     it dated March 8th, 2006?
23 A.  Yes.

Page 80

1  Q.  Do you contend that you've never seen this
2      document before?
3  A.  That's different right there because he had
4      it on computer.
5  Q.  Tell me what's different.
6          MR. TIDWELL:  Read the language
7          and see what's different, if
8          you remember.
9  A.  Like that first -- first line.
10 Q.  Claude is not performing his duties as
11     supervisor?
12 A.  I hadn't read that there.
13 Q.  That wasn't on the document that you read?
14 A.  Huh-uh.  (Negative response.)  It was
15     completed on computer.
16 Q.  Do you mean you read it off the screen of a
17     computer or --
18 A.  Huh-uh.  (Negative response.)  He had print
19     it out on the computer.
20 Q.  It was typed?
21 A.  Uh-huh.  (Positive response.)
22 Q.  Is that a yes?
23 A.  Yes.

20 (Pages 77 to 80)

Page 81

1    Q.  And it didn't say what this document says?
2        Is that what you contend?
3    A.  Huh-uh.  (Negative response.)  Some of this
4        ain't.
5    Q.  I'm sorry?
6    A.  Some of it on here is not, not what he --
7    Q.  Let's go through it line by line, and I
8        want you to tell me what you remember.
9            The first line under performance/
10       conduct description, it says:  Claude is
11       not performing his duties as a supervisor.
12       Do you contend that was not on the document
13       that you read?
14   A.  Huh-uh.  (Negative response.)  That wasn't
15       on there.
16   Q.  The second sentence says:  When working
17       last Thursday, paren 3-2-06, closed paren,
18       Claude was questioned about an employee not
19       working.  Was that on the document you
20       contend that you read?
21   A.  He talked to me about this employee.
22   Q.  Do you remember seeing that on the
23       corrective action report that you saw on

Page 82

1        March 8th, 2006?
2    A.  Onliest thing, when he called me in there
3        March the 2nd, 2006, he said -- March the
4        8th I mean.  He called me in there and
5        said -- that was a week later.  Said, I
6        didn't like the way you handled that
7        employee -- a week later.
8    Q.  Okay.  But you remember that he had written
9        a corrective action report about that?
10   A.  Yes.
11   Q.  So you think that the second -- that the
12       second sentence on this Defendant's Exhibit
13       13 was in the document that you contend you
14       read on March 8th?
15   A.  Yes.
16   Q.  But not the first sentence?
17   A.  Uh-huh.  (Positive response.)
18   Q.  Is that a yes?
19   A.  Yes.
20   Q.  Let's go to the third sentence:  He
21       answered he did not know why and did not
22       question the employee about it.
23           Was that on the document -- the

Page 83

1        typewritten document you think you read on
2        March 8th?
3    A.  I wouldn't think so because we talked --
4        talked about out on the floor, the guy went
5        and washed his hands.  And like I say, he
6        was just carrying on about the employee on
7        the floor going to wash his hands, that he
8        needed to be working.  Only thing he was
9        telling me, to go ahead on and fire the
10       guy.
11   Q.  Mr. Lee, all I'm concerned about right now
12       is what the document said that you think
13       you saw on March 8th, 2006, that you
14       contend was different than Defendant's
15       Exhibit 13 that has your signature on it.
16   A.  Like I say, he questioned me about the
17       employee out there on the floor and he
18       called me in there a week later and said he
19       didn't like the way I handled the situation
20       about the employee.
21   Q.  Look at the last sentence in that same
22       section:  We have discussed this on several
23       occasions and in great detail.

Page 84

1    A.  Not several occasions, just that night.
2    Q.  Do you remember that sentence being in the
3        typewritten document that you contend you
4        saw on March 8th, 2006?
5    A.  No.
6    Q.  No?
7    A.  No.
8    Q.  All right.  So you believe that you saw a
9        typewritten corrective action report dated
10       March 8th, 2006 --
11   A.  Um-huh.  (Positive response.)
12   Q.  -- that did not contain the first sentence
13       or the last sentence --
14   A.  Um-huh.  (Positive response.)
15   Q.  -- of this section marked performance/
16       conduct description?
17   A.  Yes.
18   Q.  But it did contain the sentences in
19       between?
20   A.  Yes.
21   Q.  And it was typewritten?
22   A.  Uh-huh.  (Positive response.)
23   Q.  Did you receive a copy of it?

Deposition of Claude Gene Lee, Sr.

Page 85

1   A.  No.
2   Q.  You don't have a copy of it?
3   A.  Huh-uh. (Negative response.)
4   Q.  Is that a no?
5   A.  No.
6   Q.  All right. Let's look at disciplinary
7       action taken. It's the next section of
8       Defendant's Exhibit 13, it says: Claude is
9       being issued a written corrective action
10      for poor job performance. Do you see that?
11  A.  Yes.
12  Q.  Do you contend that that was on the
13      typewritten document that you believe was
14      different, but also dated March 8th, 2006?
15  A.  It's a whole different -- it's a whole
16      different page here.
17  Q.  Tell me --
18  A.  What he wrote was the same thing like this
19      personnel notice right here, same kind of
20      paper, the personnel notice. This right
21      here -- exemption, non-exemption wasn't on
22      this stuff, what I signed.
23  Q.  You contend on March 8th, 2006, you signed

Page 86

1       a document titled personnel notice?
2   A.  Personnel notice.
3   Q.  Not corrective action report?
4   A.  Huh-uh. (Negative response.)
5   Q.  Is that a no?
6   A.  No.
7   Q.  So you contend that you signed a personnel
8       notice --
9   A.  Personnel notice.
10  Q.  -- on March 8th, 2006 that contained the
11      second sentence that's in the performance/
12      conduct description?
13          MR. TIDWELL:  Object to the form.
14              She's asking you if it
15          contained the exact second
16          sentence on the document.
17          THE WITNESS:  What, now?
18          MR. TIDWELL:  She's asking if this
19          exact sentence -- not the same
20          concept, but the exact
21          sentence was written on the
22          report that you saw.
23              I think that's what

Page 87

1       you're asking.
2           THE WITNESS:  Was what, now?
3           MR. TIDWELL:  She's asking if this
4           exact sentence starting with
5           when working last Thursday, if
6           that exact sentence was on the
7           report that you saw. If you
8           don't know --
9   A.  Like I say, I really don't know, because he
10      questioned me out there on the floor about
11      the employee, and that was it. Then he
12      came back March the 8th and said I didn't
13      like the way you handled that employee.
14  Q.  Okay.
15  A.  That's the only thing I know.
16  Q.  And when he said that to you, did he have
17      you sign a document?
18  A.  No. He came back March the 8th with it.
19  Q.  On March the 8th, you signed a document
20      acknowledging that?
21  A.  A week later.
22  Q.  But you contend that the document --
23  A.  But the employee was already fired.

Page 88

1   Q.  Let me finish my question so that we don't
2       talk over each other. That way our record
3       will be easier to understand.
4           You contend that the document you
5       signed on March 8th, 2006 is not
6       Defendant's Exhibit 13 with your signature
7       on it; is that right?
8   A.  That's not my -- that don't look like my
9       signature because I don't write my L's like
10      that.
11  Q.  Wait. Now, you say this is not your
12      signature?
13  A.  Uh-huh. (Positive response.)
14  Q.  Is that a yes?
15  A.  Yes.
16  Q.  Mr. Lee, just a couple of minutes ago, you
17      told me that that is your signature. Is
18      that a yes? Is this your signature or is
19      it not?
20          MR. TIDWELL:  If you don't know,
21          you don't know.
22  A.  I really don't know. Like I said, this
23      right here was in -- in -- computer.

Page 89

1    Q.  Okay.
2    A.  Computer writing.
3    Q.  I understand that, but that's not my
4        question.  My question is, is this your
5        signature at the bottom of the page of
6        Defendant's Exhibit 13?
7    A.  I'm going to say no.
8    Q.  No.  All right.  Look back with me at
9        Defendant's Exhibit 12.
10           MR. TIDWELL:  Let me find it.
11   Q.  Now, you said that's your signature on
12       Defendant's Exhibit 12, correct?
13   A.  Uh-huh.  (Positive response.)
14   Q.  Is that a yes?
15   A.  Yes.
16   Q.  Does that not look like the same signature
17       on Defendant's Exhibit 12 and 13?
18           MR. TIDWELL:  Object to the form.
19   A.  No.
20   Q.  I want to go back to your affidavit.
21           MR. TIDWELL:  What exhibit is it?
22           MS. PATE:  Mr. Lee has got it in
23             front of him.

Page 90

1    Q.  All right.  Look with me at paragraph 23 of
2        your affidavit.  You contend that this
3        situation that is discussed in paragraph
4        three where you were given a corrective
5        action report --
6    A.  Yes.
7    Q.  -- is not the same as Defendant's Exhibit
8        13?
9    A.  No.
10           MR. TIDWELL:  Kelly, why don't we
11             take about a five-minute
12             break.  Is that all right with
13             you?
14           MS. PATE:  That will be fine.
15           (Brief recess was taken.)
16   Q.  Going back on the record, Mr. Lee, I want
17       to go back to your affidavit.  Take a look
18       at paragraph 23.  You say in that
19       paragraph:  Although he had acted as my
20       supervisor for approximately two weeks, he
21       gave me a new form labeled corrective
22       action report.
23           Who is the he you're referring to

Page 91

1        there?  Is that Michael Alford?
2    A.  Mike Alford.
3    Q.  You say:  This form was discussed on March
4        8th, but referenced an incident that
5        occurred on March 2nd, 2006.  You cite in
6        that paragraph to Brendt Murphy's affidavit
7        with attached Exhibit 2.  Do you see that?
8    A.  Yes.
9    Q.  I want to show you what's been marked as
10       Defendant's Exhibit 19.
11           (Defendant's Exhibit 19 was marked
12             for identification.)
13   Q.  That's a copy of Brendt Murphy's
14       declaration.  Is this the document that
15       you're referring to in paragraph 23?
16       Maybe this will be easier.  Look at
17       Exhibit 2 of Defendant's Exhibit 19 and
18       tell me if that's what you're referring to
19       in paragraph 23 as the corrective action
20       report that you received on March 8th,
21       2006.
22   A.  Tell you what, now?
23   Q.  Is Exhibit 2 --

Page 92

1           MR. TIDWELL:  This.
2    Q.  -- of Defendant's Exhibit 19, is that the
3        corrective action report that you received
4        on March 8th, 2006 and refer to in
5        paragraph 23 of your affidavit?
6    A.  Everything that I received I thought was
7        personnel notices.  This right here got
8        salary, exempt and non-exempt, which I
9        haven't seen nothing but personnel notices.
10   Q.  Look back at paragraph 23 of your
11       affidavit.  It says in the second line,
12       quote:  He gave me a new form labeled
13       corrective action report, closed quote.  Do
14       you see that?
15   A.  Yes.
16   Q.  Do you now deny that he gave you -- Mike
17       Alford gave you a corrective action report?
18   A.  He give me a corrective action report, but
19       I thought it was a personnel notice.
20   Q.  But he did give you a corrective --
21   A.  Right.
22   Q.  -- action report?
23   A.  Uh-huh.  (Positive response.)

Page 93

1  Q.  Yes?
2  A.  Yes.
3  Q.  And is the corrective action report that he
4      gave you and that you mention in paragraph
5      23 the same as Exhibit 2 of Defendant's
6      Exhibit 19?
7  A.  No.
8  Q.  Look back at your affidavit with me,
9      paragraph 23.  Right after you say he gave
10     me a new form labeled corrective action
11     report, you cite to Murphy's affidavit,
12     which is Defendant's Exhibit 19 with
13     attached Exhibit 2.  Do you see that?
14 A.  Yes.
15 Q.  Do you now contend that Exhibit 2 attached
16     to Murphy's declaration is not the
17     corrective action report that you received?
18 A.  No, I think it's a personnel notice instead
19     of a ... I hadn't never seen anything with
20     WestPoint Home on it.
21 Q.  You've never seen anything with WestPoint
22     Home on it?
23 A.  Not no paper like this right here.  Only

Page 94

1      thing I ever seen was personnel notices.
2  Q.  Look at the bottom of attached Exhibit 2 to
3      Defendant's Exhibit 19.  In the left-hand
4      corner, is that your signature?
5  A.  I don't know.
6  Q.  Do you contend now that you've never seen
7      attached Exhibit 2 to Defendant's 19, the
8      corrective action report dated March 8th,
9      2006?
10 A.  I just don't know.
11 Q.  You don't know if you've ever seen it?
12 A.  I don't know if I've seen -- I don't know.
13     Only thing I seen was personnel notices.
14 Q.  The only thing you have ever seen was a
15     personnel notice?
16 A.  Personnel notice.
17 Q.  You've never seen a corrective action
18     report?
19 A.  Not on this kind of paper.
20 Q.  Have you ever seen a corrective action
21     report on any kind of paper?
22 A.  Personnel notice.
23 Q.  But not a corrective action report?

Page 95

1  A.  Just a personnel notice.
2  Q.  Tell me what you believe the difference is
3      between a corrective action report and a
4      personnel notice.
5  A.  A personnel notice just telling you what
6      you need to do to correct something.
7  Q.  And tell me what you believe a corrective
8      action report --
9  A.  Corrective action is when they -- you get
10     write up -- you getting wrote up.  You got
11     three times you can write up.
12 Q.  So you believe when you receive a personnel
13     notice critical of your job performance,
14     that's not a write-up?
15 A.  It shouldn't be a write-up.  It's just
16     something giving you -- telling you that
17     you need to do better or something like
18     that there.
19 Q.  And so receiving a written document that
20     tells you you need to do better is not a
21     write-up in your mind?
22 A.  Huh-uh.  (Negative response.)
23 Q.  Is that a no?

Page 96

1          MR. TIDWELL:  Object to the form.
2  A.  I don't know.
3  Q.  Mr. Lee, I want to make sure that we
4      understand each other and that I understand
5      what you're saying.  Are you telling me
6      that you have never seen and never received
7      a corrective action report?
8  A.  I don't know whether -- not on a personnel
9      notice.
10         MR. TIDWELL:  She's asking if
11             you've ever received a
12             corrective action report, but
13             did you ever receive --
14         THE WITNESS:  No.
15 Q.  Never received a corrective action report?
16 A.  No.
17 Q.  Okay.  Turn to page eight of your
18     affidavit.  Look at paragraph 25.  You say
19     that Mr. Alford observed your line and you
20     say that an employee had recently been
21     transferred to me from other shifts run by
22     white supervisors.
23         What employee are you talking about?

Page 97

1   A.  Mitchell Daniels.
2   Q.  And Mitchell --
3       Daniels?
4   A.  Uh-huh.  (Positive response.)
5   Q.  Mitchell Daniels worked for the first shift
6       and the second shift?
7   A.  Yes.
8   Q.  And then he worked for the third shift?
9   A.  He worked for second shift first time, and
10      then he transferred from second shift to
11      first shift.  That's when he come from
12      first shift to third shift.
13  Q.  And were first shift and second shift
14      supervised by Billy Wayne Bedsole and Mike
15      Etheridge?
16  A.  Yes.
17  Q.  Why was Mr. --
18      Mr. Daniels; is that right?
19  A.  Uh-huh.  (Positive response.)
20  Q.  Why was he transferred?  Did he request a
21      transfer from those shifts?
22  A.  He request a transfer.  I think he signed a
23      bid sheet to come to third shift.

Page 98

1   Q.  So Mr. Mitchell Daniels requested a
2       transfer to go from second shift to first
3       shift?
4   A.  Yes.
5   Q.  And then he requested a transfer to go from
6       first shift to third shift?
7   A.  Yes.  He had signed more bid sheets to go
8       back to second shift, but they never would
9       send him.
10  Q.  After he had been on third shift, he tried
11      to bid out and transfer to second shift?
12  A.  Signed several bid sheets to go to second
13      shift, but they never would send him back.
14  Q.  Now, you say in paragraph 25 of your
15      affidavit, you say in the -- I'm looking at
16      the last three lines of paragraph 25.  You
17      say, quote:  This same employee had been
18      recently transferred to me from the other
19      shifts run by the two white supervisors.
20      This seemed to be more of an effort to hurt
21      my performance, closed quote.
22      Now, you just told me Mr. Daniels
23      requested a transfer to third shift; is

Page 99

1       that right?
2   A.  Right.
3   Q.  Tell me the basis for the allegation that
4       his requesting a transfer to your shift was
5       an effort to hurt your performance.
6   A.  He had some kind of -- some kind of
7       sickness, I think, and he can't perform
8       like the rest of the people.
9   Q.  And so you --
10  A.  And they really didn't want him on the
11      machine neither.
12  Q.  Who is they?
13  A.  First and second shift.  The managers, like
14      Bob Turner.
15  Q.  He was a department manager?
16  A.  Uh-huh.  (Positive response.)  Like Bob
17      Turner, the manager, he really didn't want
18      the guy on the machine because of some kind
19      of sickness he had.  See, they really
20      didn't tell us what the sickness was.  He
21      was on -- like on the slow side.
22  Q.  Tell me how you believe this employee
23      requesting a transfer to work on your

Page 100

1       shift -- on the third shift was an effort
2       to hurt your performance.  Do you believe
3       that that employee was trying to hurt your
4       performance?
5           MR. TIDWELL:  Object to the form.
6   A.  No.
7   Q.  Who do you believe was trying to hurt your
8       performance?
9   A.  By them -- you know, like he come there and
10      he want to go back to the other shift.
11      They wouldn't let him.
12  Q.  Who wouldn't let him?
13  A.  The manager.
14  Q.  Who was the manager?
15  A.  Bob Turner.
16  Q.  So you think that Mr. Turner not
17      transferring this employee for a third time
18      was an effort by Mr. Turner to hurt your
19      performance?
20  A.  It could.
21          MR. TIDWELL:  Object to the form.
22  Q.  It could be?
23  A.  Yes.

Page 101

1  Q.  Do you believe it was?
2  A.  They put --
3         MR. TIDWELL:  Object to the form.
4  A.  They put him on efficiency work.
5  Q.  Tell me what you mean.
6  A.  He had to make a percentage every night.
7  Q.  He had to do what?
8  A.  Make a percentage.
9  Q.  Right.  And you believe he was not making
10     his percentage?
11 A.  Like I say, he was on the slow side because
12     of some kind of sickness he had.
13 Q.  Do you believe that that --
14 A.  That's why they didn't want him on the
15     machine, because they thought he would get
16     hurt.
17 Q.  Do you believe that that employee requested
18     a transfer to third shift in an effort to
19     hurt your performance?
20        MR. TIDWELL:  Object to the form.
21 A.  No.
22 Q.  Look at paragraph 28 of your affidavit.
23     You mention a March 11th write-up.  Do you

Page 102

1      see that?
2  A.  Uh-huh.  (Positive response.)
3         (Defendant's Exhibit 14 was marked
4         for identification.)
5  Q.  Let me show you what's been marked as
6      Defendant's Exhibit 14.  Is that the
7      corrective action report that you're
8      referring to in paragraph 28 as the
9      write-up?
10 A.  Never seen this before.  Only thing I seen
11     is personnel notices.
12 Q.  Look at the bottom of Exhibit 14.  Is that
13     your signature on Defendant's Exhibit 14?
14 A.  Yes.
15 Q.  So you signed this document acknowledging
16     that you had seen it; is that right?
17 A.  Yes.
18 Q.  So you've seen a corrective action report;
19     is that right?
20 A.  That's my signature, but still what I
21     signed was personnel notices.
22 Q.  Well, Mr. Lee, how do you believe that your
23     signature ended up on this page that is

Page 103

1      Defendant's Exhibit 14 that's titled
2      corrective action report?
3  A.  What he read to me that morning was
4      something like, Claude -- I no longer can
5      go along with Claude anymore as
6      supervisor.  That's what was on the thing
7      that morning when I left.  I don't know.
8  Q.  How do you think your signature got on
9      Defendant's Exhibit 14?
10 A.  I don't know.
11 Q.  So are you telling me, Mr. Lee, that you --
12 A.  This is not what I read when I left there
13     that morning.
14 Q.  You're telling me that Defendant's Exhibit
15     14 that has your signature on it, that
16     you've never seen this March 11th
17     corrective action report?
18 A.  I never seen this right here.  I never
19     noticed this -- this writing was different,
20     is different from what I read that morning
21     when I left.
22 Q.  Do you see the writing that you contend
23     that was on the document that morning?

Page 104

1  A.  No, not this -- what he read, what I read
2      and what he read to me ...
3  Q.  It's not on here?
4  A.  Huh-uh.  (Negative response.)  It's not on
5      here.
6  Q.  Was it in handwriting?  Was it typewritten?
7  A.  What I'm thinking, it was typewritten.
8  Q.  You think it was typewritten?
9  A.  That morning, yeah.  It wasn't -- it wasn't
10     but a few lines, all that he read to me.
11     And what I read was something like a
12     personnel notice.  Nothing with WestPoint
13     Homes on there.
14 Q.  Tell me what you think you read that day.
15 A.  Only thing Mike Alford read me was, Claude
16     no longer -- I no longer can go along with
17     Claude as supervisor.  I believe -- As of
18     3-10-06, I removed Claude from his job.
19 Q.  That's what you believe --
20 A.  That's what they read to me that morning
21     when I left.
22 Q.  And that's what you believe you read that
23     morning?

Page 105

1    A.  That's what he read to me, too, Mike
2         Alford.
3    Q.  And you believe that you read that that
4         morning?
5    A.  That's right.
6    Q.  And you believe you signed a document that
7         said that?
8    A.  I signed a document. I had got to my car.
9         They called me back and told me to come
10        back and sign the paper. That's when I
11        went back in there and signed the paper.
12   Q.  Mr. Lee, you contend you signed Defendant's
13        Exhibit 14 --
14   A.  That morning.
15   Q.  -- but that it said something different?
16   A.  Said something different.
17   Q.  So where it says on Defendant's Exhibit 14
18        performance/conduct description and it says
19        Claude has failed to aggressively implement
20        changes in production processes, associate
21        training and monitoring and communication,
22        these deficiencies have resulted in poor
23        job performance, you now contend you've

Page 106

1         never seen that before?
2    A.  Huh-uh. (Negative response.) Not that
3         morning.
4    Q.  I'm asking, have you ever seen that before?
5    A.  Huh-uh. (Negative response.) Not this
6         right here.
7    Q.  Never seen it?
8    A.  Huh-uh. (Negative response.)
9    Q.  Under disciplinary action taken, it says on
10        Defendant's Exhibit 14: Claude is
11        immediately removed from his current
12        position as supervisor in the packaging
13        department.
14            Do you contend you've ever seen that
15        before?
16   A.  No, I haven't seen that before, not on this
17        kind of paper.
18   Q.  On any kind of paper.
19   A.  It had something like this -- similar to on
20        the personnel notice. It wasn't but two or
21        three lines all they read to me that
22        morning.
23   Q.  Did you receive a copy of this personnel

Page 107

1         notice that you contend you signed that
2         morning?
3    A.  Not that morning. Huh-uh. (Negative
4         response.)
5    Q.  Ever?
6    A.  No. This right here was similar to it,
7         what was on there that morning.
8    Q.  What was similar?
9    A.  This right here was similar to it, but this
10        right here --
11   Q.  Tell me what this is.
12           MR. TIDWELL:  Read to her what was
13           similar.
14   A.  Claude is immediately removed from his
15        current position as supervisor in the
16        packing department, now, that was on there.
17   Q.  That was on the --
18   A.  Um-huh. (Positive response.)
19   Q.  -- the other document you believe you
20        signed?
21   A.  Uh-huh. (Positive response.)
22   Q.  Yes?
23   A.  But this right here wasn't that morning.

Page 108

1    Q.  Tell me what you're referring to.
2    A.  See, like the rest of it read -- as of
3         3-10, Claude is no longer a supervisor at
4         WestPoint. You're being separated at
5         WestPoint.
6    Q.  You believe that's what the document you
7         saw on 3-11-06 said?
8    A.  Uh-huh. (Positive response.)
9    Q.  Yes?
10   A.  Yes.
11   Q.  And you believe you've never seen
12        Defendant's Exhibit 14?
13   A.  No, just that part right here.
14   Q.  Just the disciplinary action section?
15   A.  Uh-huh. (Positive response.)
16   Q.  And just your signature at the bottom?
17   A.  Uh-huh. (Positive response.)
18   Q.  Yes?
19   A.  Yes.
20   Q.  Go back to your affidavit --
21   A.  And this paper right here, I never seen the
22        WestPoint Home paper.
23   Q.  You've never seen WestPoint Home corrective

Page 105

1　A.　That's what he read to me, too, Mike
2　　　Alford.
3　Q.　And you believe that you read that that
4　　.　morning?
5　A.　That's right.
6　Q.　And you believe you signed a document that
7　　　said that?
8　A.　I signed a document. I had got to my car.
9　　　They called me back and told me to come
10　　　back and sign the paper. That's when I
11　　　went back in there and signed the paper.
12　Q.　Mr. Lee, you contend you signed Defendant's
13　　　Exhibit 14 --
14　A.　That morning.
15　Q.　-- but that it said something different?
16　A.　Said something different.
17　Q.　So where it says on Defendant's Exhibit 14
18　　　performance/conduct description and it says
19　　　Claude has failed to aggressively implement
20　　　changes in production processes, associate
21　　　training and monitoring and communication,
22　　　these deficiencies have resulted in poor
23　　　job performance, you now contend you've

Page 106

1　　　never seen that before?
2　A.　Huh-uh. (Negative response.) Not that
3　　　morning.
4　Q.　I'm asking, have you ever seen that before?
5　A.　Huh-uh. (Negative response.) Not this
6　　　right here.
7　Q.　Never seen it?
8　A.　Huh-uh. (Negative response.)
9　Q.　Under disciplinary action taken, it says on
10　　　Defendant's Exhibit 14: Claude is
11　　　immediately removed from his current
12　　　position as supervisor in the packaging
13　　　department.
14　　　　Do you contend you've ever seen that
15　　　before?
16　A.　No, I haven't seen that before, not on this
17　　　kind of paper.
18　Q.　On any kind of paper.
19　A.　It had something like this -- similar to on
20　　　the personnel notice. It wasn't but two or
21　　　three lines all they read to me that
22　　　morning.
23　Q.　Did you receive a copy of this personnel

Page 107

1　　　notice that you contend you signed that
2　　　morning?
3　A.　Not that morning. Huh-uh. (Negative
4　　　response.)
5　Q.　Ever?
6　A.　No. This right here was similar to it,
7　　　what was on there that morning.
8　Q.　What was similar?
9　A.　This right here was similar to it, but this
10　　　right here --
11　Q.　Tell me what this is.
12　　　　　MR. TIDWELL: Read to her what was
13　　　　　similar.
14　A.　Claude is immediately removed from his
15　　　current position as supervisor in the
16　　　packing department, now, that was on there.
17　Q.　That was on the --
18　A.　Um-huh. (Positive response.)
19　Q.　-- the other document you believe you
20　　　signed?
21　A.　Uh-huh. (Positive response.)
22　Q.　Yes?
23　A.　But this right here wasn't that morning.

Page 108

1　Q.　Tell me what you're referring to.
2　A.　See, like the rest of it read -- as of
3　　　3-10, Claude is no longer a supervisor at
4　　　WestPoint. You're being separated at
5　　　WestPoint.
6　Q.　You believe that's what the document you
7　　　saw on 3-11-06 said?
8　A.　Uh-huh. (Positive response.)
9　Q.　Yes?
10　A.　Yes.
11　Q.　And you believe you've never seen
12　　　Defendant's Exhibit 14?
13　A.　No, just that part right here.
14　Q.　Just the disciplinary action section?
15　A.　Uh-huh. (Positive response.)
16　Q.　And just your signature at the bottom?
17　A.　Uh-huh. (Positive response.)
18　Q.　Yes?
19　A.　Yes.
20　Q.　Go back to your affidavit --
21　A.　And this paper right here, I never seen the
22　　　WestPoint Home paper.
23　Q.　You've never seen WestPoint Home corrective

Page 109

1    action report?
2    A.  No, nothing but personnel notice.
3    Q.  Go back to your affidavit, please, and look
4        at paragraph 27.  You say in a March 8th,
5        2006 write-up, that it stated, quote:  If
6        not fully in control of his position as
7        supervisor in the packaging department
8        within two weeks, including proper
9        communication of progress with manager --
10       management, Claude could be immediately
11       removed from his current position as
12       supervisor.  Do you see that?
13   A.  Yes.
14   Q.  I want you to take a look again at
15       Defendant's Exhibit 13.  Do you see what
16       you quoted in paragraph 27 of your
17       affidavit on Defendant's Exhibit 13 under
18       corrective action plan in about the middle
19       of the page?
20   A.  He told me I would go to second shift in
21       two weeks and that if I didn't make 100
22       percent efficiency that he would remove me
23       from my job, but he let me go in three

Page 110

1        days.  I never did make it to second shift.
2    Q.  Mr. Lee, that's not my question.  What I'm
3        asking you is, in paragraph 27 of your
4        affidavit, you quote from a March 8th, 2006
5        write-up.  And what I'm asking you, is what
6        you quote in paragraph 27 of your
7        affidavit -- do you see that on Defendant's
8        Exhibit 13 under corrective action plan?
9            MR. TIDWELL:  She's asking if
10           that's the same as this, those
11           sentences are the same as this
12           one.
13   A.  Yes.
14   Q.  So do you acknowledge receiving the
15       corrective action report dated March 8th,
16       2006 containing that sentence?
17           MR. TIDWELL:  Object to the form.
18   A.  I really don't know.
19   Q.  What did you understand that to mean,
20       Mr. Lee, that sentence that we've just
21       talked about?
22   A.  What do I understand about it?
23   Q.  Yeah, that sentence in paragraph 27 of your

Page 111

1        affidavit that we've just quoted, tell me
2        what you understood that to mean.
3    A.  I don't know.
4    Q.  Did you understand that to mean that
5        anytime within two weeks if you weren't
6        performing as your supervisor believed you
7        should, he could remove you?
8            MR. TIDWELL:  Object to the form.
9    A.  I don't know.
10   Q.  All right.  Look on that document where it
11       says follow-up conference date toward the
12       bottom just above your signature.  Do you
13       remember seeing that?
14   A.  No.
15   Q.  Do you agree with me that it says follow-up
16       conference date, two weeks or less just
17       above your signature?
18   A.  Yes.
19   Q.  And you contend you've never seen that
20       before?
21   A.  No.
22   Q.  What did you understand that to mean, that
23       you had -- if you were not fully in control

Page 112

1        of your position as supervisor in the
2        packaging department within two weeks, you
3        could be immediately removed from your
4        current position as supervisor?
5            MR. TIDWELL:  Object to the form.
6    A.  Mike Alford told me that he was sending me
7        to second shift.  If I didn't make 100
8        percent when I get to second shift, that he
9        could remove me.
10   Q.  You now contend that Mike Alford told you
11       he was going to remove you from -- he was
12       going to move you to second shift?
13   A.  Uh-huh.  (Positive response.)
14   Q.  Yes?
15   A.  Yes.
16   Q.  And then once you got to second shift, if
17       you weren't making 100 percent, then
18       you'd --
19   A.  Um-huh.  (Positive response.)
20   Q.  -- be removed from your supervisory
21       position?
22   A.  Yes.
23   Q.  When did --

Page 113

1    A.  But he let me go in three days.
2    Q.  When do you contend he was going to move
3        you?
4    A.  He was going to move -- make the change
5        March the 13th, that Monday.
6    Q.  To move you to second shift?
7    A.  Uh-huh.  (Positive response.)
8    Q.  Who was going to take over your shift?
9    A.  The supervisor on second shift, Billy Wayne
10       Bedsole.
11   Q.  Mr. Lee, wasn't it a pretty regular
12       practice at WestPoint that if an
13       employee -- a supervisor was out on leave
14       or on extended vacation or absent for some
15       reason, that they would move around the
16       shift supervisors to cover different
17       shifts?
18            MR. TIDWELL: Object to the form.
19   A.  Most of the time it be the lead person.
20   Q.  Would the supervisors ever work, say -- if
21       a second shift supervisor was out, wouldn't
22       they sometimes have, say, the first shift
23       supervisor cover first and second, work a

Page 114

1        12-hour shift?  Do you remember that
2        happening?
3    A.  I had to go to second shift a couple of
4        times, you know, just to fill in.
5    Q.  To fill in?
6    A.  Uh-huh.  (Positive response.)
7    Q.  Okay.
8    A.  The lead person mostly worked over, like,
9        12 hours.
10   Q.  But if the lead person wasn't available to
11       fill in, sometimes you or another
12       supervisor would do that; is that right?
13   A.  Yes.
14   Q.  Yes?
15   A.  Yes.
16   Q.  Go back to your affidavit and look at
17       paragraph 28.  Tell me what write-up you're
18       referring to in that first sentence where
19       you say you were given two weeks to correct
20       these perceived deficiencies.
21   A.  That's the write-up Mike Alford had wrote
22       for me to go to second shift.  He was going
23       to give me two weeks to see can I make 100

Page 115

1        percent on second shift, efficiency.
2    Q.  So you contend on March 11th, Mr. Alford
3        wrote you up --
4    A.  Huh-uh.  (Negative response.)  March the
5        8th.
6    Q.  All right.  You contend that on March the
7        8th, Mr. Alford wrote you up and said I'm
8        going to move you to the second shift --
9    A.  Um-huh.  (Positive response.)
10   Q.  -- and I'm going to give you two weeks to
11       make 100 percent?
12   A.  On second shift.
13   Q.  And you believe that that was a written
14       document?
15   A.  He had something on paper.  Uh-huh.
16       (Positive response.)
17   Q.  And you signed it?  You think you signed
18       it?
19   A.  Uh-huh.  (Positive response.)
20   Q.  Is that a yes?
21   A.  Yes.
22   Q.  Did you receive a copy of it?
23   A.  No.

Page 116

1    Q.  Look at page nine of your affidavit.  Look
2        at the rest of paragraph 28.  You say:
3        This was further evidence of racial
4        discrimination since the white supervisors
5        were not under the same scrutiny and were
6        not relieved of their supervisory
7        positions, even though they were
8        underperforming and not meeting their
9        quotas.
10            Tell me what you mean.  Tell me every
11       basis for that allegation that you have.
12            MR. TIDWELL: Object to the form.
13   A.  I don't know.  I don't know.
14   Q.  So are you telling me you have no basis for
15       that allegation?
16   A.  Just didn't give me a chance to go to
17       second shift.  They let me --
18            MR. TIDWELL: She's talking about
19            why the white supervisors
20            weren't under the same
21            scrutiny as you were.
22   Q.  Tell me what was -- you say in this
23       sentence, quote:  This was further evidence

Page 117

1    of racial discrimination. What are you
2    referring to there?
3 A. Well, like December, they told me that all
4    three of us got the same thing, and I don't
5    know if they got the same thing or not.
6 Q. So in paragraph 28, you're referring to the
7    notice you got in December?
8 A. And, like, the evaluation in January. It
9    ain't the same thing what I turned in.
10    Some of it had been whited out and all that
11    stuff.
12 Q. I don't understand what you're saying,
13    Mr. Lee.
14 A. It ain't the same thing.
15 Q. What's not the same?
16 A. My evaluation for the year review, a page
17    missing from the December write-up. It's a
18    lot of stuff been changed.
19 Q. Tell me specifically what you contend has
20    been changed.
21 A. Well, my evaluation, you can tell --
22 Q. Wait. Let's start there. What do you
23    believe has been changed on your

Page 118

1    evaluation?
2 A. My performance review been changed.
3 Q. What on your performance review has been
4    changed?
5    MR. TIDWELL: I think we've
6    already kind of gone through
7    it, but we'll do it again.
8 A. You can look at it and tell on my
9    performance review, you got -- you got two
10    different handwritings on there, too.
11    Ain't but supposed to be but one person's
12    handwriting on there.
13 Q. Mr. Lee, look at paragraph 28. Let's do
14    this. Look at paragraph 28 of your
15    affidavit. Are you telling me that in the
16    sentence where you say this was further
17    evidence of racial discrimination, that
18    you're referring to the December personnel
19    notice you received and the January 2006
20    performance review you received?
21 A. Uh-huh. (Positive response.)
22 Q. Is that a yes?
23 A. Yes.

Page 119

1 Q. What else are you talking about there?
2    Anything else?
3    MR. TIDWELL: Read the whole
4    section so you don't get a
5    piece of it. Read all of 28
6    so we can make sure we're on
7    the same thing instead of just
8    a piece of it.
9 Q. Read the whole paragraph.
10    Now that you've read the whole
11    paragraph, tell me in those last couple of
12    sentences, tell me every basis you have for
13    the allegation that you make in that
14    paragraph that says this was further
15    evidence of racial discrimination since the
16    white supervisors were not under the same
17    scrutiny and were not relieved of their
18    supervisory positions, even though they
19    were underperforming and not meeting their
20    quotas.
21 A. They was writing me up when I was getting a
22    hundred percent, and they didn't get
23    nothing.

Page 120

1 Q. Who is they?
2 A. The managers.
3 Q. What managers?
4 A. Mike -- Frank Majors and Mike Alford.
5 Q. Anybody else?
6 A. No.
7 Q. So you contend that Frank Major and Mike
8    Alford wrote you up for not meeting
9    production quota?
10    MR. TIDWELL: Object to the form.
11 A. No.
12 Q. What do you contend they wrote you up for?
13 A. I don't know. I really don't know. If you
14    making a hundred percent, the workers is
15    working.
16 Q. I understand that that's your contention.
17    I'm asking you, what are you saying that
18    Mike Alford and Frank Major wrote you up
19    for?
20    MR. TIDWELL: Object to the form.
21 A. I don't know.
22 Q. You don't know what they wrote you up for?
23    MR. TIDWELL: Object to the form.

Page 121

1  A. No.
2  Q. Is that what you're saying?
3  A. I don't know.
4  Q. Look in the last sentence of that
5     paragraph. You say Alford and others were
6     not interested in giving me any time to
7     clear up their alleged concerns, but simply
8     were out to fire me. Do you see that?
9  A. Yes.
10 Q. Tell me what you mean -- every basis for
11    that allegation you have.
12 A. Look at the write-ups I got. It wasn't two
13    months. Look at all the write-ups.
14 Q. Look at what write-ups?
15 A. The write-ups I got.
16 Q. Tell me what ones you're talking about.
17 A. From December to March.
18 Q. And these are --
19 A. And, really, they didn't know me and I
20    didn't know them.
21 Q. Mr. Lee, the write-ups that you are
22    referring to, are those any of the
23    documents that we've looked at today?

Page 122

1  A. Some of them is.
2  Q. Tell me which ones.
3  A. The one in December.
4  Q. Tell me -- tell me what exhibit.
5        MR. TIDWELL: I think we've gone
6        through this, but we'll do it
7        again. We'll go exhibit by
8        exhibit.
9        MS. PATE: I just want to be sure
10       that we're clear on which ones
11       that we're referring to.
12       MR. TIDWELL: Exhibit 10 is
13       December. There's all the
14       write-ups that Kelly has
15       provided.
16 A. This write-up here in December, like I
17    said, they supposed to have been -- they
18    said they had already talked to first shift
19    and second shift supervisors, but I don't
20    know whether they got this or not.
21 Q. The first shift or second shift
22    supervisors --
23 A. Whether they got it or not. They said they

Page 123

1     got the same thing I got.
2  Q. Who?
3  A. Bob Turner, my manager.
4  Q. Okay.
5  A. And what -- this affidavit or whatever --
6     they ain't got but one write-up. That's in
7     February. What happened to the one in
8     December?
9  Q. When you say that Alford and others were
10    out to fire you, who are the others that
11    you're talking about?
12 A. Frank Major and Mike Alford about the
13    onliest ones that's left.
14 Q. So you contend that Mike Alford and Frank
15    Majors were out to fire you?
16 A. Yes.
17 Q. Do you agree with me, Mr. Lee, that you
18    were removed from your supervisory position
19    on the third shift on or about March 11th,
20    2006?
21 A. Yeah, they told me I was -- I was separated
22    from the company on 3-10, but I worked that
23    night.

Page 124

1  Q. That's not my question. Maybe I didn't ask
2     that well.
3        Do you agree with me that on or about
4     March 11th, you were removed from your
5     supervisory position as third shift
6     supervisor?
7  A. Yes.
8        (Defendant's Exhibit 15 was marked
9        for identification.)
10 Q. Take a look at Defendant's Exhibit 15 for
11    me. The top of this is titled personnel
12    notice dash job refusal. It's Bates
13    stamped Lee/WPH 009. Do you see where it
14    says job offered? About the middle of the
15    page.
16 A. Uh-huh. (Positive response.)
17 Q. It says set order puller.
18 A. Uh-huh. (Positive response.)
19 Q. Is that a yes?
20 A. What you mean? Was the job --
21 Q. I'm just asking do you see where I'm
22    talking about?
23 A. Yes.

Page 125

1  Q.  Do you remember when you were removed from
2      your supervisory role that you were offered
3      the job of set order puller?
4  A.  Just the way they offered it to me.
5  Q.  That's not what I'm asking. I'm asking, do
6      you remember being offered the job of set
7      order puller?
8  A.  They offered me three choices.
9  Q.  Was one of those choices the job of set
10     order puller?
11 A.  Yes, the third choice, what's on the paper.
12 Q.  Did you refuse to sign this document that's
13     Defendant's Exhibit 15?
14 A.  Yes.
15 Q.  Why?
16 A.  Because I couldn't do that job.
17 Q.  You couldn't do the set order puller job?
18 A.  Huh-uh. (Negative response.)
19 Q.  Is that a no?
20     MR. TIDWELL:  You have to speak
21     loud. Don't say huh-uh.
22 A.  No.
23 Q.  Did you begin training for the set order

Page 126

1      puller job?
2  A.  I went out there that morning. They showed
3      me a film, and that was about it.
4  Q.  And the set order puller job, that's
5      driving a forklift; is that right?
6  A.  Forklift.
7  Q.  Driving the forklift?
8  A.  Right.
9  Q.  And you rejected that job offer; is that
10     right?
11     MR. TIDWELL:  Object to the form.
12 A.  I had talked to them and told them that I
13     didn't think I could do that job. So
14     Mr. Murphy told me to go home and wait till
15     about -- that was on Monday, the 13th.
16     Come back by Wednesday and let them know
17     did I want that job. I told him I couldn't
18     do that job.
19 Q.  So you turned --
20 A.  He told me to sign the paper that I refused
21     the job. I told him I wasn't signing
22     anything. Then he said, I'm going to wait
23     till -- he said, I can't give you a -- the

Page 127

1      third choice --
2      The first choice up there was I'm going
3      to give you a lump sum vacation. He told
4      me I can't pay you a lump sum vacation.
5      Said only thing I can do is give you four
6      weeks. You enjoy your check for four weeks
7      and you come back out here and sign your
8      papers
9  Q.  Mr. Lee, I want to get to all of those
10     things, but I want to just take it one at a
11     time if we can.
12     Do I understand you correctly that you
13     turned down the set order puller job; is
14     that right?
15     MR. TIDWELL:  Object to the form.
16     He's already answered that.
17 A.  Yes.
18     (Defendant's Exhibit 16 was marked
19     for identification.)
20 Q.  Let me show you Defendant's Exhibit 16.
21     Whose handwriting is that?
22 A.  At the top is going to be Brendt Murphy.
23     At the bottom is Mike Alford. It's where

Page 128

1      he wrote his phone number on there that
2      morning.
3  Q.  So the items numbered one, two, and three
4      on Defendant's Exhibit 16, which is Bates
5      stamped From Lee 0026, items one, two and
6      three are in Brendt Murphy's handwriting?
7  A.  Right.
8  Q.  And the telephone numbers at the bottom are
9      in Mike Alford's handwriting?
10 A.  Right.
11 Q.  Let's look at those three items.
12     Summarizing those, the first one is
13     that you could leave and be paid through
14     March 15th and receive a check for your
15     four weeks unused vacation. Is that right
16     for the first one?
17 A.  For the first one ...
18     MR. TIDWELL:  Just this one right
19     here. What does that say?
20 A.  Pay through 3-15-06, separated 3-10-06,
21     receive check for four weeks unassured
22     vacation.
23 Q.  Unused vacation?

Page 129

1   A.  Uh-huh.  (Positive response.)
2   Q.  Is that what that says?
3   A.  Uh-huh.  (Positive response.)
4   Q.  So that was the first option you were
5       given, that you could leave, be paid
6       through March 15th and receive a check for
7       your four weeks unused vacation; is that
8       right?
9   A.  Yes.
10  Q.  Or, number two, you could leave and use up
11      your vacation so that you would be paid
12      through those four weeks that you had
13      unused vacation time; is that right?
14  A.  Yes.
15  Q.  And then the last one is the one we've
16      already talked about, that you could accept
17      the set order puller job on the first shift
18      to drive the forklift; is that right?
19  A.  Yes.
20  Q.  And your choice was to refuse the set order
21      puller job and, what?
22          MR. TIDWELL:  Object to the form.
23  Q.  What of those three options, what did you

Page 130

1   choose?
2   A.  Well, I had choose a lump sum vacation
3       check.  When I went back out there, he told
4       me he couldn't give me a lump sum vacation
5       check and that he would give me a four
6       weeks vacation -- I'll receive my paycheck
7       still four weeks.
8   Q.  For four more weeks?
9   A.  Uh-huh.  (Positive response.)  Till April
10      the 15th?  April the 15th.
11  Q.  Go back to your affidavit.  Look at
12      paragraph 29.  It's on page nine.  Toward
13      the bottom of paragraph 29, you say:  These
14      options were given to me in an attempt to
15      embarrass and demean me.
16          Are you referring to the three options
17      that we just went over?
18  A.  Yes.
19  Q.  Tell me how those options that were offered
20      to you were given to you to embarrass or
21      demean you.
22  A.  Well, you go back out there on the floor
23      for a lot less of pay, and then you've got

Page 131

1   to go out there and meet employees what you
2   working with, plus you're working up under
3   the same supervision what done fired you.
4   Q.  Who do you believe was trying to embarrass
5       or demean you?
6   A.  Frank and Mike Alford.
7   Q.  Look at paragraph 30 of your affidavit.
8       You say:  Two black females in the
9       packaging department, Lottie Benson and
10      Clara Thomas, were demoted.
11          What shift were Lottie Benson and Clara
12      Thomas on?
13  A.  Lottie was on second shift as a lead
14      person, and Clara was a lead person on
15      first shift.
16  Q.  Who do you contend demoted them?
17  A.  Mike Alford demoted Lottie the same time I
18      did -- the same time he done me.
19  Q.  The same time you were removed from your
20      supervisory role?
21  A.  Yeah, Lottie.
22          Clara, they had stepped her down -- I
23      reckon that was probably a month later, I

Page 132

1   believe -- before.
2   Q.  Tell me what position they went from and
3       to.  If they were both lead people, where
4       were they moved to?
5   A.  Lottie Benson was moved back on the floor
6       on a setting machine running sets.  Clara
7       Thomas moved from supervisor to lead
8       person, getting paid by the hour.
9   Q.  So Clara Thomas you contend was a
10      supervisor?
11  A.  Yes, first shift.
12  Q.  Where was Billy Wayne Bedsole?
13  A.  He was still on second shift.
14  Q.  What about Mike Etheridge?
15  A.  He was on first shift with Clara.
16  Q.  So there were two supervisors?
17  A.  Yes.  I was the onliest one supervisor on
18      third shift.
19  Q.  Who was the other shift supervisor with
20      Mike Etheridge?
21  A.  Who was the what?
22  Q.  I think you said there were two shift
23      supervisors for the other two.

Page 133

1  A.  Uh-huh. (Positive response.)
2  Q.  Who was with Mike Etheridge?
3  A.  Clara Thomas.
4  Q.  Was she a lead person or a supervisor?
5  A.  They dropped her down to a lead person.
6  Q.  Flip over to paragraph 32 of your
7      affidavit. In this paragraph, you say that
8      there's a difference between a personnel
9      notice and a pink slip which leads to
10     termination.
11 A.  A personnel notice got a commendation, got
12     miscellaneous -- it's got six things on it.
13 Q.  That's a personnel notice?
14 A.  Uh-huh. (Positive response.) Pink slip
15     start with counseling. Like the first
16     time, we'll write them up on, like, that
17     paper -- personnel notice. If we think
18     they need a miscellaneous the first time
19     instead of give them a counseling, we'll
20     write miscellaneous on the personnel
21     notice.
22         The next time, if they don't do
23     whatever it is, we can write them up a

Page 134

1      counseling. After a counseling, you go to
2      three warnings. Your second warning, we'll
3      give you a final notice.
4  Q.  And those are the pink slips that you're
5      talking about?
6  A.  Right.
7  Q.  Mr. Lee, isn't it the case that pink slips
8      are used for hourly employees?
9          MR. TIDWELL: Object to the form.
10 A.  I really don't know.
11 Q.  Well, how did you use them?
12 A.  Yeah, I used them for hourly employees.
13 Q.  Isn't it the case that pink slips are not
14     used for salaried employees?
15 A.  I really don't know. They never did tell
16     us that.
17 Q.  Look at paragraph 35 of your affidavit on
18     the next page. Read over that for me and
19     then I've got a question to ask you.
20 A.  Do you want me to read this right here?
21 Q.  Yeah, just read that to yourself so I can
22     ask you a question about it.
23 A.  There is some statement --

Page 135

1          MR. TIDWELL: No, no. Just read
2      it to yourself.
3  A.  Okay.
4  Q.  Now, do you contend that as supervisor of
5      the third shift, you had no responsibility
6      for the line scheduling?
7  A.  The schedule for the lines for the -- it's
8      printed out. It's a printout on the
9      computer.
10 Q.  I guess --
11 A.  They got people that schedule the stuff and
12     they prints it out on -- it's a printout.
13 Q.  So do you contend that you had no
14     responsibility for any of the scheduling on
15     your shift?
16 A.  Not the schedule. Huh-uh. (Negative
17     response.) Only thing I had was
18     responsibility for the schedule to be run
19     on the machines.
20 Q.  But you didn't have -- you contend that you
21     did not have any responsibility for the
22     actual timing, the scheduling of it?
23 A.  Huh-uh. (Negative response.)

Page 136

1  Q.  Was that a no?
2  A.  No.
3  Q.  Look on the last page of your affidavit,
4      paragraph 39. You say that you filed an
5      EEOC charge of race and age discrimination
6      based on being harassed, treated unfairly,
7      and finally being terminated from my
8      employment.
9          You don't contend now that you were
10     discriminated against on the basis of your
11     age, do you?
12 A.  I just think I was discriminated against
13     because I'm black.
14 Q.  Not because of your age; is that right?
15 A.  Yes.
16 Q.  So that I'm clear, you don't contend that
17     you were discriminated against or harassed
18     in any other manner other than in relation
19     to your removal from your supervisory
20     position; is that right?
21         MR. TIDWELL: Object to the form.
22 A.  I don't know.
23 Q.  You don't know?

Page 137

1  A.  I don't know.
2  Q.  Tell me how you contend that you were
3      discriminated against or harassed.
4          MR. TIDWELL: Object to the form.
5          We've already been through it.
6          MS. PATE: Well, he says he
7          doesn't know.
8  A.  I don't know.
9  Q.  In paragraph 40 of your affidavit, you say
10     that the actions taken were devastating to
11     you and your family and that it's extremely
12     difficult to handle. Tell me what you mean
13     by this.
14 A.  My wife had to carry the load ...
15         MR. TIDWELL: That's all right.
16         Just tell them what you mean.
17 A.  It was hard for me to find a job. It took
18     me ten months to find a job, and she had to
19     carry the load. Got behind on the bills.
20 Q.  Anything else you think I ought to know
21     about that? Anything else you want to tell
22     me about that?
23 A.  I went through depression. Had to go

Page 138

1      through depression.
2  Q.  Did you see anybody for that?
3  A.  I saw the psychiatrist and saw the
4      psychologist. The psychologist helped me a
5      lot.
6  Q.  What's that person's name?
7  A.  Let me see do I have his card.
8      The psychiatrist -- the psychiatrist
9      gave me some medicine.
10 Q.  I'm sorry?
11 A.  The psychiatrist gave me some medicine to
12     take.
13 Q.  The psychiatrist you saw is J. Chris
14     Strunk, S-T-R-U-N-K, at Wiregrass Wellness
15     Center; is that right?
16 A.  Yes.
17 Q.  And his address is 256 Honeysuckle Road,
18     Suite 20, Dothan, Alabama 36305.
19         Was the psychologist you saw Robert J.
20     Nolan? Robert J. Nolan, is he the only
21     psychologist you saw at the Child and
22     Family Services?
23 A.  Yes, he's the only one talked to me.

Page 139

1  Q.  His address is 100 Westside Drive, Dothan,
2      Alabama 36303. Okay.
3          Who did you see first?
4  A.  Psychologist.
5  Q.  That's Robert J. Nolan?
6  A.  Uh-huh. (Positive response.) He
7      transferred me to the psychiatrist.
8  Q.  I want to talk about that.
9  A.  Because he didn't give medicine.
10 Q.  Right.
11         (Defendant's Exhibit 18 was marked
12         for identification.)
13 Q.  Let me show you what's been marked as
14     Defendant's Exhibit 18. This is a
15     document -- it's Bates stamped From Lee
16     1037. It says psychological consultation
17     at the top. It's dated July 7th, 2006.
18         Is that the date that you saw Robert J.
19     Nolan?
20 A.  Yes.
21 Q.  And it says referral, that Mr. Lee is
22     referred for psychological services for,
23     quote, nervous breakdown.

Page 140

1          Who referred you to Robert J. Nolan?
2  A.  I looked in the phone book and called it.
3  Q.  No one in particular referred you to him?
4  A.  No.
5  Q.  What sorts of symptoms were you having?
6  A.  I stayed at the house and wasn't going
7      nowhere, just at the house all day. And I
8      went to the psychiatrist. He told me to
9      get out of the house. If I don't get out
10     of the house, he was going to get me some
11     kind of services, make me do it.
12 Q.  At the time that you decided that you
13     needed to go see Robert J. Nolan, were you
14     having crying spells?
15 A.  That, too, but I hid it from my wife, my
16     family.
17 Q.  And about how often was that happening?
18 A.  About once or twice a day. I was at home
19     by myself anyway.
20 Q.  Okay.
21 A.  I really didn't want to talk about it, but
22     when I started talking to Dr. Nolan, he
23     really helped me a lot.

**Page 141**

1  Q.  It's important, Mr. Lee -- I know that this
2      is hard for you, and I understand that, but
3      it's important for me to understand all of
4      the things that were going on so that I
5      understand what was happening when you went
6      to Dr. Nolan.
7          Were you having at that time feelings
8      of sadness?
9  A.  Just depressed.
10  Q.  Okay.  All the time?
11  A.  Yes.
12  Q.  Were you losing sleep?
13  A.  Yes.  He give me something to sleep, where
14      I could sleep.
15  Q.  How long were you losing sleep?
16  A.  A long time.
17  Q.  A long time?
18  A.  (Witness nods head up and down.)
19  Q.  Are we talking days?
20  A.  Nights.  Nights mostly.
21  Q.  Several nights in a row or one night?
22  A.  About every night.
23  Q.  Every night?

**Page 142**

1  A.  (Witness nods head up and down.)
2  Q.  Were you sleeping at all?
3  A.  Not much.
4  Q.  How about your appetite?
5  A.  I didn't have no bad appetite.
6  Q.  So you were eating okay?
7  A.  Eating okay.
8  Q.  What about -- Did you have panic attacks?
9  A.  Didn't have no panic.
10  Q.  Did you ever think of or attempt suicide?
11  A.  No.
12  Q.  All right.  When you went to see Mr. Nolan,
13      what did you do during your visit with him?
14  A.  He just talked about -- told me about
15      depressed -- about being depressed and
16      stuff and telling me what to do for not
17      being depressed.
18  Q.  Tell me what he told you to do.
19  A.  He just said go fishing, do something.
20      Don't sit at the house, get something that
21      you can do to get stuff off your mind.
22  Q.  When you went to see Dr. Nolan, did you
23      fill out any sort of questionnaire or

**Page 143**

1      intake form, anything like that?
2  A.  No, I don't think so.  He puts everything
3      on the computer.
4  Q.  When you met with him, was he taking notes?
5  A.  Yeah, on the computer.  He writes down
6      everything you say on the computer.
7  Q.  Look at the second page of that Defendant's
8      Exhibit 18.  It says that the patient is
9      recommended to seek psychiatric services
10      and has been given the name.
11          Is Chris Strunk the name that Dr. Nolan
12      gave you?
13  A.  Yes.
14  Q.  Did you see him?
15  A.  Yes.
16  Q.  Tell me when you saw Dr. Strunk.
17  A.  It was in July, I think a week after I saw
18      the psychologist, the next week.
19  Q.  Did you see him more than once?
20  A.  He first had me come in every week.  Well,
21      I'd see both of them every week.  I think
22      that went on about a month and a half,
23      something like that.  And then they told me

**Page 144**

1      to start coming back every two weeks.
2  Q.  So you saw both Dr. Nolan and Dr. Strunk
3      for every week for a period of time?
4  A.  Uh-huh.  (Positive response.)
5  Q.  Is that a yes?
6  A.  Yes.
7  Q.  And then you saw both those doctors every
8      other week for a period of time?
9  A.  Uh-huh.  (Positive response.)  Then I
10      started going every month.
11  Q.  Every month.
12  A.  Uh-huh.  (Positive response.)
13  Q.  On the second page of that document from
14      Dr. Nolan, it says that you were scheduled
15      to return on July 28th.  And by that time,
16      you were supposed to have seen a physician,
17      probably a psychiatrist.
18  A.  Uh-huh.  (Positive response.)
19  Q.  Did you do that?
20  A.  Yes.
21  Q.  How long did you -- are you still seeing
22      those doctors?
23  A.  No.

Page 145

1    Q.   Tell me when you stopped seeing them.
2    A.   November.
3    Q.   Both of them?
4    A.   Uh-huh. (Positive response.)
5    Q.   When you went to see Dr. Strunk, did you
6         fill out any sort of questionnaire or
7         intake form there?
8    A.   Not no questionnaire.
9    Q.   Did he perform any sort of tests?
10   A.   He just asked questions.
11   Q.   He didn't do anything like hypnosis or
12        any --
13   A.   Huh-uh. (Negative response.)
14   Q.   You mentioned that he had prescribed
15        medication for you. Tell me what he
16        prescribed.
17   A.   I can't remember the name of it. I can't
18        remember the name of it.
19   Q.   Was it just one prescription he gave you?
20   A.   I had it refilled every month.
21   Q.   And how long did you take it?
22   A.   About six months.
23   Q.   Do you remember about from what month to

Page 146

1         what month, what six-month period?
2    A.   From July -- July to December, I think,
3         either December or November.
4    Q.   You just can't remember the name of it?
5    A.   Huh-uh. (Negative response.)
6    Q.   What did he prescribe it to you for?
7    A.   Depressed, mental depressed.
8    Q.   And did it help?
9    A.   Yes.
10   Q.   Do you consider yourself now back to
11        normal?
12   A.   Yes.
13   Q.   Tell me the last time you saw both of those
14        doctors.
15   A.   I think it had to be like sometime in
16        November the last time I seen them.
17   Q.   So in November of 2006, you believe you saw
18        both Dr. Nolan and Dr. Strunk?
19   A.   Uh-huh. (Positive response.) The last
20        time.
21   Q.   You're not on any sort of antidepressant
22        now, are you?
23   A.   No.

Page 147

1    Q.   Is that a no?
2    A.   No.
3    Q.   During the time that you were seeing those
4         doctors, was anyone in your family having
5         any sorts of health problems?
6    A.   No.
7    Q.   Anybody in your immediate family or your
8         close family having financial trouble?
9    A.   No.
10   Q.   When you went to see those doctors, did
11        they take down your family and medical
12        history and background?
13   A.   I think they asked me about my mom and
14        daddy.
15   Q.   Did either of your parents suffer from
16        anxiety or depression?
17   A.   No.
18   Q.   When you saw those doctors for the last
19        time in November, did they make any sorts
20        of recommendations to you?
21   A.   Only thing they said, if anything changed
22        that you can't come to see us, let them
23        know.

Page 148

1    Q.   Anything changed?
2    A.   I got a job. That's the reason I didn't go
3         back to see them.
4            MS. PATE:  Now would be a good
5         time to take a break if you
6         want it.  If not, we can press
7         on.
8            MR. TIDWELL:  That's fine.  How
9         much longer have you got?
10           (Off-the-record discussion.)
11           MR. TIDWELL:  That's fine.  We can
12        take a break.
13           (Brief recess was taken.)
14           (Defendant's Exhibit 17 was marked
15        for identification.)
16   Q.   Mr. Lee, I want to show you what's been
17        marked as Defendant's Exhibit 17, and it is
18        Bates stamped From Lee 0001 through 0013.
19        Did you create this document?
20   A.   Yes.
21   Q.   When did you create it?
22   A.   Sometime in March.
23   Q.   In March 2006?

Page 149

1    A.  Uh-huh. (Positive response.)
2    Q.  You created the whole thing then?
3    A.  Yes.
4    Q.  Did you create it for any particular
5        purpose?
6    A.  To let the lawyer know.
7    Q.  Did you create it for a lawyer?
8    A.  Yes.
9    Q.  And who was that?
10   A.  Russ Goodman.
11   Q.  Look at the last page of this exhibit.
12       It's Bates stamped From Lee 0013. It looks
13       like a fax transmission verification report
14       showing a fax on 6-30-2007. Whose fax
15       number is 278-3430?
16            MR. TIDWELL:  Right here.
17   A.  That's probably my daughter.
18   Q.  That's your daughter?
19   A.  Uh-huh. (Positive response.)
20   Q.  Did you fax it to your daughter?
21   A.  Huh-uh. (Negative response.) She probably
22       faxed it from her machine.
23   Q.  She faxed it from her machine?

Page 150

1    A.  Uh-huh. (Positive response.)
2    Q.  To who?
3    A.  To me.
4    Q.  And which daughter is this?
5    A.  My oldest daughter.
6    Q.  What's her name?
7    A.  Tamela.
8    Q.  Is she the one in Atlanta?
9    A.  No.
10   Q.  She's in Headland?
11   A.  Uh-huh. (Positive response.)
12   Q.  And she had it on her computer?
13   A.  No. I had written it out. She typed it
14       for me.
15   Q.  You had handwritten --
16   A.  Uh-huh. (Positive response.)
17   Q.  Do you still have those handwritten notes?
18   A.  I really don't know.
19   Q.  Can you check and see if you have them?
20   A.  Okay.
21   Q.  And if you have them, give them to your
22       lawyer?
23   A.  Okay.

Page 151

1            MS. PATE:  If he gets them, we'd
2        like to see them.
3            MR. TIDWELL:  We'll give them to
4        you.
5    Q.  If you'll check all your records and check
6        with your daughter, too.
7    A.  Okay.
8    Q.  The first thing I want to do is look with
9        me at the first -- let's see. Bates
10       numbered From Lee 002 through 004 -- excuse
11       me, through 005. And compare that with the
12       last four pages before the verification
13       report. That's Bates stamped From Lee 009
14       through 0012.
15            Here is my question. Looking at those
16       pages, it looks like to me that the
17       allegations contained in Bates stamped 0002
18       through 005 are the same allegations
19       verbatim as appear in the pages Bates
20       stamped From Lee 009 through 0012 and that
21       the only difference is the headings. Take
22       a moment and look at them.
23            (Brief interruption.)

Page 152

1            MR. TIDWELL:  Did you follow what
2        she was asking you, Claude?
3            She's asking if these are the
4        exact same.
5    Q.  I want to know if the allegations are
6        exactly the same and that the only
7        difference between those two sections of
8        this exhibit are the headings.
9    A.  It's the same.
10   Q.  Do you know -- well, tell me what is the
11       significance -- or what's the difference
12       between the headings. What does first
13       miscellaneous notice mean as compared to
14       first write-up? Does it mean anything
15       different to you?
16   A.  It's not anything different.
17   Q.  Do you know why there were two documents
18       created with different headings? Any
19       reason?
20   A.  It's just stating, like -- the personnel
21       notice mostly is a miscellaneous anyway.
22   Q.  So personnel notice, miscellaneous notice
23       are used interchangeably?

Page 153

1    A.  Uh-huh.  (Positive response.)
2    Q.  Is that a yes?
3    A.  Yes.
4    Q.  Personnel notice is the same thing as a
5        miscellaneous notice?
6    A.  Yes.
7    Q.  There's nothing different in your mind from
8        a miscellaneous notice or a write-up as you
9        have the headings in the second part?
10   A.  Uh-huh.  (Positive response.)
11   Q.  Is that right?
12   A.  Yes.
13   Q.  Fair enough.  That will save us some time.
14       Look with me at the first page of
15       Defendant's Exhibit 17, and that's Bates
16       stamped From Lee0001.  In the first
17       paragraph, you say:  Billy Bedsole, who was
18       the second shift supervisor, was suspended
19       from coming to work in February.  It was
20       rumored that he had been reprimanded
21       several times about his work habits.
22       Are you talking about February 2006?
23   A.  Yes.

Page 154

1    Q.  Who do you contend suspended Mr. Bedsole?
2    A.  He had trouble with the plant manager.
3    Q.  And who was that?
4    A.  He was new, too, but I really didn't know
5        his name.  I've got it at the house.
6    Q.  Is it the plant manager who you believe
7        suspended Mr. Bedsole?
8    A.  Yes, the one he had that --
9    Q.  Tell me what you mean.  You say it was
10       rumored that he had been reprimanded about
11       his work habits.  What did you understand
12       about his work habits?
13   A.  What they had told him, you know -- they
14       had told him he need to stay in the
15       department, and he was out on the other
16       side -- another department.
17   Q.  You're saying he should have -- he was told
18       to stay in the packaging department?
19   A.  Uh-huh.  (Positive response.)
20   Q.  Is that a yes?
21   A.  Yes.
22   Q.  And he was in another department?
23   A.  When he run into the plant manager.

Page 155

1    Q.  What do you mean he ran into the plant
2        manager?
3    A.  Because the plant manager asked what was he
4        doing over there.
5    Q.  Anything else about his work habits?
6    A.  His shift when I come in every night is not
7        to -- everything is in a mess.  And one
8        thing, when you come in every night, if he
9        leave me like that, that mean I got -- it's
10       on me.
11       And, see, he tell the manager -- the
12       way he left it that morning, he said, if
13       you don't straighten it out when you come
14       in, before he leave -- but ain't no way he
15       can straighten it out, that mess, before he
16       leave.  And they still say it's mine.
17   Q.  Look with me in the second paragraph of
18       that same page.  You say:  Each time I got
19       a miscellaneous notice, I was told that it
20       was just a personnel notice.
21       And we agree that -- or you've told me
22       that those are the same thing.  Personnel
23       notice and miscellaneous notice are the

Page 156

1        same; is that right?
2    A.  It's on the same paper.
3    Q.  So, like, is a miscellaneous notice company
4        lingo for personnel notice?  Does it mean
5        the same thing?
6    A.  It's a personnel notice that you can put in
7        the file.  And if you go back -- well, like
8        if you go back and write -- see, you can't
9        write two miscellaneous on a person.  If
10       you write one this week, you can't go back
11       and write another miscellaneous.  You've
12       got to write a counsel.
13   Q.  Okay.  I understand what you're saying.
14       You say:  I was even told that they had to
15       do things like this because the new
16       ownership told them that it was mandatory
17       for them to do it.  Tell me what you are
18       referring to there.
19   A.  Onliest thing I can tell you about that
20       is .. let me see.  That's because when new
21       ownership come in, they needed stuff on
22       paper.
23   Q.  They needed what?

Page 157

1    A.  They needed paperwork.
2    Q.  What do you mean they needed paperwork?
3    A.  You know, saying that you going to do the
4        job better than you was doing it.
5    Q.  So when new management came in, they
6        reviewed everybody's performance?  Is that
7        what you mean?
8    A.  Uh-huh.  (Positive response.)
9    Q.  Yes?
10   A.  Talked to everybody.  Supposed to have been
11       talking to all the supervisors, all three
12       shifts.
13   Q.  And so when new management came in, they
14       talked with everybody --
15   A.  Said they needed something on paper.
16   Q.  So they wanted to review your performance
17       on paper; is that right?
18   A.  Yeah, what they talked to you about, they
19       needed it on paper.
20   Q.  In that same paragraph, you say:  I got a
21       miscellaneous notice stating that I was not
22       being efficient.  It's in the second
23       paragraph of that same page.  Tell me what

Page 158

1        notice you're referring to.
2    A.  The first.  The first write-up when he --
3            MR. TIDWELL:  What's the date of
4        it?
5            THE WITNESS:  The 16th, December
6        16th.
7    Q.  You're talking about a December --
8    A.  Like I said, it was two pages.  See, that's
9        what I remember.
10   Q.  Let me just make sure that I understand
11       what you're talking about.  That sentence
12       that I just read, I got a miscellaneous
13       notice stating that I was not being
14       efficient, there you're referring to the
15       December 2006 notice?
16   A.  Uh-huh.  (Positive response.)
17           MR. TIDWELL:  2005.
18   Q.  2005.
19           MS. PATE:  Thank you, Jay.
20   Q.  And who wrote that?
21   A.  Bob Turner and Brendt Murphy.
22   Q.  That's the one that we looked at that was
23       Defendant's Exhibit 10?

Page 159

1    A.  Uh-huh.  (Positive response.)
2    Q.  Is that right?
3    A.  Yes.  That's it.
4    Q.  The bottom of this document, the first
5        page, you say -- I'm looking at Defendant's
6        Exhibit 17.  In February 2006, I was told
7        by Clara Thomas who at the time was the
8        first shift supervisor was offered my job
9        as third shift supervisor ...
10           Do you see that?
11   A.  Uh-huh.  (Positive response.)
12   Q.  Who told you that?
13   A.  She did.
14   Q.  Clara Thomas told you?
15   A.  Uh-huh.  (Positive response.)
16   Q.  What's Clara Thomas's race?
17   A.  Black.
18   Q.  And she --
19   A.  She said she was -- I think that was
20       another choice they had give her when they
21       stepped her down to a lead person.  See,
22       they said nothing to me at all.  She the
23       one that was saying it, you know, in the

Page 160

1        office in there.
2    Q.  I'm sorry?
3    A.  She the one that was saying it in the
4        office in there where we was.  She was
5        offered my job and said they give her a day
6        to go home and ask her husband could she
7        take that third shift job or go back on the
8        floor as a lead person -- step out as a
9        lead person from a supervisor.
10   Q.  What position was she in?
11   A.  She was a supervisor.
12   Q.  Of what shift?
13   A.  First shift.
14   Q.  So you're telling me that Clara said she
15       was offered to step down on the first
16       shift, be a lead person on the first
17       shift --
18   A.  Huh-uh.  (Negative response.)  Step down as
19       a supervisor.
20   Q.  Step down from supervisor to be a lead
21       person?
22   A.  Uh-huh.  (Positive response.)
23   Q.  Is that a yes?

Page 161

1   A.  She said she had a choice to come to third
2       shift or step down and be a lead person.
3   Q.  You're telling me instead of taking a
4       supervisor role, she chose to step down and
5       be a lead person?
6   A.  She said her husband didn't want her to be
7       on third shift.  But they didn't say
8       anything to me about it at all.  That's
9       what she said.  But I haven't heard nothing
10      about it.  They didn't tell me nothing
11      about she was taking my place or nothing.
12      She the one that said that in the office.
13  Q.  Did she tell you who told her that?
14  A.  She said that's a choice that they had give
15      her.
16  Q.  Who?  Who had given her that?
17  A.  I don't know was it Bob or Frank.  I don't
18      know which one.  I think Bob Turner, I
19      believe.
20  Q.  Would it be whoever the department head was
21      at that time in February 2006?
22  A.  Yes.
23  Q.  Flip over to the next page, Bates stamped

Page 162

1       From Lee 0002, under the heading first
2       miscellaneous notice.  At the end you say
3       that Bob Turner resigned, quote, due to him
4       not wanting to do the things that was
5       wrong.
6           Tell me what you're talking about
7       there.
8   A.  He was really under a whole lot of stress.
9       And then the way he talked, the plant
10      manager stayed on him a lot.
11  Q.  Who was the plant manager?
12  A.  I can't think of his name.
13  Q.  Okay.  What do you mean that he was
14      doing -- that he did not want to do things
15      wrong?
16  A.  They kept -- I think they kept pushing him
17      about percentage and efficiency, you know.
18  Q.  Do you contend that he was being forced to
19      do something that was -- that he shouldn't
20      have been doing?
21          MR. TIDWELL:  Object to the form.
22  A.  I really don't know.
23  Q.  You say before he resigned as head manager,

Page 163

1       he put in my yearly review files that I
2       could be -- that I could be a head
3       manager.  Do you see that?
4   A.  Yes.
5   Q.  Now, isn't it true that he didn't put that
6       in your review file, that that -- that you
7       put that down as a goal of yours?  Isn't
8       that true?
9           MR. TIDWELL:  Object to the form.
10  Q.  Did you understand my question?
11  A.  I understand.
12  Q.  Okay.
13  A.  He had put some kind of comment, and I had
14      put my goals down there.
15  Q.  Do you contend that he put down in a
16      comment on your review -- yearly reviews
17      that you could be a head manager?
18  A.  He put it down on one of them.
19  Q.  What one?
20  A.  I don't know what year it was, but he put
21      it down.  Either 2004 or five one.  I think
22      2004, it was on it.
23  Q.  Look down under the heading second

Page 164

1       miscellaneous notice.  Second line, you
2       say:  I was wrongfully givena personnel
3       notice.
4           What personnel notice are you referring
5       to there?
6           MR. TIDWELL:  She'sasking what
7           you're referring to.  What's
8           this second miscellaneous
9           notice you're referring to?
10  Q.  Look in the second line of that paragraph.
11      You say:  I was wrongfully givena
12      personnel notice.  I want to know what
13      notice you're talking about.
14  A.  Oh, that's when I had made 100 percent and
15      he wrote me up still.
16  Q.  Who?
17  A.  Frank Major.
18  Q.  Have you seen the write-up that Frank gave
19      you today?
20  A.  He got one on the 16th, but it's not what
21      I --
22  Q.  It's not the one we're talking about here?
23  A.  It's not the one he told me about taking

Page 165

1    care of my lines.
2    Q.   Okay.
3    A.   It's not the same thing he had read to me.
4    Q.   Towards the end of that paragraph, you
5         say: I was still written up and being
6         continuous -- being harassed and treated
7         unfairly due to I'm the only black
8         supervisor in my department.
9              Do you contend that Frank Major was
10        harassing you and treating you unfairly
11        because you were the only black supervisor?
12   A.   Like I said, Frank really didn't do
13        anything -- let's see. When I got the
14        evaluation, the evaluation looked good.
15        But when I got the write-up when I made 100
16        percent, he still wrote me up for about not
17        taking care of my lines.
18   Q.   Here is my question. Do you contend if --
19        do you contend that Frank Major harassed or
20        discriminated against you because of your
21        race?
22   A.   I don't know.
23   Q.   In the next sentence, you say: I was

Page 166

1         written up and lied on, saying that my
2         workers cannot do their jobs. If I am not
3         efficient by keeping their lines constantly
4         operating ... do you see that?
5    A.   Uh-huh. (Positive response.)
6    Q.   Who do you contend -- you say lied on.
7         Tell me what that means.
8    A.   My workers were working. If he wasn't --
9         they weren't working, you could have 40
10        percent. You wouldn't have 100 percent.
11   Q.   Who do you contend lied?
12   A.   Frank and Mike Alford.
13   Q.   And what did they lie about?
14   A.   About how I wasn't doing my job, which I
15        was. If I wasn't doing my job, the workers
16        wouldn't be making 100 percent.
17   Q.   You disagree with their criticism of your
18        job performance?
19   A.   That's right.
20   Q.   Flip over to the next page, From Lee 0003.
21        About four lines down, you say: Frank
22        Major accepted a higher position with the
23        company. Is that true?

Page 167

1    A.   He went to personnel.
2    Q.   Was that a promotion for him?
3    A.   I really don't know.
4    Q.   Well, did you believe it was a higher
5         position?
6              MR. TIDWELL: Object to the form.
7    A.   I don't know.
8    Q.   When you wrote Frank Major accepted a
9         higher position with the company, what did
10        you mean?
11   A.   I really don't know.
12   Q.   Okay. Towards the end of that paragraph,
13        you say: Mike Alford started harassing
14        using profanity to all of the employees,
15        including myself, and boasting about his
16        unprofessional behavior ...
17             Tell me what you mean.
18             MR. TIDWELL: Object to the form.
19   Q.   Tell me every basis you have for that
20        allegation.
21   A.   He just had an attitude and a temper out on
22        the floor.
23   Q.   And did he -- he exhibited that attitude

Page 168

1         and temper towards everybody on your shift?
2    A.   Everybody.
3    Q.   When you contend that he used profanity or
4         acted in an unprofessional -- had
5         unprofessional behavior, did he ever say
6         anything about race?
7    A.   No. He just told me that --
8              MR. TIDWELL: Just answer her
9              question. Let's go.
10   Q.   Tell me what -- You say in the last line
11        that it became an unsafe atmosphere to work
12        in. Tell me what you mean. How was it
13        unsafe?
14   A.   The way they changed everything over there
15        and fixed the lines.
16   Q.   It wasn't because of anything Mike Alford
17        was saying; is that --
18   A.   No.
19   Q.   Is that true?
20   A.   Let me see where you at.
21   Q.   I'm looking at the last sentence of the
22        first paragraph. You say it was an unsafe
23        atmosphere. I'm trying to understand what

Page 169

1    you mean.
2  A.  Just the way he had -- like I say, the way
3       he had an attitude and -- out on the floor
4       and the way he carried on out there on the
5       floor. You don't supposed to carry on out
6       there on the floor around the workers like
7       that.
8  Q.  Under the next heading, third miscellaneous
9       notice, you say: On March 7th, 2006, along
10      with personnel manager Brendt Murphy, who
11      is white, harassed me again in Mike
12      Alford's office.
13         Do you see that?
14 A.  Uh-huh. (Positive response.)
15 Q.  Do you contend that Brendt Murphy
16      discriminated against you based on your
17      race?
18 A.  I don't know.
19 Q.  Tell me what you mean by being harassed
20      again on March 7th, 2006. What happened on
21      that day?
22 A.  That's the day that I was trying to talk to
23      him and tell him the situation in the

Page 170

1    packing department.
2  Q.  Who?
3  A.  Mike Alford. And when the guy -- we was
4       standing there, and the guy -- me, him --
5       Mike Alford and Mike Lingo was standing
6       there, and the guy walked off from the
7       machine.
8  Q.  What guy?
9  A.  At 11:00 o'clock when the bell rung.
10      Mitchell Daniels.
11 Q.  Okay.
12 A.  I was talking to them about, I got two
13      lines and supposed to have 11 people, but I
14      didn't have but five at each line, that I
15      was going to put them together. And I had
16      told that line not to start up because it
17      ain't enough people to run that line. I
18      was going to put them together. I was
19      trying to show him that, you know, I needed
20      more people on third shift.
21 Q.  Trying to show?
22 A.  Mike Alford. But he kept carrying on about
23      Mitchell Daniels the whole time. So I just

Page 171

1    went on and told the line, just go on and
2    move to the number one line.
3  Q.  Do you contend that him doing that was
4       discriminatory in some way?
5  A.  I don't know because he never did -- well,
6       he did say he was going to bring somebody
7       from first shift, give me ten people from
8       first shift that night, but --
9         I had told the first shift supervisor,
10      Clara, that he said he's going to send ten
11      of your Manpower people there. Said he
12      can't do that. We need our people.
13        He came back the next day and said
14      we're going to get ten people from the
15      Manpower to come in. They come in that
16      Thursday night before I left. I sat down
17      and read them the safety hazards and all
18      that stuff, showed them around.
19 Q.  Look further down in this paragraph under
20      third miscellaneous notice toward the end.
21      It says -- you write: I was forced to sign
22      three write-ups in the period of three
23      months.

Page 172

1         What are you talking about there?
2  A.  Which they didn't give me a chance to do
3       anything, really.
4  Q.  I don't understand what you mean.
5  A.  To prove that I can do my job.
6  Q.  Who are you saying, forced you to sign
7       three write-ups?
8  A.  The managers.
9  Q.  What managers?
10 A.  Frank and Mike Alford.
11 Q.  Who did you sign write-ups for?
12 A.  I signed personnel notices.
13 Q.  And you contend that you were forced to do
14      that?
15 A.  You know, they was telling me what I need
16      to do, you know, but --
17 Q.  Did you --
18 A.  It's a whole different story now, you know.
19 Q.  Did you disagree with writing up your
20      employees?
21      MR. TIDWELL: Kelly, he's talking
22      about the personnel notices
23      that he was written up for, he

Page 173

1          was forced to sign those.
2          MS. PATE: Okay. Talking about
3          two different things here.
4          That's what I'm trying to
5          figure out.
6    Q.   Why keep asking for -- help me understand.
7          All right.
8          So you don't contend that you were
9          forced to write up your employees, do you?
10   A.   I was forced to write up my employees?
11   Q.   Do you contend that?
12   A.   No, I wasn't forced to write up my
13        employees. Only thing I was forced to do
14        was Mitchell Daniels.
15   Q.   And did you fire Mitchell Daniels?
16   A.   Yes, I fired Mitchell Daniels.
17   Q.   On what basis?
18   A.   Poor job performance.
19   Q.   Poor job performance. Tell me about --
20        What was his poor job performance?
21   A.   Mike Alford, he still was standing there
22        when he come from the bathroom. He stood
23        there and watched him work. He said -- he

Page 174

1          said, he ain't doing nothing and I don't
2          like the way he bag. He bag too slow. I
3          don't see how y'all put up with that long.
4          I ain't going to put up with him, so I want
5          you to fire him, like that.
6    Q.   Had you ever written up Mitchell Daniels
7          before?
8    A.   I had give his final notice.
9    Q.   You had written him up three times?
10   A.   I had give him -- he had one counsel when
11        he come from first shift, I think. I wrote
12        him up the three warnings and final notice,
13        too.
14   Q.   And then Mr. Alford said to you, let's go
15        ahead and fire him?
16   A.   Uh-huh. (Positive response.) But he
17        didn't know what kind of record Mitchell
18        had. See, you got to wait till the next
19        morning and go to personnel, but I already
20        knowed.
21   Q.   Did you disagree with the decision to
22        terminate him?
23   A.   I disagree with him, but he told me to go

Page 175

1          ahead on and fire him without looking at
2          anything.
3          (Brief interruption.)
4    A.   See, Mike hadn't looked at his record, but
5          I know what his record was because I just
6          had wrote him up probably three or four
7          weeks ago. But if he -- he didn't have the
8          final notice, I would have had to have said
9          something different to him. I couldn't
10        have fired him.
11   Q.   Flip over to the next page, From Lee 0004.
12        We've already talked about some of this, so
13        I want to go down about midway on that
14        page. There's a sentence that starts on
15        March 11, 2006. Do you see where I am?
16   A.   Uh-huh. (Positive response.)
17   Q.   You say on that day that you went in to the
18        personnel office and, quote, once I got
19        there, Mike Alford and Brendt Murphy
20        harassed me. Mike Alford told me that he
21        does not like the way I supervise, closed
22        quote.
23        Tell me how you contend they harassed

Page 176

1          you.
2    A.   That's when he told me he was sending me to
3          second shift to see if I can supervise. I
4          had been supervising for three years by
5          myself, from 2001 to 2004. Like I say, he
6          had come in there -- hadn't been there
7          three weeks -- two weeks. Two weeks. He
8          fired me in two and a half weeks.
9    Q.   Mr. Alford told you that he was unhappy
10        with your performance as a supervisor?
11   A.   Uh-huh. (Positive response.)
12   Q.   Is that a yes?
13   A.   Yes.
14   Q.   And you believe that his telling you that
15        was harassment?
16        MR. TIDWELL: Object to the form.
17   A.   I don't know.
18   Q.   Well, did you believe that he told you he
19        was unhappy with your job performance
20        because of your race?
21   A.   I don't know.
22   Q.   Later on in that paragraph a couple of
23        lines down, you say: I think it is only

Page 177

```
 1    fair and just that if he -- and you're
 2    referring to Mike Alford -- wants to
 3    discuss what goes on with third shift, he
 4    should discuss it with me and not my
 5    helper, Michael Lingo, who is not a
 6    supervisor, but a lead person.
 7  A. Uh-huh. (Positive response.)
 8  Q. Tell me the basis for that.
 9  A. He would call Michael in there and talk
10    with Michael first. Then he would call me
11    in there second.
12  Q. And you believed that he should have called
13    you in first to talk to you?
14  A. Right.
15  Q. How long had Michael Lingo worked for you?
16  A. I think he started in 2004.
17  Q. And he's a black male?
18  A. Right.
19  Q. The next sentence says: Michael Lingo is
20    not doing his job efficiently due to he
21    does not help the workers on the floor like
22    his job requires him to do.
23      Help me understand what you mean there.
```

Page 178

```
 1  A. I could be in the office, like, doing --
 2    fixing the time, the reports for the
 3    night. You know, you got to keep up with
 4    the time and the hours they work. I be
 5    there doing that.
 6      When I come back out on the floor,
 7    Michael be standing there and they call me
 8    to the machine. And I say, where is
 9    Michael at? Why didn't y'all call him? I
10    don't want to see Michael. Michael don't
11    know what to do with this. I want to see
12    you.
13  Q. And Michael Lingo reported directly to you?
14  A. Yes.
15  Q. Did you ever write Mr. Lingo up?
16  A. No.
17  Q. Ever give him a personnel notice?
18  A. No.
19  Q. Ever give him a miscellaneous notice?
20  A. No.
21  Q. Ever give him a corrective action report?
22  A. No, just a yearly review.
23  Q. How long did he work under you?
```

Page 179

```
 1  A. 2004 November, I think, or October when he
 2    started.
 3  Q. 2004?
 4  A. Uh-huh. (Positive response.)
 5  Q. The last sentence on this page, you say: I
 6    was told by word of mouth the three choices
 7    I could take which was discuss in a very
 8    unprofessional and full-of-hatred manner.
 9      Now, are you talking there about the
10    three choices we talked about earlier?
11  A. Yes.
12  Q. About you could take the forklift job or
13    work out your unused vacation --
14  A. Uh-huh. (Positive response.)
15  Q. -- or receive pay for it or receive it in a
16    lump sum?
17  A. Yes.
18  Q. Were those options discussed in a meeting
19    with you?
20  A. No.
21  Q. How did you learn of them?
22  A. When they called me in the office March
23    11th.
```

Page 180

```
 1  Q. Who called you in?
 2  A. Mike Alford -- well, I was in there
 3    finishing doing my paperwork. He told me
 4    when you get through with your paperwork --
 5    that Saturday morning, he said, I want you
 6    to come to personnel. I've got to talk to
 7    you about something.
 8      So when I got to personnel, I said --
 9    the first thing Brendt Murphy said, you're
10    being separated from the company.
11  Q. Were Mike Alford and Brendt Murphy the only
12    people there?
13  A. Uh-huh. (Positive response.) The only
14    people in there.
15  Q. And at that time, they told you that they
16    were removing you from your third shift
17    supervisory role?
18  A. (Witness nods head up and down.) I was
19    separated from the company.
20  Q. Did they first tell you that you were
21    removed from your supervisory role?
22  A. Huh-uh. (Negative response.) They told
23    me -- Brendt Murphy talked first. Told me,
```

**Page 181**

1    first thing he said, I was separated from
2    the company. Then he told me that -- he
3    was asking did I have any insurance. I
4    said, my insurance is with my wife. He
5    said, that's a good thing for you. Said,
6    if you want to --
7  Q.  Get what?
8  A.  He said, you're going to drop down to a
9    lower bracket -- if you take a lower-paying
10   job, you drop down to a lower bracket. He
11   said, look ahere, I'm going to give you
12   these choices, and that's the three
13   choices.
14 Q.  Then he offered you --
15 A.  Three choices after he said I was
16   separated.
17 Q.  And one of the choices was the set order
18   puller job?
19 A.  Uh-huh. (Positive response.)
20 Q.  Is that a yes?
21 A.  Yes.
22 Q.  Tell me how is it that you contend that
23   Mike Alford and Brendt Murphy were very

**Page 182**

1    unprofessional and acted in a full-of-
2    hatred manner during that meeting.
3  A.  Just like he just told me -- Mike Alford
4    told me, said, don't come in tonight. I
5    got somebody in your place. Just check
6    back with us -- call me at my house Sunday
7    if you want any of them three choices.
8  Q.  And you believe their giving you those
9    choices was full of hatred and
10   unprofessional?
11 A.  Uh-huh. (Positive response.) I'm the one
12   that told them to write down them three
13   choices. So Brendt Murphy took the pencil
14   and wrote it down. Mike Alford said call
15   me. I'm going to write down my phone
16   number. He wrote his phone number on the
17   paper.
18 Q.  Do you contend that Mike Alford and Brendt
19   Murphy discriminated against you based on
20   your race in giving you those three
21   choices?
22 A.  I don't know.
23 Q.  Flip over to the next page, Bates stamped

**Page 183**

1    From Lee 0005. I'm looking about the
2    middle of the page. You say: I was fired
3    on March 10, 2006, and not given notice
4    until I had worked that day and given
5    notice a day later.
6        Help me understand what you mean by
7    that. Tell me the basis for that
8    allegation.
9  A.  Like I say, when he called me in there and
10   told me I was separated on 3-10-06, that
11   Saturday morning, but I had worked eight
12   hours, the 11th -- all Friday night going
13   into Saturday morning. I had worked all
14   night. Really didn't even supposed to be
15   on the premises if I was separated on the
16   10th. Anybody get separated from the
17   plant, they don't want you on the property
18   at all.
19 Q.  Let me make sure I'm understanding you.
20   You're saying you worked March the 10th a
21   full day?
22 A.  I went in March the 10th at 11 o'clock.
23       MR. TIDWELL:  11:00 at night.

**Page 184**

1  A.  Going into the 11th.
2  Q.  To start your shift?
3  A.  On Friday night, March the 10th, that's our
4    11th.
5  Q.  So you worked that whole day or that whole
6    shift?
7  A.  Whole shift.
8  Q.  Through 7:00 a.m. on the 11th?
9  A.  Uh-huh. (Positive response.)
10 Q.  And then that's when you met with Brendt
11   Murphy and Michael Alford?
12 A.  Yeah, told me to go to personnel, do my
13   paperwork.
14 Q.  On the 11th?
15 A.  Uh-huh. (Positive response.)
16 Q.  Is that a yes?
17 A.  Yes.
18 Q.  Look at the next page, Bates stamped From
19   Lee 0006. In the middle of that page, you
20   have seven, looks like, places listed where
21   you say you've applied for a job. Do you
22   see that?
23 A.  Uh-huh. (Positive response.)

Page 185

1   Q.  Do you have copies of the applications that
2       you made at these companies?
3   A.  No.  I got a copy of Michelin.
4   Q.  You have a copy of what?
5   A.  Michelin.
6   Q.  Michelin?
7   A.  Not an application.  I got a copy where
8       they told me to come take a test.
9   Q.  Was that in response to a job application?
10  A.  Uh-huh.  (Positive response.)
11  Q.  Was that a yes?
12  A.  Yes.
13  Q.  I'd like to see that, if you would give
14      that to your attorney.
15          MR. TIDWELL:  Do you still have
16          it?
17          THE WITNESS:  Where they told me
18          to come take the test.
19  Q.  There are seven items listed there, and
20      four through seven you show on-site in
21      parentheses.  Does that mean you applied
22      for a position on-site at that company?
23  A.  Uh-huh.  (Positive response.)

Page 186

1   Q.  Is that a yes?
2   A.  Yes.
3   Q.  Tell me for the items you list in one
4       through three how you applied for those
5       jobs.
6   A.  I went to Wal-Mart Distribution, and you
7       have to fill your application out on the
8       computer.
9   Q.  So you went to the distribution center?
10  A.  Uh-huh.  (Positive response.)
11  Q.  What about number two, CDA Security?
12  A.  I went to Ft. Rucker and tried for
13      security.
14  Q.  What do you mean you tried for security?
15  A.  In order for you to pass -- pass -- when
16      you first get there, they give you that --
17      you've got to run a mile.
18  Q.  Okay.
19  A.  And I couldn't run a mile.
20  Q.  You went there and did a physical?
21  A.  You've got to do, I think, 20 sits-ups and
22      20 push-ups and run a mile, and I couldn't
23      run the mile.

Page 187

1   Q.  Number three, you show three different --
2       you say you applied for unemployment, or
3       did you apply for jobs at unemployment?
4   A.  Unemployment.
5   Q.  Okay.  And did you receive unemployment?
6   A.  Yes.
7   Q.  And then under that, it says Michelin Tire
8       Company.  Did you apply for a job there?
9   A.  Yes.
10  Q.  Did you go to Michelin Tire Company?
11  A.  Huh-uh.  (Negative response.)  Not this
12      time.
13  Q.  Tell me how you applied --
14  A.  The first time when they call you -- when
15      you go fill the application out, you go to
16      the unemployment office for Michelin.  And
17      then the next time the unemployment call
18      you, you fill out the application.
19          So I went to the unemployment office to
20      fill out the application.  That's when
21      Michelin will call you to come to their
22      plant to fill out an application.
23  Q.  And did you do that, go to the Michelin

Page 188

1       plant?
2   A.  Huh-uh.  (Negative response.)  They never
3       called me to come take an application.  But
4       they called me I think the first of the
5       year to come take another application.
6       They called me then.
7   Q.  Did you do that?
8   A.  I took the test, but they never did call me
9       to come work.
10  Q.  What about -- Under that, it says KHF
11      Industry.
12  A.  That was a new company coming to Dothan.
13  Q.  And where did you apply for --
14  A.  At the unemployment office.
15  Q.  Tell me when you applied for each of those
16      jobs.
17  A.  I think Wal-Mart Distribution after I
18      applied -- I applied -- in security, I
19      applied in March.
20  Q.  So you applied for a security job at
21      Wal-Mart in March?
22  A.  Huh-uh.  (Negative response.)  Number one
23      and number two.

Page 189

1    Q.  Number one and number two. Okay. I see.
2        What was the job you applied for at
3        Wal-Mart?
4    A.  Onliest thing they showed me was the
5        distribution center.
6    Q.  What about Michelin Tire and KHF?
7    A.  Onliest thing I put down there, you know --
8        if they called me, I'd have put general
9        down there on the application.
10   Q.  When did you put in those applications?
11   A.  I think Michelin had something like an ad
12       in the paper. I think it was about in May
13       or something like that.
14   Q.  What about the KHF?
15   A.  I went to that in May. I went to Dunbarton
16       in May. I went to Twitchell two or three
17       times. I went to Nutcracker the same day I
18       went to Dunbarton. I went to the yeast
19       plant I think a day or two later.
20   Q.  In May also?
21   A.  Uh-huh. (Positive response.)
22   Q.  Is that a yes?
23   A.  Yes.

Page 190

1    Q.  Did you apply anywhere else other than
2        these places listed here?
3    A.  I went and filled out an application at
4        Perdue.
5    Q.  What?
6    A.  Perdue.
7    Q.  Perdue?
8    A.  Uh-huh. (Positive response.)
9    Q.  What is that?
10   A.  It's something like a chicken plant in
11       Dothan.
12   Q.  Anywhere else?
13   A.  I filled out the job I got now.
14   Q.  All right.
15   A.  I went to the egg plant in Abbeville.
16   Q.  Is that everything you did to try to find a
17       job after you left WestPoint?
18   A.  It could be some more, but I can't
19       remember. I went to a lot --
20   Q.  Everything you remember.
21   A.  Another job I went to, my pastor had told
22       me to sign up for the nuclear plant in
23       Columbia, so I signed up for the nuclear

Page 191

1        plant online. He told me to go online and
2        sign up. They sent a thing back saying I
3        wasn't qualified this time, to keep my name
4        in the thing.
5    Q.  Tell me when you found a job. When did you
6        get hired?
7    A.  They sent me a thing in the mail in
8        December.
9    Q.  Who were you hired by?
10   A.  Unemployment. I had to go to the
11       unemployment office and fill the
12       application out.
13   Q.  For what job?
14   A.  For SWIFCO.
15   Q.  SWIFCO?
16   A.  Uh-huh. (Positive response.)
17   Q.  And is that who you're with now?
18   A.  Uh-huh. (Positive response.)
19   Q.  What's your position?
20   A.  I'm at the window department.
21   Q.  At the what department?
22   A.  Window. Window department. They make
23       doors and windows.

Page 192

1    Q.  What do you do in the window department?
2    A.  I do -- I call it prep. You've got to cut
3        the parts out for to fit all four corners
4        of the windows.
5    Q.  And how long have you been there?
6    A.  Since January the 22nd.
7    Q.  January 27th of 2007?
8    A.  Uh-huh. (Positive response.) They sent me
9        a letter in the mail, told me I had to come
10       take -- had to go to class for a week.
11       That was January the 15th I think they told
12       me --
13   Q.  So you've been working there since January?
14   A.  Uh-huh. (Positive response.)
15   Q.  That was the first place you were hired?
16   A.  First place that said they'd hire me.
17   Q.  And how much are you -- are you being paid
18       hourly or on salary?
19   A.  Hourly.
20   Q.  What's your rate?
21   A.  Right now, it's 9.25. It was 8.50 when I
22       started.
23           MR. TIDWELL: Just make it clear.

Page 193

1        You started in January of '07,
2        right?
3        THE WITNESS: Uh-huh. (Positive
4        response.)
5  Q.  On the next couple of pages here, Bates
6      stamped From Lee 0007 through 0008, you
7      give a list of items that you contend are
8      your lost wages and benefits. Did anybody
9      help you come up with those calculations?
10  A.  It was me and my wife.
11  Q.  And you list an amount for lost wages, lost
12      vacation pay, lost life insurance, lost
13      social security, lost Medicare, lost
14      severance pay of six months; is that right?
15  A.  Yes.
16  Q.  All of the calculations that you did are
17      based on if you had worked for WestPoint
18      for another 15 years; is that right?
19  A.  Yes.
20  Q.  Now, didn't WestPoint's pension plan end
21      for all employees in December of 2004?
22  A.  I don't know.
23  Q.  You don't remember that the pension plan

Page 194

1      ended in December 2004?
2  A.  I really don't know.
3  Q.  You would still – you're still eligible to
4      start drawing a monthly pension at age 55;
5      is that right?
6  A.  Yes.
7  Q.  The life insurance that you -- the first
8      life insurance that you mention on this
9      calculation, that's still available to you
10      at a premium; is that right?
11  A.  Yes.
12  Q.  The second life insurance that you mention,
13      Universal Life insurance, that wasn't a
14      WestPoint-sponsored plan, was it?
15  A.  It's been there a long time.
16  Q.  Wasn't that a vendor that came to WestPoint
17      and offered life insurance? It wasn't a
18      company policy I guess is a better
19      question.
20  A.  I really don't know.
21  Q.  Isn't vacation pay part of your salary?
22      It's not a separate part in addition to
23      salary, is it?

Page 195

1  A.  We don't get no vacation pay. Onliest time
2      you get vacation pay, you separated –
3      onliest time you get vacation pay is if
4      you're separated from the company. You
5      done already earned it.
6  Q.  But you get vacation time I guess is --
7  A.  You get your vacation days, yeah. Onliest
8      thing about – you still get paid.
9  Q.  All right. At the end, on From Lee 0008,
10      you say that you've been caused pain and
11      suffering. Is there anything that you feel
12      like encompasses the pain and suffering
13      that you believe you've been caused that
14      you have not already told me about?
15  A.  Is there any what, now?
16  Q.  Tell me what pain and suffering you believe
17      has been caused.
18  A.  Lost wages. It's listed right there.
19      MR. TIDWELL: She's talking about
20        your other stuff you've
21        already talked about, your
22        emotional distress and all
23        that kind of stuff.

Page 196

1  Q.  I want to make sure there's not anything
2      that you haven't already told me about.
3  A.  No.
4  Q.  You've told me everything?
5  A.  Yes.
6  Q.  Prior to today, I sent a request for
7      documents to your attorney. Were you aware
8      of that?
9  A.  To who, now?
10  Q.  I sent a request for documents to your
11      lawyer. Did you know that?
12  A.  What lawyer are you talking about?
13      MR. TIDWELL: She's talking about
14        me. Remember when we met to
15        go over answers to questions
16        and all that?
17      THE WITNESS: Yeah.
18  Q.  Did you produce all the documents, notes,
19      diaries, everything that you have that
20      relates to this case?
21  A.  Yes.
22  Q.  You gave it to Jay?
23  A.  To Jay.

Deposition of Claude Gene Lee, Sr.

Page 197

1  Q.  And you don't have anything else at home
2      that you haven't already produced?
3  A.  Huh-uh. (Negative response.)
4         MR. TIDWELL:  With the exception
5         of the two things that we've
6         talked about, Michelin --
7         MS. PATE:  Right, that you're
8         going to go back and look for
9         and the handwritten notes.
10 Q.  We requested your 2005 and 2006 tax
11     return.  You've provided your 2006 tax
12     return.  Can you provide your 2005 tax
13     return?
14        THE WITNESS:  What did you get?
15        MR. TIDWELL:  You gave me the 2006
16        one, but you said you couldn't
17        find the 2005.
18 A.  Yeah.  I'll look for it.
19 Q.  If you'll put that on your list of things
20     to look for and get that to Jay.
21 A.  Okay.
22        MS. PATE:  I think I need just a
23        couple of minutes just to go

Page 198

1         over a couple of things, maybe
2         like three or four follow-up
3         questions, and then we can be
4         done.
5         (Brief recess was taken.)
6  Q.  I want you to take a look at Defendant's
7      Exhibit 19, and that's the declaration of
8      Brendt Murphy.  And there are -- all I need
9      you to do is look at -- go through one by
10     one the first three exhibits to Defendant's
11     Exhibit 19.  I want you to tell me if
12     you've seen the document before --
13        MR. TIDWELL:  Kelly, I think we've
14        already done this.
15        MS. PATE:  I know, but it's not
16        real clear.
17        MR. TIDWELL:  Have you seen
18        Exhibit 1?  Let's start with
19        Exhibit 1.
20 A.  One page of it.
21 Q.  And you contend that there's a second page
22     to this?
23 A.  Right.

Page 199

1  Q.  And that's your signature at the bottom of
2      the page?
3  A.  Yes.
4  Q.  What about Exhibit 2 to Defendant's Exhibit
5      19?
6  A.  It's totally different.  Like I say,
7      everything had a personnel notice on it.  I
8      never did see anything with WestPoint Homes
9      on it.
10 Q.  Have you ever seen Exhibit 3 to Defendant's
11     Exhibit 19?
12 A.  I still didn't see a WestPoint Homes
13     paper.  Only thing I saw was this writing,
14     this part they read me.
15 Q.  The part under disciplinary action?
16 A.  That's the only thing I remember.
17 Q.  But you don't remember the part under
18     performance/conduct description?
19 A.  No.
20 Q.  You don't believe you've ever seen that
21     before?
22 A.  Huh-uh. (Negative response.)
23 Q.  Is that a no?

Page 200

1  A.  No.
2  Q.  Mr. Lee, just so that the record is clear,
3      I want you to tell me every person who you
4      believe discriminated or harassed you based
5      on your race.
6  A.  I think Bob Turner.  I think Brendt Murphy,
7      Mike Alford and Frank Majors.
8  Q.  Have you told me everything you know
9      related to the allegations that you've made
10     in this lawsuit?
11 A.  Yes.
12        MS. PATE:  I don't think I have
13        anything further.
14        MR. TIDWELL:  I've got a couple of
15        questions.
16        EXAMINATION
17 BY MR. TIDWELL:
18 Q.  First, Mr. Lee, why were you terminated
19     from WestPoint?
20        MS. PATE:  Object to the form.
21 A.  One reason, because I was black.  Another
22     reason --
23 Q.  Well, let's -- I'm sorry.  Go ahead.

Page 201

1   A.  Another reason was my yearly review was
2       altered.  They told me they was going to
3       give me two weeks to clear myself up as a
4       supervisor.  They just give me three days
5       and let me go.
6   Q.  Is that all you can remember at this time?
7   A.  It could be some more, but I can't think of
8       it.
9   Q.  But you feel you were terminated because of
10      your race?
11  A.  Yes.
12          MR. TIDWELL:  I don't have any
13              other questions.
14          MS. PATE:  That's it.
15          (Deposition concluded at 4:30 p.m.)
16
17
18
19
20          * * * * * * * * * * * *
21      FURTHER DEPONENT SAITH NOT
22          * * * * * * * * * * * *
23

Page 202

1           REPORTER'S CERTIFICATE
2   STATE OF ALABAMA:
3   MONTGOMERY COUNTY:
4       I, Lisa J. Nix, Registered Professional
5   Reporter and Commissioner for the State of Alabama
6   at Large, do hereby certify that I reported the
7   deposition of:
8           CLAUDE GENE LEE, SR.
9   who was first duly sworn by me to speak the truth,
10  the whole truth and nothing but the truth, in the
11  matter of:
12          CLAUDE GENE LEE, SR.,
13          Plaintiff,
14          Vs.
15      WESTPOINT HOME, INC.,
16          Defendant.
17      In The U.S. District Court
18      For the Middle District of Alabama
19      Northern Division
20      Case Number 1:06-CV-874-MHT
21  on Tuesday, July 17, 2007.
22      The foregoing 201 computer printed pages
23  contain a true and correct transcript of the

Page 203

1   examination of said witness by counsel for the
2   parties set out herein.  The reading and signing of
3   same is hereby waived.
4       I further certify that I am neither of kin
5   nor of counsel to the parties to said cause nor in
6   any manner interested in the results thereof.
7       This 18th day of July 2007.
8
9
10
            _____
11          Lisa J. Nix, Registered
            Professional Reporter and
            Commissioner for the State
12          of Alabama at Large
13
14
15
16
17
18
19
20
21
22
23

**A**

**Abbeville** 9:13 10:5
12:11 15:22 47:2
190:15
**ability** 7:21 52:8
**about** 10:9 11:1 12:20
13:7,8 14:1,7 15:11
15:13 17:6,7,11 21:4
22:22 23:2,12 28:2
29:4 32:1,19 35:10
35:19,20 36:13,14
38:1 39:2 40:2,7,13
41:14 42:1,11,14
43:11 44:22 45:2,4,6
45:16 47:21 49:6,16
54:5,9 55:2,13 60:10
61:19 62:7,22 63:2,3
67:11 68:3,5,22
69:11,14 71:3,8,22
73:1,11 75:8 76:15
76:19 77:5,12 78:20
78:21 79:1 81:18,21
82:9,22 83:4,6,11,16
83:20 87:10 90:11
96:23 109:18 110:21
110:22 116:18 119:1
121:16 123:11,12,19
124:3,14,22 126:3,15
129:16 132:14 134:5
134:22 137:21,22
139:8 140:17,18,21
141:22 142:4,8,14,14
142:15 143:22
145:22,23 147:13
153:21,22 154:10,12
155:5 156:19 157:18
158:7,11 161:8,10,11
162:6,17 164:13,22
164:23 165:16
166:13,14,21 167:15
168:6 170:12,22
172:1,22 173:2,19
175:12,13 179:9,10
179:12 180:7 183:1
186:11 188:10 189:6
189:12,14 195:8,14
195:19,21 196:2,12
196:13 197:6 199:4
**above** 19:23 20:2 25:4
25:15 42:5 72:10
111:12,17
**absent** 113:14
**accept** 129:16
**accepted** 166:22 167:8
**according** 45:19 54:15
**acknowledge** 20:3 25:5
110:14
**acknowledges** 25:1,18
**acknowledging** 20:6
26:1 87:20 102:15

**acknowledgment** 3:10
3:15 24:23 25:16
**acted** 90:19 168:4
182:1
**action** 3:17 4:6,8 27:8
28:3 37:20 39:1,11
56:17 72:9,14 79:11
81:23 82:9 84:9 85:7
85:9 86:3 90:5,22
91:19 92:3,13,17,18
92:22 93:3,10,17
94:8,17,20,23 95:3,8
95:9 96:7,12,15
102:7,18 103:2,17
106:9 108:14 109:1
109:18 110:8,15
178:21 199:15
**actions** 27:21 43:14
137:10
**actual** 135:22
**Actually** 69:5
**ad** 189:11
**addition** 194:22
**address** 9:12,14 11:11
11:19 27:22 28:4,13
138:17 139:1
**addressed** 71:18
**affect** 7:20 8:2
**affidavit** 3:20 44:1 46:6
51:16 53:13 58:20
61:1,8 68:12,14
75:23 89:20 90:2,17
91:6 92:5,11 93:8,11
96:18 98:15 101:22
108:20 109:3,17
110:4,7 111:1 114:16
116:1 118:15 123:5
130:11 131:7 133:7
134:17 136:3 137:9
**African-American**
31:16 61:6
**after** 6:8 11:3 12:16
21:20 29:9 47:6
49:17,18 52:12,12
61:2 70:20 73:18,20
74:8 75:6,13,15 93:9
98:10 134:1 143:17
181:15 188:17
190:17
**again** 39:6 109:14
118:7 122:7 169:11
169:20
**against** 15:1 29:20
31:13 33:16 41:6,10
43:8 136:10,12,17
137:3 165:20 169:16
182:19
**age** 136:5,11,14 194:4
**ages** 12:4
**aggressively** 105:19

**ago** 88:16 175:7
**agree** 20:5 25:23 36:2
49:12 50:20 51:4
55:16 57:3 111:15
123:17 124:3 155:21
**agreed** 5:2,16,23
**agreement** 1:15
**ahead** 64:1 83:9 174:15
175:1 200:23
**ahere** 181:11
**ain't** 29:4 39:13,21
60:20 63:7,8 64:9
71:5 81:4 117:9,14
118:11 123:6 155:14
170:17 174:1,4
**AL** 2:6
**Alabama** 1:2,17,20
2:12 5:8 9:13 12:8
138:18 139:2 202:2,5
202:18 203:12
**Alford** 36:11 43:12
74:14,20 75:1,9,12
75:13 79:12 91:1,2
92:17 96:19 104:15
105:2 112:6,10
114:21 115:2,7 120:4
120:8,18 121:5 123:9
123:12,14 127:23
131:6,17 166:12
167:13 168:16 170:3
170:5,22 172:10
173:21 174:14
175:19,20 176:9
177:2 180:2,11
181:23 182:3,14,18
184:11 200:7
**Alford's** 76:4 128:9
169:12
**allegation** 31:21 33:20
41:9 43:18 99:3
116:11,15 119:13
121:11 167:20 183:8
**allegations** 151:17,18
152:5 200:9
**allege** 33:16
**alleged** 121:7
**almost** 13:3
**along** 32:15 103:5
104:16 169:9
**already** 16:13 37:16
72:23 87:23 118:6
122:18 127:16
129:16 137:5 174:19
175:12 195:5,14,21
196:2 197:2 198:14
**altered** 201:2
**Although** 90:19
**always** 17:11,13 53:7
63:19
**amount** 193:11

**another** 26:7 46:1
53:22,22 54:1,17,17
55:15 56:8 75:5
77:22 114:11 154:16
154:22 156:11
159:20 188:5 190:21
193:18 200:21 201:1
**answer** 7:1,5 24:9
33:10 168:8
**answered** 37:16 72:23
82:21 127:16
**answering** 6:17
**answers** 196:15
**antidepressant** 146:21
**anti-harassment** 22:14
**Anti-harassment/ret...**
3:13
**anxiety** 147:16
**anybody** 9:20 11:21
63:21 64:8,8 77:9
78:23 120:5 138:2
147:7 183:16 193:8
**anymore** 103:5
**anyone** 15:1 35:7 51:12
147:4
**anything** 38:21 43:5
55:20 58:4 63:1 71:3
71:8,21 72:18 93:19
93:21 119:2 126:22
137:20,21 143:1
145:11 147:21 148:1
152:14,16 155:5
161:8 165:13 168:6
168:16 172:3 175:2
195:11 196:1 197:1
199:8 200:13
**anytime** 63:4 111:5
**anyway** 140:19 152:21
**anywhere** 22:21 26:16
31:6 190:1,12
**appear** 151:19
**APPEARANCES** 2:1
**appears** 24:20 68:8
**appetite** 142:4,5
**application** 185:7,9
186:7 187:15,18,20
187:22 188:3,5 189:9
190:3 191:12
**applications** 185:1
189:10
**applied** 184:21 185:21
186:4 187:2,13
188:15,18,18,19,20
189:2
**apply** 187:3,8 188:13
190:1
**approximately** 1:21
90:20
**April** 130:9,10
**area** 56:20

**around** 13:19 30:22
31:2 113:15 169:6
171:18
**arrested** 8:23
**asked** 17:14 61:20 62:6
72:10 145:10 147:13
155:3
**asking** 33:8 76:18
86:14,18 87:1,3
96:10 106:4 110:3,5
110:9 120:17 124:21
125:5,5 152:2,3
164:6 173:6 181:3
**asset** 8:13
**assistance** 72:11
**assist** 49:3
**associate** 105:20
**associates** 3:9,11,14
19:2 20:7 21:11,18
21:23 24:18 25:9
26:10 27:8,11 36:5
70:17,19
**assume** 7:1
**Atlanta** 12:9 150:8
**atmosphere** 168:11,23
**attached** 91:7 93:13,15
94:2,7
**attacks** 142:8
**attempt** 130:14 142:10
**attitude** 167:21,23
169:3
**attorney** 185:14 196:7
**Attorneys** 2:11
**August** 16:11 19:21
49:6
**automatic** 13:13
**available** 114:10 194:9
**Avenue** 1:19 2:5
**average** 42:5 46:7
67:19,20,22 68:10
**aware** 196:7
**a.m** 44:15,16,18 184:8

**B**

**back** 15:14 37:15 52:14
53:14 56:4,5,7 58:20
61:1 62:8 66:6 67:5
68:12,20 87:12,18
89:8,20 90:16,17
92:10 93:8 98:8,13
100:10 105:9,10,11
108:20 109:3 114:16
126:16 127:7 130:3
130:11,22 132:5
144:1 146:10 148:3
156:7,8,10 160:7
171:13 178:6 182:6
191:2 197:8
**background** 76:6
147:12

**bad** 60:20 142:5
**bag** 174:2,2
**BALCH** 2:10
**bankruptcy** 15:7,9,16
  16:6
**based** 28:8 33:17 38:18
  136:6 169:16 182:19
  193:17 200:4
**basis** 31:14,20 33:20
  41:7,8 43:18 76:8
  99:3 116:11,14
  119:12 121:10
  136:10 167:19
  173:17 177:8 183:7
**Bates** 18:23 19:17
  24:19 26:10,12 27:5
  55:18 65:12 66:19
  124:12 128:4 139:15
  148:18 149:12 151:9
  151:13,17,19 153:15
  161:23 182:23
  184:18 193:5
**bathroom** 173:22
**became** 42:21 61:3
  74:14 168:11
**Bedsole** 32:9 38:2,16
  39:7 40:14,22 75:21
  97:14 113:10 132:12
  153:17 154:1,7
**before** 1:15 5:6 8:16,18
  10:17 11:9 18:3 19:3
  26:13 27:9 29:22
  34:4 37:1 42:20,21
  43:3 46:10 56:14
  57:13 63:20 64:7
  70:7 73:4 76:21 80:2
  102:10 106:1,4,15,16
  111:20 132:1 151:12
  155:14,15 162:23
  171:16 174:7 198:12
  199:21
**begin** 125:23
**behavior** 167:16 168:5
**behind** 137:19
**being** 27:15 28:17
  50:13,17 51:7,11,11
  71:19 75:3,10,14
  84:2 85:9 108:4
  125:6 136:6,7 142:15
  142:17 157:22
  158:13 162:18 165:5
  165:6 169:19 180:10
  192:17
**believe** 38:4 40:17,22
  51:10 54:21 55:5,10
  55:13 84:8 85:13
  95:2,7,12 99:22
  100:2,7 101:1,9,13
  101:17 102:22
  104:17,19,22 105:3,6

107:19 108:6,11
115:13 117:23 131:4
132:1 146:17 154:6
161:19 167:4 176:14
176:18 182:8 195:13
195:16 199:20 200:4
**believed** 111:6 177:12
**bell** 170:9
**below** 25:1,17
**belt** 50:2
**belts** 50:1
**benefits** 193:8
**Benson** 131:9,11 132:5
**best** 6:21
**better** 11:5,6 32:13
  40:5 52:18 57:16
  69:12 73:11 95:17,20
  157:4 194:18
**between** 5:3,17 6:1
  31:6 46:7,12 84:19
  95:3 133:8 152:7,12
**bid** 97:23 98:7,11,12
**big** 35:11 38:10
**bills** 137:19
**Billy** 32:9 38:2 39:19
  40:14 58:3 75:21
  97:14 113:9 132:12
  153:17
**BINGHAM** 2:10
**Birmingham** 1:20 2:6
**birth** 9:10
**bit** 31:11 44:8
**black** 17:15 31:15
  33:23 48:16 77:17
  131:8 136:13 159:17
  165:7,11 177:17
  200:21
**block** 59:7,9
**blood** 7:15,16
**board** 43:1
**boasting** 167:15
**Bob** 32:5 34:1,3,4,10
  41:15,16,16,20 42:13
  43:11 51:18 61:2
  63:19 64:5 99:14,16
  100:15 123:3 158:21
  161:17,18 162:3
  200:6
**book** 27:12 140:2
**booklet** 3:11,15 21:18
  21:22 24:18
**both** 132:3 143:21
  144:2,7 145:3 146:13
  146:18
**bottom** 19:19 25:15
  53:15 55:18 56:1
  69:18 70:10 72:7
  74:11 79:18 89:5
  94:2 102:12 108:16
  111:12 127:23 128:8

130:13 159:4 199:1
**box** 49:20 66:22
**boxes** 13:18
**bracket** 181:9,10
**break** 7:10 31:11 90:12
  148:5,12
**breakdown** 139:23
**Brendt** 4:14 51:22 52:1
  64:5 91:6,13 127:22
  128:6 158:21 169:10
  169:15 175:19 180:9
  180:11,23 181:23
  182:13,18 184:10
  198:8 200:6
**brief** 60:4 90:15 148:13
  151:23 175:3 198:5
**bring** 37:3 171:6
**bringing** 46:20
**Brock** 15:21 16:4
**brought** 46:21 49:18
  49:19
**bulletin** 38:10
**B-R-O-C-K** 15:21

---

## C

**calculation** 194:9
**calculations** 193:9,16
**call** 29:7,9 45:14,23
  76:14 177:9,10 178:7
  178:9 182:6,14
  187:14,17,21 188:8
  192:2
**called** 40:1 82:2,4
  83:18 105:9 140:2
  177:12 179:22 180:1
  183:9 188:3,4,6
  189:8
**came** 62:3 75:9 76:21
  87:12,18 157:5,13
  171:13 194:16
**car** 105:8
**card** 138:7
**care** 40:2,3,5 165:1,17
**career** 20:20
**carried** 169:4
**carrier** 10:16
**carry** 137:14,19 169:5
**carrying** 83:6 170:22
**case** 1:7 5:18,20 13:14
  16:13,14 134:7,13
  196:20 202:20
**Caucasian** 40:12
**cause** 203:5
**caused** 195:10,13,17
**CDA** 186:11
**center** 138:15 186:9
  189:5
**certain** 31:19
**CERTIFICATE** 202:1
**certify** 202:6 203:4

**chain** 29:10
**chance** 35:14 116:16
  172:2
**change** 45:15,21 49:7
  49:12 59:20,21 60:1
  113:4
**changed** 8:12 42:4,6,7
  50:1,5,13 73:18,20
  74:8 117:18,20,23
  118:2,4 147:21 148:1
  168:14
**changes** 49:13,15,16
  50:7,21 51:5,10,14
  75:16 105:20
**charge** 30:15 136:5
**charged** 8:23
**check** 59:15 60:18
  127:6 128:14,21
  129:6 130:3,5 150:19
  151:5,5 182:5
**checkmark** 66:22
**chicken** 190:10
**Child** 138:21
**choice** 125:11 127:1,2
  129:20 159:20 161:1
  161:14
**choices** 4:10 125:8,9
  179:6,10 181:12,13
  181:15,17 182:7,9,13
  182:21
**choose** 130:1,2
**chose** 161:4
**Chris** 138:13 143:11
**circumstances** 15:11
**cite** 91:5 93:11
**Civil** 5:5
**Clara** 131:10,11,14,22
  132:6,9,15 133:3
  159:7,14,16 160:14
  171:10
**class** 192:10
**Claude** 1:5,14 3:2,20
  4:11 5:4 6:7 9:5 10:2
  12:2,6 32:18 56:18
  72:10 80:10 81:10,18
  85:8 103:4,5 104:15
  104:17,18 105:19
  106:10 107:14 108:3
  109:10 152:2 202:8
  202:12
**clear** 121:7 122:10
  136:16 192:23
  198:16 200:2 201:3
**Clemson** 46:23 47:6,17
  48:2
**clerk** 10:14
**close** 34:12 50:23 147:8
**closed** 46:23 47:6,17
  48:2 57:2 81:17
  92:13 98:21 175:21

**closely** 51:6
**color** 31:15 33:17
**Columbia** 190:23
**come** 17:5,3 32:1 34:20
  37:2 40:15 41:18
  46:2 48:13 57:23
  61:14,16,16,16 63:8
  63:20 64:23 97:11,23
  100:9 105:9 126:16
  127:7 143:20 147:22
  155:6,8,13 156:21
  161:1 171:15,15
  173:22 174:11 176:6
  178:6 180:6 182:4
  185:8,18 187:21
  188:3,5,9 192:9
  193:9
**coming** 32:12 34:11
  36:3 37:7,9 44:23
  45:6 57:10,11 62:8
  62:15 144:1 153:19
  188:12
**commencing** 1:21
**commendation** 59:6,20
  60:1 133:11
**comment** 163:13,16
**commission** 5:9
**Commissioner** 1:17 5:8
  202:5 203:11
**communicate** 56:23
**communicating** 57:18
  58:7
**communication** 71:14
  105:21 109:9
**companies** 185:2
**company** 8:10 17:18
  123:22 156:3 166:23
  167:9 180:10,19
  181:2 185:22 187:8
  187:10 188:12
  194:18 195:4
**compare** 151:11
**compared** 37:21 38:5
  38:18 152:13
**complain** 35:7 78:23
**complaint** 3:8,19 18:13
  23:7 26:22 28:11
  29:1,19 31:5 37:18
  40:9 41:3,4
**complaints** 3:16 26:9
  26:21
**completed** 65:5,17
  79:12 80:15
**computer** 74:1,1,8
  79:15,16 80:4,15,17
  80:19 88:23 89:2
  135:9 143:3,5,6
  150:12 186:8 202:22
**concept** 86:20
**concerned** 83:11

concerns 121:7
concluded 201:15
conduct 81:10 84:16
   86:12
conference 111:11,16
confidence 52:8
conscious 43:15
consider 39:10 146:10
constantly 166:3
consultation 4:13
   139:16
contain 84:12,18
   202:23
contained 86:10,15
   151:17
containing 110:16
contend 35:4 38:3,16
   43:5 64:16 70:6 73:8
   73:15,21 78:1,10
   80:1 81:2,12,20
   82:13 83:14 84:3
   85:12,23 86:7 87:22
   88:4 90:2 93:15 94:6
   103:22 105:12,23
   106:14 107:1 111:19
   112:10 113:21 115:2,6
   117:19 120:7,12
   123:14 131:16 132:9
   135:4,13,20 136:9,16
   137:2 154:1 162:18
   163:15 165:9,18,19
   166:6,11 168:3
   169:15 171:3 172:13
   173:8,11 175:23
   181:22 182:18 193:7
   198:21
contention 120:16
continue 70:19
continuous 165:6
contract 20:4 25:6
control 109:6 111:23
conversation 62:5
conversations 61:22
   62:1 65:3
copies 185:1
copy 18:5 19:5 21:21
   22:10,17 29:19 54:18
   66:13 84:23 85:2
   91:13 106:23 115:22
   185:3,4,7
corner 94:4
corners 192:3
correct 56:22 65:6
   70:20 89:12 95:6
   114:19 202:23
Correction 4:6
corrective 3:17 4:8
   27:7,21 28:3 72:13
   79:11 81:23 82:9
   84:9 85:9 86:3 90:4

90:21 91:19 92:3,13
   92:17,18,20 93:3,10
   93:17 94:8,17,20,23
   95:3,7,9 96:7,12,15
   102:7,18 103:2,17
   108:23 109:18 110:8
   110:15 178:21
correctly 127:12
counsel 5:3,17 156:12
   174:10 203:1,5
counseling 59:11,13
   60:21 133:15,19
   134:1,1
count 41:3,4 43:6
COUNTY 202:3
couple 8:12 88:16
   114:3 119:11 176:22
   193:5 197:23 198:1
   200:14
course 14:12 62:9
court 1:1 7:6 8:21
   15:16 16:9,10,12,16
   16:17 29:20 202:17
cover 113:16,23
Covered 72:9
covering 26:9,21 27:8
create 148:19,21 149:4
   149:7
created 149:2 152:18
crime 9:1
critical 95:13
criticism 58:17 72:4
   166:17
criticisms 68:15
critiques 67:2
crying 140:14
current 9:12 106:11
   107:15 109:11 112:4
currently 7:12
cut 192:2

_____ D _____

daddy 147:14
Daniels 97:1,3,5,18
   98:1,22 170:10,23
   173:14,15,16 174:6
dash 124:12
date 9:10 30:23 111:11
   111:16 139:18 158:3
dated 19:21 69:21 70:2
   79:22 84:9 85:14
   94:8 110:15 139:17
daughter 149:17,18,20
   150:4,5 151:6
day 36:22 38:12 55:9
   104:14 140:7,18
   160:5 169:21,22
   171:13 175:17 183:4
   183:5,21 184:5
   189:17,19 203:7

days 35:17,18 110:1
   113:1 141:19 195:7
   201:4
December 3:21 9:11
   31:23 41:12,13 48:17
   49:2 51:18 53:18
   57:4 58:23 117:3,7
   117:17 118:18
   121:17 122:3,13,16
   123:8 146:2,3 158:5
   158:7,15 191:8
   193:21 194:1
decided 30:9 140:12
decision 174:21
declaration 4:14 91:14
   93:16 198:7
declare 15:7,9
Defendant 1:9 2:9
   202:16
Defendant's 3:7 17:22
   18:2,20,23 19:14,17
   21:12,16 22:1,5,8
   23:10,16 24:13,16
   26:4,7 27:1,2 29:16
   29:17 41:5 43:14,20
   43:23 53:10,12,16
   65:9,10 69:2,3,6 72:8
   79:8,10 82:12 83:14
   85:8 88:6 89:6,9,12
   89:17 90:7 91:10,11
   91:17 92:2 93:5,12
   94:3,7 102:3,6,13
   103:1,9,14 105:12,17
   106:10 108:12
   109:15,17 110:7
   124:8,10 125:13
   127:18,20 128:4
   139:11,14 143:7
   148:14,17 153:15
   158:23 159:5 198:6
   198:10 199:4,10
deficiencies 105:22
   114:20
demean 130:15,21
   131:5
demoted 131:10,16,17
deny 92:16
department 14:11,13
   14:14,15,16,20,22
   52:14,16,20 57:1
   66:3 71:2 99:15
   106:13 107:16 109:7
   112:2 131:9 154:15
   154:16,18,22 161:20
   165:8 170:1 191:20
   191:21,22 192:1
DEPONENT 201:21
deposed 8:16,18
deposition 1:14 5:4,6
   5:13,18 6:2 8:19

201:15 202:7
depressed 141:9
   142:15,15,17 146:7,7
depression 137:23
   138:1 147:16
described 29:11
description 81:10
   84:16 86:12 105:18
   199:18
detail 40:7 83:23
details 17:9 70:13 71:7
devastating 137:10
diaries 196:19
difference 23:21 46:11
   95:2 133:8 151:21
   152:7,11
different 13:4,5,8 14:8
   21:7 59:10 80:3,5,7
   83:14 85:14,15,16
   103:19,20 105:15,16
   113:16 118:10
   152:15,16,18 153:7
   172:18 173:3 175:9
   187:1 199:6
difficult 44:9 137:12
directed 31:6 33:2
directly 53:4 178:13
disagree 42:8,9 58:16
   63:17 72:3 166:17
   172:19 174:21,23
disagreed 67:2 68:15
disciplinary 37:20 39:1
   39:11 85:6 106:9
   108:14 199:15
discipline 56:22
disclaimer 3:15 20:2
   25:3
discriminate 23:4
discriminated 28:17
   31:13 33:16 41:6,10
   43:8 136:10,12,17
   137:3 165:20 169:16
   182:19 200:4
discrimination 17:2,8
   17:19 22:23 23:13,23
   43:17 116:4 117:1
   118:17 119:15 136:5
discriminatory 171:4
discuss 177:3,4 179:7
discussed 83:22 90:3
   91:3 179:18
discussion 148:10
disregard 43:15
distress 195:22
distribution 50:12
   186:6,9 188:17 189:5
district 1:1,2 29:20
   202:17,18
Division 1:3 202:19
doctors 144:7,22

146:14 147:4,10,18
document 3:7 29:21
   55:11 65:14 66:18
   73:2,3,21 79:21 80:2
   80:13 81:1,12,19
   82:13,23 83:1,12
   84:3 85:13 86:1,16
   87:17,19,22 88:4
   91:14 95:19 102:15
   103:23 105:6,8
   107:19 108:6 111:10
   115:14 125:12
   139:15 144:13
   148:19 159:4 198:12
documents 121:23
   152:17 196:7,10,18
doing 47:3,4,7 55:3
   58:13 60:16,19,20
   76:12,17 155:4 157:4
   162:14,20 166:14,15
   171:3 174:1 177:20
   178:1,5 180:3
done 13:4,7 29:4 32:7
   38:12,12,13 42:19
   60:23 64:22 131:3,18
   195:5 198:4,14
door 23:1,14 38:11
doors 191:23
Dothan 15:23 16:1,17
   138:18 139:1 188:12
   190:11
down 7:7 10:5 13:19
   46:23 47:1,17 49:22
   49:23,23 59:2 79:6
   127:13 131:22 133:5
   141:18 142:1 143:5
   147:11 159:21
   160:15,18,20 161:2,4
   163:7,14,15,18,21,23
   166:21 171:16,19
   175:13 176:23
   180:18 181:8,10
   182:12,14,15 189:7,9
dozen 13:15
Dr 140:22 141:6
   142:22 143:11,16
   144:2,2,14 145:5
   146:18,18
drawing 194:4
drive 129:18 139:1
driving 126:5,7
drop 181:8,10
dropped 133:5
due 162:3 165:7 177:20
duly 6:8 202:9
Dunbarton 189:15,18
during 14:11 20:20
   52:6 62:22 71:16,17
   142:13 147:3 182:2
duties 80:10 81:11

| E | | | | |
|---|---|---|---|---|
| **E** 1:18 2:4 66:20 | 64:9,10 153:13 | **excessive** 70:17 | **figure** 173:5 | 61:9 163:21 170:14 |
| **each** 6:22 14:1 38:12 | 170:17 | **excuse** 151:10 | **file** 156:7 163:6 | **five-minute** 90:11 |
| 57:9,10,13,23 58:7 | **entitled** 3:7 21:22 | **exempt** 92:8 | **filed** 14:23 15:15 16:8 | **fixed** 168:15 |
| 88:2 96:4 155:18 | **equal** 3:12 17:15,17 | **exemption** 27:10 85:21 | 16:18 29:19 44:1 | **fixing** 178:2 |
| 170:14 188:15 | 22:13 | **exhibit** 3:5,7 17:22 | 136:4 | **flagrant** 43:14 |
| **earlier** 6:13 44:8,21 | **Etheridge** 38:2,17 39:7 | 18:2,20,23 19:14,17 | **files** 163:1 | **flat** 10:21,21 |
| 179:10 | 75:20 97:15 132:14 | 21:12,16 22:1,5,8 | **filing** 5:18,22 | **Flip** 44:6 133:6 161:23 |
| **early** 57:10,11 | 132:20 133:2 | 23:10,16 24:13,16 | **fill** 14:8 16:3,6 114:4,5 | 166:20 175:11 |
| **earned** 59:5 | **evaluation** 41:19,20,23 | 26:4,7 27:1,2 29:16 | 114:11 142:23 145:6 | 182:23 |
| **easier** 88:3 91:16 | 42:1,3,8,12,17 117:8 | 29:17 43:20,23 53:10 | 186:7 187:15,18,20 | **floor** 58:2 61:17 76:10 |
| **eating** 142:6,7 | 117:16,21 118:1 | 53:12,16 60:3 65:9 | 187:22 191:11 | 76:12,16 77:7,8 83:4 |
| **education** 12:16 | 165:14,14 | 65:10 69:2,3,6 72:8 | **filled** 190:3,13 | 83:7,17 87:10 130:22 |
| **EEOC** 30:15 136:5 | **even** 8:11 70:20,21 | 79:8,10 82:12 83:15 | **film** 126:3 | 132:5 160:8 167:22 |
| **effect** 25:2,20 | 71:17 116:7 119:18 | 85:8 88:6 89:6,9,12 | **final** 134:3 174:8,12 | 169:3,5,6 177:21 |
| **efficiency** 31:18 33:19 | 156:14 183:14 | 89:17,21 90:7 91:7 | 175:8 | 178:6 |
| 34:14,17,19 35:1 | **events** 4:11 | 91:10,11,17,17,23 | **finally** 136:7 | **flow** 71:1 |
| 36:9 38:7 49:22 54:8 | **eventually** 40:10 | 92:2 93:5,6,12,13,15 | **financial** 147:8 | **follow** 18:15 152:1 |
| 55:2,9 101:4 109:22 | **ever** 8:16,18,21,23 9:6 | 94:2,3,7 102:3,6,12 | **find** 58:2 71:17 89:10 | **follows** 6:10 |
| 115:1 162:17 | 12:20 14:23 15:3,7 | 102:13 103:1,9,14 | 137:17,18 190:16 | **follow-up** 111:11,15 |
| **efficient** 157:22 158:14 | 18:2 19:8 22:10 23:9 | 105:13,17 106:10 | 197:17 | 198:2 |
| 166:3 | 23:15,18,19 24:3 | 108:12 109:15,17 | **fine** 20:5 31:3 90:14 | **forced** 162:18 171:21 |
| **efficiently** 177:20 | 26:13,15,18,20 27:9 | 110:8 122:4,7,8,12 | 148:8,11 | 172:6,13 173:1,9,10 |
| **effort** 98:20 99:5 100:1 | 35:7 62:8,12,14 | 124:8,10 125:13 | **finish** 88:1 | 173:12,13 |
| 100:18 101:18 | 78:23 94:1,11,14,20 | 127:18,20 128:4 | **finishing** 180:3 | **foregoing** 202:22 |
| **egg** 190:15 | 96:11,13 106:4,14 | 139:11,14 143:8 | **fire** 64:7 83:9 121:8 | **forklift** 126:5,6,7 |
| **eight** 46:5 96:17 183:11 | 107:5 113:20 142:10 | 148:14,17 149:11 | 123:10,15 173:15 | 129:18 179:12 |
| **either** 5:14,20 146:3 | 168:5 174:6 178:15 | 152:8 153:15 158:23 | 174:5,15 175:1 | **form** 5:11 20:8 21:1 |
| 147:15 163:21 | 178:17,19,21 199:10 | 159:6 198:7,11,18,19 | **fired** 12:21 64:22 87:23 | 27:23 28:6,14,19 |
| **eligible** 194:3 | 199:20 | 199:4,4,10,11 | 131:3 173:16 175:10 | 31:22 36:6 46:13,15 |
| **embarrass** 130:15,20 | **every** 17:6 20:17,19 | **exhibited** 167:23 | 176:8 183:2 | 51:2,8,13 54:23 57:6 |
| 131:4 | 31:20 34:20 38:12 | **exhibits** 198:10 | **first** 6:8 13:2 21:19 | 58:18 60:12 62:21 |
| **emotional** 195:22 | 41:8 45:17 55:9,9 | **experienced** 77:15 | 28:23 30:14,17 31:12 | 67:14 72:22 78:16 |
| **employed** 16:20 | 62:3 101:6 116:10 | **explain** 77:2 | 31:23 32:7,17 33:14 | 86:13 89:18 90:21 |
| **employee** 20:4 76:14 | 119:12 121:10 | **extended** 113:14 | 34:17,19 35:12,14 | 91:3 92:12 93:10 |
| 81:18,21 82:7,22 | 141:22,23 143:20,21 | **extent** 7:22 8:6 | 36:12,18 39:20 46:2 | 96:1 100:5,21 101:3 |
| 83:6,17,20 87:11,13 | 144:1,3,7,10,11 | **extremely** 137:11 | 48:13 57:8 59:8,13 | 101:20 110:17 111:8 |
| 87:23 96:20,23 98:17 | 145:20 155:6,8 | | 59:15 62:16,16 64:17 | 112:5 113:18 116:12 |
| 99:22 100:3,17 | 167:19 200:3 | **F** | 68:8 70:4 71:7 75:7 | 120:10,20,23 126:11 |
| 101:17 113:13 | **everybody** 17:14,16 | **F** 2:10 | 75:16,20 77:11 80:9 | 127:15 129:22 134:9 |
| **employees** 28:5 31:7 | 34:12 77:8 78:12,15 | **facility** 66:3 | 80:9 81:9 82:16 | 136:21 137:4 143:1 |
| 35:20 44:23 46:7,11 | 157:10,14 168:1,2 | **failed** 105:19 | 84:12 97:5,9,11,12 | 145:7 162:21 163:9 |
| 47:9,15 59:5 63:13 | **everybody's** 157:6 | **Failure** 72:11 | 97:13 98:2,6 99:13 | 167:6,18 176:16 |
| 63:18 64:13 77:10,14 | **everyone** 50:21 | **fair** 7:2 24:12 66:22 | 113:22,23 114:18 | 200:20 |
| 78:9 131:1 134:8,12 | **everything** 7:7 47:1 | 67:12,17 153:13 | 122:18,21 127:2 | **formality** 5:9 |
| 134:14 167:14 | 49:23 57:12 58:4,6 | 177:1 | 128:12,16,17 129:4 | **found** 191:5 |
| 172:20 173:9,10,13 | 61:19 62:6 66:16 | **family** 137:11 138:22 | 129:17 131:15 | **four** 47:20 127:5,6 |
| 193:21 | 73:2 92:6 143:2,6 | 140:16 147:4,7,8,11 | 132:11,15 133:15,18 | 128:15,21 129:7,12 |
| **employment** 3:12 | 155:7 168:14 190:16 | **fax** 149:13,14,14,20 | 139:3 143:20 151:8,9 | 130:5,7,8 151:12 |
| 22:13 25:6 31:14 | 190:20 196:4,19 | **faxed** 149:22,23 | 152:12,14 153:14,16 | 166:21 175:6 185:20 |
| 41:5 43:17 76:4 | 199:7 200:8 | **February** 4:5 39:4,9 | 158:2,2 159:4,8 | 192:3 198:2 |
| 136:8 | **evidence** 5:13 33:2 | 69:7,21 70:2 73:9,22 | 160:13,15,16 162:1 | **Frank** 41:22 42:6,11,21 |
| **encompasses** 195:12 | 43:5 116:3,23 118:17 | 74:10,13,13 123:7 | 168:22 171:7,8,9 | 43:12 61:2,14 63:22 |
| **end** 56:10,15 162:2 | 119:15 | 153:19,22 159:6 | 174:11 177:10,13 | 65:17 68:22 74:17 |
| 165:4 167:12 171:20 | **exact** 86:15,19,20 87:4 | 161:21 | 180:9,20,23 181:1 | 120:4,7,18 123:12,14 |
| 193:20 195:9 | 87:6 152:4 | **federal** 5:5 16:17 29:20 | 186:16 187:14 188:4 | 131:6 161:17 164:17 |
| **ended** 102:23 194:1 | **exactly** 152:6 | **feel** 64:2 195:11 201:9 | 192:15,16 194:7 | 164:18 165:9,12,19 |
| **enforce** 56:21 58:9 | **examination** 3:1 6:11 | **feelings** 141:7 | 198:10 200:18 202:9 | 166:12,21 167:8 |
| **enjoy** 127:6 | 200:16 203:1 | **felt** 28:16 | **fishing** 142:19 | 172:10 200:7 |
| **enough** 24:12 36:15 | **exceeding** 68:17 | **females** 131:8 | **fit** 192:3 | **Frank's** 42:8 |
| | **exception** 197:4 | **few** 73:12,13 104:10 | **five** 13:6,6 31:5 50:3 | **free** 43:16 |

**Friday** 183:12 184:3
**from** 4:10,12,13 8:5
11:12,13 12:21 27:6
27:20 28:2 34:10
36:18 37:3 40:11
42:4 44:14 45:11,23
47:14,21 48:17 49:1
58:2 61:15 72:14
73:5 96:21 97:10,11
97:21 98:2,5,18
103:20 104:18
106:11 107:14
109:11,23 110:4
112:3,11,20 117:17
121:17 123:18,22
124:4 125:1 128:5
131:19 132:2,7 136:7
136:19 139:15
140:15 144:13
145:23 146:2 147:15
148:18 149:12,22,23
151:10,13,20 153:7
153:16,19 160:9,20
162:1 166:20 170:6
171:7,7,14 173:22
174:11 175:11 176:5
180:10,16,19,21
181:1 183:1,16
184:18 193:6 195:4,9
200:19
**front** 22:23 23:1,13,14
56:3 66:2 89:23
**Ft** 186:12
**full** 9:3 182:9 183:21
**fullest** 7:22 8:6
**fully** 66:16 67:8 109:6
111:23
**full-of** 182:1
**full-of-hatred** 179:8
**functions** 50:13
**further** 5:16,23 116:3
116:23 118:16
119:14 171:19
200:13 201:21 203:4

**G**

**Gallery** 76:5,21
**gave** 27:10 48:8 69:8
90:21 92:12,16,17
93:4,9 138:9,11
143:12 145:19
164:18 196:22
197:15
**Gene** 1:5,14 3:2,20 5:4
6:7 9:5 10:2 202:8,12
**general** 189:8
**Georgia** 12:9 17:6
**gets** 151:1
**getting** 24:3 39:21
41:12 55:7 79:7

95:10 119:21 132:8
**give** 16:13 21:8 38:7
41:22 47:18 70:8
92:18,20 114:23
115:10 116:16
126:23 127:3,5 130:4
130:5 133:19 134:3
139:9 141:13 150:21
151:3 159:20 160:5
161:14 171:7 172:2
174:8,10 178:17,19
178:21 181:11
185:13 186:16 193:7
201:3,4
**given** 44:10 51:17
70:21 74:21 90:4
114:19 129:5 130:14
130:20 143:10
161:16 164:2,11
183:3,4
**gives** 18:15
**giving** 95:16 121:6
182:8,20
**go** 12:10 16:10 17:6,12
28:12,18 29:3 30:14
32:14 35:14 46:3,4
53:14 58:1 63:23
64:10 68:12 77:21
81:7 82:20 83:9
89:20 90:17 98:2,5,7
98:12 100:10 103:5
104:16 108:20 109:3
109:20,23 113:1
114:3,16,22 116:16
122:7 126:14 130:11
130:22 131:1 134:1
137:23 140:13
142:19 148:2 156:7,8
156:10 160:6,7 168:9
171:1 174:14,19,23
175:13 184:12
187:10,15,15,23
191:1,10 192:10
196:15 197:8,23
198:9 200:23 201:5
**goal** 163:7
**goals** 31:19 32:22
72:12 163:14
**goes** 177:3
**going** 20:11 32:2,13
33:15 36:17,19,23
39:18 61:19 62:7
83:7 89:7 90:16
112:11,12 113:2,4,8
114:22 115:8,10
126:22 127:2,22
140:6,10 141:4
144:10 157:3 170:15
170:18 171:6,10,14
174:4 181:8,11

182:15 183:12 184:1
197:8 201:2
**gone** 9:6 41:20 73:15
118:6 122:5
**good** 36:9 45:14,20
51:15 62:3 148:4
165:14 181:5
**Goodman** 30:6,7,14
149:10
**graduate** 12:12,14
**great** 83:23
**Group** 1:19 2:4
**guess** 135:10 194:18
195:6
**guidance** 72:11
**guidebook** 3:9,11,14
19:2 20:4,7,17,21,23
21:5,10,17,22 22:2
24:17 25:2,5,9
**guidebooks** 20:15 21:9
**guidelines** 72:12
**guy** 83:4,10 99:18
170:3,4,6,8

**H**

**habits** 153:21 154:11
154:12 155:5
**half** 13:15 53:23 54:2
54:20 143:22 176:8
**halfway** 49:21
**hand** 61:18 65:1
**handle** 52:18 137:12
**handled** 82:6 83:19
87:13
**handling** 48:4
**hands** 83:5,7
**handwriting** 65:23
66:4 79:13 104:6
118:12 127:21 128:6
128:9
**handwritings** 118:10
**handwritten** 74:4
150:15,17 197:9
**hang** 53:13
**happened** 123:7 169:20
114:2 140:17 141:5
**happening** 49:17 50:21
**harassed** 28:17 136:6
136:17 137:3 165:6
165:19 169:11,19
175:20,23 200:4
**harassing** 165:10
167:13
**harassment** 17:1,19
176:15
**hard** 79:6 137:17 141:2
**hatred** 182:2,9
**having** 3:10 6:8 57:23
62:15 65:2 140:5,14
141:7 147:4,8

**hazards** 171:17
**head** 7:6 59:2 73:5
141:18 142:1 161:20
162:23 163:2,17
180:18
**heading** 162:1 163:23
169:8
**headings** 151:21 152:8
152:12,18 153:9
**Headland** 12:8 150:10
**health** 147:5
**heard** 75:5 161:9
**held** 12:23 13:21
**help** 24:7 30:15 33:13
46:18,22 47:13,16,19
146:8 173:6 177:21
177:23 183:6 193:9
**helped** 138:4 140:23
**helper** 52:22 177:5
**helping** 52:22
**helps** 79:6
**hemmer** 10:21
**her** 10:13,20 24:7 28:5
33:1 79:6 107:12
131:22 133:5 149:22
149:23 150:6,12
159:20,21 160:5,6
161:6,6,13,15,16
168:8
**hereto** 5:21 6:1
**he'll** 61:16,16,18
**hid** 140:15
**high** 7:15 12:10,11,16
44:10
**higher** 34:17 74:22
75:4 166:22 167:4,9
**him** 30:18 40:15,20
41:22 42:23 52:13
56:19 61:13 62:8,15
63:17 72:10 75:1,14
79:1 89:23 98:9,13
99:10 100:11,12
101:4,14 126:17,21
140:3 142:13 143:4
143:14,19 154:13,14
162:3,10,16 167:2
169:23,23 170:4,19
171:3 173:23 174:4,5
174:9,10,12,15,22,23
175:1,6,9,10 177:22
178:9,17,19,21
**hire** 36:23 192:16
**hired** 45:3 47:4 191:6,9
192:15
**hiring** 45:9
**history** 147:12
**hold** 13:19
**holler** 77:7,9
**hollering** 76:11 78:2,3
**home** 1:8 11:14 22:9

93:20,22 108:22,23
126:14 140:18 160:6
197:1 202:15
**Homes** 10:19 104:13
199:8,12
**Honeysuckle** 138:17
**hotline** 29:6,9
**hour** 57:11 132:8
**hourly** 134:8,12 192:18
192:19
**hours** 44:11,13 114:9
178:4 183:12
**house** 9:16,17 140:6,7
140:9,10 142:20
154:5 182:6
**huh-uh** 24:10 48:1
52:21 55:23 56:12
62:1 66:5 71:10,23
72:21 73:17 74:5
79:3,7 80:14,18 81:3
81:14 85:3 86:4
95:22 104:4 106:2,5
106:8 107:3 115:4
125:18,21 135:16,23
145:13 146:5 149:21
160:18 180:22
187:11 188:2,22
197:3 199:22
**human** 22:9 25:14,19
26:2,8 27:7 29:2 52:3
52:4
**hundred** 40:18 119:22
120:14
**hurt** 98:20 99:5 100:2,3
100:7,18 101:16,19
**husband** 160:6 161:6
**hypnosis** 145:11

**I**

**identification** 17:23
18:21 19:15 22:6
24:14 26:5 27:3
29:18 43:21 53:11
65:11 69:4 79:9
91:12 102:4 124:9
127:19 139:12
148:15
**immediate** 70:22 147:7
**immediately** 25:3,20
71:19 72:13 106:11
107:14 109:10 112:3
**implement** 105:19
**implemented** 50:17
51:7,11
**important** 36:4 37:10
141:1,3
**improper** 70:19
**improve** 56:21
**improvement** 71:14
**inability** 56:19

inadequately 37:21
  38:5,17
INC 1:8 202:15
incident 91:4
include 72:14
including 109:8 167:15
incorrect 71:1
increase 70:16,23
INDEX 3:1,5
indicating 55:20
indication 58:22
industry 76:7 188:11
inefficient 56:20
inform 70:15
information 20:10
instead 7:5 52:17 76:16
  93:18 119:7 133:19
  161:3
insurance 181:3,4
  193:12 194:7,8,12,13
  194:17
intake 143:1 145:7
intentional 43:15
interaction 61:10,12
  62:14,20 64:16
interchangeably
  152:23
interested 121:6 203:6
interruption 151:23
  175:3
introduced 5:19
involved 15:3,5
issued 71:19 85:9
issues 27:22 28:4 71:17
items 128:3,5,11
  185:19 186:3 193:7

_____

J

J 1:16 5:7 138:13,19,20
  139:5,18 140:1,13
  202:4 203:10
January 4:3 41:18
  42:15 65:6,17 117:8
  118:19 192:6,7,11,13
  193:1
Jay 1:18 2:4 7:9 158:19
  196:22,23 197:20
Joanne 9:23
job 11:5,6 12:19,21
  32:14 39:18 40:20
  46:2 49:1 52:9 58:13
  59:22 60:5,10,17,20
  64:2,12 67:3,6,11
  68:16,20 70:8,20
  71:20 72:15 85:10
  95:13 104:18 105:23
  109:23 124:12,14,20
  125:3,6,9,16,17
  126:1,4,9,13,17,18
  126:21 127:13

129:17,21 137:17,18
  148:2 157:4 159:8
  160:5,7 166:14,15,18
  172:5 173:18,19,20
  176:19 177:20,22
  179:12 181:10,18
  184:21 185:9 187:8
  188:20 189:2 190:13
  190:17,21 191:5,13
jobs 13:4,5,6,8,21 14:2
  14:3,17 166:2 186:5
  187:3 188:16
jointly 16:18,19
Jr 10:2 12:2
judgment 44:2
July 1:20 21:20 139:17
  143:17 144:15 146:2
  146:2 202:21 203:7
Junior 12:6
just 6:20 7:10 14:17
  15:14 23:3 29:4,10
  34:23 38:5,9 39:2
  40:8 42:13 45:9
  56:12 59:17,20 63:5
  63:22,23 64:17,23
  72:5 73:10,14 74:6
  76:18 83:6 84:1
  88:16 94:10 95:1,5
  95:15 98:22 108:13
  108:14,16 110:20
  111:1,12,16 114:4
  116:16 119:7 122:9
  124:21 125:4 127:10
  128:18 130:17
  134:21 135:1 136:12
  137:16 140:7 141:9
  142:14,19 145:10,19
  146:4 152:20 155:20
  158:10,12 167:21
  168:7,8 169:2 170:23
  171:1 175:5 177:1
  178:22 182:3,3,5
  192:23 197:22,23
  200:2 201:4

_____

K

Katrina 12:2,5,7,9
keep 55:6 78:21 173:6
  178:3 191:3
keeping 166:3
Kelly 2:10 6:13 90:10
  122:14 172:21
  198:13
kept 162:16,16 170:22
KHF 188:10 189:6,14
kids 11:23
kin 203:4
kind 13:4 61:20 76:13
  85:19 94:19,21 99:6
  99:6,18 101:12

106:17,18 118:6
  140:11 163:13
  174:17 195:23
knew 42:16
know 6:20 7:10 13:23
  14:3 16:12,14 17:11
  17:12,16,20 22:4
  23:3,8,12 27:11 34:8
  36:8,10 41:23 42:7
  42:11,11,18 49:21
  54:5,8,15 57:15 59:4
  63:20,23 74:23 75:15
  76:10,14 77:23 78:20
  82:21 87:8,9,15
  88:20,21,22 94:5,5
  94:10,11,12,12 96:2
  96:8 100:9 103:7,10
  110:18 111:3,9 114:4
  116:13,13 117:5
  120:13,13,21,22
  121:3,19,20 122:20
  126:16 134:10,15
  136:22,23 137:1,7,8
  137:20 141:1 147:23
  149:6 150:18 152:5
  152:10,17 154:4,13
  157:3 159:23 161:17
  161:18 162:17,22
  163:20 164:12
  165:22 167:3,7,11
  169:18 170:19 171:5
  172:15,16,18 174:17
  175:5 176:17,21
  178:3,11 182:22
  189:7 193:22 194:2
  194:20 196:11
  198:15 200:8
knowed 174:20
knowledge 7:22 8:7
  76:9

_____

L

labeled 90:21 92:12
  93:10
lack 31:17 33:19 34:14
  34:19
laid 12:20
language 80:6
Large 1:17 5:8 202:6
  203:12
last 15:10 44:3 65:13
  66:6 71:13 81:17
  83:21 84:13 87:5
  98:16 119:11 121:4
  129:15 136:3 146:13
  146:16,19 147:18
  149:11 151:12
  168:10,21 179:5
late 74:13
later 20:11 82:5,7

83:18 87:21 131:23
  176:22 183:5 189:19
Law 1:18,18 2:4,11
Lawrence 2:16 6:15
lawsuit 14:23 64:11
  200:10
lawyer 15:17,18 30:4
  149:6,7 150:22
  196:11,12
lead 46:17 47:12,18,23
  48:8,10,18 56:19
  113:19 114:8,10
  131:13,14 132:3,7
  133:4,5 159:21 160:8
  160:9,16,20 161:2,5
  177:6
leads 133:9
learn 14:5 179:21
learned 13:22
least 49:1
leave 11:2 113:13
  128:13 129:5,10
  155:9,14,16
Lee 1:5,14 3:2,20 4:10
  4:11,12,13 5:4 6:7,13
  8:9 9:5,8,23 10:2
  12:2,2,3,10 14:23
  28:8 68:12 79:19
  83:11 88:16 89:22
  90:16 96:3 102:22
  103:11 105:12 110:2
  110:20 113:11
  117:13 118:13
  121:21 123:17 127:9
  128:5 134:7 139:15
  139:21 141:1 148:16
  148:18 149:12
  151:10,13,20 153:16
  162:1 166:20 175:11
  183:1 184:19 193:6
  195:9 200:2,18 202:8
  202:12
Lee/WPH 3:8,9,11,13
  3:15,16,17,21 4:4,5,7
  4:8,9 19:1,18 26:11
  27:5 65:12 66:19
  124:13
left 11:4 35:16,19 37:1
  61:2 74:8 75:7,15,19
  103:7,12,21 104:21
  123:13 155:12
  171:16 190:17
left-hand 94:3
legal 9:3
less 34:22 35:9 40:12
  40:17,22 42:2 111:16
  130:23
lesser 35:6
let 6:20 7:10 15:14 18:1
  18:22 19:16 22:7

24:15 26:6 29:15
  32:18 33:12 43:22
  53:12 63:15 65:8
  69:5,5 88:1 89:10
  100:11,12 102:5
  109:23 113:1 116:17
  126:16 127:20 138:7
  139:13 147:22 149:6
  156:20 158:10
  168:20 183:19 201:5
letter 192:9
letting 63:17
let's 15:20 37:15 49:5
  79:10 81:7 82:20
  85:6 117:22 118:13
  128:11 151:9 165:13
  168:9 174:14 198:18
  200:23
lie 166:13
lied 166:1,6,11
life 193:12 194:7,8,12
  194:13,17
like 7:9 8:19 13:3,18
  20:12 21:11,12,14,15
  22:22 23:3,16 26:21
  28:16 29:10 34:3,5
  35:11,16 36:11 41:10
  42:3,5,23 47:15,16
  49:18 50:1,3,4 56:7,8
  58:12 59:4,21,22
  60:15 61:21 64:2,21
  65:19,21 66:10,15
  67:8 69:16 70:3,8
  71:5 72:19 74:2,6
  77:22 80:9 82:6 83:5
  83:16,19 85:18 87:9
  87:13 88:8,9,22
  89:16 93:23 95:17
  99:8,13,16,21 100:9
  101:11 103:4 104:11
  106:19 108:2 114:8
  117:3,8 122:16
  133:15,16 143:1,23
  145:11 146:15
  149:13 151:2,16
  152:20 155:9 156:3,7
  156:15 158:8 165:12
  169:2,6 174:2,5
  175:21 176:5 177:21
  178:1 182:3 183:9
  184:20 185:13
  189:11,13 190:10
  195:12 198:2 199:6
line 20:1 39:15 50:3,4,6
  80:9 81:7,7,9 92:11
  96:19 135:6 164:1,10
  168:10 170:14,16,17
  171:1,2
lines 40:3,3,5,6 50:5
  69:11,12 73:11,13,14

Deposition of Claude Gene Lee, Sr.
Case 1:06-cv-00874-MHT-TFM    Document 51-7    Filed 09/12/2007    Page 61 of 70
July 17, 2007

Page 7

98:16 104:10 106:21
135:7 165:1,17 166:3
166:21 168:15
170:13 176:23
**lingo** 48:11,22 52:17,19
53:4 156:4 170:5
177:5,15,19 178:13
178:15
**Lingo's** 48:12 49:1
**Lisa** 1:15 5:6 202:4
203:10
**list** 4:10 186:3 193:7,11
197:19
**listed** 184:20 185:19
190:2 195:18
**litigation** 15:4
**little** 21:7 31:11 44:8
61:10
**live** 9:20 11:9 12:7
**living** 11:18,21
**LLC** 2:4
**load** 137:14,19
**long** 9:14 10:23 11:11
11:16 14:1 45:16
46:18 141:15,16,17
144:21 145:21 174:3
177:15 178:23 192:5
194:15
**longer** 50:2 103:4
104:16,16 108:3
148:9
**look** 21:16 22:1 24:22
25:13 27:1 31:4,10
37:15 41:3 43:13
46:5 49:5 51:16 56:1
56:7,17 58:20 60:3
61:1 65:19,20 66:10
66:15,19,20 67:5
68:12,20 69:18 70:13
72:7 75:23 79:10
83:21 85:6 88:8 89:8
89:16 90:1,17 91:16
92:10 93:8 94:2
96:18 101:22 102:12
109:3,14 111:10
114:16 116:1,1 118:8
118:13,14 121:4,12
121:13,14 124:10
128:11 130:11 131:7
134:17 136:3 143:7
149:11 151:8,22
153:14 155:17
163:23 164:10
171:19 181:11
184:18 197:8,18,20
198:6,9
**looked** 51:5 121:23
140:2 158:22 165:14
175:4
**looking** 98:15 151:15

159:5 168:21 175:1
183:1
**looks** 149:12 151:16
184:20
**lose** 35:15
**losing** 141:12,15
**lost** 193:8,11,11,12,12
193:13,13 195:18
**lot** 37:6 117:18 130:23
138:5 140:23 162:8
162:10 190:19
**Lottie** 131:9,11,13,17
131:21 132:5
**loud** 19:23 78:3,4
125:21
**lower** 41:1 181:9,10
**lower-paying** 181:9
**lump** 127:3,4 130:2,4
179:16
**L's** 88:9

---

**M**

**machine** 10:22 13:12
13:13,14 14:18 77:20
77:21,22 99:11,18
101:15 132:6 149:22
149:23 170:7 178:8
**machines** 36:16 49:20
58:14 135:19
**made** 5:11 39:4 50:2,6
56:19 69:12 73:12
75:15 164:14 165:15
185:2 200:9
**mail** 10:16 191:7 192:9
**Major** 61:3,6,10,23
62:15 65:3,5,17
66:18 67:10 69:8
74:19 120:7,18
123:12 164:17 165:9
165:19 166:22 167:8
**Majors** 64:17 68:23
75:3,10 120:4 123:15
200:7
**Major's** 67:2 68:15
72:3 74:17
**make** 21:19 36:1 37:10
37:17 44:22 49:20
51:6 55:7,8 57:12,16
58:6,12,14 64:6,8
70:4 96:3 101:6,8
109:21 110:1 112:7
113:4 114:23 115:11
119:6,13 140:11
147:19 158:10
183:19 191:22
192:23 196:1
**making** 28:22 32:21
33:4 34:23 35:23
40:18,20 42:5 48:14
68:17 101:9 112:17

120:14 166:16
**male** 177:17
**man** 17:5
**manage** 44:10
**management** 34:11
43:3 50:22 109:10
157:5,13
**manager** 29:2 32:2,4
32:10 39:23 43:1,4
52:5 57:1 76:20
99:15,17 100:13,14
109:9 123:3 154:2,6
154:23 155:2,3,11
162:10,11,23 163:3
163:17 169:10
**managers** 99:13 120:2
120:3 172:8,9
**managing** 76:5,6
**mandatory** 156:16
**manner** 5:20 136:18
179:8 182:2 203:6
**Manpower** 36:12,13
37:3 45:3,4,5,9,12,13
45:14,17 46:20,21
47:5 171:11,15
**manual** 22:10 25:15,20
26:2,9 27:7,13,16
**many** 44:23 62:1
**MAR** 3:6
**March** 4:6,8 30:11,12
30:21,21,22 31:1,2
47:21 48:17 49:2
79:17,22 82:1,3,3,14
83:2,13 84:4,10
85:14,23 86:10 87:12
87:18,19 88:5 91:3,5
91:20 92:4 94:8
101:23 103:16 109:4
110:4,15 113:5 115:2
115:4,6 121:17
123:19 124:4 128:14
129:6 148:22,23
169:9,20 175:15
179:22 183:3,20,22
184:3 188:19,21
**mark** 59:15
**marked** 17:22 18:1,20
18:22 19:14,16 21:12
22:2,5,7 23:10 24:13
24:15 26:4,6 27:2
29:15,17 43:20,22
53:10 65:8,10 68:10
69:3 79:8 84:15 91:9
91:11 102:3,5 124:8
127:18 139:11,13
148:14,17
**married** 11:16
**matter** 202:11
**may** 5:6,12,13,19 37:16
44:21 71:16 72:14

189:12,15,16,20
**maybe** 15:5 33:12,15
91:16 124:1 198:1
**ma'am** 19:7 62:11
**mean** 20:14 33:21
34:15 35:1,1 42:10
44:17 63:10 65:20
79:14 80:16 82:4
101:5 110:19 111:2,4
111:22 116:10
121:10 124:20
137:12,16 152:13,14
154:9 155:1,9 156:4
157:2,7 162:13
167:10,17 168:12
169:1,19 172:4
177:23 183:6 185:21
186:14
**means** 59:3 166:7
**meant** 58:11
**medical** 147:11
**Medicare** 193:13
**medication** 7:12,20
145:15
**medicine** 7:15,16 138:9
138:11 139:9
**meet** 31:19 67:6 72:12
131:1
**meeting** 33:5 52:7,11
116:8 119:19 120:8
179:18 182:2
**memory** 8:2
**mental** 146:7
**mention** 93:4 101:23
194:8,12
**mentioned** 14:18 49:14
55:2 145:14
**mess** 155:7,15
**met** 6:13 67:10 143:4
184:10 196:14
**method** 70:20
**methods** 50:8 70:20
**Michael** 15:20,21
48:11,12,22 49:1
52:17,19 53:4 74:14
91:1 177:5,9,10,15
177:19 178:7,9,10,10
178:13 184:11
**Michelin** 185:3,5,6
187:7,10,16,21,23
189:6,11 197:6
**middle** 1:2 70:14
109:18 124:14 183:2
184:19 202:18
**midway** 175:13
**Mike** 32:8 36:11 38:2
39:19 43:12 74:20
75:1,12,13,20 91:2
92:16 97:14 104:15
105:1 112:6,10

114:21 120:4,4,7,18
123:12,14 127:23
128:9 131:6,17
132:14,20 133:2
166:12 167:13
168:16 169:11 170:3
170:5,5,22 172:10
173:21 175:4,19,20
177:2 180:2,11
181:23 182:3,14,18
200:7
**mile** 186:17,19,22,23
**mind** 95:21 142:21
153:7
**mine** 155:16
**minute** 40:8 53:14
**minutes** 88:16 197:23
**miscellaneous** 59:8
60:2,16,18 63:11
133:12,18,20 152:13
152:21,22 153:5,8
155:19,23 156:3,9,11
157:21 158:12 162:2
164:1,8 169:8 171:20
178:19
**missing** 117:17
**Mitchell** 97:1,2,5 98:1
170:10,23 173:14,15
173:16 174:6,17
**mom** 147:13
**moment** 151:22
**Monday** 115:3 126:15
**monitor** 36:4 37:13
64:13
**monitoring** 70:16
105:21
**Montgomery** 2:12
202:3
**month** 15:10 42:2
131:23 143:22
144:10,11 145:20,23
146:1
**monthly** 194:4
**months** 121:13 137:18
145:22 171:23
193:14
**more** 11:7 20:21 27:4
35:5,8 40:7 46:16,20
46:22 47:3,4,4,7,9,17
48:4 49:19 50:2,6
55:21 67:22 73:11
98:7,20 130:8 143:19
170:20 190:18 201:7
**morning** 36:20 39:23
62:3,4 64:21,23
103:3,7,13,20,23
104:9,20,23 105:4,14
106:3,22 107:2,3,7
107:23 126:2 128:2
155:12 174:19 180:5

183:11,13
most 8:13 35:18 44:9
  113:19
mostly 13:4 47:5 114:8
  141:20 152:21
motion 44:2 70:18
mouth 179:6
move 45:23 112:12
  113:2,4,6,15 115:8
  171:2
moved 132:4,5,7
Movie 76:5,20
much 34:23 35:2,3 36:3
  54:15 142:3 148:9
  192:17
Murphy 4:14 51:22
  64:5 126:14 127:22
  158:21 169:10,15
  175:19 180:9,11,23
  181:23 182:13,19
  184:11 198:8 200:6
Murphy's 52:1 91:6,13
  93:11,16 128:6
Murry 9:13 11:9
must 56:20
myself 46:19 47:13
  140:19 167:15 176:5
  201:3

**N**

name 8:12 9:4,6 10:1
  15:19 66:2 138:6
  143:10,11 145:17,18
  146:4 150:6 154:5
  162:12 191:3
named 9:23
names 9:22 12:1 13:10
necessarily 15:4
necessary 64:14
need 5:11 7:9 32:12
  40:2,4 47:15 70:16
  71:18 95:6,17,20
  133:18 154:14
  171:12 172:15
  197:22 198:8
needed 47:9 69:11
  72:10 73:10 83:8
  140:13 156:21,23
  157:1,2,15,19 170:19
needs 70:22 71:13
Negative 48:1 52:21
  55:23 56:12 62:1
  66:5 71:10,23 72:21
  73:17 74:5 79:3
  80:14,18 81:3,14
  85:3 86:4 95:22
  104:4 106:2,5,8
  107:3 115:4 125:18
  135:16,23 145:13
  146:5 149:21 160:18

180:22 187:11 188:2
  188:22 197:3 199:22
neither 99:11 203:4
nervous 139:23
never 13:6 20:12 22:13
  23:22 24:1 42:19
  61:20,22 70:6 71:5
  72:18,18,20 73:3
  80:1 93:19,21 94:6
  94:17 96:6,6,15 98:8
  98:13 102:10 103:16
  103:18,18 106:1,7
  108:11,21,23 110:1
  111:19 134:15 171:5
  188:2,8 199:8
new 25:2,18 26:1 32:11
  34:11 35:22 36:3,7
  37:3,7,9 44:23 45:5
  45:11,18 50:15 51:4
  51:6,10 90:21 92:12
  93:10 154:4 156:15
  156:20 157:5,13
  188:12
next 29:1,2 31:10 36:22
  39:23 49:5 60:19
  69:21 85:7 133:22
  134:18 143:18
  161:23 165:23
  166:20 169:8 171:13
  174:18 175:11
  177:19 182:23
  184:18 187:17 193:5
night 36:11 37:2 39:18
  54:9 55:4,9 58:1 84:1
  101:6 123:23 141:21
  141:22,23 155:6,8
  171:8,16 178:3
  183:12,14,23 184:3
nights 141:20,20,21
nine 116:1 130:12
Nix 1:16 5:7 202:4
  203:10
nobody 63:8
nodding 7:5
nods 59:2 141:18 142:1
  180:18
Nolan 138:20,20 139:5
  139:19 140:1,13,22
  141:6 142:12,22
  143:11 144:2,14
  146:18
none 73:14
non-exempt 92:8
non-exemption 27:11
  85:21
normal 146:11
Northern 202:19
notes 143:4 150:17
  196:18 197:9
nothing 6:10 29:4,5

56:3 61:21 62:6 63:7
  69:16 92:9 104:12
  109:2 119:23 153:7
  159:22 161:9,10,11
  174:1 202:10
notice 3:21 4:5,9 51:18
  52:13 53:19 54:11
  55:17 58:23 59:1,17
  59:20 60:1,9 69:7
  70:1,7,15 71:20 72:8
  85:19,20 86:1,2,8,9
  92:19 93:18 94:15,16
  94:22 95:1,4,5,13
  96:9 104:12 106:20
  107:1 109:2 117:7
  118:19 124:12 133:9
  133:11,13,17,21
  134:3 152:13,21,22
  152:22 153:4,5,8
  155:19,20,23,23
  156:3,4,6 157:21
  158:1,13,15 162:2
  164:1,3,4,9,12,13
  169:9 171:20 174:8
  174:12 175:8 178:17
  178:19 183:3,5 199:7
noticed 58:21 103:19
notices 39:2 54:13 92:7
  92:9 94:1,13 102:11
  102:21 172:12,22
November 145:2 146:3
  146:16,17 147:19
  179:1
nowhere 140:7
nuclear 190:22,23
number 16:13,14 46:14
  55:18 128:1 129:10
  149:15 171:2 182:16
  182:16 186:11 187:1
  188:22,23 189:1,1
  202:20
numbered 128:3
  151:10
numbers 38:19 41:1
  55:17 128:8
Nutcracker 189:17

**O**

oath 6:17
Object 20:8 21:1 27:23
  28:6,14,19 31:22
  36:6 46:13,15 51:2,8
  51:13 54:23 57:6
  58:18 60:12 62:21
  67:14 72:22 78:16
  86:13 89:18 96:1
  100:5,21 101:3,20
  110:17 111:8 112:5
  113:18 116:12
  120:10,20,23 126:11

127:15 129:22 134:9
  136:21 137:4 162:21
  163:9 167:6,18
  176:16 200:20
objections 5:5,10,10
observed 96:19
obstacles 57:2
occasions 83:23 84:1
occurred 71:16 91:5
October 47:22 179:1
off 12:20 80:16 142:21
  170:6
offer 126:9
offered 5:13 124:14
  125:2,4,6,8 130:19
  159:8 160:5,15
  181:14 194:17
office 10:18 11:3 16:21
  76:15 160:1,4 161:12
  169:12 175:18 178:1
  179:22 187:16,19
  188:3 . 91:11
Offices 1:18
Off-the-record 148:10
often 45:11 140:17
Oh 164:14
okay 6:23 7:4,8,11 8:14
  15:14 24:22 32:14
  36:19 60:14 61:1
  74:9 75:18 78:23
  82:8 87:14 89:1
  96:17 114:7 123:4
  135:3 139:2 140:20
  141:10 142:6,7
  150:20,23 151:7
  156:13 162:13
  163:12 165:2 167:12
  170:11 173:2 186:18
  187:5 189:1 197:21
old 9:8 10:3 77:17
oldest 150:5
once 20:21 56:4 112:16
  140:18 143:19
  175:18
one 14:14 20:19 21:11
  21:12,14,15 23:16,18
  23:19 24:1,4,11 27:4
  39:3 41:3,16 42:19
  43:6 54:13 55:21
  56:13 63:13 70:3
  74:6 110:12 118:11
  122:3 123:6,7 125:9
  127:10 128:3,5,12,16
  128:17,18 129:15,15
  132:17 138:23 140:3
  141:21 145:19 150:8
  154:8 155:7 156:10
  158:22 159:23 160:3
  161:12,18 163:18,19
  163:21 164:20,22,23

171:2 174:10 181:17
  182:11 186:3 188:22
  189:1 197:16 198:9
  198:10,20 200:21
ones 73:15 121:16
  122:2,10 123:13
onliest 61:14 64:5 82:2
  123:13 132:17
  156:19 189:4,7 195:1
  195:3,7
online 191:1,1
only 23:4 31:18 35:10
  41:4 59:4,23 61:17
  62:14,20 64:16,22
  69:9,10 74:23 75:5
  83:8 87:15 93:23
  94:13,14 102:10
  104:15 127:5 135:17
  138:20,23 147:21
  151:21 152:6 165:7
  165:11 173:13
  176:23 180:11,13
  199:13,16
on-site 185:20,22
open 46:2
opening 35:12
operating 166:4
operational 49:13,15
operator 13:12,13,14
  14:18
opportunity 3:12 22:14
  46:4
opposition 44:1
option 129:4
options 129:23 130:14
  130:16,19 179:18
order 124:17 125:3,7
  125:10,17,23 126:4
  127:13 129:17,20
  181:17 186:15
other 5:10,14,20 6:22
  9:6 11:21 12:16,19
  15:3 32:23 33:4 43:7
  54:3 55:17 56:23
  57:9,10,23 58:8 65:2
  72:11 78:21 88:2
  96:4,21 98:18 100:10
  107:19 132:19,23
  136:18,18 144:8
  154:15 190:1 195:20
  201:13
others 121:5 123:9,10
ought 137:20
out 7:5 14:4,5,7 16:3,6
  17:5,5,13 19:23
  34:20 35:18,21 50:1
  50:6 54:16 58:2,2
  61:17 66:11 73:18,20
  74:8 76:10,12,16
  80:19 83:4,17 87:10

98:11 113:13,21
117:10 121:8 123:10
123:15 126:2 127:7
130:3,22 131:1 135:8
135:12 140:9,9
142:23 145:6 150:13
154:15 155:13,15
160:8 167:21 169:3,4
169:5 173:5 178:6
179:13 186:7 187:15
187:18,20,22 190:3
190:13 191:12 192:3
203:2
**outburst** 77:7
**outbursts** 77:4
**outside** 38:11 64:8
**over** 17:7 31:4 45:21
72:5 73:15 88:2
113:8 114:8 130:17
133:6 134:18 155:4
161:23 166:20
168:14 175:11
182:23 196:15 198:1
**overall** 66:21 68:3,6
**own** 9:18,19 11:14
63:16,23
**ownership** 32:12 49:7
49:13 156:16,21
**o'clock** 58:1 170:9
183:22

---

**P**
**packaging** 14:19,21
106:12 109:7 112:2
131:9 154:18
**packer** 13:15
**packing** 14:16 52:14,16
52:20 75:11 107:16
170:1
**page** 3:10 19:19 24:20
25:14 31:4 44:4,6
49:5 53:22,23 54:1,2
54:4,10,12,13,17,19
54:22 55:15,17,21
56:3,4,5,7,8,11,13,15
56:16 61:9 66:19
68:8,9,13 70:11,14
76:1 79:19 85:16
89:5 96:17 102:23
109:19 116:1 117:16
124:15 130:12
134:18 136:3 143:7
144:13 149:11
153:14 155:18
157:23 159:5 161:23
166:20 175:11,14
179:5 182:23 183:2
184:18,19 198:20,21
199:2
**pages** 53:22 54:14

65:14 66:6 151:12,16
151:19 158:8 193:5
202:22
**paid** 128:13 129:5,11
132:8 192:17 195:8
**pain** 195:10,12,16
**palletizer** 13:20
**panic** 142:8,9
**paper** 32:11 38:7 59:18
65:22 85:20 93:23
94:19,21 105:10,11
106:17,18 108:21,22
115:15 125:11
126:20 133:17 156:2
156:22 157:15,17,19
182:17 189:12
199:13
**papers** 16:6 41:22 42:6
65:22 127:8
**paperwork** 16:3 17:20
42:4,7 157:1,2 180:3
180:4 184:13
**paragraph** 19:23 21:19
31:5,10,10 32:20
34:15 37:15,18 40:9
41:5 43:6,13 44:6
46:5 47:20 49:5
51:16 52:6 53:6,20
58:21 61:8 68:13,14
76:3 77:3 90:1,3,18
90:19 91:6,15,19
92:5,10 93:4,9 96:18
98:14,16 101:22
102:8 109:4,16 110:3
110:6,23 114:17
116:2 117:6 118:13
118:14 119:9,11,14
121:5 130:12,13
131:7 133:6,7 134:17
136:4 137:9 153:17
155:17 157:20,23
164:10 165:4 167:12
168:22 171:19
176:22
**particular** 140:3 149:4
**parties** 5:3,17 6:1
203:2,5
**parts** 192:3
**party** 5:14,20 15:4
**pass** 186:15,15
**pastor** 190:21

**Pate** 2:10 3:3 6:12,13
33:9 63:3 68:5 69:1
89:22 90:14 122:9
137:6 148:4 151:1
158:19 173:2 197:7
197:22 198:15
200:12,20 201:14
**patient** 143:8
**pay** 11:7 59:22 127:4
128:20 130:23
179:15 193:12,14
194:21 195:1,2,3
**paycheck** 130:6
**pencil** 182:13
**pension** 193:20,23
194:4
**people** 14:3 34:22 35:6
35:13,16,18,22 36:3
36:8,12,13,15,18
37:1,2,3,7,9 39:14
45:3,4,5,5,10,11,17
46:16,19,20,21 47:5
47:5 49:19 50:2,4,5,6
52:18 56:19 76:6,11
78:18 99:8 132:3
135:11 170:13,17,20
171:7,11,12,14
180:12,14
**perceived** 114:20
**percent** 38:14,15 39:5
39:13,16,22 40:4,6
40:19,21 55:3 69:13
73:12 109:22 112:8
112:17 115:1,11
119:22 120:14
164:14 165:16
166:10,10,16
**percentage** 35:23 38:13
49:22 54:6,7 101:6,8
101:10 162:17
**percentages** 54:9
**Perdue** 190:4,6,7
**perform** 52:8 99:7
145:9
**performance** 4:3 27:22
28:4 53:8 56:18 57:5
57:16 58:17 60:5,10
60:17,20 65:5,16
66:9,14,21 67:3,11
68:7,16,20 70:8
71:20 72:4 81:9
84:15 85:10 86:11
95:13 98:21 99:5
100:2,4,8,19 101:19
105:23 118:2,3,9,20
157:6,16 166:18
173:18,19,20 176:10
176:19
**performance/conduct**
105:18 199:18

**performed** 37:21
**performing** 38:4,17
80:10 81:11 111:6
**period** 144:3,8 146:1
171:22
**person** 45:18 46:17
47:12,18,23 48:8,10
48:18 113:19 114:8
114:10 131:14,14
132:8 133:4,5 156:9
159:21 160:8,9,16,21
161:2,5 177:6 200:3
**personnel** 31 4:5,9
32:3,16 51:5,17
52:13 53:18 54:11,13
55:16 58:23 59:17
60:9 69:7 70:1,7,15
71:20 72:8 85:19,20
86:1,2,7,9 92:7,9,19
93:18 94:1,13,15,16
94:22 95:1,4,5,12
96:8 102:11,21
104:12 106:20,23
109:2 118:18 124:11
133:8,11,13,17,20
152:20,22 153:4
155:20,22 156:4,6
164:2,4,12 167:1
169:10 172:12,22
174:19 175:18
178:17 180:6,8
184:12 199:7
**person's** 118:11 138:6
**phone** 128:1 140:2
182:15,16
**physical** 8:4 186:20
**physician** 144:16
**piece** 119:5,8
**pillow** 13:14
**Pine** 11:10
**pink** 59:9,10,11,13,16
60:21 63:11 133:9,14
134:4,7,13
**place** 40:16 42:13
74:17 75:22 161:11
182:5 192:15,16
**places** 184:20 190:2
**plaintiff** 1:6 2:3 31:13
31:17 40:10 41:7
202:13
**plaintiff's** 37:22 43:16
193:20,23 194:14
**plan** 109:18 110:8
193:20,23 194:14
**plant** 32:10 46:23 47:2
47:6 48:2 154:2,6,23
155:1,3 162:9,11
183:17 187:22 188:1
189:19 190:10,15,22
191:1
**please** 7:4 109:3

**pleased** 53:7 57:5
**plus** 131:2
**point** 20:20
**policies** 17:19 28:9
**policy** 3:13,16,17 18:3
18:7,9,12 19:3,6,9,11
22:10,13,18,20 23:10
23:15,23 25:14,19
26:8,13,15,18,20,21
27:4,7,9,12,13,16,18
27:20 28:2 194:18
**poor** 60:17 71:20 85:10
105:22 173:18,19,20
**position** 10:13,20 40:11
42:21 43:3 74:22
75:4,6 106:12 107:15
109:6,11 112:1,4,21
123:18 124:5 132:2
136:20 160:10
166:22 167:5,9
185:22 191:19
**positions** 12:23 13:11
14:9 116:7 119:18
**Positive** 7:17 11:8 13:9
13:22 14:10,21 16:2
20:22 24:6 25:10
29:12 30:8 38:20
39:9 44:12,19 45:7
47:8,10 48:3,5,19
49:9 50:9 52:5 53:1
60:6 61:11 62:17
63:14 64:19 67:21
69:15 74:3,7 77:11
78:5 80:21 82:17
84:11,14,22 88:13
89:13 92:23 97:4,19
99:16 102:2 107:18
107:21 108:8,15,17
112:13,19 113:7
114:6 115:9,16,19
118:21 124:16,18
129:1,3 130:9 133:1
133:14 139:6 144:4,9
144:12,18 145:4
146:19 149:1,19
150:1,11,16 153:1,10
154:19 157:8 158:16
159:1,11,15 160:22
166:5 169:14 174:16
175:16 176:11 177:7
179:4,14 180:13
181:19 182:11 184:9
184:15,23 185:10,23
186:10 189:21 190:8
191:16,18 192:8,14
193:3
**post** 10:17 11:3 16:20
**Postal** 10:8,12,14
**posted** 18:9 19:11
22:20 26:16

potential 71:15
practice 113:12
practices 41:6
premises 183:15
premium 194:10
prep 192:2
prepared 4:11 30:3
prescribe 146:6
prescribed 145:14,16
prescription 145:19
PRESENT 2:15
press 148:6
pressure 7:15,16
pretty 17:17 34:12
   50:23 51:6 113:11
prevent 8:5
previous 71:15 76:4
print 80:18
printed 135:8 202:22
printout 135:8,12
prints 135:12
Prior 196:6
probably 13:5,5,6
   30:21 34:22 35:21
   54:5 131:23 144:17
   149:17,21 175:6
problem 3:8 18:13,16
   23:7 28:11,13 70:23
   76:13,16
problems 8:4 71:15
   147:5
procedure 5:5 28:12
procedures 37:11
   56:22 58:10
processes 37:13 50:15
   50:23 51:7 105:20
produce 196:18
produced 197:2
producing 35:2,3,4,8,8
production 31:19
   32:22 33:5 38:18
   40:23 68:17 69:14
   71:4,8,22 105:20
   120:9
profanity 77:4 78:10
   79:2 167:14 168:3
Professional 1:16 5:7
   202:4 203:11
progress 109:9
project 43:1,4
promoted 74:19 75:3
   75:10,14
promotion 167:2
prone 77:4
proper 109:8
property 183:17
prove 172:5
provide 197:12
provided 5:15,21
   122:15 197:11

psychiatric 143:9
psychiatrist 138:3,8,8
   138:11,13 139:7
   140:8 144:17
psychological 4:13
   139:16,22
psychologist 138:4,4
   138:19,21 139:4
   143:18
publication 25:18
puller 124:17 125:3,7
   125:10,17 126:1,4
   127:13 129:17,21
   181:18
purpose 5:14 149:5
pursuant 1:15 5:5
pushing 162:16
push-ups 186:22
put 13:18 43:1 54:16
   59:6,8 101:2,4 156:6
   163:1,5,7,13,14,15
   163:18,20 170:15,18
   174:3,4 189:7,8,10
   197:19
puts 143:2
p.m 1:21 44:14,15,16
   44:16,18 201:15

----

**Q**

qualified 40:12,17,23
   191:3
question 5:11 6:19 7:1
   17:14 33:1 82:22
   88:1 89:4,4 110:2
   124:1 134:19,22
   151:15 163:10
   165:18 168:9 194:19
questioned 81:18 83:16
   87:10
questionnaire 142:23
   145:6,8
questions 5:10 6:17
   61:21 145:10 196:15
   198:3 200:15 201:13
quota 70:5 120:9
quotas 68:17 69:14
   71:4,8,22 116:9
   119:20
quote 31:12 52:7 56:18
   57:2 92:12,13 98:17
   98:21 109:5 110:4,6
   116:23 139:23 162:3
   175:18,22
quoted 109:16 111:1

----

**R**

race 17:7 31:15 33:17
   41:7 48:12,15 136:5
   159:16 165:21 168:6
   169:17 176:20

----

182:20 200:5 201:10
racial 43:16 116:3
   117:1 118:17 119:15
rage 78:22
raise 48:13
raising 79:1
ran 155:1
rate 192:20
rated 67:12
rather 52:15
rating 66:21 68:3,6,7
read 3:10 18:7 19:23
   20:2,6,23 21:6,19
   25:3 30:1 69:16 70:9
   74:10 80:6,12,13,16
   81:13,20 82:14 83:1
   103:3,12,20 104:1,1
   104:2,10,11,14,15,20
   104:22 105:1,3
   106:21 107:12 108:2
   119:3,5,9,10 134:18
   134:20,21 135:1
   158:12 165:3 171:17
   199:14
reading 19:8 23:9
   26:18 27:18 203:2
reads 71:13
ready 20:15
real 78:3,4 198:16
really 19:4 23:8 28:20
   34:21 35:14 36:7,15
   43:19 51:9 87:9
   88:22 99:10,17,19
   110:18 120:13
   121:19 134:10,15
   140:21,23 150:18
   154:4 162:8,22
   165:12 167:3,11
   172:3 183:14 194:2
   194:20
reason 55:6 113:15
   148:2 152:19 200:21
   200:22 201:1
Recap 4:11
receipt 25:1
receive 18:5 23:19 39:8
   54:18 84:23 95:12
   96:13 106:23 115:22
   128:14,21 129:6
   130:6 179:15,15
   187:5
received 20:12,19
   21:21 25:8 26:1
   37:19 38:23 39:3
   59:1 91:20 92:3,6
   93:17 96:6,11,15
   118:19,20
receiving 17:1,4,18
   19:5 20:17 22:17
   23:15,18 24:11 26:20

----

27:13 28:9 95:19
   110:14
recently 8:13 96:20
   98:18
recess 90:15 148:13
   198:5
reckon 21:7 131:23
recommendations
   147:20
recommended 143:9
record 9:3 88:2 90:16
   174:17 175:4,5 200:2
recorded 66:18
records 151:5
refer 8:9 92:4
referenced 91:4
referral 139:21
referred 139:22 140:1
   140:3
referring 8:10 53:19
   90:23 91:15,18 102:8
   108:1 114:18 117:2,6
   118:18 121:22
   122:11 130:16
   156:18 158:1,14
   164:4,7,9 177:2
refilled 145:20
refusal 124:12
refuse 125:12 129:20
refused 126:20
regardless 5:21
Registered 1:16 5:7
   202:4 203:10
regular 45:2,23 113:11
regularly 45:1
rejected 126:9
related 200:9
relates 196:20
relation 136:18
relieved 116:6 119:17
remember 13:10 14:1
   16:23 17:4,9,18 18:9
   19:5,8,11 20:17
   22:17,20 23:2,9,15
   23:18,22 24:3,11
   26:15,18,20 27:13,15
   27:18 28:9 29:6 30:5
   30:9,17,22 49:17
   50:7,12 52:2 54:19
   62:8,14 65:2 67:10
   67:12,16,18 75:3,9
   75:14 80:8 81:8,22
   82:8 84:2 111:13
   114:1 125:1,6 145:17
   145:18,23 146:4
   158:9 190:19,20
   193:23 196:14
   199:16,17 201:6
removal 72:14 136:19
remove 109:22 111:7

----

112:9,11
removed 40:11 104:18
   106:11 107:14
   109:11 112:3,20
   123:18 124:4 125:1
   131:19 180:21
removing 180:16
rent 9:18 11:14,15
rephrase 6:21 33:12
replaced 40:12
report 4:6,8 28:4,18,22
   79:11 81:23 82:9
   84:9 86:3,22 87:7
   90:5,22 91:20 92:3
   92:13,17,18,22 93:3
   93:11,17 94:8,18,21
   94:23 95:3,8 96:7,12
   96:15 102:7,18 103:2
   103:17 109:1 110:15
   149:13 151:13
   178:21
reported 53:4 178:13
   202:6
reporter 1:16 5:7 7:6
   202:5 203:11
REPORTER'S 202:1
reports 178:2
representing 5:3,17
   6:14
reprimanded 153:20
   154:10
request 97:20,22 196:6
   196:10
requested 46:22 98:1,5
   98:23 101:17 197:10
requesting 99:4,23
required 56:21 58:9
requirements 33:6
   67:7
requires 177:22
reserved 5:12
resigned 34:4 162:3,23
resource 29:2 52:3
resources 22:9 25:14
   25:19 26:2,8 27:7
   52:4
response 7:17 11:8
   13:9,22 14:10,21
   16:2 20:22 24:6
   25:10 29:12 30:8
   38:20 39:9 44:12,19
   45:7 47:8,10 48:1,3,5
   48:19 49:9 50:9 52:5
   52:21 53:1 55:23
   56:12 60:6 61:11
   62:2,17 63:14 64:19
   66:5 67:21 69:15
   71:10,23 72:21 73:17
   74:3,5,7 77:11 78:5
   79:3 80:14,18,21

Deposition of Claude Gene Lee, Sr.
Case 1:06-cv-00874-MHT-TFM    Document 51-7    Filed 09/12/2007    Page 65 of 70
July 17, 2007

Page 11

81:3,14 82:17 84:11
84:14,22 85:3 86:4
88:13 89:13 92:23
95:22 97:4,19 99:16
102:2 104:4 106:2,5
106:8 107:4,18,21
108:8,15,17 112:13
112:19 113:7 114:6
115:4,9,16,19 118:21
124:16,18 125:18
129:1,3 130:9 133:1
133:14 135:17,23
139:6 144:4,9,12,18
145:4,13 146:5,19
149:1,19,21 150:1,11
150:16 153:1,10
154:19 157:8 158:16
159:1,11,15 160:18
160:22 166:5 169:14
174:16 175:16
176:11 177:7 179:4
179:14 180:13,22
181:19 182:11 184:9
184:15,23 185:9,10
185:23 186:10
187:11 188:2,22
189:21 190:8 191:16
191:18 192:8,14
193:4 197:3 199:22
responsibility 64:3
135:5,14,18,21
rest 35:22 99:8 108:2
116:2
restated 52:7
result 72:13
resulted 105:22
results 203:6
retaliation 22:15
return 144:15 197:11
197:12,13
review 4:4 42:15 64:4
65:5,16 66:9,14
68:21 117:16 118:2,3
118:9,20 157:16
163:1,6,16 178:22
201:1
reviewed 51:11,14
157:6
reviews 163:16
revised 21:23 22:3
right 9:17 15:20 18:13
20:9,12,16 21:20
24:5 28:21 31:8
32:20 34:14 37:1
41:2 43:16 44:8
46:2,5,8 48:9,23
49:10,14 51:1,20
53:8 55:12,22 56:2,8
56:9 57:13,15 58:4
59:18 60:5,11 61:4

65:23 66:10,12,15
67:6,9,13 68:18
69:15,17 70:9,13
71:6 72:17 73:6,7
74:12,22 76:23 80:3
83:11 84:8 85:6,19
85:20 88:7,23 89:8
90:1,12 92:7,21 93:9
93:23 97:18 99:1,2
101:9 102:16,19
103:18 105:5 106:6
107:6,9,10,23 108:13
108:21 111:10
114:12 115:6 126:5,8
126:10 127:14 128:7
128:10,15,18 129:8
129:13,18 134:6,20
136:14,20 137:15
138:15 139:10
142:12 149:16
153:11 156:1 157:17
159:2 166:19 173:7
177:14,18 190:14
192:21 193:2,14,18
194:5,10 195:9,18
197:7 198:23
Road 138:17
Robert 138:19,20
139:5,18 140:1,13
role 52:1 125:2 131:20
161:4 180:17,21
room 54:16
row 141:21
Rucker 186:12
Rules 5:5
ruling 5:12
rumored 153:20
154:10
run 36:15 52:16 54:16
96:21 98:19 135:18
154:23 170:17
186:17,19,22,23
rung 170:9
running 13:16 34:23
52:19 58:14 132:6
Russ 30:6,7 149:10

_____
S

sadness 141:8
safety 171:17
SAITH 201:21
salaried 3:9,11,14 19:2
20:7 21:10,17,23
24:18 25:9 27:8,10
134:14
Salaried-Exempt 4:3
salary 92:8 192:18
194:21,23
sale 8:14 49:17
same 5:22 10:15 14:13

14:13 17:7 34:7,9
53:6 56:8 57:22
65:19,21 70:3 83:21
85:18,19 86:19 89:16
90:7 93:5 98:17
110:10,11 116:5,20
117:4,5,9,14,15
119:7,16 123:1 131:3
131:17,18,19 151:18
152:4,6,9 153:4
155:18,22 156:1,2,5
157:20,23 165:3
189:17 203:3
sat 171:16
Saturday 37:4 64:21
64:22 180:5 183:11
183:13
save 153:13
saw 15:18 20:21 72:20
73:16 81:23 83:13
84:4,8 86:22 87:7
108:7 138:3,3,13,19
138:21 139:18
143:16,17 144:2,7
146:13,17 147:18
199:13
saying 25:8 57:7 96:5
117:12 120:17 121:2
154:17 156:13 157:3
159:23 160:3 166:1
168:17 172:6 183:20
191:2
says 21:20 24:23 25:17
31:5 32:21 41:5
43:13 56:17 60:5
66:2,20 67:6 70:13
70:14 72:9 81:1,10
81:16 85:8 92:11
105:17,18 106:9
111:11,15 119:14
124:14,17 129:2
137:6 139:16,21
143:8 144:14 171:21
177:19 187:7 188:10
schedule 135:7,11,16
135:18
scheduled 144:14
scheduling 135:6,14,22
school 10:5 12:10,11,17
screen 80:16
scrutiny 34:12 50:23
116:5,21 119:17
second 25:13 31:4 32:8
34:18,18 35:12 39:17
39:18 40:19 44:6
46:3 54:10,12,17,22
56:14 57:8 58:3
59:15 70:4 71:21
75:20 77:2,12 78:15
81:16 82:11,12 86:11

86:15 92:11 97:6,9
97:10,13 98:2,8,11
98:12 99:13 109:20
110:1 112:7,8,12,16
113:6,9,21,23 114:3
114:22 115:1,8,12
116:17 122:19,21
131:13 132:13 134:2
143:7 144:13 153:9
153:18 155:17
157:22 163:23 164:1
164:8,10 176:3
177:11 194:12
198:21
section 24:22 25:13,17
26:8 27:6,15 66:20
83:22 84:15 85:7
108:14 119:4
sections 152:7
security 186:11,13,14
188:18,20 193:13
see 15:20 16:4 25:21
30:14,17 33:12 34:3
36:19 38:10 52:9
56:2 58:4 60:15 66:9
66:22 73:10 80:7
85:10 91:7 92:14
93:13 99:19 102:1
103:22 108:2 109:12
109:15 110:7 114:23
121:8 124:13,21
138:2,7 139:3 140:13
142:12,22 143:14,19
143:21 145:5 147:10
147:22 148:3 150:19
151:2,9 155:11 156:8
156:20 158:8 159:10
159:21 163:3 165:13
166:4 168:20 169:13
174:3,18 175:4,15
176:3 178:10,11
184:22 185:13 189:1
199:8,12
seeing 18:9 19:11 22:20
26:15 29:6 81:22
111:13 144:21 145:1
147:3
seek 143:9
seemed 98:20
seen 18:2 19:3 21:6,10
21:12,15 22:10,13
23:22 24:1 26:13
27:9 29:21 70:6 71:5
72:18 73:4 80:1 92:9
93:19,21 94:1,6,11
94:12,13,14,17,20
96:6 102:10,10,16,18
103:16,18 106:1,4,7
106:14,16 108:11,21
108:23 111:19

144:16 146:16
164:18 198:12,17
199:10,20
send 36:20,23 98:9,13
171:10
sending 112:6 176:2
seniority 35:13,15
sent 40:20 47:1 191:2,7
192:8 196:6,10
sentence 81:16 82:12
82:16,20 83:21 84:2
84:12,13 86:11,16,19
86:21 87:4,6 110:16
110:20,23 114:18
116:23 118:16 121:4
158:11 165:23
168:21 175:14
177:19 179:5
sentences 84:18 110:11
119:12
separate 55:14 194:22
separated 108:4 123:21
128:20 180:10,19
181:1,16 183:10,15
183:16 195:2,4
Service 10:8,12
services 138:22 139:22
140:11 143:9
set 124:17 125:3,6,9,17
125:23 126:4 127:13
129:17,20 181:17
203:2
sets 132:6
setting 132:6
seven 40:9 44:7 59:9
60:18 76:2,3 184:20
185:19,20
seventh 75:23
several 83:22 84:1
98:12 141:21 153:21
severance 193:14
sewing 10:22
sex 17:7
shake 61:18
Shakes 73:5
sheet 10:21,21 97:23
sheets 98:7,12
shift 31:18,19 32:8,8
34:18,18,19,21,21
35:11,13,14,15 36:13
36:18,21 37:7,19,22
38:12,13,14 39:14,17
39:18,20 40:15,19
44:9 46:1,1,3 47:6
57:8,13 58:3,5 62:9
62:16 64:18 70:4
71:16 75:7,17,20,21
75:22 77:12 78:9,13
78:15,21,22 97:5,6,8
97:9,10,11,12,12,13

| | | | | |
|---|---|---|---|---|
| 97:13,23 98:2,3,6,6,8 | 73:8,22 85:22,23 | 190:10 | staying 12:8 | 42:22 51:19 56:20 |
| 98:10,11,13,23 99:4 | 86:7 87:19 88:5 | sometime 30:11 31:1 | step 15:15 160:8,15,18 | 57:8,12,14 61:3 63:6 |
| 99:13 100:1,1,10 | 97:22 98:7,12 102:15 | 61:14 74:13 146:15 | 160:20 161:2,4 | 64:3,13 71:15 74:15 |
| 101:18 109:20 110:1 | 102:21 105:6,8,11,12 | 148:22 | stepped 42:13 131:22 | 75:6,17,19 80:11 |
| 112:7,8,12,16 113:6 | 107:1,20 115:17,17 | sometimes 45:22 | 159:21 | 81:11 90:20 103:6 |
| 113:8,9,16,21,22 | 172:12 190:23 | 113:22 114:11 | steps 18:15,18 | 104:17 106:12 |
| 114:1,3,22 115:1,8 | significance 152:11 | somewhere 31:2 | Stevens 10:19 21:22 | 107:15 108:3 109:7 |
| 115:12 116:17 | signing 25:8 126:21 | son 9:21 10:15 11:21 | 24:17 25:19 | 109:12 111:6 112:1,4 |
| 122:18,19,21,21 | 203:2 | son's 10:1 | still 16:20 34:22 35:23 | 113:9,13,21,23 |
| 123:19 124:5 129:17 | similar 106:19 107:6,8 | sorry 26:11 48:15 69:1 | 39:4,5 74:20,21,23 | 114:12 124:6 132:7 |
| 131:11,13,15 132:11 | 107:9,13 | 81:5 138:10 160:2 | 75:11 102:20 130:7 | 132:10,17,19 133:4 |
| 132:13,15,18,19,22 | simply 121:7 | 200:23 | 132:13 144:21 | 135:4 153:18 159:8,9 |
| 135:5,15 153:18 | since 116:4 119:15 | sort 8:4 9:1 62:5 | 150:17 155:16 | 160:9,11,19,20 161:4 |
| 155:6 159:8,9 160:7 | 192:6,13 | 142:23 145:6,9 | 164:15 165:5,16 | 165:8,11 171:9 |
| 160:12,13,16,17 | sit 142:20 | 146:21 | 173:21 185:15 194:3 | 176:10 177:6 201:4 |
| 161:2,7 168:1 170:20 | sits-ups 186:21 | sorts 77:19 78:1,8 | 194:3,9 195:8 199:12 | supervisors 17:12 |
| 171:7,8,9 174:11 | situation 60:4 83:19 | 140:5 147:5,19 | stipulated 5:2,16,23 | 27:21 32:23 34:6,7,8 |
| 176:3 177:3 180:16 | 90:3 169:23 | South 1:19 2:5 | stipulation 1:15 5:1 | 37:19,23 43:9 46:16 |
| 184:2,6,7 | situations 56:23 | SOUTHERN 1:3 | stood 173:22 | 50:22 57:1,20,21 |
| shifts 37:20 38:8 77:14 | six 18:15,18 31:10 | speak 6:9 125:20 202:9 | stop 32:18 | 96:22 98:19 113:16 |
| 78:19,20 96:21 97:21 | 37:15,18 59:7 68:13 | specifically 54:21 | stopped 77:21 145:1 | 113:20 116:4,19 |
| 98:19 113:17 157:12 | 133:12 145:22 | 117:19 | store 76:5 | 119:16 122:19,22 |
| shook 64:23 | 193:14 | spells 140:14 | story 172:18 | 132:16,23 157:11 |
| show 18:1,22 19:16 | six-month 146:1 | spot 59:23 | straight 44:20 61:17 | supervisory 40:11 |
| 22:7 24:15 26:6 27:4 | sleep 141:12,13,14,15 | Sr 1:5,14 3:2 4:12 5:4 | straighten 155:13,15 | 112:20 116:6 119:18 |
| 29:15 43:22 53:12 | sleeping 142:2 | 6:7 9:5 202:8,12 | strapper 13:16,16,17 | 123:18 124:5 125:2 |
| 65:8 69:5 91:9 102:5 | slip 59:9,10,11,14,16 | stamp 55:18 | 14:19 | 131:20 136:19 |
| 127:20 139:13 | 60:21 63:12 133:9,14 | stamped 19:1,18 24:19 | straps 13:19 | 180:17,21 |
| 148:16 170:19,21 | slips 134:4,7,13 | 26:10,12 27:5 65:12 | Street 2:12 9:13 11:9 | supposed 16:10 36:1 |
| 185:20 187:1 | slow 99:21 101:11 | 66:19 124:13 128:5 | 11:10 | 41:18 42:14 67:7 |
| showed 126:2 171:18 | 174:2 | 139:15 148:18 | stress 162:8 | 76:14 77:21 118:11 |
| 189:4 | slowed 49:23 | 149:12 151:13,17,20 | Strunk 138:14 143:11 | 122:17 144:16 |
| showing 32:11,13 | social 193:13 | 153:16 161:23 | 143:16 144:2 145:5 | 157:10 169:5 170:13 |
| 149:14 | solve 57:1 | 182:23 184:18 193:6 | 146:18 | 183:14 |
| shown 70:21 | solving 70:23 | standing 170:4,5 | stuff 20:12 49:22 66:11 | sure 21:19 37:10,17 |
| shows 33:3 | some 14:3 20:20 21:8 | 173:21 178:7 | 67:7 76:11 77:22 | 44:22 51:6 55:7 |
| sick 14:8 | 35:17 36:12 42:3 | start 46:20 57:9,13,22 | 85:22 117:11,18 | 57:12,16 58:6,13,14 |
| sickness 99:7,19,20 | 45:3,13,22 46:22 | 58:5,7,12 62:16 | 135:11 142:16,21 | 64:6,8 96:3 119:6 |
| 101:12 | 49:14,16,19 50:1,7 | 117:22 133:15 144:1 | 156:21 171:18 | 122:9 158:10 183:19 |
| side 73:5,5 99:21 | 50:12 51:14 60:16 | 170:16 184:2 194:4 | 195:20,23 | 196:1 |
| 101:11 154:16 | 78:17 81:3,6 99:6,6 | 198:18 | subordinate 31:7 52:23 | suspended 153:18 |
| sign 56:3,5 87:17 | 99:18 101:12 113:14 | started 13:3 30:6 45:9 | sue 30:9 | 154:1,7 |
| 105:10 125:12 | 117:10 122:1 134:23 | 57:23 77:2 140:22 | suffer 147:15 | SWIFCO 191:14,15 |
| 126:20 127:7 171:21 | 138:9,11 140:10 | 144:10 167:13 | suffering 195:11,12,16 | sworn 6:9 202:9 |
| 172:6,11 173:1 | 153:13 163:13 171:4 | 177:16 179:2 192:22 | suicide 142:10 | symptoms 140:5 |
| 190:22 191:2 | 175:12 190:18 201:7 | 193:1 | Suite 1:19 2:5,11 | S-T-R-U-N-K 138:14 |
| signature 6:2 19:19 | somebody 14:7 45:15 | starting 41:13 87:4 | 138:18 | |
| 20:1 24:19 25:1,16 | 45:21 47:13 171:6 | starts 175:14 | sum 127:3,4 130:2,4 | T |
| 25:17 44:3 53:15 | 182:5 | State 1:17 5:8 202:2,5 | 179:16 | |
| 56:5,13 65:13 66:7,8 | someone 28:18 | 203:11 | Summarizing 128:12 | take 7:6 15:14 17:21 |
| 69:19,20,22 70:10,12 | something 33:22 22:2 | stated 109:5 | summary 44:2 | 40:2,3 64:8 90:11,17 |
| 73:3 74:11,12 79:18 | 23:12 32:10,12 42:23 | statement 134:23 | Sunday 182:6 | 109:14 113:8 124:10 |
| 83:15 88:6,9,12,17 | 47:15 50:3 55:2 | STATES 1:1 | supervise 175:21 176:3 | 127:10 138:12 |
| 88:18 89:5,11,16 | 59:21,22 95:6,16,17 | stating 152:20 157:21 | supervised 46:6,14,19 | 145:21 147:11 148:5 |
| 94:4 102:13,20,23 | 103:4 104:11 105:15 | 158:13 | 97:14 | 148:12 151:21 160:7 |
| 103:8,15 108:16 | 105:16 106:19 | Statute 5:15,21 | supervising 32:14 | 179:7,12 181:9 185:8 |
| 111:12,17 199:1 | 115:15 141:13 | stay 12:9 14:4,5 154:14 | 176:4 | 185:18 188:3,5 |
| signed 20:6,16 25:23 | 142:19,20 143:23 | 154:18 | supervision 131:3 | 192:10 198:6 |
| 56:2,3,10,14,16 | 157:15 162:19 175:9 | stayed 11:10 140:6 | supervisor 17:15 28:3 | taken 1:14 5:4,6 56:17 |
| 66:17 67:23 69:10 | 180:7 189:11,13 | 162:10 | 29:1 32:8 39:12,19 | 72:9 85:7 90:15 |
| | | | | 106:9 137:10 148:13 |

Deposition of Claude Gene Lee, Sr.  Case 1:06-cv-00874-MHT-TFM   Document 51-7   Filed 09/12/2007   Page 67 of 70
July 17, 2007

Page 13

| | | | | |
|---|---|---|---|---|
| 198:5 | 167:19 168:10,12 | 33:1,14,22 34:1 | 122:6 128:13,20 | **times** 8:12 73:1 95:11 |
| **takes** 25:2,20 | 169:19,23 173:19 | 35:19,20 42:6,16 | 129:6,12 137:5,23 | 114:4 153:21 174:9 |
| **taking** 7:12,14 40:5 | 175:23 177:8 180:20 | 43:2 44:7,20 54:1,3 | 138:1 148:18 151:10 | 189:17 |
| 143:4 161:3,11 | 181:22 183:7 186:3 | 54:10 58:10 67:22 | 151:11,14,18,20 | **timing** 135:22 |
| 164:23 165:17 | 187:13 188:15 191:5 | 68:10 70:18 77:2 | 180:4 184:8 185:20 | **Tire** 187:7,10 189:6 |
| **talk** 12:19 17:11 40:7 | 195:16 198:11 200:3 | 82:11 83:1,3,12 | 186:4 193:6 198:9 | **title** 21:17 24:17,23 |
| 62:10 67:11 88:2 | **telling** 55:6 57:10,15 | 86:23 93:18 97:22 | **throughout** 62:9 71:1 | **titled** 18:12 25:14 26:9 |
| 139:8 140:21 169:22 | 73:10 83:9 95:5,16 | 99:7 100:16 103:8 | **throwed** 49:21 | 86:1 103:1 124:11 |
| 177:9,13 180:6 | 96:5 103:11,14 | 104:8,14 115:17 | **Thursday** 37:2 81:17 | **today** 6:14,16 7:22 8:6 |
| **talked** 32:7 34:5 35:10 | 116:14 118:15 | 118:5 122:5 126:13 | 87:5 171:16 | 8:9 12:20 36:20 |
| 36:11 54:9 55:4 | 142:16 160:14 161:3 | 132:22 133:17 | **Tidwell** 1:18,18 2:4,4 | 121:23 164:19 196:6 |
| 81:21 83:3,4 110:21 | 172:15 176:14 | 136:12 137:20 | 20:8 21:1,4,14 24:2,9 | **together** 170:15,18 |
| 122:18 126:12 | **tells** 95:20 | 142:10 143:2,17,21 | 27:23 28:6,14,19 | **told** 32:2,6 36:22 37:4 |
| 129:16 138:23 | **temper** 167:21 168:1 | 146:2,15 147:13 | 31:22 32:18 36:6 | 39:12 40:15 41:11,16 |
| 142:14 157:10,14,18 | **ten** 36:14,17,23 37:1,2 | 159:19 161:18 | 43:7 46:13,15 51:2,8 | 52:15 56:18 57:7,21 |
| 162:9 175:12 179:10 | 41:5 43:6 49:6 50:4 | 162:12,16 163:21 | 51:13 54:23 57:6 | 64:6 69:9 77:1 88:17 |
| 180:23 195:21 197:6 | 58:1 73:1 137:18 | 174:11 176:23 | 58:18 60:12 62:21 | 98:22 105:9 109:20 |
| **talking** 14:7 15:12 21:4 | 171:7,10,14 | 177:16 179:1 186:21 | 67:14 68:2,22 72:22 | 112:6,10 117:3 |
| 32:19 38:1 39:2 | **terminate** 174:22 | 188:4,17 189:11,12 | 76:18 78:16 80:6 | 123:21 126:12,14,17 |
| 40:13 41:14 43:11 | **terminated** 12:21 37:5 | 189:19 192:11 | 86:13,18 87:3 88:20 | 126:20,21 127:3 |
| 45:6 47:21 55:13 | 136:7 200:18 201:9 | 197:22 198:13 200:6 | 89:10,18,21 90:10 | 130:3 140:8 142:14 |
| 62:22 63:2,3 68:2,5 | **termination** 133:10 | 200:6,12 201:7 | 92:1 96:1,10 100:5 | 142:18 143:23 |
| 68:22 69:11,14 75:8 | **terms** 38:6 | **thinking** 104:7 | 100:21 101:3,20 | 154:13,14,17 155:19 |
| 77:12 78:21 96:23 | **test** 185:8,18 188:8 | **third** 34:20,21 35:11,15 | 107:12 110:9,17 | 155:21 156:14,16 |
| 116:18 119:1 121:16 | **testified** 6:10 8:21 | 36:21 37:6 40:15 | 111:8 112:5 113:18 | 159:6,12,14 161:13 |
| 123:11 124:22 134:5 | **testify** 7:21 | 44:9 46:1 59:16 68:9 | 116:12,18 118:5 | 164:23 168:7 170:16 |
| 140:22 141:19 | **testifying** 8:5 | 75:22 77:12 78:13 | 119:3 120:10,20,23 | 171:1,9 174:23 |
| 153:22 157:11 158:7 | **tests** 145:9 | 82:20 97:8,12,23 | 122:5,12 125:20 | 175:20 176:2,9,18 |
| 158:11 162:6 164:13 | **Thank** 158:19 | 98:6,10,23 100:1,17 | 126:11 127:15 | 179:6 180:3,15,22,23 |
| 164:22 170:12 172:1 | **their** 9:22 12:1,4 33:5 | 101:18 123:19 124:5 | 128:18 129:22 134:9 | 181:2 182:3,4,12 |
| 172:21 173:2 179:9 | 37:13,20 58:13 60:20 | 125:11 127:1 132:18 | 135:1 136:21 137:4 | 183:10 184:12 185:8 |
| 195:19 196:12,13 | 70:4 116:6,8 119:17 | 135:5 159:9 160:7 | 137:15 148:8,11 | 185:17 190:21 191:1 |
| **Tallapoosa** 2:12 | 119:19 121:7 166:2,3 | 161:1,7 169:8 170:20 | 149:16 151:3 152:1 | 192:9,11 195:14 |
| **Tamela** 12:2,5,7,8 | 166:17 182:8 187:21 | 171:20 177:3 180:16 | 158:3,17 162:21 | 196:2,4 200:8 201:2 |
| 150:7 | **thereof** 203:6 | **Thomas** 131:10,12 | 163:9 164:6 167:6,18 | **tonight** 182:4 |
| **tax** 197:10,11,12 | **they'd** 192:16 | 132:7,9 133:3 159:7 | 168:8 172:21 176:16 | **top** 21:17 24:16,22 |
| **telephone** 12:8 | **thing** 10:15 17:7 23:4 | 159:14 | 183:23 185:15 | 34:20 56:12,16 60:4 |
| **tell** 9:3 12:23 15:11,13 | 34:7,9 35:10 38:11 | **Thomas's** 159:16 | 192:23 195:19 | 70:1 79:21 124:11 |
| 20:14 22:1 23:2,5,6 | 56:9 57:22 59:4 | **though** 8:11 116:7 | 196:13 197:4,15 | 127:22 139:17 |
| 28:21 31:20 33:19,20 | 61:18 62:16 64:5,22 | 119:18 | 198:13,17 200:14,17 | **total** 38:13 |
| 34:15 38:11,13 41:8 | 65:19,21 69:10,10 | **thought** 92:6,19 101:15 | 201:12 | **totally** 199:6 |
| 43:17 46:10 49:16 | 74:23 75:5 77:19 | **three** 11:23 29:3 34:5,6 | **till** 126:14,23 130:9 | **touched** 44:7 |
| 54:21 59:3 61:12,20 | 82:2 83:8 85:18 | 34:8 38:8 41:11 | 174:18 | **toward** 111:11 130:12 |
| 65:20 66:6,17 76:8 | 87:15 94:1,13,14 | 42:14 57:21 59:14,23 | **time** 5:12,12 7:9 14:12 | 171:20 |
| 76:15 77:5 80:5 81:8 | 102:10 103:6 104:15 | 90:4 95:11 98:16 | 15:15 36:4 37:7,9 | **towards** 25:15 56:1 |
| 85:17 91:18,22 95:2 | 117:4,5,9,14 119:7 | 106:21 109:23 113:1 | 51:19 59:8 60:19 | 60:4 165:4 167:12 |
| 95:7 99:3,20,22 | 123:1 127:5 135:17 | 117:4 125:8 128:3,6 | 61:14 70:18 79:7 | 168:1 |
| 101:5 104:14 107:11 | 147:21 149:2 151:8 | 128:11 129:23 | 97:9 100:17 113:19 | **train** 36:8 |
| 108:1 111:1 114:17 | 153:4 155:8,22 156:5 | 130:16 134:2 157:11 | 121:6 127:11 129:13 | **trained** 37:4 75:13 |
| 116:10,10,22 117:19 | 156:19 165:3 173:13 | 171:22,22 172:7 | 131:17,18,19 133:16 | **training** 17:1,4 74:20 |
| 117:21 118:8 119:11 | 180:9 181:1,5 189:4 | 174:9,12 175:6 176:4 | 133:18,22 140:12 | 75:1,11 105:21 |
| 119:12 121:10,16 | 189:7 191:2,4,7 | 176:7 179:6,10 | 141:7,10,16,17 144:3 | 125:23 |
| 122:2,4,4 130:19 | 195:8 199:13,16 | 181:12,15 182:7,12 | 144:8,15 146:13,16 | **transcript** 202:23 |
| 132:2 134:15 137:2 | **things** 78:2,8,12,17 | 182:20 186:4 187:1,1 | 146:20 147:3,19 | **transfer** 97:21,22 98:2 |
| 137:12,16,21 142:18 | 127:10 133:12 141:4 | 189:16 198:2,10 | 148:5 153:13 155:18 | 98:5,11,23 99:4,23 |
| 143:16 145:1,15 | 156:15 162:4,14 | 201:4 | 159:7 161:21 170:23 | 101:18 |
| 146:13 152:10 154:9 | 173:3 197:5,19 198:1 | **through** 19:1 26:11,12 | 178:2,4 180:15 | **transferred** 96:21 |
| 155:11 156:17,19 | **think** 11:12,12 13:8 | 27:5 28:12 29:3,10 | 187:12,14,17 191:3 | 97:10,20 98:18 139:7 |
| 157:23 161:10,13 | 16:8 17:5,14 23:19 | 48:17 49:2 65:12 | 194:15 195:1,3,6 | **transferring** 100:17 |
| 162:5 166:7 167:17 | 23:20 24:2 31:14 | 71:18 81:7 118:6 | 201:6 | **transmission** 149:13 |

treated 136:6 165:6
treating 165:10
trial 5:19
tried 98:10 186:12,14
trouble 147:8 154:2
true 163:5,8 166:23
  168:19 202:23
truth 6:9,9,10 202:9,10
  202:10
truthfully 7:21
try 7:4 15:14 190:16
trying 100:3,7 131:4
  168:23 169:22
  170:19,21 173:4
Tuesday 1:20 202:21
turn 60:19 66:14 67:8
  96:17
turned 117:9 126:19
  127:13
Turner 32:5 34:1,10
  41:15,16,16,20 43:11
  51:18 52:7 53:6 57:4
  61:2 63:19 99:14,17
  100:15,16,18 123:3
  158:21 161:18 162:3
  200:6
Turner's 42:13 58:16
turnover 35:11 36:3
  37:6 44:10
twice 24:20 140:18
Twitchell 189:16
two 32:23 33:4 39:12
  39:15 43:9 45:17
  46:16 50:5 53:22
  54:14 65:14 66:6
  69:13 90:20 98:19
  106:20 109:8,21
  111:5,16 112:2
  114:19,23 115:10
  118:9 121:12 128:3,5
  129:10 131:8 132:16
  132:22,23 144:1
  152:7,17 156:9 158:8
  170:12 173:3 176:7,7
  176:8 186:11 188:23
  189:1,16,19 197:5
  201:3
type 58:22
typed 80:20 150:13
typewritten 73:23 83:1
  84:3,9,21 85:13
  104:6,7,8

**U**

uh-huh 7:17 11:8 13:9
  13:22 14:10,21 16:2
  20:22 24:6,10 25:10
  29:12 30:8 38:20
  39:9 44:12,19 45:7
  47:8,10 48:3,5,19

49:1 50:9 52:5 53:1
60:6 61:11 62:17
63:14 64:19 67:21
69:15 74:3,7 77:11
78:5 79:7 80:21
82:17 84:22 88:13
89:13 92:23 97:4,19
99:16 102:2 107:21
108:8,15,17 112:13
113:7 114:6 115:15
115:19 118:21
124:16,18 129:1,3
130:9 133:1,14 139:6
144:4,9,12,18 145:4
146:19 149:1,19
150:1,11,16 153:1,10
154:19 157:8 158:16
159:1,11,15 160:22
166:5 169:14 174:16
175:16 176:11 177:7
179:4,14 180:13
181:19 182:11 184:9
184:15,23 185:10,23
186:10 189:21 190:8
191:16,18 192:8,14
193:3
Um-huh 84:11,14
  107:18 112:19 115:9
unassured 128:21
under 6:17 24:22 34:12
  41:3 43:6 50:23
  56:17 60:3 64:10
  66:22 71:7 72:9 81:9
  106:9 109:17 110:8
  116:5,20 119:16
  131:2 162:1,8 163:23
  169:8 171:19 178:23
  187:7 188:10 199:15
  199:17
underperforming
  116:8 119:19
understand 6:16,19,22
  8:11 15:12 18:18
  20:3 25:4,7 27:20
  28:2,8,10 34:10
  37:17 43:19 44:22
  63:10 72:16 88:3
  89:3 96:4,4 110:19
  110:22 111:4,22
  117:12 120:16
  127:12 141:2,3,5
  154:11 156:13
  158:10 163:10,11
  168:23 172:4 173:6
  177:23 183:6
understanding 76:4
  183:19
understood 7:2 28:16
  28:21 37:11 60:9
  64:12 76:19 111:12

unemployment 187:2,3
  187:4,5,16,17,19
  188:14 191:10,11
unfairly 31:17 33:18
  136:6 165:7,10
unhappy 176:9,19
UNITED 1:1
Universal 194:13
Unless 73:17,19 74:7
unprofessional 167:16
  168:4,5 179:8 182:1
  182:10
unsafe 168:11,13,22
until 46:19 183:4
unused 128:15,23
  129:7,13 179:13
unusual 44:11
upset 77:6
use 59:23 70:19 129:10
  134:11
used 5:14,20 78:10
  134:8,12,14 152:23
  168:3
using 59:18 77:4 79:1
  167:14
usually 54:13
U.S 10:8,12 202:17

**V**

vacation 113:14 127:3
  127:4 128:15,22,23
  129:7,11,13 130:2,4
  130:6 179:13 193:12
  194:21 195:1,2,3,6,7
vendor 194:16
verbally 7:5
verbatim 151:19
verification 149:13
  151:12
verify 63:21
very 6:21 61:9 179:7
  181:23
visit 142:13
voice 79:1
Vs 1:7 202:14

**W**

wages 193:8,11 195:18
wait 88:11 117:22
  126:14,22 174:18
waiting 77:20
waived 5:19 6:3 203:3
waiving 5:22
walk 22:23 23:14 71:17
walked 73:18,20 170:6
Wal-Mart 186:6
  188:17,21 189:3
want 31:11 37:16 40:7
  44:22 46:3 53:13
  55:3 81:8 89:20

90:16 91:9 96:3
99:10,17 100:10
101:14 109:14 122:9
126:17 127:9,10
134:20 137:21 139:8
140:21 148:6,16
151:8 152:5 161:6
162:14 164:12 174:4
175:13 178:10,11
180:5 181:6 182:7
183:17 196:1 198:6
198:11 200:3
wanted 58:12 157:16
wanting 162:4
wants 32:10 177:2
warning 59:15,16,16
  134:2
warnings 59:14 134:2
  174:12
wash 83:7
washed 83:5
wasn't 40:18 52:19
  67:17 73:12 74:4,19
  79:13 80:13 81:14
  85:21 104:9,9 106:20
  107:23 113:11
  114:10 121:12
  126:21 140:6 166:8
  166:14,15 168:16
  173:12 191:3 194:13
  194:16,17
waste 70:17
watched 173:23
way 7:6 8:2 15:5 32:6
  52:13 82:6 83:19
  87:13 88:2 125:4
  155:12,14 162:9
  168:14 169:2,2,4
  171:4 174:2 175:21
Wayne 32:9 38:2 39:19
  40:14 58:3 75:21
  97:14 113:9 132:12
ways 43:7
Wednesday 126:16
week 34:20 37:1 82:5,7
  83:18 87:21 143:17
  143:18,20,21 144:3,8
  156:10 192:10
weeks 39:13,15 42:14
  45:17 69:13 90:20
  109:8,21 111:5,16
  112:2 114:19,23
  115:10 127:6,6
  128:15,21 129:7,12
  130:6,7,8 144:1
  175:7 176:7,7,7,8
  201:3
well 13:12 28:23 31:23
  33:9 35:10 40:6 59:4
  63:5 102:22 117:3,21

124:2 130:2,22
134:11 137:6 143:20
152:10 156:7 167:4
171:5 176:18 180:2
200:23
Wellness 138:14
went 11:3 15:17 16:3
29:10 30:17 72:5
75:5,6,16,19,20
83:4 105:11 126:2
130:3,17 132:2
137:23 140:8 141:5
142:12,22 143:22
145:5 147:10 167:1
171:1 175:17 183:22
186:6,9,12,20 187:19
189:15,15,16,17,18
189:18 190:3,15,19
190:21
were 8:13 11:11 13:1
13:21 14:12,19 16:23
20:11 25:7 28:17
32:21 33:4,7,15,16
33:18 34:22 35:4,8,8
38:4,17 40:13 41:1
43:14 44:13 45:16
46:10,21 47:3 48:4
49:13 50:21,23 51:5
51:7,11,11,17 53:19
54:13 68:16 73:15
75:8 90:4 97:13
111:23 114:19 116:5
116:5,7,21 119:16,17
119:19 121:5,8 123:9
123:15,18 124:4
125:1,2 129:4 130:14
130:19,20 131:10,11
131:19 132:3,4,16,22
136:9,17 137:2,10
140:5,13 141:4,7,12
141:15 142:2,6
144:14,16 147:3
152:17 165:11 166:8
172:13 173:8 179:18
180:11,16,20 181:23
191:9 192:15 196:7
200:18 201:9
weren't 32:23 45:20
111:5 112:17 116:20
166:9
WestPoint 1:8 6:14 8:9
10:19,23 11:2 13:1,2
16:23 17:6 18:10
19:12 21:21 22:9,21
23:3 24:17 25:19
26:16 27:6 29:21
30:10 31:12 47:2
49:8 61:2 74:21
76:22 93:20,21
104:12 108:4,5,22,23

113:12 190:17
193:17 194:16 199:8
199:12 200:19
202:15
**WestPoint's** 44:2
193:20
**WestPoint-sponsored**
194:14
**Westside** 139:1
**we'll** 118:7 122:6,7
133:16,19 134:2
151:3
**we're** 12:19 16:10
42:14 119:6 122:10
122:11 164:22
171:14
**we've** 73:14 110:20
111:1 118:5 121:23
122:5 129:15 137:5
175:12 197:5 198:13
**while** 8:12 12:23 16:23
31:18 32:22 37:20
50:20 75:8
**white** 17:15 32:9 37:19
37:23 40:16 43:9
77:17 96:22 98:19
116:4,19 119:16
169:11
**whited** 66:11 117:10
**whole** 6:9 41:21 85:15
85:15 119:3,9,10
149:2 162:8 170:23
172:18 184:5,5,7
202:10
**wife** 9:21,23 10:9,17
11:18 16:18,20
137:14 140:15 181:4
193:10
**Williams** 2:16 6:15
**window** 191:20,22,22
192:1
**windows** 191:23 192:4
**Wiregrass** 138:14
**witness** 6:1,2,8 15:5
59:2 86:17 87:2
96:14 141:18 142:1
158:5 180:18 185:17
193:3 196:17 197:14
203:1
**word** 179:6
**work** 10:9,11,17 14:11
31:6 32:1,1 37:11,13
39:18 45:13,19 47:3
47:4,7 48:4 49:19,21
50:7,15 51:15 56:22
58:10 62:23 71:1
99:23 101:4 113:20
113:23 153:19,21
154:11,12 155:5
168:11 173:23 178:4

178:23 179:13 188:9
**worked** 8:11 97:5,8,9
114:8 123:22 177:15
183:4,11,13,20 184:5
193:17
**workers** 45:2,23 47:17
55:7,8 58:13 59:19
60:16 120:14 166:2,8
166:15 169:6 177:21
**working** 10:6,7 45:20
48:18 55:8 57:9,22
81:16,19 83:8 87:5
120:15 131:2,2 166:8
166:9 192:13
**wouldn't** 7:20 8:2
56:10 83:3 100:11,12
113:21 166:10,16
**wrapping** 14:16 52:14
**write** 27:21 28:3 41:23
59:5,7 60:15,17 63:6
63:8,11,17,20 64:1
64:14 88:9 95:10,11
133:16,20,23 156:8,9
156:10,11,12 171:21
173:9,10,12 178:15
182:12,15
**writes** 143:5
**write-up** 31:23 32:17
34:4 39:3,8,10 59:19
60:10 63:5 95:14,15
95:21 101:23 102:9
109:5 110:5 114:17
114:21 117:17
122:16 123:6 152:14
153:8 158:2 164:18
165:15
**write-ups** 62:23 64:7,9
64:10 121:12,13,14
121:15,21 122:14
171:22 172:7,11
**writing** 42:1,12 43:9,10
72:17,20 89:2 103:19
103:22 119:21
172:19 199:13
**written** 20:2 25:4 31:17
33:18,22 39:2,3 55:5
55:10 82:8 85:9
86:21 95:19 115:13
150:13 165:5 166:1
172:23 174:6,9
**wrong** 162:5,15
**wrongfully** 33:22 34:1
164:2,11
**wrote** 32:16 34:1 39:5
39:14,14,20,21 40:2
41:12 52:12 70:5
73:13 85:18 95:10
114:21 115:3,7 120:8
120:12,18,22 128:1
158:20 164:15

165:16 167:8 174:11
175:6 182:14,16

――――――― **Y** ―――――――
**yeah** 16:19 20:19 41:16
44:16 55:15 57:19
68:5 77:9 104:9
110:23 123:21
131:21 134:12,21
143:5 157:18 184:12
195:7 196:17 197:18
**year** 12:14 17:6 20:18
20:19 30:12 35:18
41:21 117:16 163:20
188:5
**yearly** 41:19 42:15
163:1,16 178:22
201:1
**years** 9:15 11:1,17
14:14 35:21 176:4
193:18
**yeast** 189:18
**young** 77:17
**you-all** 62:4
**y'all** 32:13 77:20 174:3
178:9

――――――― **0** ―――――――
**0001** 4:12 148:18
153:16
**0002** 151:17 162:1
**0003** 166:20
**0004** 175:11
**0005** 4:5 183:1
**0006** 4:7 184:19
**0007** 4:8 193:6
**0008** 193:6 195:9
**0009** 4:9
**0011** 3:11 19:18
**0012** 3:15 24:19 151:14
151:20
**0013** 4:12 148:18
149:12
**002** 151:10
**0026** 4:10 128:5
**003** 26:11
**0036** 3:21 4:4 65:12
**0038** 66:19
**004** 151:10
**0040** 4:4 65:13
**005** 151:11,18
**009** 124:13 151:13,20
**0138** 4:13
**0245** 3:8
**0246** 3:9 19:1
**0248** 3:9 19:1
**0326** 3:13
**0336** 3:16 26:12
**0338** 3:16 26:12
**0427** 3:17 27:5

**0428** 3:18 27:6
**07** 193:1
**07-01-04** 21:23 22:3
**07-10874** 16:15

――――――― **1** ―――――――
**1** 3:7 17:22 18:2 21:20
198:18,19
**1:06-CV-874-MHT** 1:7
202:20
**10** 3:21 35:20 53:10,12
53:16 60:3 122:12
158:23 183:3
**10th** 183:16,20,22
184:3
**10:30** 32:1
**100** 9:13 38:14,14 39:4
39:13,15,22 40:4,6
40:20 55:3 69:12
73:12 109:21 112:7
112:17 114:23
115:11 139:1 164:14
165:15 166:10,16
**102** 4:8
**1037** 139:16
**105** 2:12
**11** 4:3 43:13 50:5 65:9
65:10 69:2 170:13
175:15 183:22
**11th** 1:19 2:5 101:23
103:16 115:2 123:19
124:4 179:23 183:12
184:1,4,8,14
**11.42** 48:14
**11:00** 44:14,15,16,18
170:9 183:23
**12** 4:5 51:16 52:6 53:20
69:3,6 72:8 89:9,12
89:17 114:9
**12-hour** 114:1
**12:15** 1:21
**124** 4:9
**127** 4:10
**13** 4:6 11:1 58:21 79:8
79:10 82:13 83:15
85:8 88:6 89:6,17
90:8 109:15,17 110:8
**13th** 113:5 126:15
**137** 4:13
**139** 4:13
**14** 4:8 61:8 102:3,6,12
102:13 103:1,9,15
105:13,17 106:10
108:12
**148** 4:11
**15** 4:9 35:21 124:8,10
125:13 193:18
**15th** 9:11 128:14 129:6
130:10,10 192:11
**16** 4:10 127:18,20

128:4
**16th** 69:21 70:2 73:9
73:22 74:10 158:5,6
164:20
**17** 1:20 3:7 4:11 148:14
148:17 153:15 159:6
202:21
**18** 3:9 4:13 139:11,14
143:8
**18th** 203:7
**19** 3:10 4:14 68:13,14
91:10,11,17 92:2
93:6,12 94:3,7 198:7
198:11 199:5,11
**1955** 9:11
**1974** 12:15

――――――― **2** ―――――――
**2** 3:9 18:20,23 21:12
22:1 91:7,17,23 93:5
93:13,15 94:2,7
199:4
**2nd** 82:3 91:5
**20** 13:5,7,8 34:22 35:21
138:18 186:21,22
**20th** 30:22 31:2
**200** 2:11
**2000** 47:22
**2001** 47:14 176:5
**2004** 21:21 47:14,22
163:21,22 176:5
177:16 179:1,3
193:21 194:1
**2005** 3:21 8:14 19:21
45:2 47:1 48:17 49:2
49:6,17 51:18 53:18
57:4 58:23 158:17,18
197:10,12,17
**2006** 4:3,5,6,8 30:13
48:17 49:2 65:6,17
69:1,7,21 70:2 73:9
73:22 74:14 79:22
82:1,3 83:13 84:4,10
85:14,23 86:10 88:5
91:5,21 92:4 94:9
109:5 110:4,16
118:19 123:20
139:17 146:17
148:23 153:22
158:15 159:6 161:21
169:9,20 175:15
183:3 197:10,11,15
**2007** 1:20 192:7 202:21
203:7
**201** 202:22
**206** 11:10
**21st** 16:10
**2112** 1:19 2:5
**217** 1:19 2:5
**22** 3:12 10:4 12:6 76:3

Case 1:06-cv-00874-MHT-TFM    Document 51-7    Filed 09/12/2007    Page 70 of 70
Deposition of Claude Gene Lee, Sr.                                July 17, 2007

Page 16

**22nd** 192:6
**23** 90:1,18 91:15,19
  92:5,10 93:5,9
**24** 3:14
**25** 9:15 12:5 13:3 96:18
  98:14,16
**256** 138:17
**26** 3:16
**27** 3:17 109:4,16 110:3
  110:6,23
**27th** 192:7
**278-3430** 149:15
**28** 101:22 102:8 114:17
  116:2 117:6 118:13
  118:14 119:5
**28th** 144:15
**29** 3:19 14:14 130:12
  130:13

---
**3**
**3** 3:10 19:14,17 21:16
  199:10
**3rd** 19:21
**3-10** 108:3 123:22
**3-10-06** 104:18 128:20
  183:10
**3-11-06** 108:7
**3-15-06** 128:20
**3-2-06** 81:17
**3/15/06** 4:9
**30** 11:17 36:13 45:4
  46:18 131:7
**31** 12:5
**32** 133:6
**35** 46:7,18 47:15
  134:17
**35205** 2:6
**36104** 2:12
**36303** 139:2
**36305** 138:18
**36310** 9:13
**39** 136:4

---
**4**
**4** 3:12 22:5,8 23:11,16
**4:30** 201:15
**40** 46:7,18 137:9 166:9
**43** 3:20

---
**5**
**5** 3:14 24:13,16
**51** 9:9
**53** 3:21
**55** 194:4

---
**6**
**6** 3:3,16 26:4,7
**6-30-2007** 149:14
**6:00** 61:15
**6:30** 61:15

**60** 35:17,22 45:2
**65** 4:3 31:7 35:19 46:10
**69** 4:5

---
**7**
**7** 3:17 27:1,2
**7th** 139:17 169:9,20
**7/7/06** 4:13
**7:00** 44:14,15,16,16,18
  61:15,15 184:8
**75** 11:12,13
**79** 4:6

---
**8**
**8** 3:19 29:16,17
**8th** 79:17,22 82:1,4,14
  83:2,13 84:4,10
  85:14,23 86:10 87:12
  87:18,19 88:5 91:4
  91:20 92:4 94:8
  109:4 110:4,15 115:5
  115:7
**8.50** 192:21
**80** 31:7 46:11
**82** 11:12,13

---
**9**
**9** 3:20 43:20,23
**9.25** 192:21
**90** 35:17
**91** 4:14

# TAB 7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CLAUDE GENE LEE, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     CASE NO. 1:06-CV-874-MHT |
| | ) |
| WESTPOINT HOME, INC., | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF FRANK MAJOR, III

Pursuant to 28 U.S.C. § 1746, I, Frank Major, III, certify that the following declaration is based upon my personal knowledge.

1.    I am a black male and am currently the Safety/Training Director for WestPoint Home, Inc. and I assist in the human resources department in this role.

2.    From December 15, 2005 to February 20, 2006, I was Claude Lee's direct supervisor. Mr. Lee was third shift supervisor of the packaging department at that time. I also supervised, during that time, Mr. Billy Wayne Bedsole and Mr. Mike Ethridge, the other packaging department shift supervisors.

3.    I completed performance reviews in January 2006 for Mr. Lee, Mr. Bedsole, and Mr. Ethridge. I am aware that Mr. Lee now contends that his January 25, 2006 performance review has been altered. His performance review as attached to my original affidavit appears as it did when he signed it. After discussing the review I completed for Mr. Lee with the plant manager, Mr. Glenn McCants, I lowered a few of the ratings I had marked in certain categories. I made these changes before Mr. Lee signed the performance review and before I met with Mr. Lee to discuss the review. I made similar changes on the performance reviews of Mr. Bedsole

and Mr. Ethridge -- that is, after discussing the reviews with Mr. McCants, but before the reviews were discussed or signed by Mr. Bedsole and Mr. Ethridge, I lowered some of the ratings in certain categories. Attached hereto are true and correct copies of the January 2006 performance reviews I completed for Mr. Bedsole and Mr. Ethridge.

4.     On May 29, 2007 WestPoint announced its decision to entirely close the Abbeville Plant as of August 31, 2007. Since that time, WestPoint has determined that it will leave the distribution operations open and running at Abbeville. However, all other departments, including the packaging department in which Mr. Lee worked, are still slated to close. In fact, the second and third shifts in the packaging department have already closed. Employees on those shifts completed their last day of work on August 9, 2007.

5.     Clara Thomas, a black female, was an employee on the first shift in the packaging department at the time Mr. Lee was removed from his position as third shift supervisor in that department. Ms. Thomas was offered a position as third shift supervisor; however, she declined the job because she desired to remain on the same shift on which she had been working. She accepted an hourly position on the first shift, rather than the salaried third shift supervisor position she was offered. Attached hereto·is a true and correct copy of the personnel notice reflecting Ms. Thomas's position.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12 day of September, 2007.

Frank Major, III

# ATTACHMENT 1



**CONFIDENTIAL**



## WESTPOINT HOME

## SALARIED-EXEMPT
## PERFORMANCE REVIEW

NAME _Mike Ethridge_

DEPARTMENT/POSITION TITLE _Wrap & Pack / Supervisor_

FACILITY _____

DIVISION and/or BUSINESS UNIT _____

DATE LAST REVIEWED _____

JSD _____

RATING PERIOD _____

PERFORMANCE RATING _____

DATE COMPLETED _____

### GENERAL INSTRUCTIONS

| | |
|---|---|
| **Timing:** | A performance review is to be completed for each salaried-exempt associate annually between January 1 and January 31. It is the responsibility of each supervisor to prepare the performance review. |
| **Procedure:** | The associate's performance of assigned tasks and accountabilities should be rated with respect to the performance factors below, utilizing the following scale:<br><br>**S – Superior:** Consistently and substantially exceeds major job requirements. Accomplishments are extraordinary as demonstrated by job results.<br><br>**AR – Above Requirements:** Exceeds most job requirements. Job results are measurably higher than job requirements.<br><br>**MR – Meets Requirements:** Meets major job requirements. Performance is fully acceptable as demonstrated by job results.<br><br>**F – Fair:** Performance is slightly below what is expected in the position. Performance needs improvement.<br><br>**M – Marginal:** Fails to meet most job requirements. Performance requires immediate, substantial and sustained improvement. |
| **Acknowledgement:** | This appraisal has been reviewed with the associate. It is understood that the signature does not necessarily indicate agreement with the content of the review. |

Return to Table of Contents

Lee/WPH   0577

06/12/2006  15:08  3345854207                    WESTPOINT STEVENS                    PAGE 02

## I.  MANAGEMENT SKILLS EVALUATION

After carefully evaluating individual's work performance in relation to current job requirements, check the appropriate box to indicate the associate's performance. Explanations of terms appear at the bottom of this page. If not applicable, indicate N/A.

| Management Skills (Evaluate the first two skills categories only if the associate has supervisory responsibility.) | SUPERIOR | ABOVE REQUIREMENTS | MEETS REQUIREMENTS | FAIR | MARGINAL | Comments or Supportive Details  This section *must* be completed for each rating. |
|---|:---:|:---:|:---:|:---:|:---:|---|
| **DEVELOPMENT OF SUBORDINATES.** Ability to prepare subordinates for current positions, as well as for positions of greater responsibility. | ☐ | ☒ | ☐ | ☐ | ☐ | Associates are trained on several different jobs. |
| **SUPERVISION/MANAGEMENT SKILLS** Ability to direct and control subordinates; ability to motivate and effectively coordinate the efforts of work groups. | ☐ | ☐ | ☒ | ☐ | ☐ | Mike has great management skills. Motivates associates to work hard & safe. |
| **STRATEGIC PLANNING/ORGANIZING** Ability to establish courses of action to accomplish specific goals. Allocation of resources, including setting priorities, meeting deadlines, anticipating problems | ☐ | ☐ | ☒ | ☐ | ☐ | Stays on top of priorities and keeps associates aware on issues and any problems that may occur. |
| **JOB KNOWLEDGE** Technical knowledge and the level of competence required to be successful in the incumbent position. | ☐ | ☒ | ☐ | ☐ | ☐ | Has excellent knowledge of the job. |
| **QUALITY** Conformance to requirements re: accuracy, thoroughness, acceptability of work performed. | ☐ | ☐ | ☒ | ☐ | ☐ | Makes sure that all associates are aware of potential quality problems |
| **COMMUNICATION SKILLS** Ability to clearly and persuasively express concepts, both orally and in writing; also, ability to listen effectively, grasp ideas and instructions. | ☐ | ☐ | ☒ | ☐ | ☐ | Communicates very well with associates |
| **INTERPERSONAL SKILLS** Ability to work cooperatively with subordinates, peers, superiors, and external contacts; ability to influence others without direct authority. | ☐ | ☐ | ☒ | ☐ | ☐ | Works very well with associates as well as other supervisors. |
| **ADMINISTRATIVE** Ability to satisfy all administrative components of position (i.e. timeliness, completeness, accuracy, documentation.) | ☐ | ☐ | ☒ | ☐ | ☐ | Complets paper work in a very timely manner. |
| **LEARNING CAPABILITIES; OTHER RELEVANT SKILLS** | ☐ | ☐ | ☐ | ☐ | ☐ | Able to adapt to changes. |

**PERFORMANCE EVALUATION RATING**

| | |
|---|---|
| **Superior** | Consistently and substantially exceeds major job requirements. Accomplishments are extraordinary as demonstrated by job results. |
| **Above Requirements** | Exceeds most job requirements. Job results are measurably higher than job requirements. |
| **Meets Requirements** | Meets major job requirements. Performance is fully acceptable as demonstrated by job results. |
| **Fair** | Performance is slightly below what is expected in the position. Performance needs improvement. |
| **Marginal** | Fails to meet most job requirements. Performance requires immediate, substantial and sustained improvement. |

Return to Table of Contents

M f 0 XQ ! ! 1689

06/12/2006  15:08    3345854207                    WESTPOINT STEVENS                    PAGE  03

## ANNUAL ACCOMPLISHMENT SUMMARY DEVELOPMENT REVIEW          **Strictly Private**
(This page to be completed by associate)

**A.  ACCOMPLISHMENT SUMMARY** (Summarize your accomplishments versus goals in the past year.)

Goals                          Accomplishments
Lost Time 2005 - 0 ——————— 0
Record ables - 0 ———————
incident Rate -1.20 ————
Productive Cost .55 ——————— .68

**B.  STRENGTHS/GROWTH** (Describe your strengths and how they changed in the past year.)

1. Good Listener
2. Associate know what I tell them is the Truth
3. Knowledge in Safety
4. Knowledge from working on production Lines, most of the dept. & Office

**C.  IMPROVEMENT/DEVELOPMENT NEEDS/PLANS** (Identify most critical needs and responsive action plans.)

I still feel Like a short Time study CLASS for Supervisors
would give us another tool to use for a more efficiency
department

**D.  JOB/CAREER INTEREST** (If interested in a job change, list preference including position title, business unit, location. Specify any geographic
limitations, desired timing, etc. Also describe long-term interest.)

I am happy in my position and my goal is to retire
at Age 62. Also Anywhere this plant needs me. I will
be willing to go.

_Michael E. [signature]_                              1-25-06
Associate's Signature                                    Date

[ Return to Table of Contents ]

M f 0XQ ! ! 168:

06/12/2006  15:08    3345854207                WESTPOINT STEVENS                        PAGE  04

## II. ANNUAL ACCOMPLISHMENT SUMMARY DEVELOPMENT REVIEW
(This page to be completed by immediate manager)

**A. PERFORMANCE SUMMARY AND TREND** (Summarize your view of associate's accomplishments versus goals in the past year and indicate performance.)

Zero lost time accidents

9 recordables for the department

Incident rate for department was 4.02

**B. STRENGTHS/GROWTH** (Describe associates strengths and how they changed in the past year.)

Mikes able to motivate associates and do what it takes to get the job done. Has excellant knowledge of the Packaging department.

**C. DEVELOPMENTAL RECOMMENDATIONS**
1. List Developmental Objectives and/or Skills To Improve based on overall performance rating and evaluation of management skills.
2. For any deficiencies noted on Management Skill Evaluation, planned development activity must be detailed here.
3. Developmental Objectives or Skills To Improve should be directly transferred onto next year's Objective Setting page.

| Developmental Objectives/Skills To Improve | Planned Developmental Activity |
|---|---|
| House keeping | Continue to monitor |
| Associate Training | Continue to observe associates for areas of improvement. |
| | |
| | |

**D. FUTURE CAREER DISCUSSION**
Discuss associate's career goals and objectives. List any positions in which the associate expresses an interest. Refer to Human Resources Manager if indicated.

**E. OVERALL PERFORMANCE RATING**
☐ Superior    ☐ Above Requirements    ☒ Meets Requirements    ☐ Fair    ☐ Marginal

**F. ASSOCIATE'S COMMENTS**

**G. SIGNATURES**                              ☐ Check if additional comments attached

Immediate Manager          Date  1.25.06

Reviewing Manager          Date  1-25-66

Associate's Initials  1-25-06
Indicates that he/she read
this appraisal and it has been
discussed with him/her.

Return to Table of Contents

M f 0XQ ! ! 1691

06/12/2006  15:08   3345854207          WESTPOINT STEVENS                    PAGE  05



WESTPOINT HOME

## PLANNED PERSONAL OBJECTIVES AND ACCOMPLISHMENTS FOR SALARIED-EXEMPT ASSOCIATES

_Etheridge  Mike S._
Associate's Name (last, first, middle initial)

_Wrap and Pack Supervisor_
Title

_Bed Productions/sheeting_
Division and/or Business Unit
Date

Planned Personal Objective Form    _1-1-06_    to    _12-31-06_

1. Efficiency Goal 95% end of 1st Qtr, 100% for 2nd, 3rd, 4th
2. Incident Rate of 2% or less for Dept.
3. Reduce cost per doz by .13¢ by end of 4th Qtr.
   A. Goal of .06¢ 1st Qtr, .06¢ end of 2nd, .5¢ end of 3rd, .56¢ end of 4th
4. Zero lost time accidents in 2006

_Michael E. Etheridge_
Associate's Signature

_1-25-06_
Date

_F K Maj III_
Supervisor/Manager

_1-25-06_
Date

(Note:  All salaried-exempt associates supervising others must include in their goals their efforts in meeting EEO/AAP expectations.)

Please indicate target date for meeting each goal (1st, 2nd, 3rd and 4th quarter).

*Signatures above indicate agreement on goals and objectives at beginning of evaluation period.

Return to Table of Contents

M f 0XQ! ! 1692

WESTPOINT STEVENS                    PAGE  01


CONFIDENTIAL



WESTPOINT HOME

## SALARIED-EXEMPT
## PERFORMANCE REVIEW

NAME ___Billy Wayne Bedsole___

DEPARTMENT/POSITION TITLE ___Wrap +Pack Supervisor___

FACILITY _____

DIVISION and/or BUSINESS UNIT _____

DATE LAST REVIEWED _____

JSD _____

RATING PERIOD ___1-01-06 - 12-31-06___

PERFORMANCE RATING ___MR___

DATE COMPLETED ___1-25-06___

## GENERAL INSTRUCTIONS

| Timing: | A performance review is to be completed for each salaried-exempt associate annually between January 1 and January 31. It is the responsibility of each supervisor to prepare the performance review. |
| --- | --- |
| Procedure: | The associate's performance of assigned tasks and accountabilities should be rated with respect to the performance factors below, utilizing the following scale: <br><br> **S – Superior:** Consistently and substantially exceeds major job requirements. Accomplishments are extraordinary as demonstrated by job results. <br><br> **AR – Above Requirements:** Exceeds most job requirements. Job results are measurably higher than job requirements. <br><br> **MR – Meets Requirements:** Meets major job requirements. Performance is fully acceptable as demonstrated by job results. <br><br> **F – Fair:** Performance is slightly below what is expected in the position. Performance needs improvement. <br><br> **M – Marginal:** Falls to meet most job requirements. Performance requires immediate, substantial and sustained improvement. |
| Acknowledgement: | This appraisal has been reviewed with the associate. It is understood that the signature does not necessarily indicate agreement with the content of the review. |

Return to Table of Contents

M f 0XQ ! ! 1693

05/12/2006  15:04   3345854207          WESTPOINT STEVENS                    PAGE  02

## I.   MANAGEMENT SKILLS EVALUATION

After carefully evaluating individual's work performance in relation to current job requirements, check the appropriate box to indicate the associate's performance. Explanations of terms appear at the bottom of this page. If not applicable, indicate N/A.

| Management Skills (Evaluate the first two skills categories only if the associate has supervisory responsibility.) | SUPERIOR | ABOVE REQUIREMENTS | MEETS REQUIREMENTS | FAIR | MARGINAL | Comments or Supportive Details — This section *must* be completed for each rating. |
|---|---|---|---|---|---|---|
| **DEVELOPMENT OF SUBORDINATES** Ability to prepare subordinates for current positions, as well as for positions of greater responsibility. | ☐ | ☒ | ☐ | ☐ | ☐ | Keeps associates well informed of what is expected of them |
| **SUPERVISION/MANAGEMENT SKILLS** Ability to direct and control subordinates; ability to motivate and effectively coordinate the efforts of work groups. | ☐ | ☐ | ☒ | ☐ | ☐ | Does a good job motivating associates |
| **STRATEGIC PLANNING/ORGANIZING** Ability to establish courses of action to accomplish specific goals. Allocation of resources, including setting priorities, meeting deadlines, anticipating problems. | ☐ | ☐ | ☒ | ☐ | ☐ | Does a good job keeping up with priorities |
| **JOB KNOWLEDGE** Technical knowledge and the level of competence required to be successful in the incumbent position. | ☐ | ☐ | ☒ | ☐ | ☐ | Very good job knowledge of the job. |
| **QUALITY** Conformance to requirements re: accuracy, thoroughness, acceptability of work performed. | ☐ | ☐ | ☒ | ☐ | ☐ | Always room for better quality. |
| **COMMUNICATION SKILLS** Ability to clearly and persuasively express concepts, both orally and in writing; also, ability to listen effectively, grasp ideas and instructions. | ☐ | ☐ | ☒ | ☐ | ☐ | Communicates well with associates |
| **INTERPERSONAL SKILLS** Ability to work cooperatively with subordinates, peers, superiors, and external contacts; ability to influence others without direct authority. | ☐ | ☐ | ☒ | ☐ | ☐ | Associates really respects him as a supervisor |
| **ADMINISTRATIVE** Ability to satisfy all administrative components of position (i.e. timeliness, completeness, accuracy, documentation.) | ☐ | ☐ | ☒ | ☐ | ☐ | Keeps up with paperwork and reviews. |
| **LEARNING CAPABILITIES; OTHER RELEVANT SKILLS** | ☐ | ☐ | ☒ | ☐ | ☐ | Very able to adapt to changes. |

**PERFORMANCE EVALUATION RATING**

| | |
|---|---|
| **Superior** | Consistently and substantially exceeds major job requirements. Accomplishments are extraordinary as demonstrated by job results. |
| **Above Requirements** | Exceeds most job requirements. Job results are measurably higher than job requirements. |
| **Meets Requirements** | Meets major job requirements. Performance is fully acceptable as demonstrated by job results. |
| **Fair** | Performance is slightly below what is expected in the position. Performance needs improvement. |
| **Marginal** | Fails to meet most job requirements. Performance requires immediate, substantial and sustained improvement. |

Return to Table of Contents

MT0XQ ! ! 1694

06/12/2006  15:04   3345854207              WESTPOINT STEVENS              PAGE  03

## II. ANNUAL ACCOMPLISHMENT SUMMARY DEVELOPMENT REVIEW
(This page to be completed by immediate manager)

**A. PERFORMANCE SUMMARY AND TREND** (Summarize your view of associate's accomplishments versus goals in the past year and indicate performance.)

Zero lost time accidents
9 Recordables for the department
Incident rate for department was 402

**B. STRENGTHS/GROWTH** (Describe associates strengths and how they changed in the past year.)

Has allot of experience in the Packaging department. Has the respect of his associates as a Supervisor.

**C. DEVELOPMENTAL RECOMMENDATIONS**
1. List Developmental Objectives and/or Skills To Improve based on overall performance rating and evaluation of management skills.
2. For any deficiencies noted on Management Skill Evaluation, planned development activity must be detailed here.
3. Developmental Objectives or Skills To Improve should be directly transferred onto next year's Objective Setting page.

| Developmental Objectives/Skills To Improve | Planned Developmental Activity |
|---|---|
| House Keeping | Continue to monitor |
| Associate Training | Continue to observe associates for areas of improvement. |
| | |
| | |
| | |

**D. FUTURE CAREER DISCUSSION**
Discuss associate's career goals and objectives. List any positions in which the associate expresses an interest. Refer to Human Resources Manager if indicated.

This job means allot to Billy Wayne and he enjoys it very much.

**E. OVERALL PERFORMANCE RATING**
☐ Superior    ☐ re Requirements    ☒ Meets Requirements    ☐ Fair    ☐ Marginal

**F. ASSOCIATE'S COMMENTS**

Happy in current position

**G. SIGNATURES**    ☐ Check if additional comments attached

Immediate Manager _____    Date 1-25-06

Reviewing Manager _____    Date 1-25-06

Associate's initials _____    Date 1-25-06
Indicates that he/she read this appraisal and it has been discussed with him/her.

Return to Table of Contents

M f 0XQI ! ! 1695

06/12/2006  15:04    3345854207                    WESTPOINT STEVENS                    PAGE  04

**ANNUAL ACCOMPLISHMENT SUMMARY DEVELOPMENT REVIEW**          <u>**Strictly Private**</u>
(This page to be completed by associate)

A.  ACCOMPLISHMENT SUMMARY (Summarize your accomplishments versus goals in the past year.)

Recordable - Set Goal O Had O
Lost Time Accident - Set Goal O Had O
Incident Rate - Set Goal 1.2, Had 1.5
Absentism Set Goal 1.3 Had 1.29

B.  STRENGTHS/GROWTH (Describe your strengths and how they changed in the past year.)

1) Able To Talk To Associates And Associates Know They will Be Treated Fair.
2) Work with Other Supervisors And Help where I Am Needed
3) Safety - really stress safety to all
4) Prepairing Ahead of Time For My Shift

C.  IMPROVEMENT/DEVELOPMENT NEEDS/PLANS (Identify most critical needs and responsive action plans.)

Need A school To Help Reduce cost And running of Machines.

D.  JOB/CAREER INTEREST (If interested in a job change, list preference including position title, business unit, location. Specify any geographic limitations, desired timing, etc. Also describe long-term interest.)

Happy in My Position - will work where The Company needs me.

Billy Belrose
Associate's Signature                                   1-25-06
                                                        Date

Return to Table of Contents

Mf 0XQl ! ! 1696



# WESTPOINT HOME

## PLANNED PERSONAL OBJECTIVES AND ACCOMPLISHMENTS FOR SALARIED-EXEMPT ASSOCIATES

Billy Wayne Bedsole
Associate's Name (last, first, middle initial)

Date  1-25-06

Wrap & Pack Supervisor
Title

Best Products / Sheeting
Division and/or Business Unit

Planned Personal Objective Form  1-1-06  to  12-31-06

1) Efficiency Goal 95% end of 1st Qtr, 100% for 2nd, 3rd & 4th
2) Incident Rate 2% or less for Dept.
3) Reduce cost per doz by .13¢ by end of 4th Qtr.
   A. Goal of .68¢ 1st Qtr, .61¢ end of 2nd, .58¢ end of 3rd, .55¢ end of 4th
4) ... Zero lost Time accidents for 2006

Billy Bedsole
Associate's Signature

[signature]
Supervisor/Manager

Date  1-25-06

Date  1.25.06

(Note: All salaried-exempt associates supervising others must include in their goals their efforts in meeting EEO/AAP expectations.)

Please indicate target date for meeting each goal (1st, 2nd, 3rd and 4th quarter).

*Signatures above indicate agreement on goals and objectives at beginning of evaluation period.

Return to Table of Contents

Mf0XQ!!1697

# ATTACHMENT 2

**PERSONNEL NOTICE**                                    W E S T P O I N T   S T E V E N S

☐ INITIATED BY COMPANY            ☐ AT REQUEST OF EMPLOYEE

| EMPLOYEE | | | EMPLOYEE NUMBER | **TYPE OF NOTICE** |
|---|---|---|---|---|

EMPLOYEE: _Clara L. Thomas_

EMPLOYEE NUMBER: _33257_

FACILITY: _044_ • DEPARTMENT: _65_ • ROOM • SHIFT: _1st_

SUPERVISOR: _Mike Estrich_

NOTICE DATE: _1.4.06_

EFFECTIVE DATE OF CHANGE: _1.9.06_

**TYPE OF NOTICE**
◄ 1 - EMPLOYEE PROBLEM
2 - EMPLOYEE COMPLAINT
3 - NOTICE OF CHANGE
4 - REQUEST FOR CHANGE
5 - EMPLOYEE REQUEST
6 - COMMENDATION
7 - MISCELLANEOUS NOTICE

SITUATION IN BRIEF

Department, (Job,) Shift, or Rate Change

DETAILS

| Present | Proposed |
|---|---|
| Dept.# _65_ | Dept. No. _65_ |
| Dept. Name _PACKING_ | Dept. Name _PACKING_ |
| Shift _1st_ | Shift _1st_ |
| Job # _6305_ | Job # _65-101_ |
| Job Title _Supervisor_ | Job Title _Lead Person_ |
| Rate _SALARied_ | Rate ~~11.11~~ _11.42_ |

JSD

DSD

FSD

The following to be completed when employee changes job:

The Job Hazard Study for a _____ has

been reviewed with me.        _____
                                   Employee's Signature

ACTION TAKEN

Change due to:

Circle One
Bid Sheet
Displacement
Recall
(Other (explain))

_Clara's supervisor job was ELEMINATED on 1st shift. She had option of Supervisor 3rd (65) or Lead Person on 1st - She chose Lead Person_

| DISTRIBUTION | | RECOMMENDED BY |
|---|---|---|
| ☐ COST DEPT. | ☐ VICE-PRESIDENT | _Mike Estrich_   1-4-06 |
| ☐ DEPT. FILES | ☐ MANAGER | DEPARTMENT HEAD  _F.L. Mayo_   1.4.06 |
| ☐ INDUSTRIAL RELATIONS | ☐ ASST. MANAGER | |
| ☐ OFFICE MANAGER | ☐ OVERSEER | OTHER  _Clara Thomas_   1-4-06 |
| ☐ PAYROLL DEPT. | ☐ PRODUCTION DEPT | SIGNATURE                          DATE |
| ☐ PERSONNEL DEPT. | ☐ SUPPLY ROOM | |

# TAB 8

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      SOUTHERN DIVISION
 4      CASE NUMBER:   1:06-CV-874-MHT
 5      CLAUDE GENE LEE, SR.,
 6                  Plaintiff,
 7          vs.
 8      WESTPOINT HOME, INC.,
 9                  Defendant.
10
11
12         DEPOSITION OF FRANK LAMONT MAJOR, III
13              In accordance with Rule 5(d) of
14      The Alabama Rules of Civil Procedure as
15      Amended, effective May 15, 1988, I,
16      Virginia Denese Barrett, am hereby
17      delivering to Mr. Jay E. Tidwell, the
18      original transcript of the oral testimony
19      taken on the 29th day of August, 2007,
20      along with exhibits.
21              Please be advised that this is
22      the same and not retained by the Court
23      Reporter, nor filed with the Court.
```

3

```
 1      force and effect as if full compliance had
 2      been had with all laws and rules of Court
 3      relating to the taking of depositions.
 4              IT IS FURTHER STIPULATED AND
 5      AGREED that it shall not be necessary for
 6      any objections except as to form or leading
 7      questions, and that counsel for the parties
 8      may make objections and assign grounds at
 9      the time of the trial, or at the time said
10      deposition is offered in evidence, or prior
11      thereto.
12              IT IS FURTHER STIPULATED AND
13      AGREED that the notice of filing of the
14      deposition by the Commissioner is waived.
15
16
17
18
19
20
21
22
23
```

2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      SOUTHERN DIVISION
 4      CASE NUMBER:   1:06-CV-874-MHT
 5      CLAUDE GENE LEE, SR.,
 6                  Plaintiff,
 7          vs.
 8      WESTPOINT HOME, INC.,
 9                  Defendant.
10
11              S T I P U L A T I O N
12              IT IS STIPULATED AND AGREED by
13      and between the parties through their
14      respective counsel, that the deposition of
15      FRANK LAMONT MAJOR, III, may be taken
16      before Virginia Denese Barrett,
17      Commissioner, at the offices of Balch and
18      Bingham, 105 Tallapoosa Street, Montgomery,
19      Alabama, on the 29th day of August, 2007.
20              IT IS FURTHER STIPULATED AND
21      AGREED that the signature to and the
22      reading of the deposition by the witness is
23      waived, the deposition to have the same
```

4

```
 1                      INDEX
 2      EXAMINATION BY:              PAGE NUMBER:
 3      Mr. Tidwell                            6
 4      Ms. Pate                             159
 5      Mr. Tidell                           165
 6                  EXHIBIT INDEX
 7      PLAINTIFF'S EXHIBITS:        PAGE NUMBER:
 8      A - Declaration of Frank Major, III      82
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

5

```
1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                  SOUTHERN DIVISION
4    CASE NUMBER:  1:06-CV-874-MHT
5    CLAUDE GENE LEE, SR.
6              Plaintiff,
7         vs.
8    WESTPOINT HOME, INC.,
9              Defendant.
10
11   BEFORE:
12     VIRGINIA DENESE BARRETT, Commissioner
13   HAND ARENDALL, by Mr. Jay E.
14   Tidwell, 1200 Park Place Tower, 2001 Park
15   Place North, Birmingham, Alabama  35203,
16   appearing on behalf of the Plaintiff.
17              BALCH & BINGHAM, by Ms. Kelly F.
18   Pate, 105 Tallapoosa Street, Suite 200,
19   Montgomery, Alabama  36104, appearing on
20   behalf of the Defendant.
21
22
23
```

6

```
1              FRANK LAMONT MAJOR, III
2              The witness, having been first
3    duly sworn or affirmed to speak the truth,
4    the whole truth, and nothing but the truth,
5    testified as follows:
6                   EXAMINATION
7    BY MR. TIDWELL:
8         Q.    Mr. Major, I'm Jay Tidwell.  We
9    met right before we started this
10   deposition.  And just I guess basic -- some
11   basic instructions.  If you don't
12   understand what I'm saying or the question
13   I'm asking you, just ask me to rephrase it
14   and I'll be glad to try my best to phrase
15   it another way.
16        A.    Okay.
17        Q.    If you need to take a break at
18   any time, just let me know and we'll be
19   glad to take a break.
20        A.    Okay.
21        Q.    Are you on any medication that
22   would affect your memory or anything like
23   that?
```

7

```
1         A.    No, sir.
2         Q.    And you're not under the
3    influence of drugs or alcohol or anything
4    like that?
5         A.    No, sir.
6         Q.    Have you ever given a
7    deposition before?
8         A.    Not sure.  It's been a while.
9    I think I was at one, but I'm not sure if
10   they actually took mine.  So no.
11        Q.    Let me before I dig into that a
12   little bit more, would you please state
13   your full name for the record?
14        A.    Frank Lamont Major, III.
15        Q.    And where do you live,
16   Mr. Major?
17        A.    Dothan, Alabama.
18        Q.    What is your address?
19        A.    927 Honeysuckle Road, Apartment
20   G-81.  That's Dothan, Alabama, 36305.
21        Q.    And what's your date of birth?
22        A.    November 22nd, 1974.
23        Q.    Now, are you from Dothan?  Have
```

8

```
1    you always lived there?
2         A.    No.
3         Q.    Where did you live before
4    Dothan?
5         A.    South Carolina.
6         Q.    Did you go to college?
7         A.    Yes.
8         Q.    Where did you go?
9         A.    Clemson.
10        Q.    Clemson Tiger.  When did you
11   graduate or did you graduate?
12        A.    No.
13        Q.    When was your last year you
14   attended?
15        A.    '96.
16        Q.    What was the last grade you
17   completed I guess or how many years did you
18   attend Clemson?
19        A.    Two and a half.
20        Q.    Two and a half.  Where did you
21   graduate from high school?
22        A.    Cross High.  That's in Cross,
23   South Carolina.
```

9

1    Q.    When did you graduate from high
2  school?
3    A.    1993.
4    Q.    And what was your major at
5  Clemson?
6    A.    Electrical engineering.
7    Q.    Why did you drop out after two
8  and a half years?
9    A.    Didn't actually drop out.  I
10  just -- money problems.
11    Q.    Couldn't afford to go?
12    A.    Yeah.
13    Q.    Did you go to any other
14  colleges?
15    A.    No.
16    Q.    Any other training, seminars,
17  anything like that that you've attended?
18        MS. PATE:  Object to the form.
19        THE WITNESS:  Say it again.
20        MS. PATE:  Go ahead.
21    A.    Other than just job training.
22    Q.    So you've never gone to any I
23  guess junior colleges --

10

1    A.    No.
2    Q.    -- or trade schools or anything
3  like that?
4    A.    No.
5    Q.    What did you do after you left
6  Clemson?
7    A.    I was working at Westpoint.
8    Q.    Were you working at Westpoint
9  in South Carolina?
10    A.    Yeah.  In Clemson, South
11  Carolina.
12    Q.    Did you do that while you were
13  in school?
14    A.    Yes.  Briefly.
15    Q.    When did you start working?
16    A.    At Westpoint?
17    Q.    For Westpoint, yeah.
18    A.    I want to say April of '96.
19    Q.    What did you do?
20    A.    I was a machine operator when I
21  first started.
22    Q.    What department?
23    A.    Packaging.

11

1    Q.    So you started in 1996 as a
2  machine operator.  How long did you work in
3  the Clemson Westpoint?
4    A.    Up until '05.
5    Q.    So you worked there from 1996
6  to 2005?
7    A.    Yes.
8    Q.    Continuous?
9    A.    Yes.
10    Q.    What are all the positions
11  you've held there?
12    A.    Well, I was a data entry clerk.
13    Q.    If you can, try to give me -- I
14  know it might be difficult -- but a time
15  frame for when you were at each position
16  and how long you stayed there?
17    A.    That's going to be kind of
18  hard.
19    Q.    Just to the best -- I mean,
20  just to the best of your knowledge.
21    A.    Let's see.  Machine operator
22  first and then maybe a year later lift
23  truck operator.  Then maybe a year later

12

1  data entry clerk.  Let's see.  And then
2  after that I was a training instructor and
3  substitute supervisor.  So I guess that was
4  roughly around -- might have been another
5  year or two later.
6    Q.    Training instructor and
7  substitute?
8    A.    Back-up supervisor.
9    Q.    Are those all the positions
10  you've held?
11    A.    No.  Then in -- I want to say
12  in 2000 I became the packaging shift
13  supervisor.  And in 2003 or '4 -- I'm not a
14  hundred percent sure -- I became the
15  assistant human resource manager and safety
16  director.
17    Q.    In 2003, 2004, you did what,
18  now?
19    A.    Assistant human resource
20  director.  Well, assistant human resource
21  manager and safety manager.  You need up to
22  presently what I'm doing?
23    Q.    Well, let's stop at South

13

```
1   Carolina first.
2        A.    Okay.
3        Q.    Until you --
4        A.    That's it in South Carolina.
5        Q.    Okay.  So your last position
6   you held in South Carolina was assistant HR
7   manager and safety manager?
8        A.    Yes.
9        Q.    Okay.  How is the plant at
10  South Carolina, how does it compare to the
11  plant in Dothan or outside Dothan in terms
12  of size, in terms of departments?
13       A.    I mean, it consists basically
14  of the same departments.  Just I think
15  Clemson may have been a little bit bigger
16  than Abbeville department wise.
17       Q.    You listed about four or five
18  or six different jobs you held while in
19  South Carolina.  Did you -- were they all
20  promotions?
21       A.    The hourly jobs, I mean, in a
22  sense, yes.
23       Q.    Okay.  Let's just start with
```

14

```
1   the machine operator.  How much were you
2   making as a machine operator?
3        A.    When I started off, it was
4   maybe a little over nine an hour.  Then the
5   lift truck was more or less a lateral, I
6   think, move.
7        Q.    Why did you move?
8        A.    Just couldn't see myself doing
9   -- operating machinery.  Eager to learn
10  something different.
11       Q.    Okay.  And then you moved to
12  data entry clerk?
13       A.    Uh-huh.
14       Q.    Is that a promotion?
15       A.    Yes, it was.  I think the data
16  entry clerk may have made I'm going to say
17  roughly almost ten dollars an hour or
18  something like that.  I'm not a hundred
19  percent sure on the wages.
20       Q.    Right.  And then you went from
21  the data entry to training instructor and
22  back-up supervisor?
23       A.    Yes.
```

15

```
1        Q.    Was that a promotion?
2        A.    Yes, but not pay wise.  It was
3   more or less, like I said, a training
4   instructor, and I filled in for the
5   supervisor in their absence.  But yeah, it
6   was a promotion.  It was a different -- it
7   was a pay change.  When I was instructing,
8   I think the pay may have been a dollar and
9   a half more when I was instructing.
10       Q.    What did you -- what did you
11  instruct or who?
12       A.    Everybody in the department.
13  The machine operators, the lift truck
14  drivers.  Whatever job was in that
15  department, I would -- was the training
16  instructor for those, for new employees and
17  the retraining of old employees, also.
18       Q.    So you trained people on the
19  machines.  You trained people, the lift
20  truck operators?
21       A.    Uh-huh.
22       Q.    You trained -- did you train
23  managers or just the --
```

16

```
1        A.    The hourly associates.
2        Q.    Okay.  And was this training in
3   regards to human resources issues, or was
4   it strictly training regarding how to
5   operate a machine or how to operate a lift
6   truck or how to --
7        A.    It was job specific, yeah.
8        Q.    So you didn't train people on,
9   for example, race discrimination policies
10  and procedures or anything like that?
11       A.    No, not in that position.
12       Q.    Have you ever trained anybody
13  in that regard?
14       A.    Other than just like maybe
15  monthly safety topics as a supervisor,
16  dealing with sexual harassment or just
17  policies.
18       Q.    So you would train people on it
19  or you would just review?
20       A.    The policy with them.
21       Q.    With employees?
22       A.    Yes.
23       Q.    Now, you moved to -- in 2000
```

17

```
1   you said to packaging shift supervisor?
2        A.    Yes.
3        Q.    What department?  I mean, what
4   shift was that?
5        A.    Second shift.
6        Q.    How much were you making?
7        A.    It was salary.  I don't even
8   remember.  I want to say at the time it was
9   roughly thirty-five maybe thousand a year.
10        Q.    And then you went to the
11   associate human resource manager and safety
12   manager?
13        A.    Assistant, yeah.
14        Q.    Assistant safety manager, too?
15        A.    No.  Assistant HR manager.
16        Q.    Right.
17        A.    Yeah.  And safety manager.
18        Q.    Was that a promotion?
19        A.    Yes.
20        Q.    How much were you making there?
21        A.    I want to say -- let me think.
22   Like maybe -- I want to say maybe like
23   forty, forty-two, something like that.
```

18

```
1        Q.    What were your job duties in
2   that assistant HR manager and then safety
3   manager?
4        A.    I was in charge of the plant
5   safety program and I also assisted the HR
6   manager in I guess personnel duties.  I
7   also conducted employee orientation.
8   That's -- basically that's it.
9        Q.    Did you hand out manuals,
10   policies and all that?
11        A.    Uh-huh.  Reviewed policies with
12   them, also.
13        Q.    Did y'all have a race
14   discrimination policy?
15        A.    Specifically?
16        Q.    Uh-huh.
17        A.    Yes.  It was -- I can't call it
18   off the top of my head, but the policy
19   deals with discrimination, yes.
20        Q.    What was the policy?
21        A.    To quote it, I couldn't quote
22   it.  I mean, it was -- I'm not sure.  I
23   don't know how to phrase it.  It was more
```

19

```
1   along the line that under Westpoint, we
2   didn't discriminate against someone because
3   of race, color, religion.
4        Q.    Were there any mechanisms in
5   place to ensure that people weren't
6   discriminated against based on race?
7        A.    Meaning?  When you say
8   mechanisms?
9        Q.    Policies or procedures in place
10   that the company did for their procedures
11   of reporting, for example, race
12   discriminations.  How did the company
13   handle issues about race discrimination if
14   a complaint was to be reported?
15             MS. PATE:  Object to the form.
16             You can answer.
17        A.    We have what we call an open
18   door policy, that if an associate feels as
19   though they're being harassed or
20   discriminated against, then it's, I guess,
21   a chain of command to go through.  And each
22   situation would be investigated as far as
23   on the HR side and upper management side.
```

20

```
1        Q.    What is the chain of command to
2   go through?
3        A.    You -- if you're an hourly
4   associate, if you have a complaint of any
5   kind, you'll report it to your supervisor.
6   And if you're -- if you're not comfortable
7   with your supervisor, the next chain of
8   command would be the department manager.
9   Then from the department manager to --
10   excuse me -- the human resource manager and
11   from human resource manager to the plant
12   manager.
13        Q.    I'm going to come back to that.
14   But let's move to how did you end up going
15   to the Abbeville plant?
16        A.    When they announced the Clemson
17   plant was closing, I guess there was
18   opportunities to transfer to different
19   plants.  And I took the opportunity to
20   transfer here.
21        Q.    When did the Clemson plant
22   close?
23        A.    It was announced I believe in
```

21

```
 1    March of '05.  And I'm not a hundred
 2    percent sure.  I wasn't the last person
 3    left as far as when it closed down,
 4    manufacturing closed totally.
 5         Q.    So in March of '05, they said,
 6    hey, we're going to --
 7         A.    I think that's when the first
 8    layoff started, in March of '05.
 9         Q.    And there were rumors or did
10    the company come up and say we're going to
11    have to close the plant down?
12         A.    No.  It was not rumor.
13         Q.    The company came out and said
14    it?
15         A.    It was announced.  I believe it
16    was actually announced in January.
17         Q.    When did you leave?
18         A.    I left the end of April,
19    beginning of May, '05.
20         Q.    Did you go -- when did you
21    start in Abbeville?
22         A.    In the beginning of May of '05.
23         Q.    So did you take any time off or
```

22

```
 1    anything or do anything in between?
 2         A.    No.
 3         Q.    What was your title in the
 4    beginning of May?
 5         A.    Project manager.
 6         Q.    Project manager?
 7         A.    Uh-huh.
 8         Q.    What was your job description
 9    or job duties?
10         A.    At that time, we were -- I
11    don't know if I want to say outsourcing
12    product from the plant being done at an
13    outside facility.  And I was in charge of
14    that and also with just various projects of
15    reconstructing in the Abbeville facility,
16    so to speak.
17         Q.    Tell me a little bit more about
18    reconstructing Abbeville.
19         A.    Basically, it was reorganizing.
20    Maybe I should have said that.
21    Reorganizing the plant for product storage
22    and better product flow.
23         Q.    Now, did this have anything to
```

23

```
 1    do with the managers that were already in
 2    place, the supervisor and employees, or was
 3    this more of how can we rearrange the
 4    machinery and things in the plant?
 5         A.    That was more or less the
 6    machinery and the product in the plant.
 7         Q.    So when you first started as a
 8    project manager, you didn't have any
 9    oversight over actual employees, so to
10    speak?
11         A.    No.
12         Q.    Is that correct?
13         A.    Yes.
14         Q.    What were your hours?
15         A.    Oh, some days five thirty to
16    seven thirty some days.  Five thirty in the
17    morning to seven thirty in the evening some
18    days.  But --
19         Q.    So it was mainly a day shift?
20         A.    Yeah.
21         Q.    Did you ever work at nights?
22         A.    Some.
23         Q.    Did you ever work during third
```

24

```
 1    shift?
 2         A.    Yeah.  Basically five thirty,
 3    that is still third shift.
 4         Q.    Third shift goes off at seven,
 5    I guess?
 6         A.    Yeah.
 7         Q.    So did you ever work in the
 8    third shift other than, you know, maybe
 9    five or five thirty to seven?
10         A.    During this time?
11         Q.    Yes.  While you were the
12    project manager.
13         A.    I can't remember maybe a couple
14    times coming in at night maybe at two or
15    three o'clock in the morning, but it was
16    something special going on.  But on a
17    regular basis, no, other than that five
18    thirty in the morning.
19         Q.    While you -- well, let me go
20    back.  How long were you a project manager
21    or in that position as project manager?
22         A.    I'm not sure.  I'm trying to
23    find dates.
```

25

```
1          Q.     It doesn't have to be exact.  I
2   mean, was it July?  Was it December?  Was
3   it November?
4          A.     I'm not sure.
5          Q.     What was your next -- what was
6   your next position you held?
7          A.     The assistant department
8   manager of the packaging department.
9          Q.     And that was over the whole
10  packaging department?
11         A.     Yeah.
12         Q.     Who is the department manager?
13         A.     Bob Turner.
14         Q.     Was that a promotion to get
15  that job?
16         A.     That was a lateral move, yeah.
17         Q.     What was your pay as a project
18  manager?
19         A.     Well, maybe forty-five,
20  forty-seven, something in that
21  neighborhood.
22         Q.     Let me go back real quick.  How
23  did you get that job?  I know you said that
```

27

```
1          A.     He was plant manager.
2          Q.     So was he the plant manager
3   over the whole Abbeville plant?
4          A.     Yes.
5          Q.     So your supervisor -- you
6   talked to your supervisor and let him know
7   you were interested in other jobs within
8   the company, and your supervisor, I guess,
9   for lack of a better word, hooked you up
10  with this plant down here?
11         A.     Yes.
12         Q.     Okay.  You interviewed with
13  Mr. Irving and they offered you the job?
14         A.     Not at that time.  He gave me a
15  couple of days or -- it might have been a
16  couple days to think about it.  And I
17  called him and I guess accepted the job.
18         Q.     All right.  So let's go back.
19  You went from project manager.  You said
20  you started somewhere around in May of '05
21  at the Abbeville plant as a project
22  manager.  Then sometime later -- you don't
23  remember when -- but you made a lateral
```

26

```
1   there were opportunities.  Was there a
2   bulletin board up at Clemson?  Did they
3   send out a list of job openings, or how did
4   you go from the Clemson plant to
5   specifically the Abbeville plant?
6          A.     When -- like I said, when they
7   announced the Clemson plant was closing,
8   they were -- I guess my upper management
9   was trying to get people that were
10  interested in maybe transferring to another
11  facility.  And I believe my plant manager
12  may have talked with the plant manager down
13  here.  Well, at the Abbeville plant.
14  Excuse me.  Somehow I sent them a resume
15  and came down for an interview, and they
16  brought me in as a project manager.
17         Q.     Who was that?  Who did you
18  interview with down in Abbeville or who
19  brought you in down there?
20         A.     Bubba Irving.
21         Q.     Bubba Irving?
22         A.     Uh-huh.
23         Q.     What's his title?
```

28

```
1   move to assistant department manager?
2          A.     Yes.  I think it was lateral.
3          Q.     Okay.  And you don't know about
4   when you made that move to assistant?
5          A.     (Witness shaking head in the
6   negative.)
7          Q.     Do you remember if it was cold
8   outside?  Was it still summer?
9          A.     I can't -- I can't remember.
10  No.
11         Q.     Okay.
12         A.     I'm trying to think.
13         Q.     What about -- what were your
14  job duties as the assistant department
15  manager?
16         A.     Basically I guess other than
17  the obvious reasons, I assisted the
18  department manager.  But I was I guess in
19  charge of making sure that the product that
20  flowed through the packaging department was
21  going properly and also responsible to make
22  sure that the rush orders were getting out.
23         Q.     Did you have any direct
```

29

```
1    observation or supervisory or supervision
2    of the shift leaders, shift managers, shift
3    supervisors?
4         A.    Yes.
5         Q.    Okay.  Which ones?
6         A.    All of them.
7         Q.    So when you were the assistant
8    department manager, you supervised all the
9    shift managers?
10        A.    No.  Observed all the shift
11   managers.
12        Q.    Okay.  So did you rotate your
13   work days or your work hours I mean,
14   meaning did you some days observe first
15   shift, some days observe second shift, some
16   days come in and observe third shift?
17        A.    On a normal day, I was there on
18   all three shifts every day.
19        Q.    When does first shift run?
20        A.    From seven to three.
21        Q.    When is second shift?
22        A.    Three to seven.
23        Q.    And then third shift is eleven
```

30

```
1    to seven?
2         A.    Yes.
3         Q.    So I don't guess I can
4    understand how you were there.  You were
5    there twenty-four hours a day?
6         A.    No.
7         Q.    Or you were there just during a
8    portion?
9         A.    A portion.  But most of my time
10   was spent on first shift.
11        Q.    So explain to me when -- like
12   on a normal day when you would get there
13   and when you would leave.
14        A.    During this time?
15        Q.    Uh-huh.  When you were
16   assistant department manager.
17        A.    Between five and five thirty
18   a.m. until about seven, seven thirty p.m.
19        Q.    So that would be a typical day.
20   You'd get to work about five, five thirty
21   a.m. and you would leave about seven or
22   seven thirty p.m.?
23        A.    During that time, yes.
```

31

```
1         Q.    Was your -- let me rephrase
2    that.  In your job as assistant department
3    manager, did you interact with the shift
4    supervisors or shift leaders?
5         A.    Yes.
6         Q.    And in what capacity?
7         A.    Basically to the point to where
8    it was why things -- whatever was going on
9    in the department.
10        Q.    Now, would you -- would you
11   consider the assistant department manager a
12   supervisor over the shift supervisors?
13        A.    No.
14        Q.    So I guess what I'm asking is
15   at this time, would you be called Lee's
16   supervisor?
17        A.    No.
18        Q.    Who would be called Lee's
19   supervisor at this time?
20        A.    The department manager.
21        Q.    So that was Bob Turner?
22        A.    Yes.
23        Q.    So you didn't have any
```

32

```
1    supervisory capacity over the shift leaders
2    at this time?
3         A.    No.  Well, in the absence of
4    Bob Turner, then I would.
5         Q.    Were there ever circumstances
6    when you were -- when Bob Turner wasn't
7    there or even if Bob Turner was there when
8    you had to discipline supervisors at that
9    time?
10        A.    No.
11        Q.    Did you ever talk to them,
12   critique them about the way they managed or
13   the way they worked at this time?
14        A.    Job performance, yes.
15        Q.    Okay.  So you did talk to them
16   about job performance but you never
17   disciplined?
18        A.    Yes.
19        Q.    Okay.  And what would you --
20   what was your role?  Was it evaluating job
21   performance or what?
22        A.    Yes.
23        Q.    So as the assistant department
```

33

1  manager, you would evaluate the shift
2  supervisor's job performance?
3      A.    Yes.  But that wasn't -- that
4  was not just the only thing I did as an
5  assistant department manager.
6      Q.    And I guess the -- like you
7  stated earlier, your main time being there
8  was during first shift?
9      A.    Yes.
10     Q.    And you caught an hour and a
11 half or so of third shift and you caught an
12 hour and a half or more of second shift?
13     A.    Yes.
14     Q.    So you -- I guess it's fair to
15 say during this period of time, you didn't
16 -- the majority of the time Claude Lee was
17 the third shift supervisor, you weren't
18 there?
19         MS. PATE:  Object to the form.
20         Go ahead.
21     A.    I guess if you're saying the
22 majority of the shift, yes.
23     Q.    Yes.  That's what I'm saying.

34

1  We've already said that his shift started
2  at eleven p.m. and ended at seven a.m.
3      A.    Uh-huh.
4      Q.    And you stated on most or
5  normal days you would get there at five or
6  five thirty?
7      A.    Uh-huh.
8      Q.    So most of the time, the only
9  opportunity you would have to observe
10 Claude would be from five or five thirty to
11 seven; is that correct?
12     A.    No.
13     Q.    Tell me why that's not correct.
14     A.    Because on given days, they
15 would stay past seven as far as paperwork
16 and reviewing.
17     Q.    As far as doing paperwork?
18     A.    Yeah.  And reviewing with the
19 department manager what went on the night
20 before or even reviewing with me what went
21 on the night before.
22     Q.    How long would they stay?
23     A.    Sometimes anywhere from thirty

35

1  minutes to another hour.
2      Q.    Okay.  And how often -- how
3  frequently?
4      A.    Oh, that's every day.
5      Q.    Okay.  So Claude's shift then
6  generally didn't end?  Although the third
7  shift was over at seven, he usually didn't
8  leave until eight, seven thirty, eight,
9  something like that?
10     A.    Yes.
11     Q.    Okay.  So let me rephrase that.
12 The only observation that you would have of
13 Mr. Lee would be from five or five thirty
14 when they were -- depending on what day
15 whenever you got in that morning until
16 seven thirty or eight o'clock that morning?
17     A.    Yes.
18         MS. PATE:  During that time
19             period.
20     A.    Yes.  During that time period.
21     Q.    Right.  During the time period
22 you were the assistant department manager?
23     A.    Yes.

36

1      Q.    How long were you the assistant
2  department manager?
3      A.    I'm not sure because, like I
4  said, I can't remember when I started -- I
5  mean when I changed over to that.  So ...
6      Q.    What was your position after
7  that?
8      A.    Then I was the acting
9  department manager.
10     Q.    So you replaced Bob Turner?
11     A.    Yes.
12     Q.    What happened with Bob Turner?
13     A.    Not sure.
14     Q.    Was he fired?
15     A.    Not sure.
16     Q.    So you don't know if he left
17 voluntarily or if he was fired?
18     A.    Not sure.
19     Q.    When did you take over as
20 department manager?
21     A.    I want to say maybe December
22 '05.
23     Q.    Okay.  In your declaration that

37

```
 1   you did for your attorneys for I guess
 2   their motion for summary judgment brief,
 3   you state that from December 15th, 2005 to
 4   February 20th, 2006, I was Claude Lee's
 5   direct supervisor.  Is that the time period
 6   you're saying that you were the department
 7   manager?
 8        A.    Yes.  Yes.
 9        Q.    So previous to becoming the
10   department manager, you were not Claude
11   Lee's direct supervisor; is that correct?
12        A.    Correct.
13        Q.    And I think we've already
14   stated, but Bob Turner was Claude Lee's
15   direct supervisor?
16        A.    Yes.
17        Q.    So it's safe to say that your
18   direct supervision of Mr. Lee started on or
19   about December 15th of 2005?
20        A.    Yes.
21        Q.    Prior to December 15th of 2005,
22   did you and Mr. Turner ever talk about
23   Mr. Lee?
```

38

```
 1        A.    Yes.
 2        Q.    On what occasion?
 3        A.    It was not just him.  It was
 4   about all the supervisors.  I mean, from --
 5        Q.    And what were those
 6   conversations?
 7        A.    Just basic as far as, like I
 8   said, job performance or this order didn't
 9   get out, this order didn't get out.  You
10   know, work flow.
11        Q.    Right.  Other than just
12   standard everyday, Hey, we need to make
13   sure this gets done.  This didn't get done
14   yesterday.  We've got to do it, did you and
15   Mr. Turner ever specifically have a
16   conversation about Mr. Lee's poor job
17   performance?
18        A.    Yes.
19        Q.    When was that?
20        A.    As far as a date, I have no
21   idea.
22        Q.    About what month?
23        A.    I mean, like I said, it was
```

39

```
 1   more or less about the entire department.
 2   As far as singling out Claude from the rest
 3   of them, I couldn't say when exactly.
 4        Q.    So are you saying that y'all
 5   had conversations regarding the entire
 6   department's poor job performance, not
 7   specifically Mr. Lee's?
 8        A.    It may have been specific
 9   problems relating to third shift compared
10   to second and first shift, but actual
11   conversations, I don't remember.
12        Q.    I don't think I'm following
13   you.  My initial question was did you and
14   Mr. Turner ever have a specific
15   conversation about not the whole department
16   but about Mr. Lee's poor job performance?
17        A.    Yes.
18        Q.    Okay.  And I think you've
19   stated you can't recall the exact date for
20   that.
21        A.    Exactly.
22        Q.    Can you tell me what month it
23   was in?
```

40

```
 1        A.    No.
 2        Q.    What was said?  Not exact
 3   quotes but just generally.
 4        A.    I can't remember exactly.  I
 5   mean, I can't.
 6        Q.    So you remember having a
 7   conversation about Mr. Lee's poor job
 8   performance, but you can't remember why it
 9   was poor or what the conversation entailed?
10        MS. PATE:  Object to the form.
11        A.    I'm -- I believe at that time,
12   like I said, more or less it was -- it was
13   more problems on third shift than it was on
14   second and first.
15        Q.    What were the problems?
16        A.    As far as the work flow, as far
17   as the associates and their work habits.
18        Q.    So you're saying that you and
19   Mr. Turner talked about Mr. Lee and the
20   problems that his shift was having with the
21   work flow and the work habits of I guess
22   the people on the floor?
23        A.    Yes.
```

41

```
 1        Q.    Okay.  What was wrong with
 2   their work flow?
 3        A.    There were I want to say orders
 4   not getting ran in the order that they
 5   should have.  Maybe low production on some
 6   lines.  High down time on some lines.
 7   Housekeeping.
 8        Q.    Let me go into production since
 9   we kind of started that way.  Now, you just
10   -- you just said that part of the work flow
11   problem was low production?
12        A.    Uh-huh.  Some lines.
13        Q.    Right.  How did Mr. Lee's
14   production compare to first and second
15   shift?
16        A.    Total shift production?
17        Q.    Yes.
18        A.    It was at times higher and at
19   times lower.
20        Q.    During your supervision
21   overall, how would it compare?  Higher or
22   lower?
23        A.    My direct supervision?
```

42

```
 1        Q.    Uh-huh.
 2        A.    It was back and forth.  I mean,
 3   certain weeks it will -- I mean, you can
 4   have -- I mean, to my memory, I mean, it
 5   was back and forth just like all the shifts
 6   were back and forth.
 7        Q.    Okay.  Did you talk to the
 8   other supervisors about their low
 9   production?
10        A.    Yes.
11        Q.    Did you talk to Mr. Lee about
12   his low production?
13        A.    Yes.
14        Q.    I believe there was a December
15   meeting -- and I don't think you
16   participated in it -- with Bob Turner and
17   Mr. Lee wherein -- let me see if I can find
18   this.  Hold on one second.  Were you
19   present at the -- Mr. Lee was given a
20   personnel notice on 12/12 of '05.  Do you
21   recall anything about that?
22        A.    No.
23        Q.    Do you recall any of the other
```

43

```
 1   supervisors being given a personnel notice
 2   on or around 12/12 of '05?
 3        A.    Not to my knowledge.  I mean,
 4   not that I remember.  I don't know.
 5        Q.    And if you don't remember,
 6   that's fine.  What I was going to ask is
 7   Mr. Lee states that this 12/12/05 personnel
 8   notice was more of an informing him and the
 9   other supervisors that the shift
10   supervisors were now required to meet a
11   hundred percent production requirement.  Do
12   you remember -- recall anything regarding
13   notifying shift supervisors about that?
14              MS. PATE:  Object to the form.
15        A.    Exactly, no.  I mean, we talked
16   to them, yes, about meeting a hundred
17   percent efficiency, yes.  But the exact
18   date, the exact conversation, no.
19        Q.    Well, that's -- yeah.  I'm not
20   asking you the exact date.  I'm just asking
21   you if you remember talking with -- or Bob
22   Turner talking with all the shift
23   supervisors about them being required to
```

44

```
 1   meet a hundred percent production
 2   efficiency?
 3        A.    Yes.
 4        Q.    Okay.  You do remember that?
 5        A.    Yes.  I'm -- yes.
 6        Q.    And that talk was to all the
 7   shift supervisors?
 8        A.    Yes.
 9        Q.    Who were the other two shift
10   supervisors at that time?
11        A.    Mike Etheridge -- Etheridge and
12   Billy Wayne Bedsole.
13        Q.    Now, you admit that Mr. Lee's
14   department, the third shift, had a high or
15   a fairly high efficiency rating?
16        A.    At certain times, yes.
17        Q.    Well, your declaration doesn't
18   say at certain times.  It just says
19   although Mr. Lee's department had fairly
20   high efficiency reports?
21        A.    Uh-huh.
22        Q.    So you admit that he had high
23   efficiency reports?
```

A. Yes.

Q. You go on to say that while meeting or exceeding production standards was certainly important, Westpoint needed to have supervisors who were willing and able to take charge, implement and enforce new work methods and help move the company toward the goal of becoming a stronger industry competitor. What do you mean by that?

A. With -- okay. The efficiency, yes, was a big part of it. But it was -- reasons for high efficiency could vary. Okay. And I think one of the biggest things that we were -- well, that the company was pressing was that okay, yeah, you've got a hundred percent efficiency, but how much stuff is going out of the door. Understand? And it was more or less, yes, efficiency had a lot to do with it. But it was accountability. It was associates not wasting time, running rush orders.

---

46

Q. Maybe it's the way y'all calculate efficiency and production efficiency. But it doesn't seem to fit that you can have a high efficiency and then you can have workers not doing anything. Can you explain that to me?

A. Yes.

Q. Okay.

A. Okay. At this time it was anywhere from maybe nine to twelve lines running.

Q. Let me stop you for one second. Are you talking specifically about Mr. Lee's third shift, or are you talking about just in general?

A. Third shift.

Q. Okay.

A. Okay. Well, I don't know if it's -- because it ran the same amount of lines on all three shifts.

Q. Isn't it true that Mr. Lee's shift normally did not have as many employees as the other shifts?

---

A. At this present time?

Q. Yes.

A. Maybe five or ten less.

Q. Okay.

A. I mean, because, at this time, it was -- I mean, we had work for days.

Q. I guess to answer the question, he did have less employees?

A. Yes.

Q. Okay. Go ahead. I didn't mean to interrupt you. But you were telling me how a shift can have a high production efficiency but yet also have workers standing around doing nothing?

A. Okay. The efficiency is -- is also based on the amount of hours that a line runs. Okay. Each line has a standard efficiency to meet within eight hours. Now, if a line runs two hours out of eight hours and the efficiency for that two hours -- well, let's say if you was expected to put out two hundred units in two hours, well, in two hours you put out six hundred

---

48

units. Your efficiency was -- and for those two hours, you didn't run the other six on that line. Those two hours would be what your efficiency would be based on.

Q. On what you were running?

A. Yes.

Q. Right.

A. And in certain days -- I mean, certain weeks, in a normal forty hour week, you may have only ran that line twenty hours out of that forty hour week. But that efficiency was still figured in for that entire week.

Q. So you're saying an efficiency is only calculated if the line is running?

A. Yes.

Q. So are you now saying that Claude Lee would have lines that weren't running?

A. Down time.

Q. And did you attribute any of that down time to him having five to ten less employees than the other white

**49**

supervisors?

A.    No.

Q.    Why?

A.    Because, like I said, on an average -- okay.  I guess to go back and say I can't a hundred percent say that, I guess, given the total of people, how many people less that he had than the other two shifts.  Okay.  But let's see.  Let me see how can I say this.  It all depends on the product that you're running and the time that you run that product.

Q.    What do you mean the product?  Would certain product require more people?

A.    Yes.  Sometimes.  Yes.

Q.    Now, how many -- how many people does it take to run a line?

A.    It depends.

Q.    On what?

A.    The product.

Q.    Okay.  Tell me for the different products how many people it takes to run a line.

**51**

been -- I don't know what you're saying I guess is what I'm getting at.

A.    I guess what I was trying to say is just because the efficiency is, like I say, a hundred percent or more, it doesn't mean that more product went out the door.

Q.    Right.  I understand that.  Because you were saying that the efficiency only measures the lines that are run?

A.    Uh-huh.

Q.    So if you've got a group of people that are sitting there doing nothing, it's not affecting your efficiency.  Is that what you're saying?

A.    No.  Let me see if I can explain it some more.

Q.    I guess I'm way lost.

A.    All right.  The efficiency is figured through the entire department.  Okay.  If -- just an example, if line one is running over a hundred percent efficiency and then line three is running

**50**

A.    You've got -- we have certain lines that requires four people to run a line and sometimes six people to run that same line.  And like I said, the line could be ran with less people, yes.  There are certain lines that requires three people.  Certain lines that requires maybe seven, eight, sometimes ten people.

Q.    So are you saying that Claude had sufficient people to run the lines?  He just wasn't ensuring that his employees were running the line?

A.    Not saying that exactly.

Q.    Tell me what you're saying.  Claude's production efficiency reports, at least the ones we've looked at and analyzed -- and we have a couple here -- show that he was producing more than Mike Etheridge or his production efficiency was better than Mike Etheridge and Billy Bedsole's.  But yet you're saying that his production might not -- even though his efficiency was better, that his production might not have

**52**

less than a hundred percent efficiency, with the average of all the lines, that line one's efficiency could bring up line three's efficiency.

Q.    The reports I have show line one at the end of one week and it gives an efficiency, a production efficiency, ninety-five or a hundred percent, whatever it is.

A.    Uh-huh.

Q.    Okay.  Line two -- I mean not line.  Shift one, shift two and shift three, it's also broken down per machine and all that.  But the totals that I'm looking at and I'm curious about is the production efficiency total for shift one versus shift two versus shift three?

A.    Uh-huh.

Q.    Now, I think you were saying that Claude Lee was an ineffective manager is essentially what you've said I think in your declaration.  And I'm trying to figure out how he was an ineffective manager when

53

1    his efficiencies were so high.
2       A.    Okay.
3       Q.    Especially compared with line
4    -- shift one and shift two.  Can you
5    explain that to me?
6       A.    Okay.  I'm going to try to do
7    this again.
8       Q.    Okay.
9       A.    All right.  Twelve lines in a
10   department.  Okay.  Let's say Claude was
11   responsible for the first six and his lead
12   was responsible for the second six.
13      Q.    Right.
14      A.    Now, at the end of the day, the
15   efficiency is totaled from the entire
16   shift.
17      Q.    Okay.
18      A.    Okay.  So if the lead person's
19   lines are doing better than a hundred
20   percent -- and I'm just saying this as an
21   example.
22      Q.    I know.  I'm listening.
23      A.    And Claude's lines are not,

1    But yes.
2       Q.    So you did talk to his hourly
3    associates?
4       A.    Yes.
5       Q.    Okay.  And what did you talk to
6    them about?
7       A.    I guess just basic things.
8    Maybe how was the night going and maybe
9    from time to time -- well, it's hard to
10   say.  I mean --
11      Q.    What was their view of Claude
12   as a manager or supervisor?
13      A.    Everybody's?
14      Q.    Of the shift supervisors you
15   talked to?
16      A.    Wait a minute.
17      Q.    I mean, not shift supervisors.
18   Of the hourly associates under Claude that
19   you talked to, what was their view about
20   Claude as a manager?
21      A.    I mean, from what I can recall,
22   it was -- some of them would more or less
23   -- I'm trying to see how to phrase this.

54

1    then at the end of the day, the totals are
2    going to be up.  My problem with Claude was
3    the fact that when I would ask him -- if I
4    would come in and a line was down or people
5    were standing around and I would ask him
6    why, it's like some days he didn't have an
7    answer for me.  So my complaint was never
8    the efficiency.  It was more or less his
9    performance towards his hourly associates.
10   Does that make sense?
11      Q.    Did you ever talk to any of the
12   hourly associates about him, about his
13   managerial skills or anything like that?
14   Ask them about how they view him?
15      A.    Specifically, I -- I'm sure I
16   did, but I can't recall specifically a
17   specific conversation with the associates.
18      Q.    So you're saying you're sure
19   you talked to the associates, the hourly
20   associates about Mr. Lee, but you can't
21   ever recall doing it?
22      A.    No.  I can't recall
23   specifically -- a specific conversation.

56

1    I'm trying to see how to phrase it.  Just I
2    guess to the point he was okay as a
3    supervisor.  I'm trying to --
4       Q.    Did any of his associates that
5    worked under him on the floor, did they
6    ever come to you complaining that Claude
7    lacked managerial skills, that he wasn't
8    doing what he was supposed to do?
9       A.    No.
10      Q.    Okay.
11      A.    Not that I can remember.
12      Q.    Did his shift supervisor ever
13   complain?  Well, let me take that back.
14   Shift leader.  Did he have a shift leader?
15      A.    Yes.
16      Q.    Who was his shift leader?
17      A.    Michael Lingo.
18      Q.    And when was he the shift
19   leader?
20      A.    I'm not sure of his dates, but
21   he was --
22      Q.    Was he there the whole time you
23   were the department supervisor?

57

1    A.    Yeah.

2    Q.    And did Mr. Lingo ever come to

3  you and tell you that Mr. Lee wasn't doing

4  the job as a supervisor?

5    A.    For the most part, any

6  situations that Michael ran up on, he took

7  care of it himself.

8    Q.    I'm not asking you that.  I'm

9  asking if he came to you and ever -- came

10  to you, Mr. Lingo ever came to you and

11  specifically told you or said anything to

12  you about Mr. Lee's performance as a

13  manager?

14    A.    I can't recall.

15    Q.    And we've already gone through

16  that your observations of the third shift

17  were limited to two or three hours at most?

18    A.    At this time, yeah.

19    Q.    Was there any other time that

20  you observed third shift?

21    A.    There were times when -- for

22  the most part, I would work that five

23  thirty to seven thirty, those hours for the

58

1  most part.  But there were times that I

2  spent time on third shift.  I spent time on

3  second shift.  Total time.

4    Q.    With Mr. Lee?

5    A.    Yeah.

6    Q.    How many times would you say --

7  well, let me back up.  Your declaration

8  states that you were no longer Mr. Lee's

9  direct supervisor on February 20th of 2006?

10    A.    Okay.

11    Q.    And I think was that because

12  you moved to another department, or what

13  happened there?

14    A.    That's -- I think during that

15  time, that's when I was -- that's when, I

16  guess, Michael Alford came in and I was

17  offered the lateral move to my present job.

18    Q.    And what was that?

19    A.    I am now the safety and

20  training director.

21    Q.    Of the Abbeville plant?

22    A.    Yes.

23    Q.    So as a safety and training

59

1  director, did you have any direct

2  supervision over Mr. Lee?

3    A.    No.

4    Q.    So is it fair to say that your

5  direct supervision over Mr. Lee was limited

6  to the time period between December 15th of

7  2005 and February 20th of 2006?

8    A.    Yes.

9    Q.    Now, during that time, December

10  15th of 2005 through February 20th of 2006,

11  how many times would you say that you were

12  on Mr. Lee's third shift?

13    A.    The entire shift?

14    Q.    Uh-huh.  Or a significant

15  portion other than five to five thirty in

16  the morning until seven or seven thirty in

17  the morning.

18    A.    I couldn't say how many times.

19    Q.    Was it one?  Was it ten?  Was

20  it a hundred?

21    A.    It was one at least.

22    Q.    So at least one time?

23    A.    Yes.

60

1    Q.    Was it more than five?

2    A.    I'm not sure.

3    Q.    Was it more than ten?

4    A.    Not sure.

5    Q.    So you can -- is it fair to say

6  you can only specifically remember one

7  time?

8    A.    At least one time, yeah.

9    Q.    Was it more than twenty?

10    A.    See, what it is is that, like I

11  said, during this time period, it was a

12  whole lot going on during the transition.

13    Q.    I understand.

14    A.    And like I said, certain days

15  would require certain things.  And it was

16  -- I mean, it's hard for me to say.

17    Q.    I'm just trying to ask you to

18  remember when you worked on Mr. Lee's

19  shift.  That's the eleven to seven shift.

20  Not the specific dates.  Just about how

21  many times you worked on that shift?

22    A.    I can't remember.

23    Q.    You have no indication of how

61

```
1   many times at all?
2        A.    (Witness shaking head in the
3   negative.)
4        Q.    I'm not asking specifics.
5        A.    No.  Honestly, I can't
6   remember.
7        Q.    You don't know if it was five
8   or twenty?
9        A.    No.
10       Q.    Okay.  Did you -- was that out
11  of the norm?  Did you spend more time on
12  Mr. Lee's shift than other shifts?  Let me
13  rephrase that question.
14       A.    Please.
15       Q.    Was there -- did you perceive
16  there to be a problem on Mr. Lee's shift
17  that required you to spend extra attention
18  on his shift?
19       A.    Yes.
20       Q.    Okay.  And you stated that you
21  did spend extra time on his shift?
22       A.    Yes.
23       Q.    Let's go back to what you say
```

63

```
1   whole department?
2        A.    Yes.
3        Q.    Okay.  And what changes did you
4   make because of this?
5        A.    More or less it was -- it was,
6   like I say, better job habits, changeovers.
7        Q.    I guess specifically what I'm
8   asking is what new work methods did you
9   introduce?
10       A.    It was -- I guess the methods
11  were more or less improving on I guess the
12  current way -- we also did have new
13  machinery.  It was new product which
14  required I guess new methods.
15       Q.    Did Mr. Lee not utilize the new
16  machinery and new products?
17       A.    I mean, he used them, yes.
18       Q.    Did you have any problems with
19  the way he used them?
20       A.    Yes.
21       Q.    Tell me.
22       A.    That's -- I guess not
23  specifically the way he used them.  It was
```

62

```
1   in your declaration.  Y'all were looking
2   for managers, supervisors who were able to
3   take charge, implement and enforce new work
4   methods.  Tell me about the new work
5   methods that you were implementing and
6   enforcing.
7        A.    We were introduced to this
8   thing called muda.
9        Q.    Can you spell that or is that
10  an acronym or something?
11       A.    I want to say it was M-U-D-A.
12       Q.    M-U-D-A?
13       A.    Yeah.
14       Q.    Does it stand for something?
15       A.    I think so.  It was --
16  I'm not sure of the origin of the word, but
17  basically what it was was a waste.  Okay.
18  And not just a waste of time, but a waste
19  of procedure, a waste of motion, a waste of
20  job steps, job habits.  And what it was was
21  that it was a lot of waste on procedures
22  and running the products.
23       Q.    Are you talking about in the
```

64

```
1   more or less on how he was holding his
2   associates accountable for using.
3        Q.    Explain that to me.
4        A.    Okay.  I guess, like I said,
5   again, the -- my problem was -- was I guess
6   the accountability for the lines.  Yes.
7   Like I say, again, there were -- the
8   department as a whole was running a hundred
9   percent efficient.
10       Q.    You're talking about the third
11  shift?
12       A.    Third shift.  But my problem
13  was when I would come in and you have down
14  time on this line, you'd have associates
15  standing around.  You'd have lines out of
16  product.  You have line-ups not in the way
17  that they should be.  And when I would go
18  to Claude and ask Claude, Well, why is this
19  like that.  Why is this like that.  It was
20  more or less, Let me go find out.  I don't
21  know.  So that was my biggest thing.
22       Q.    I'm going to come back to the
23  efficiency hopefully for the last time.
```

1  But I still don't understand if you're a
2  hundred percent production efficiency, I
3  don't understand how you can have products,
4  lines out of products and people standing
5  around doing nothing.  Can you explain that
6  to me?
7      A.    I'm going to try.  I'm going to
8  try.
9      Q.    I know you've tried.  I know.
10     A.    I'm going to try.
11     Q.    I just don't understand.
12     A.    Okay.  Let's say my line is
13 scheduled to run eight hours.  Okay.  And
14 just to throw a number out there, in that
15 eight hours, I'm required to run sixteen
16 hundred sheets.
17     Q.    Uh-huh.
18     A.    Okay.  But let's say my line
19 only runs four hours.
20     Q.    Right.
21     A.    Or let's say that I can get
22 that sixteen hundred in six hours instead
23 of eight hours.  Okay.

---

1      A.    Yes.
2      Q.    If you go over that, then, you
3  know, you might be a hundred and thirty
4  percent efficient?
5      A.    Yes.
6      Q.    Now, they do that same thing
7  for the first shift and the second shift,
8  right?
9      A.    Yes.
10     Q.    So in essence what I think I'm
11 gathering is you're punishing Claude for
12 being too efficient and his people finished
13 early and then they might not have any --
14 you know, they might not have seen any
15 reason to make a hundred and fifty percent
16 efficient when they had already done a
17 hundred and thirty percent?
18         MS. PATE:  Object to the form.
19         Go ahead.
20     A.    No.  The thing is associates
21 get paid for eight hours.
22     Q.    Right.
23     A.    Okay.  Regardless of how much

---

66

---

1      Q.    Uh-huh.
2      A.    So that first six hours I ran a
3  hundred and thirty percent efficiency.
4  Okay?
5      Q.    You'd be doing well.
6      A.    But the last two hours being
7  that I already have over a hundred percent
8  efficiency, why don't I just sit down and
9  not do nothing the rest of the night
10 because I already have a hundred percent
11 efficiency.
12     Q.    Who determines how much a
13 machine is supposed to run?
14     A.    We have our IE department.
15     Q.    So the IE department says,
16 Okay, Claude, your shift line one is
17 supposed to run X of product, whatever the
18 product may be?
19     A.    Uh-huh.
20     Q.    And if you meet that, then --
21 say sixteen hundred like you were talking
22 about, if you meet that, then you're a
23 hundred percent production efficient.

---

1  you do or how little you do, eight hours --
2  listen.
3      Q.    Regardless --
4      A.    It's not a piece rate.
5      Q.    Right.
6      A.    Okay.  Regardless of how little
7  you do, how much you do, you get paid for
8  eight hours.
9      Q.    I understand.
10     A.    Okay.  And if you can run a
11 hundred percent efficiency in six hours,
12 then being that I have my hundred percent
13 efficiency, then this means the last two
14 hours I can just do whatever I want.  And,
15 see, that's the problem.  That's what I
16 keep saying.  The thing about the
17 efficiency is just a little piece of the
18 pie.
19     Q.    Well, it doesn't make any sense
20 to me, because what I'm understanding is
21 you've got shift one.  Let's just focus on
22 one line on each shift.
23     A.    Okay.

---

68

69

```
 1      Q.     Say line one on shift one.
 2  They're scheduled to run sixteen hundred
 3  sheets or whatever.
 4      A.     Okay.
 5      Q.     Shift two line one is scheduled
 6  to run sixteen hundred sheets.  Same thing
 7  on third shift.  Third shift line is
 8  scheduled to run sixteen hundred sheets.
 9  So you're saying that in the first shift if
10  it takes them all eight hours to run
11  sixteen hundred sheets, then everything is
12  fine.  They're doing good.  Second shift
13  same thing.  Third shift, if Claude can get
14  his employees to run all sixteen hundred
15  sheets in six hours, then you're going to
16  discipline him if they don't run any more
17  for the next two hours because his
18  employees are just standing around?
19      A.     Yes.
20      Q.     Even though --
21      A.     Well --
22      Q.     Even though Claude has gotten
23  more out of his workers than the other
```

71

```
 1  supervisors were, then he was expected to
 2  keep getting more?
 3          MS. PATE:  Object to the form.
 4      A.     The machine is supposed to run
 5  eight hours --
 6      Q.     Right.
 7      A.     -- regardless.  If you have no
 8  down time, there's no reason for that
 9  machine to stop running whether you have
10  your efficiency or you don't have your
11  efficiency.  That machine is running.
12  You're paying these people to run that
13  machine eight hours.
14      Q.     Okay.  So you don't care how
15  much they produce.  If they produce seven
16  hundred, it doesn't matter as long as
17  they're working for eight hours?
18          MS. PATE:  Object to the form.
19      A.     I'm not saying that.
20      Q.     Well, you just told me that all
21  y'all care about or one part that you care
22  about -- not all you care about -- one part
23  that you care about is having the workers
```

70

```
 1  shift?
 2          MS. PATE:  Object to the form.
 3      A.     Okay.  Again, I say the problem
 4  was people standing around not doing
 5  anything.
 6      Q.     I understand.
 7      A.     Okay.  Like I said, I keep
 8  stressing the efficiency is just a small
 9  piece.  It's more or less accountability.
10  Yeah.  I gave my hundred percent
11  efficiency.  Well, if I got a hundred
12  percent efficiency in six hours, then I
13  don't have anything else to do the rest of
14  the night.  Then send me home.  Why don't
15  you send them home?
16      Q.     So Mr. Lee was held to a higher
17  standard than the other white supervisors?
18          MS. PATE:  Object to the form.
19          Go ahead.
20      A.     No.
21      Q.     What you're telling me is if
22  Mr. Lee was able to get more out of his
23  employees in a lesser time than the white
```

72

```
 1  run a machine for eight hours.  It doesn't
 2  have to do with if they go over or how much
 3  over they've already produced.  You still
 4  want that machine running.
 5          MS. PATE:  Object to the form.
 6          Go ahead.
 7      A.     Yes.  The machine runs for
 8  eight hours.
 9      Q.     Right.  No matter if they're
10  producing seven hundred or sixteen or
11  nineteen hundred per eight hours.
12      A.     And, see, at the same time --
13  okay.  At the same time, if a line runs
14  below efficiency, then it's up to the
15  supervisor to discipline for low
16  efficiency, also.  So I guess sort of my
17  philosophy is like you can't praise them
18  for doing good and don't discipline them
19  for doing bad.
20      Q.     So your problem with Mr. Lee
21  was not the efficiency, not how much he was
22  producing.  But it was just the matter of
23  maybe he produced eight hours' worth of
```

1 work in six hours and then the employees
2 were standing around for two of those
3 hours?  Is that what you're trying to tell
4 me?
5      A.     Yes, accountability.  And, see,
6 I guess -- well, nothing.
7      Q.     Go ahead.
8      A.     I'm fine.  I'm fine.
9      Q.     Okay.  You said accountability?
10      A.     Yes.
11      Q.     Now, it's not accountability
12 for producing what he was required to
13 produce.  It's accountability to make sure
14 what?
15      A.     That your associates are
16 working for eight hours.
17      Q.     What is Mr. Lee's job for -- as
18 far as scheduling?
19      A.     He is supposed to make sure
20 that his set coordinator is keeping the
21 line scheduled according to rush orders and
22 product and to make sure that she stays on
23 that schedule or whoever is running it at

1 responsibility to schedule the work?
2      A.     No.
3      Q.     Okay.  So in your declarations,
4 if it says it was Mr. Lee's responsibility
5 to handle scheduling for his shift, that
6 wouldn't be correct, would it?
7           MS. PATE:  Object to the form.
8                Go ahead.
9      A.     Okay.  When I say handle, it's
10 more or less making sure that the set
11 coordinator stays on top of the orders that
12 need to be scheduled.
13      Q.     Well, I just asked you who
14 handled the scheduling, and you said it was
15 the set coordinator that handled the
16 scheduling.
17           MS. PATE:  Object to the form.
18      Q.     Didn't you just say that?
19      A.     No.  You didn't ask me that.
20      Q.     I said who handles the
21 scheduling, and you said the set
22 coordinator?
23           MS. PATE:  Object to form.  Jay,

1 that time.
2      Q.     Okay.  Who sets the schedule?
3      A.     We have what we call a set book
4 that the planner set the schedules.
5      Q.     Did the set coordinator ever
6 change that?
7      A.     The book?
8      Q.     No.  The schedule.
9      A.     From time to time, yes, they
10 have.
11      Q.     When the set coordinator would
12 change the schedules, what do they need to
13 do?  Who do they need to notify?
14      A.     Their supervisor.
15      Q.     What do they need to do?  Do
16 they need to go tell their supervisor to
17 get approval or what?
18      A.     Yes.
19      Q.     What was the set coordinator's
20 responsibility?
21      A.     To schedule the work on the
22 lines.
23      Q.     Okay.  So that wasn't Mr. Lee's

1                if you want to show him what
2                you're talking about or what
3                you're reading from, that
4                might help so that y'all are
5                both talking about the same
6                thing.
7      A.     Yes, please.
8      Q.     This that I just underlined.
9 Where it says it was --
10      A.     Okay.
11      Q.     Now, that really is not what I
12 was asking you.  But to go back, I just
13 asked you who is -- whose responsibility or
14 who handled the scheduling, and you said it
15 was the set coordinator?
16           MS. PATE:  Object to the form.
17                Why don't we -- do you want
18                to get the question read
19                back?
20           MR. TIDWELL:  Well, no.  That's
21                all right.
22      Q.     What's the difference between
23 responsibility and handling?

1    A.    My definition?

2    Q.    Yes.

3    A.    Responsibility I would say

4  would be accountable.  I don't know.  And

5  handling would be more or less taking care

6  of it.

7    Q.    I mean, correct me if I'm

8  wrong.  But are you saying that it was

9  Mr. Lee's -- Mr. Lee was supposed to handle

10  scheduling, but the set coordinator was

11  supposed to -- is responsible for

12  scheduling?  Is that what you're saying?

13    A.    Yes.  And --

14    Q.    Please explain that to me.

15    A.    Okay.  The scheduling of the

16  lines, we have a coordinator that schedules

17  the work for the line.  That's her job.

18    Q.    Right.

19    A.    Okay.  And as a supervisor --

20  this is hard to say -- as far as the work

21  that needs to be done based on your

22  priorities and your rush orders, the

23  supervisor is supposed to make sure that

---

1  schedule.

2    Q.    Okay.  Where does the schedule

3  go from there?

4    A.    Supervisor gives the schedule

5  to the coordinator and reviews the schedule

6  with the coordinator.

7    Q.    What does the coordinator then

8  do?

9    A.    Schedules the work based on the

10  rush orders, based on the reviewing of it

11  with -- with the supervisor and then

12  schedules the lines.

13    Q.    So are you saying that Mr. Lee

14  did not go over that with the set

15  coordinator, did not take the orders to the

16  set coordinator and did not go over the

17  orders with the set coordinator?  Is that

18  what you're saying that he was deficient in

19  doing?

20    A.    Okay.  Let me see if I can say

21  it like this.  What I'm saying is once the

22  schedule was set --

23    Q.    By the set coordinator?

---

1  the coordinator stays on that scheduling.

2    Q.    So you're saying your

3  definition of -- it was Mr. Lee's

4  responsibility to handle scheduling for

5  this shift and meant that he was overseeing

6  the set coordinator to make sure she was

7  staying on or the set coordinator was

8  staying on the proper schedule?  Is that

9  what you're saying?

10    A.    Okay.  I'm trying to explain

11  this the best way I can.

12    Q.    Let me rephrase it unless you

13  want to continue.

14    A.    Go ahead.

15    Q.    When you get a bunch of

16  orders --

17    A.    Uh-huh.

18    Q.    -- or when it comes through

19  that, okay, you've got to run a thousand

20  sheets, you've got to run two thousand

21  pillow cases, you've got to run whatever,

22  who does that go to?

23    A.    The supervisors receive the

---

1    A.    By the book, yes.  Once the

2  schedule comes out, once the supervisor

3  reviews what should be done --

4    Q.    Right.

5    A.    -- on the schedule, my thing

6  was instead of following the schedule,

7  instead of Claude making sure that she

8  follows the schedule, it was more or less

9  to the point to where she would run what

10  she wanted to run as far as big orders and

11  easy orders.  And that was the problem.

12  Because when -- again, when I would ask,

13  well, why are we running this and not

14  running this, he had no clue as to why.

15  Because the set coordinator would change it

16  around the way she wanted to run it.

17    Q.    To make it most efficient?

18    MS. PATE:  Object to the form.

19    Q.    I mean, that's her job.  Or not

20  her.  I'm sorry.  I don't know if it was a

21  male or female.  But that's the set

22  coordinator's job is to run it to be the

23  most productive and most efficient way to

1  run it, right?
2  A.  By priorities.
3  Q.  Well, I understand if you've
4  got rush jobs that need to go through.  But
5  other than rush jobs, wasn't it the set
6  coordinator's responsibility to look at
7  what the orders were and to figure out the
8  best way to have them run to be most
9  productive and efficient?
10  MS. PATE:  Object to form.
11  A.  By priority.
12  Q.  Is there any other priority
13  than rush orders?
14  A.  You have lower priorities.
15  Q.  Well, that's what I'm saying.
16  Other than --
17  A.  Okay.  I guess to kind of
18  explain it, okay, if you have a list of
19  orders.  Let's say one through ten.  Well,
20  number ten is an order for seven thousand.
21  Okay.  But number one, number three and
22  number five are orders for a hundred and
23  three hundred and four hundred.  Okay.  But

---

1  one of the lowest -- talking about rating
2  Mr. Lee as fair -- is one of the lowest
3  ratings on the performance review and was
4  due to poor performance in
5  supervision/management skills,
6  communication skills and administration
7  areas?
8  A.  Uh-huh.
9  Q.  Can you be specific and give me
10  some examples of that?
11  A.  Of each?
12  Q.  Of each.
13  A.  Okay.  I guess in the matter of
14  supervision management skills, like I say,
15  it was more or less as accountability to
16  the associates.  Communication skills, more
17  or less to the point of communicating with
18  the previous supervisor or the next
19  supervisor as far as problems in the
20  department, rush orders, stuff like that.
21  And administrative areas, I guess
22  disciplinary, as far as disciplinary action
23  with the associates on the floor.

---

82

1  they were of higher priority than number
2  ten was.  Well, being that number ten was a
3  bigger order with a lower priority but I
4  could get more out of this order with less
5  changeover, why not skip over the little
6  orders and go to the big order.  Which like
7  I say, in that case, it was based on
8  priority.
9  Q.  But didn't they have to have
10  all the orders done by the end of the
11  shift?
12  A.  No.  It's a list.  You have
13  pages and pages of them.
14  MR. TIDWELL:  I'm going to go
15  ahead and mark this, the
16  declaration of Frank Major
17  as Plaintiff's Exhibit A.
18  (Whereupon Plaintiff's Exhibit A
19  was marked for identification
20  and attached to the original
21  transcript.)
22  Q.  On page two, paragraph four of
23  this declaration, you state that this is

---

84

1  Q.  Let me ask you about the
2  associates on the floor.  Isn't it true
3  that the third shift has a higher turnover
4  than the first or second shift?
5  A.  I can't say yes to that.
6  Q.  If Mr. Lee would say the third
7  shift had a higher turnover ratio, would
8  you have any -- would you be able to
9  dispute that?
10  A.  During this time?
11  Q.  Yes.
12  A.  Yes, because it was all three
13  of the shifts had turnovers at that time.
14  Q.  I'm not saying whether they
15  had.  I'm saying the third shift had a
16  higher turnover.  You would dispute that
17  Mr. Lee would claim -- is claiming that the
18  third shift had a higher turnover?
19  A.  Than the other two?
20  Q.  Than the first or second shift?
21  A.  To state exactly, I'm -- I
22  can't say exactly.
23  Q.  I'm not asking you to state

85

1    that. I'm asking you if you would dispute
2    that?
3        A.    Like I said, my reason would be
4    that all three shifts had turnovers.
5        Q.    I understand that. I'm asking
6    if you would dispute that the third shift
7    had a higher turnover than the first and
8    the second shift, if you could dispute
9    that?
10        A.    I'm not sure how to answer that
11    question.
12        Q.    You just stated that you were
13    not aware of whether the third shift had a
14    higher turnover ratio or turnover than the
15    first or second shift?
16        A.    Uh-huh.
17        Q.    Right?
18        A.    Uh-huh.
19        Q.    Now, I'm saying would you -- do
20    you have any facts that would be able to
21    dispute Mr. Lee, if Mr. Lee stated that his
22    shift, the third shift, had a higher
23    turnover than first and second shift? Do

87

1        A.    It really wouldn't matter to me
2    as long as I was working.
3        Q.    So you wouldn't care whether
4    you were working from eleven p.m. to seven
5    a.m. or seven a.m. -- or seven p.m. -- I'm
6    sorry. Or five a.m. to seven p.m. You
7    wouldn't care?
8        A.    Me personally?
9        Q.    You personally?
10        A.    No.
11        Q.    Have you ever worked a night
12    shift before?
13        A.    Yes.
14        Q.    When?
15        A.    You mean for long period of
16    time?
17        Q.    Yeah. I'm not talking about
18    like just one night.
19        A.    This was back in Clemson. Yes.
20        Q.    Okay.
21        A.    At the Clemson plant.
22        Q.    What were you doing?
23        A.    I might have been supervising

86

1    you have any facts to dispute that?
2        A.    Other than maybe records of --
3        Q.    I'm asking do you have any
4    records?
5        A.    You're saying facts?
6        Q.    Yes.
7        A.    I mean, me personally?
8        Q.    Yes.
9        A.    No.
10        Q.    Okay. Thank you.
11        A.    All right.
12        Q.    In your opinion, what was a --
13    as a floor associate, would the third shift
14    be less desirable to work for than the
15    first or second shift?
16        A.    In my opinion?
17        Q.    Because of the hours, yes.
18        A.    It depends, because you have
19    some people that would rather work third
20    than work first or second.
21        Q.    Would you?
22        A.    Me personally?
23        Q.    Yes.

88

1    at the time.
2        Q.    So you were supervising the
3    third shift?
4        A.    Uh-huh.
5        Q.    And why did you quit doing
6    that?
7        A.    I went to second shift.
8        Q.    That's what I was asking.
9        A.    Yeah. I went to second shift.
10        Q.    And why did you go to second
11    shift?
12        A.    Because the -- there were
13    changes made in the department, and my
14    department manager said he needed me on
15    second shift instead of third shift.
16        Q.    So it had nothing to do with
17    hours?
18        A.    No.
19        Q.    You're saying you don't have an
20    opinion as far as whether normal people
21    would want to work eleven p.m. to seven
22    a.m. versus seven a.m. to five p.m. or
23    something like that?

89

1      A.    I mean, like I said, you have
2    some people that would rather work the
3    night shift than the day shift.
4      Q.    If Mr. Lee states that he lost
5    numerous employees because they didn't want
6    to work the night shift and they wanted to
7    transfer as soon as a job opened up on
8    first or second shift, would you disagree
9    with that?
10     A.    Say that again.
11     Q.    If Mr. Lee states that he lost
12   several third shift hourly associates
13   because of the reason that they did not
14   like to work the night shift and they
15   wanted to work on the first or second
16   shift, would you have any reason to
17   disagree with that?
18     A.    Okay.    Say it one more time,
19   please.    Say it one more time for me.
20     Q.    Mr. Lee states the third shift
21   was a less desirable shift because of the
22   hours.
23     A.    Okay.

91

1      A.    Yes.
2      Q.    Who?
3      A.    Oh, okay.    Well, maybe I should
4    have asked you to say the question again.
5      Q.    In the same position, not
6    moving up to management.    I'm saying do you
7    know of any first or second shift hourly
8    employees that wanted to move to the same
9    position on third shift?
10     A.    During this time?
11     Q.    Yes.
12     A.    No.
13     Q.    Okay.    Did you know of any on
14   the third shift that wanted to move to
15   second or first shift during this time?
16     A.    No.
17     Q.    Do you know if there was any
18   transfers from third shift to first or
19   second shift, lateral moves?
20     A.    I can't remember.
21     Q.    If Mr. Lee says that there
22   were, do you have any reason to dispute
23   that?

90

1      Q.    He states as soon as openings
2    were -- if there was an opening on first
3    and second shift, a lot of times third
4    shift employees would try to get those jobs
5    because of the hours.    Would you disagree
6    with what Mr. Lee is stating about the
7    third shift?
8      A.    Okay.    I guess for me to get my
9    understanding, if there were associates on
10   second shift that wanted first shift jobs,
11   I mean, I don't know how can I -- I can't
12   answer that question.
13     Q.    Do you have any facts or any
14   knowledge that would disagree with Mr. Lee
15   stating that his third shift hourly
16   associates, some of them wanted to work on
17   first shift because they didn't like the
18   hours?
19     A.    No.
20     Q.    Okay.    Do you know of any
21   associates on first or second shift, hourly
22   associates, that wanted to work on third
23   shift?

92

1      A.    That there were transfers?
2      Q.    Yes.
3      A.    No.
4      Q.    Now, I think we briefly talked
5    about Michael Alford taking over for you as
6    the department manager.
7      A.    Uh-huh.
8      Q.    Is it true that Mr. Alford had
9    never worked at Westpoint before?
10     A.    To my knowledge, yes.
11     Q.    And is it also true that he was
12   a former manager at Movie Gallery before
13   being hired as the department manager?
14     A.    From what I had heard, yes.
15     Q.    Do you know the circumstances
16   surrounding Mr. Alford's hire?
17     A.    No.
18     Q.    Did you partake in the
19   interview regarding Mr. Alford's hire?
20     A.    No.
21     Q.    Let's talk briefly about --
22   well, not briefly.    But let's talk about
23   your evaluation you completed on Mr. Lee

93

```
 1    that's dated 1/25/06.  And it's attached to
 2    your declaration if you want to just flip a
 3    few pages over.  Will you please look over
 4    this evaluation and see if this is an
 5    evaluation you completed according to
 6    Mr. Lee as you remember completing it?
 7        A.    Yes.
 8        Q.    Is that your signature on I
 9    guess the third page of this document?
10        A.    Yes.
11        Q.    Who is the reviewing manager's
12    signature?  Is that you?
13        A.    No.
14        Q.    Under that, who is that?
15        A.    That's Anthony Perry.
16        Q.    Now, who was Anthony Perry?
17        A.    Okay.  I'm going to try to
18    explain this.  During this transition,
19    while I was I guess acting department
20    manager, the decision of upper management
21    was decided to -- to put packaging and the
22    distribution center under the same
23    department manager.  And that would be
```

95

```
 1    Mr. Lee his yearly review for the entire
 2    2005 when you had only been his direct
 3    supervisor for a month and a half at best?
 4        A.    Well, I -- like I said, direct
 5    supervisor for that month and a half.  But
 6    I guess the most part of the year I was in
 7    the department and observing him throughout
 8    that.
 9        Q.    But you weren't his supervisor?
10        A.    No.
11        Q.    And we've already gone through
12    that, that you stated that you didn't
13    supervise him?
14        A.    No.
15        Q.    So, you know, you might have
16    seen him here and there, but you weren't
17    his supervisor?
18        A.    But I did observe him and I did
19    have conversations with him.
20        Q.    But you don't remember when you
21    first started observing him?
22        A.    No.
23        Q.    You stated that you were hired
```

94

```
 1    Anthony Perry.
 2        Q.    Okay.  This, according to the
 3    date on the front of this performance
 4    review, says it was completed on 1/25 of
 5    '06?
 6        A.    Uh-huh.
 7        Q.    Is that correct?  Is that when
 8    you completed it?
 9        A.    I believe so.  Yes.
10        Q.    Now, what is this performance
11    review for?
12        A.    It's an annual performance
13    review done yearly.
14        Q.    What year is it for?
15        A.    This is for the previous year.
16        Q.    2005?
17        A.    Yes.
18        Q.    And we talked earlier that you
19    were Mr. Lee's direct supervisor at the
20    time this was done about a month and a half
21    at best?
22        A.    Direct supervisor, yes.
23        Q.    So you felt qualified to give
```

96

```
 1    in May of 2005 --
 2        A.    Uh-huh.
 3        Q.    -- as a project manager which
 4    you did not have any observations of
 5    Mr. Lee at that period?
 6        A.    Is that what I said?
 7        Q.    Well, when we talked about you
 8    being hired as project manager --
 9        A.    Uh-huh.
10        Q.    Let's see where it is.  In
11    charge of outsourcing and restructuring
12    Abbeville or reorganizing Abbeville,
13    talking about the product storage and
14    product flow.  No oversight over actual
15    employees.
16        A.    Okay.
17        Q.    Do you remember saying that?
18        A.    Yes.
19        Q.    Okay.  And I think it was you
20    don't remember when, but you started doing
21    that in May of '05 as the product manager?
22        A.    Uh-huh.
23        Q.    And then sometime later -- you
```

97

```
1   can't remember when -- you were transferred
2   or you took the position of assistant
3   department manager over the whole packaging
4   department?
5        A.    Uh-huh.
6        Q.    Now, while you were working
7   there, you stated that you didn't have any
8   supervisory capacity over Mr. Lee?
9        A.    Uh-huh.
10       Q.    And you said that was Bob
11  Turner who was the department manager?
12       A.    Yes.
13       Q.    Okay.  So you didn't get any
14  direct supervision over Mr. Lee until
15  December 15th, 2005?
16       A.    Yes.
17       Q.    So let me go back to this.
18       A.    Okay.
19       Q.    Did you feel qualified to give
20  Mr. Lee a 2005 yearly review when you had
21  only been his direct supervisor for a month
22  and a half?
23       A.    Yes.
```

```
1   direct supervisor?
2        A.    Yes.
3        Q.    So you talked to Mr. Lee about
4   his job performance before he -- before you
5   became supervisor or direct supervisor over
6   him?
7        A.    Yes.
8        Q.    But you can't remember when?
9        A.    No.
10       Q.    Do you remember what you talked
11  to him about?
12       A.    No.
13       Q.    What about January through May
14  of 2005?  You didn't manage him then, did
15  you?
16       A.    No.
17       Q.    You didn't supervise him and
18  you didn't observe him then, did you?
19       A.    No.
20       Q.    But this review that we're
21  looking at right here that's attached to
22  Exhibit A, that covers that period, doesn't
23  it?
```

98

```
1        Q.    Why?
2        A.    Because like I said, I was his
3   direct supervisor for I guess, like I say,
4   a month and a half.  But I had been working
5   maybe not with him, but I had been
6   observing him for more than just a month
7   and a half.
8        Q.    How long?
9        A.    Don't know exactly.
10       Q.    Give me a guess.  Three months?
11  Four months?  Five months?  We know it
12  wouldn't have been longer than seven
13  because seven months would have been right
14  when you first started.
15       A.    I'm not sure.  I mean --
16       Q.    When was the first time you
17  talked to Mr. Lee or disciplined Mr. Lee or
18  said anything to Mr. Lee about his job
19  performance?
20       A.    Exactly when, I can't remember.
21       Q.    Approximately when?
22       A.    I'm not sure.
23       Q.    Was it before you became his
```

100

```
1        A.    Yes.
2        Q.    Well, how did you feel
3   confident to fill this out if you didn't
4   observe him for that period of time?
5             MS. PATE:  Object to form.  Asked
6                  and answered.
7        A.    I guess based on -- I guess
8   based on the time that I did know him.
9        Q.    Okay.  So in essence, this is
10  not a yearly review, then.  It's just a
11  review of since you knew him?
12            MS. PATE:  Object to the form.
13       Q.    Or since you observed him?
14       A.    No.  It's a yearly review.
15       Q.    Although you didn't evaluate
16  him or observe him the whole year, right?
17       A.    You're still asking is this a
18  yearly review?
19       Q.    You said it was a yearly
20  review?
21       A.    Yes.
22       Q.    And I said although you did not
23  observe him or reevaluate him that whole
```

101

```
1   year?
2        A.      This is a yearly review.
3        Q.      That's not answering my
4   question.
5        A.      Okay.  Ask the question again,
6   please.
7        Q.      You didn't observe him the
8   whole year of 2005, did you?
9        A.      No.
10       Q.      Okay.  But yet you filled out
11  -- the company had you fill out a yearly
12  review for him for the whole entire year of
13  2005, correct?
14       A.      Yes.
15       Q.      Can you explain to me why it
16  appears that ratings were changed on this
17  evaluation?
18       A.      Yes.
19       Q.      Please do.
20       A.      When -- like I said, keep in
21  mind the transition that was going on.
22  When it came time to do the reviews, the
23  plant manager wanted to review the reviews
```

102

```
1   once the department managers did the
2   reviews.
3        Q.      Who was the plant manager that
4   wanted to review the reviews?
5        A.      At this time, it was Glen
6   McCants.
7        Q.      Glen McCants?
8        A.      Yeah.  I think.  James Glen
9   McCants.
10       Q.      Okay.  So after you filled out
11  this evaluation --
12       A.      Uh-huh.
13       Q.      -- Mr. McCants wanted to review
14  it?
15       A.      Yeah.  This was all
16  evaluations.
17       Q.      Was -- well, let's just talk
18  specifically about this one.
19       A.      Okay.
20       Q.      Was this before you met with
21  Claude or after?
22       A.      Before.
23       Q.      So you filled out this
```

104

```
1   evaluation on Claude?
2        A.      Uh-huh.
3        Q.      Then you take it to
4   Mr. McCants?
5        A.      Uh-huh.
6        Q.      You and Mr. McCants sit down
7   and talk about it?
8        A.      Uh-huh.
9        Q.      Okay.  Did he instruct you to
10  change these?
11       A.      He made recommendations that
12  once discussing it with him that I agreed
13  with that needed to be changed.
14       Q.      Did Mr. McCants ever observe
15  Mr. Lee?
16       A.      Yes.
17       Q.      On what occasion?
18       A.      I'm not sure about that.
19       Q.      How do you know he did?
20       A.      Because he was -- Mr. McCants
21  was the plant manager who also spent time
22  on all three shifts.
23       Q.      How do you know Mr. McCants
```

104

```
1   observed Mr. Lee?  Did you physically see
2   him?
3        A.      Yes.
4        Q.      Okay.  When?
5        A.      He was in the packaging
6   department all the time.
7        Q.      Did he ever work on Mr. Lee's
8   shift?
9        A.      Entirely?
10       Q.      Uh-huh.
11       A.      Not sure.
12       Q.      Okay.  You don't know any dates
13  that Mr. McCants would have observed
14  Mr. Lee?
15       A.      No, sir.
16       Q.      What was Mr. McCants' hours?
17       A.      He basically made his own
18  hours.
19       Q.      Well, what was the normal day
20  for him?
21       A.      For the most part, we -- like I
22  said, we all were -- all managers were
23  working anywhere from five thirty to seven
```

105

```
1    thirty at night.
2         Q.    So Mr. McCants was in there at
3    five, five thirty to seven, seven thirty
4    every day?
5         A.    For the most part, yes.
6         Q.    Was he working alongside of
7    you?
8              MS. PATE:  Object to the form.
9         A.    Okay.  Alongside of me?  What
10   you mean?
11        Q.    Well, I mean, were y'all going
12   around together doing your thing, or was he
13   doing something else?
14        A.    Sometimes we did.  We did walk
15   around together sometimes.
16        Q.    Did you ever hear Mr. McCants
17   talk to Mr. Lee about anything?
18        A.    I'm not sure about that.
19        Q.    Did you ever hear Mr. McCants
20   discipline or critique Mr. Lee's job
21   performance to Mr. Lee?
22        A.    I'm not sure.
23        Q.    Okay.  You're not sure whether
```

107

```
1    Mr. McCants and you talk and you -- do you
2    make these changes or does he?
3         A.    Me.  I did based on his
4    recommendations.
5         Q.    So Mr. McCants recommends that
6    you change, for example,
7    supervision/management skills -- and you've
8    got a copy in front of you.
9         A.    Yes.
10        Q.    -- from meets requirements to
11   fair?
12        A.    Uh-huh.
13        Q.    Did Mr. McCants change anything
14   in the comments on that where it says
15   Claude has good management skill?  Needs to
16   work a little harder motivating associates?
17        A.    No.
18        Q.    So you're stating right here --
19   that's your handwriting, right?
20        A.    Yes.
21        Q.    That Claude has good management
22   skills?
23        A.    Uh-huh.
```

106

```
1    you ever heard it?
2         A.    No.
3         Q.    Okay.  You never did hear it?
4         A.    Unh-unh.
5         Q.    So you never observed Mr. Lee
6    and Mr. McCants or Mr. McCants talking to
7    Mr. Lee about his job performance?
8         A.    No.
9         Q.    What was Mr. McCants' job
10   duties?
11        A.    He was manager of the entire
12   facility.
13        Q.    What did that entail?
14        A.    To say exactly what it was, I
15   couldn't say exactly.  But he was mainly
16   responsible for the Abbeville facility.
17        Q.    Did he walk around on the
18   floor?
19        A.    Yes.
20        Q.    Did he have an office there?
21        A.    Yes.
22        Q.    So let's go back to you and
23   Mr. McCants have a meeting wherein
```

108

```
1         Q.    That's what you wrote, right?
2         A.    Yes.
3         Q.    Okay.  Go down two.
4         A.    Okay.
5         Q.    Job knowledge.  You rated him
6    as above requirements.  And it was changed
7    to meets requirements?
8         A.    Uh-huh.
9         Q.    You wrote has good knowledge of
10   the job and job duties?
11        A.    Uh-huh.
12        Q.    Is that what you wrote?
13        A.    Yes.
14        Q.    Okay.  Go down two more.
15        A.    Uh-huh.
16        Q.    This is a large discrepancy
17   right here.  You put -- --
18              MS. PATE:  Object to the form.
19        Q.    Under communication skills, you
20   had previously rated him as above
21   requirements?
22        A.    Uh-huh.
23        Q.    After your meeting with
```

109

```
1    McCants, it's changed to fair?
2         A.    Uh-huh.
3         Q.    Now, it looks like the comment
4    section was whited out.  Looks like there
5    was something written in and then it was
6    changed.  Do you remember what was
7    originally there?
8              MS. PATE:  Object to the form.
9         A.    No.  I don't know if that was
10   -- no.
11        Q.    Don't remember what was
12   originally there?
13        A.    No.
14        Q.    Now, do you know who has the
15   original of these documents?
16        A.    It may be in his personnel
17   file.  I'm not sure.
18             MR. TIDWELL:  I think we've asked
19                  for those.  But if you have
20                  the original of those
21                  documents.
22             MS. PATE:  I'll check.
23        Q.    Let's go down two more.
```

```
1    don't remember.  But based on his
2    recommendations, I changed them, agreed
3    with them and changed them.
4         Q.    Do you feel it had anything to
5    do with Mr. Lee's race?
6              MS. PATE:  Object to the form.
7         A.    Do I what?
8         Q.    Do you feel that Mr. McCants
9    wanting to change all of these to lower
10   requirements had anything to do with
11   Mr. Lee's race?
12             MS. PATE:  Object to the form.
13                  Go ahead.
14        A.    No.
15        Q.    Did you ever keep a copy of
16   these?
17        A.    No.
18        Q.    Were you aware of Mr. Lee's
19   history with that company?
20        A.    As far as?
21        Q.    Being with the company for
22   twenty-nine years, working his way up from
23   on the floor to becoming management?
```

110

```
1         A.    Okay.
2         Q.    Administrative, you had marked
3    above requirements.  After your meeting
4    with Mr. McCants, y'all changed it.  You or
5    him changed it to fair?
6         A.    Uh-huh.
7         Q.    And, again, it looks like if
8    you look at the -- it looks like something
9    was whited out over the comment section?
10        A.    Uh-huh.
11        Q.    And something else was written.
12   Do you remember what was originally in
13   there?
14        A.    No, sir.
15        Q.    Okay.  Do you remember changing
16   those comments?
17        A.    Yes.
18        Q.    Okay.  And why did you change
19   them?
20        A.    When Mr. McCants and I sat down
21   and reviewed it, based on recommendations
22   that he made, exactly what the
23   recommendations were, word for word, I
```

112

```
1         A.    I knew he was there for quite
2    some time.  But exactly how long, at this
3    time, maybe not exactly how long.  No.
4         Q.    Did you ever have any doubts
5    about Mr. Lee's knowledge of the packaging
6    department and what was supposed to be
7    done?
8              MS. PATE:  Object to the form.
9                  Go ahead.
10        A.    Some doubts, yes.
11        Q.    Particularly what?
12        A.    You said as far as his
13   knowledge of the job.  Well, maybe not his
14   knowledge of the job.  Okay.  Well --
15        Q.    So there are no doubts?
16        A.    Based on his knowledge of the
17   packaging department?
18        Q.    Yeah.
19        A.    No.
20        Q.    Okay.  So he knew what he was
21   supposed to be doing?
22        A.    Yes.
23        Q.    I mean, he'd been there for
```

113

```
 1   twenty something years?
 2        MS. PATE:  Object to the form.
 3        Q.    Let's look at -- you're on the
 4   same page -- B.  You put strengths.  Is
 5   that your handwriting?
 6        A.    Yes.
 7        Q.    And I'm just going to read what
 8   you wrote.  Claude's strength is experience
 9   in the packaging department and his ability
10   to adapt to changes?
11        A.    Uh-huh.
12        Q.    Doesn't that contradict what
13   you wrote in the declaration?
14        MS. PATE:  Object to the form.
15        Q.    And I'm going to show you what
16   you said in this declaration.  Well, I take
17   that back.  You didn't directly say that
18   Mr. Lee was not able to adapt to changes.
19   However, you did imply it in paragraph
20   three which says, Although Mr. Lee's
21   department had fairly high efficiency
22   report, that is the standard for each line
23   which apparently you'd like to change.  You
```

115

```
 1        Q.    Pardon me?
 2        A.    Claude.
 3        Q.    These goals, I guess the
 4   planned personal objective and
 5   accomplishments, is that what you fill out
 6   or is that Claude?
 7        A.    That's me.
 8        Q.    Okay.  Are these -- it looks
 9   like one, two, three, four -- four goals
10   for 2006, is that what they are?
11        A.    Yes.
12        Q.    First one being efficiency goal
13   ninety-five percent end of first quarter, a
14   hundred percent for second, third and
15   fourth?
16        A.    Uh-huh.
17        Q.    I guess Mr. Lee was terminated
18   before the end of the first quarter.  But
19   was he on track, in your opinion, to meet
20   that first goal of ninety-five percent?
21        A.    I'm not sure.
22        Q.    Do you have anything that would
23   say that he wasn't?  Did you ever talk to
```

114

```
 1   said that while meeting and exceeding
 2   production standards was certainly
 3   important, more important was that
 4   Westpoint have on every shift and every
 5   department managers, supervisors who were
 6   willing and able to take charge, implement
 7   and enforce new work methods and help move
 8   the company forward towards its goal.  From
 9   reading the strengths and weaknesses, it
10   appears that you thought that Mr. Lee was
11   able to adapt to changes.  Isn't that what
12   you put?
13        A.    Yes.
14        Q.    Now, you -- the last thing that
15   was changed on this or that I can tell that
16   was changed was section E was changed from
17   overall performance rating from meets
18   requirements to fair, correct?
19        A.    Yes.
20        Q.    Accomplishments, is that what
21   you fill out or is that what Claude writes
22   on the next page?
23        A.    Claude.
```

116

```
 1   him about his production efficiency goal to
 2   indicate that he wasn't meeting that?
 3        A.    I'm not sure.
 4        Q.    You're not sure if you ever
 5   talked to him about it?
 6        A.    Specifically during this time
 7   period, I'm not sure.
 8        Q.    If Mr. Lee states that he was
 9   meeting his goal, would you disagree with
10   that?
11        A.    It's hard to say.  I mean --
12        Q.    I don't understand why it's
13   hard to say.  Either you would or you
14   wouldn't?
15        A.    No.  Off the top of my head
16   now, I don't remember exactly what his
17   efficiency was then.
18        Q.    So you don't have any knowledge
19   right now as we sit here to state whether
20   Mr. Lee was meeting that ninety-five
21   percent or not?
22        A.    Right here in front of me, no.
23        Q.    And you don't remember?
```

117

```
1        A.    No.
2        Q.    What about the second one?  The
3   incident rate of two percent or less from
4   the department?
5        A.    Uh-huh.
6        Q.    Do you remember if he met that
7   one?
8        A.    No, sir.
9        Q.    He did not or you don't
10  remember?
11       A.    I don't remember.
12       Q.    Okay.  Let's go to the third
13  one.  Reduce -- reduce cost per dozen by it
14  looks like one third?
15       A.    Thirteen cents.
16       Q.    Thirteen cents.  Is that by the
17  end of fourth quarter?
18       A.    Yes.
19       Q.    Okay.  Do you know if he was
20  reducing costs?
21       A.    No, sir.
22       Q.    You don't know?
23       A.    Unh-unh.
```

119

```
1   remember, he was meeting that -- all these
2   goals?  I mean.  I'm sorry.  Not all these
3   goals, but that fourth goal?
4        A.    Lost time accident?
5        Q.    Yes.
6        A.    That one I can say yes.
7        Q.    That he was meeting?
8        A.    Yes.
9        Q.    Okay.  And for the other three,
10  you just don't remember?
11       A.    No.  I'm not sure with the
12  numbers and the time period.
13       Q.    Right.  That's what I'm asking.
14  You just don't remember on the other three?
15       A.    No.
16       Q.    Next that's still attached to
17  Exhibit A is a personnel notice?
18       A.    Uh-huh.
19       Q.    What was the basis of this
20  notice?
21       A.    Poor job performance.
22       Q.    Why was there not a -- in the
23  top right corner there's an indication of
```

118

```
1        Q.    Okay.  Is that 3-A or
2   something?  What is that?
3        A.    It might be.
4        Q.    Goals of sixty-five cents end
5   of first quarter, sixty-one cents end of
6   second, fifty-eight end of third,
7   fifty-five end of fourth.  What is that
8   referring to?
9        A.    It's the same.  The cost per
10  dozen.
11       Q.    Okay.  Do you know if he was
12  doing that?
13       A.    No, sir.
14       Q.    You don't remember?
15       A.    No, sir.
16       Q.    Okay.  What about the zero lost
17  time incidents?
18       A.    That's --
19       Q.    Accidents.  I'm sorry.  Do you
20  remember if he was meeting those goals?
21       A.    I don't believe we had a lost
22  time accident during that time.
23       Q.    Okay.  So as far as you can
```

120

```
1   what the notice is for?
2        A.    Uh-huh.
3        Q.    Why was there no indication of
4   what the notice was for?
5        A.    Talking about in the one
6   through seven box?
7        Q.    Yes.
8        A.    There's no reason.
9        Q.    Were you not supposed to circle
10  or check as far as what the notice was for?
11       A.    Well, when I reviewed the
12  notice with him, I explained to him what it
13  was for.
14       Q.    I'm not asking that.  I'm
15  asking if you were not supposed to check or
16  mark or indicate on the top right-hand
17  corner what this notice was for?
18       A.    As standard procedure?
19       Q.    Yes.
20       A.    Yes and no.
21       Q.    Okay.  Well, explain that to
22  me.
23       A.    Well, none of these apply to
```

121

1   what the notice was for.
2       Q.    Is there another notice that
3   you're supposed to fill out for poor job
4   performance?
5       A.    Oh, it's several notices you
6   can fill out for poor job performance.
7       Q.    Well, why would you have chosen
8   this one if none of these one through seven
9   apply?
10      A.    Because -- can I explain to you
11  what this personnel notice is?
12      Q.    Sure.
13      A.    Okay.  Basically, my -- the way
14  I like to explain it, a personnel notice is
15  a verbal warning on paper.
16      Q.    Okay.
17      A.    And, basically, this was me
18  letting Claude know that these things
19  needed to be worked on.  So I guess nothing
20  was circled up there because I believe
21  everything was addressed in the notice and
22  along with Claude going over the notice.
23      Q.    What other types of notices are

122

1   there?
2       A.    You have many written
3   counsellings, written warnings.  Gosh.  My
4   mind has gone blank.  Corrective actions.
5   I mean, you have miscellaneous notices.
6       Q.    What's the difference between a
7   personnel notice and the written
8   counselling, written warning or corrective
9   action?
10      A.    Okay.  The difference is, like
11  I say, the personnel notices are like
12  verbal warnings.  And it's a stage that you
13  go through as far as write-ups are
14  concerned.
15      Q.    Okay.
16      A.    Okay.  For an hourly associate,
17  usually the personnel -- what follows a
18  personnel notice for -- if a -- if a
19  violation was -- -- okay.  The written
20  counselling follows a personnel notice.
21      Q.    Okay.  Is that on a particular
22  form?
23      A.    Yes.  It's I guess like what we

123

1   refer to as pink papers.
2       Q.    Okay.  Did you ever give
3   Mr. Lee one of those?
4       A.    No.
5       Q.    Do you know if anybody ever
6   did?
7       A.    I don't know.
8       Q.    Tell me the procedure you just
9   kind of started to.  You were saying
10  personnel notice is followed by written
11  counselling.  But tell me the complete
12  procedure.
13      A.    For hourly or salary?
14      Q.    For Mr. Lee.
15      A.    Okay.  With --
16      Q.    Salary employee.
17      A.    With a salaried employee, the
18  same procedures don't apply for salary as
19  it does for hourly.
20      Q.    Okay.
21      A.    Okay.  Like I said, the
22  personnel notice is a verbal warning.  The
23  next step for a salaried associate after a

124

1   personnel notice would be a --
2       Q.    Let me stop you.  I'm not
3   interested -- okay.  I'm not interested in
4   hourly.  Just do the salary.
5       A.    The next step after a salaried
6   associate is issued a personnel notice
7   would be a corrective action.
8       Q.    So there's no pink slip for
9   salaried employees?
10      A.    No.  That -- that process, it
11  doesn't apply to salary.
12      Q.    Why?
13      A.    It's just policy, I guess.
14      Q.    So the policy is that hourly
15  associates get personnel notices and a
16  written counselling notice or a pink slip,
17  but the salaried employees, they go
18  straight from a personnel notice to a
19  corrective action?
20      A.    I mean, there are cases that
21  you wouldn't have to issue a salaried
22  associate a personnel notice.
23      Q.    Like what?

A.    I mean, if -- if -- if I guess
an upper manager feels as though they want
to give you a corrective action, they can
give you a corrective action.  I mean, like
I said, a personnel notice is to let you
know that you're being warned about
something and your next step will be this.
It's almost like I guess you want to say
maybe a wake-up call, so to speak.

Q.    Do you have -- does the company
have any particular policies that would
outline what actions would get a personnel
notice versus what action would get a
corrective action or versus what action
would get just a straight termination, or
is it just up to the supervisor?

A.    No.  It's policies in place for
that.

Q.    Okay.  Tell me about them.

A.    Now, which one do you want to
hear about?  The hourly or salary?

Q.    Salary.

A.    Okay.  Each salaried associate

---

126

is given what we call an associates guide
book, a salary guide book.  And all of
these procedures are listed in that book.
I believe it's even a section on corrective
action.

Q.    So it tells you what action
deserves what?

A.    Uh-huh.

Q.    Okay.  But you don't -- you
can't recall it off the top of --

A.    No.  I can't recall it.

Q.    And when you fill out personnel
notices, do you refer back to that book?

A.    See, when -- well, like I said,
with the personnel notices, it's the
personnel notices are, like I said, what I
like to call verbal warnings on paper.

Q.    Right.

A.    And the reason I would say
verbal warnings on paper would be just to
assure that this was covered with that
person.

Q.    Okay.  You state in here, Your

---

associates continue to use improper job
methods.  What are you talking about?

A.    That's what I was talking
about, the waste.  I mean --

Q.    Well, you've already -- I think
you've already stated that right before
that is excessive waste of time and motion.
Is this your associates continue to use
improper job methods even after the correct
method has been given or even shown to
them, is this just a duplicate of the
previous sentence, or are you referring
about something else?

A.    Maybe it's a duplicate of the
previous sentence.  It all goes together.

Q.    Incorrect work flow throughout
the department.  Is that in the third
shift, or is that in first and second
shift, too?

A.    Well, actually I believe this
-- this notice was actually given to all
three of the supervisors.  To all of them.

Q.    So this wasn't a specific

---

128

notice given to Claude Lee?  It was given
to basically company -- I mean department
wide to all the supervisors?

A.    Yes, sir.

Q.    Why?

A.    Just to I guess basically let
them know of the improvements that needed
to be done in the packaging department.

Q.    Why were you instructed to give
this?

A.    No.  This was on me.

Q.    So you just felt that it was on
you to give all the -- all three
supervisors a personnel notice?

A.    Yeah.  What -- with me
personally, what I tend to do is I tend to
try to be consistent with all supervisors
unless it's a certain area that only --
only relates to you.

Q.    Right.  So this related to all
three of the supervisors?

A.    Yes.

Q.    And just to clarify, the other

129

```
1   two white supervisors were not fired, were
2   they?
3              MS. PATE:  Object to the form.
4        Q.    Were the other two, Mike
5   Etheridge and Billy Bedsole, fired?
6              MS. PATE:  Object to the form.
7              Go ahead.
8              THE WITNESS:  I can answer?
9              MS. PATE:  Uh-huh.
10       A.    Fired, no.
11       Q.    Terminated?  Whatever you want
12  to call it.
13       A.    Terminated, no.
14       Q.    Okay.  So the only written
15  documentation you gave to Mr. Lee was the
16  2005 yearly review and this personnel
17  notice which was not directed particularly
18  at Claude Lee.  It was directed to all the
19  supervisors in the packaging department,
20  correct?
21       A.    Correct.
22       Q.    Oh, let me ask you one other
23  question.  Who was -- Bob Turner was
```

131

```
1   mean terminated?  As far as --
2        Q.    Terminated his employment?
3        A.    Like paperwork or --
4        Q.    Who actually told -- whose
5   decision was it to terminate Mr. Lee?
6              MS. PATE:  Object to the form.
7        A.    It had to have been in
8   personnel I mean as far as HR goes.
9        Q.    Did you recommend to anybody in
10  personnel to terminate to Mr. Lee?
11       A.    No.
12       Q.    Did you recommend to anybody to
13  terminate Mr. Lee?
14       A.    No.
15       Q.    Do you think Mr. Lee should
16  have been terminated?
17       A.    My opinion?
18       Q.    Your opinion.
19       A.    In my opinion, he wasn't
20  terminated.  He quit.
21       Q.    Okay.  Do you think Mr. Lee
22  should have been terminated, in your
23  opinion, regardless of whether he quit or
```

130

```
1   Mr. Lee's former direct supervisor, right?
2        A.    Uh-huh.
3        Q.    When you went to go fill out
4   this 2005 yearly review, did you call Bob
5   up?  He was no longer with the company,
6   right?
7        A.    Uh-huh.
8        Q.    Did you call him up and ask him
9   to get his input on this?
10       A.    No.
11             MR. TIDWELL:  Let me take a quick
12             break and then we'll come
13             back.
14             (Brief recess)
15       Q.    Mr. Lee, I don't think I have
16  too much more for you.  I know you'll be
17  excited about that.
18       A.    Major.
19       Q.    I'm sorry.  Mr. Major.  Do you
20  know who terminated Mr. Lee?
21       A.    HR manager.
22       Q.    Who is that?
23       A.    Okay.  Terminated.  What do you
```

132

```
1   was terminated?  Do you think he should
2   have been terminated?
3        A.    No.
4        Q.    You don't think he should have
5   been?  Do you think he should have been
6   removed from management position?
7        A.    My opinion, yes.
8        Q.    Okay.  Let me go back to
9   something.  You said that Mr. Lee was not
10  terminated.  He quit?
11       A.    Yes.
12       Q.    What are you basing that on?
13       A.    On the fact that after he was
14  removed from third shift supervisor, he was
15  I think offered an hourly job.  I think it
16  was a lift truck operator job on first
17  shift.
18       Q.    How do you know he was offered
19  a lift truck job?
20       A.    Because the morning he came in
21  to start the lift truck job, I was there.
22       Q.    Did you talk to him?
23       A.    Yes.
```

133

```
1       Q.      What did he say?
2       A.      I mean more than basically just
3   good morning, how are you doing.  But as
4   far as --
5       Q.      So you found out through
6   somebody else, I guess, that he was
7   terminated from his -- or removed from his
8   third shift supervisor and was going to be
9   a lift truck operator?
10      A.      Yeah.
11      Q.      Who did you find out from?
12      A.      It may have been the department
13  manager at the time or even HR manager.
14  I'm not a hundred percent sure who.
15      Q.      So Mike Alford was department
16  manager, right?
17      A.      Yes.
18      Q.      Okay.  Who was the HR manager
19  then?
20      A.      Brent Murphy.
21      Q.      Now, did Brent Murphy observe
22  Mr. Lee, to your knowledge?
23      A.      From time to time, yes.
```

135

```
1   That's it?
2       A.      Yes.
3       Q.      And Mr. Murphy, did he observe
4   Mr. Etheridge and Mr. Bedsole?
5       A.      Yes.
6       Q.      How many times; do you know?
7       A.      At least one that I know.
8       Q.      And, again, you never
9   recommended to Mr. Murphy or to anyone else
10  that Mr. Lee should be terminated, did you?
11      A.      No.
12      Q.      Did you ever recommend that he
13  should be removed from management?
14      A.      No.
15      Q.      Do you know if anybody ever
16  recommended that he be removed from
17  management?
18      A.      I don't know.
19      Q.      Did Mike Alford ever recommend
20  that he be removed from management?
21      A.      I don't know.
22      Q.      So you don't know the
23  circumstances that arose to cause Mr. Lee
```

134

```
1       Q.      All right.  Was that part of
2   Mr. Murphy's job to observe the shift -- I
3   mean to observe the shift leaders or
4   supervisors?
5       A.      In the entire facility, yes.
6       Q.      Did you ever observe him
7   observing Mr. Lee?
8       A.      I can't recall any time
9   specific.
10      Q.      I'm just asking if you observed
11  Mr. Murphy observing Mr. Lee.
12      A.      I'm sure, yes.
13      Q.      You did?
14      A.      Uh-huh.
15      Q.      How many times?
16      A.      Oh, I have no idea.
17      Q.      One?  Ten?  Twenty?
18      A.      At least one.
19      Q.      More than ten?
20      A.      Not sure.
21      Q.      More than twenty?
22      A.      Not sure.
23      Q.      So we know at least one.
```

136

```
1   to be removed from management?
2       A.      Maybe some.
3       Q.      Tell me what you know.
4       A.      To my knowledge, it was
5   basically the job performance, I think.
6       Q.      But who decided that Mr. Lee
7   should be removed from management?
8       A.      It would have had to have been
9   his department manager at the time.
10      Q.      Which would have been?
11      A.      Michael Alford.
12      Q.      So according to you, Michael
13  Alford was the one that decided to remove
14  Mr. Lee from management?
15      A.      I don't know if I can say that
16  a hundred percent, but yes.  Because he --
17  Claude was Michael's subordinate.
18      Q.      Who was the -- was there an
19  assistant department manager at that time?
20      A.      No.
21      Q.      So really the only direct
22  supervisor over Mr. Lee was Mr. Alford?
23      A.      Yes.
```

137

```
1        Q.      And at the time Mr. Lee was
2   removed from third shift manager, do you
3   know about how long Mr. Alford had been
4   working there?
5        A.      Off the top of my head, no.
6        Q.      If I told you it had been about
7   one month, would you have any -- would you
8   have any reason to disbelieve that?
9        A.      I guess I would -- I would -- I
10  guess I'm not sure when he started, and I'm
11  not a hundred percent sure of the day
12  Claude was removed.
13       Q.      Well, didn't he start when you
14  were transferred over to HR?
15       A.      No.
16       Q.      Oh, he didn't.  So February
17  20th --
18       A.      He started before then
19  probably.
20       Q.      So you and --
21       A.      I was actually working with
22  Mr. Alford when he started.
23       Q.      Okay.
```

139

```
1        A.      I would have to look at the
2   exact date, but it sounds like it was
3   around that time.
4        Q.      I mean, you don't have anything
5   that would suggest that it wasn't March.  I
6   mean, I've got it.  I just don't have it in
7   front of me.
8        A.      Okay.
9        Q.      Which would mean that if
10  Mr. Lee was removed in March of '06, then
11  that would mean that Mr. Alford had been on
12  the job for approximately a month, maybe a
13  little bit longer than a month?
14       A.      Like I said, I'm not sure when
15  Mr. Alford started.
16       Q.      Well, you were there, weren't
17  you?
18       A.      Yeah.  But I'm not sure when he
19  started.
20       Q.      Was he there when you did the
21  yearly review?
22       A.      No.
23       Q.      Okay.  So we know he wasn't
```

138

```
1        A.      Before I went into HR.
2        Q.      So you went into HR about
3   February of '06 or before that?
4        A.      No.  It had to have been -- it
5   would have had to have been after that
6   because, like I said, I worked with
7   Mr. Alford.  When he came in, I don't know
8   if -- I don't know if I was responsible for
9   training him, so to speak, but I worked
10  with him I know for a few weeks before I
11  went.
12       Q.      Well, your declaration said
13  that you had no supervision of Mr. -- or
14  direct supervision of Mr. Lee after
15  February 20th of '06?
16       A.      Okay.  So Mr. Alford was in
17  charge, then.  If I wasn't supervising
18  Claude, then Mr. Alford was there.
19       Q.      Right.
20       A.      Yes.
21       Q.      Mr. Lee was terminated or --
22  sorry -- removed from his third shift
23  management in March of '06, correct?
```

140

```
1   there January 25th --
2        A.      Okay.
3        Q.      -- of '06.  So that would have
4   meant he would have had to start after
5   January 25th of '06, right?
6        A.      Yes.
7        Q.      And we all know that Mr. Lee
8   was removed from management position in
9   March of '06?
10       A.      Okay.
11       Q.      So, you know, let's say he
12  started January 26th.  At most, he was
13  there for less than two months?
14       A.      Okay.
15       Q.      Is that right?
16       A.      I guess based on that, yes.
17       Q.      Okay.  Did you ever talk to
18  Mike Alford about Mr. Lee's job
19  performance?
20       A.      Yes.
21       Q.      What did y'all talk about?
22       A.      Specifically, I can't remember
23  specifically what we talked about, but it
```

141

```
1    had to have been along the line of areas
2    that he needed to work on.
3         Q.    Was it in the conversation that
4    you were talking about all of the shift
5    managers, or were you just particularly
6    talking about Mr. Lee?
7         A.    I'm sure it -- like I said,
8    with Mr. Alford just starting, I had to
9    have talked to him about each supervisor
10   individually.
11        Q.    But you don't remember exactly
12   what was said or the basis of the
13   conversation?
14        A.    No, sir.
15        Q.    And you don't remember when any
16   conversations occurred?
17        A.    No, sir.
18        Q.    Okay.  What happened to Mike
19   Alford; do you know?
20        A.    No.
21        Q.    He's no longer with the
22   company, is he?
23        A.    No.
```

142

```
1         Q.    Do you know when -- was he
2    fired from the company or terminated?
3         A.    I'm not sure if he was
4    terminated or voluntarily quit.  I'm not
5    sure.
6         Q.    Do you know about when he was
7    fired or voluntarily left?
8         A.    No.
9         Q.    You don't have any idea?
10        A.    No.
11        Q.    Was it June, July, summer of
12   '06?  Was it spring of '06?  Was it fall?
13        A.    I'm not sure.
14        Q.    Do you know of any problems
15   management or anybody was having with
16   Mr. Alford?
17        A.    Problems?
18        Q.    In his work.
19        A.    As far as management was having
20   with Mr. Alford?
21        Q.    Uh-huh.
22        A.    Specifically, no.
23        Q.    Generally?
```

143

```
1         A.    No.  I don't -- I don't know of
2    any or I can't remember any.
3         Q.    Did you ever observe Mr. Alford
4    managing?
5         A.    Yes.
6         Q.    Did he appear to be doing a
7    good job to you?
8         A.    I would have to say yes,
9    because I was responsible for training him.
10   So yes.
11        Q.    And you don't know what
12   Mr. Alford is doing today, do you?
13        A.    No.
14        Q.    When was the last time you've
15   spoken with him?
16        A.    It would have had to have been
17   right before he left from the plant.  But,
18   like I say, I can't remember when that was,
19   when he left.
20        Q.    What's your current job title?
21        A.    Safety and training director.
22        Q.    At the Abbeville plant?
23        A.    Yes.
```

144

```
1         Q.    When are y'all planning on
2    shutting down that plant?
3         A.    We've actually laid off second
4    and third shift.  We started laying off the
5    9th of August.  Second and third shift
6    actually was gone the 9th of August, I
7    think.
8         Q.    All of second and third?
9         A.    Yes.
10        Q.    So there's no longer a second
11   and third shift?
12        A.    No.  And I believe the rest of
13   the plant should be October maybe.  I think
14   the only thing that will be left will be
15   the distribution center.
16        Q.    Did you offer any packages for
17   the management?
18        A.    Did I?
19        Q.    Did the company?
20        A.    They have -- they received a
21   severance for -- a two week severance for
22   the time that they were with Westpoint
23   Home.
```

145

```
 1        Q.    What do you mean two weeks for
 2   the time that they were with Westpoint?
 3        A.    They received a week's pay for
 4   every year that they were with Westpoint
 5   Home.
 6        Q.    Just management or everybody?
 7        A.    Everybody did.
 8        Q.    Did management get anything
 9   else?
10        A.    Not that I know of.  No.
11        Q.    So if somebody had been with
12   Westpoint for twenty years, they would have
13   gotten twenty weeks' pay?
14        A.    No.  If they'd been with
15   Westpoint Home for twenty years, yes.
16        Q.    That's what I'm asking.
17        A.    But --
18        Q.    Not --
19        A.    -- not Stevens.
20        Q.    Okay.  So they didn't take into
21   consideration the previous company that
22   they acquired when they did severance
23   packages?
```

147

```
 1        A.    Yes.
 2        Q.    They wouldn't have given him
 3   any credit for the years he worked for the
 4   previous company?
 5        A.    When Westpoint Home took over
 6   Westpoint Stevens, as of I think August 5th
 7   of '05, that was the hire date, so to
 8   speak.
 9        Q.    For all employees?
10        A.    Yes.
11        Q.    And you said it was one week of
12   severance per one year?
13        A.    Yes.  Something like that.
14        Q.    And that's all they got?
15        A.    Yes, to my knowledge.
16        Q.    Are they transferring people to
17   other plants and all that, too, or is
18   everybody just being let go?
19        A.    There were some hourly jobs
20   like at the Chipley plant, but as far as
21   anyone else, no.  When second and third
22   went, when everybody went, they --
23        Q.    What about your job?
```

146

```
 1        A.    No.
 2        Q.    Okay.  When did Westpoint Home
 3   take over --
 4        A.    August.
 5        Q.    -- Westpoint Stevens?
 6        A.    August of '05.
 7        Q.    So the most anybody could have
 8   gotten that was an employee of Westpoint
 9   Stevens before then would have been I guess
10   two years -- I mean they would have been
11   given credit for being there for two years?
12        A.    Under Westpoint Home?
13        Q.    Uh-huh.
14        A.    Yes, because they --
15        Q.    So if Mr. Lee would have lasted
16   until August when his -- this past August
17   when his shift was terminated completely or
18   eliminated, then -- or the third shift was
19   eliminated completely, then the most
20   severance he would have gotten would have
21   been two weeks?
22        A.    If he stayed until now?
23        Q.    Yes.  That's what I'm asking.
```

148

```
 1        A.    What about it?
 2        Q.    Well, what are you going to do?
 3        A.    I am searching just like
 4   everybody else.
 5        Q.    So the company hasn't talked to
 6   you about continuing to be an employee of
 7   Westpoint Home?
 8        A.    No.  Unh-unh.  I have -- I
 9   mean, my date I was -- everybody that's
10   left was given a letter, and the last
11   letter I received takes me I think through
12   the beginning of October.
13        Q.    So as far as you know, after
14   that, you won't have a job with Westpoint?
15        A.    Exactly, unless something
16   happens.  I'm praying.
17        Q.    What did you review?  Did you
18   review anything to prepare for today's
19   deposition?
20        A.    Other than my declaration.
21        Q.    That's all you reviewed was
22   your declaration?
23        A.    Yes.  I can't remember the name
```

1   of the other paper.
2          MS. PATE:  The brief.
3      A.      The brief.  Yeah.
4      Q.      Motion for summary judgment
5   brief?
6      A.      Uh-huh.
7      Q.      Have you looked at Mr. Lee's
8   deposition testimony?
9      A.      I'm not sure if I've seen his
10  deposition.  I'm not sure.
11     Q.      So you don't know if you read
12  it or not?
13     A.      I'm not a hundred percent sure.
14     Q.      Other than talking with your
15  attorney, did you talk with anybody else
16  about your deposition today?
17     A.      Just my managers.  They knew I
18  was coming down here.  But specifically
19  about what to do, what to say, no.
20     Q.      Well, let me review my notes
21  and I think that's about it.  Let me look.
22          (Off-the-record discussion)
23     Q.      Have you ever received a

1      A.      For I want to say poor job
2   performance.
3      Q.      Have you ever received or been
4   talked to about not disciplining
5   supervisors or employees?
6      A.      No, not that I can remember.
7      Q.      Do you remember being
8   disciplined, the reasons they stated poor
9   job performance?
10     A.      On mine?
11     Q.      Yes.
12     A.      I think mine -- my poor job
13  performance was based on I guess my time
14  framing and getting things done, to my
15  knowledge, from what I can remember.
16     Q.      All right.  Do you remember
17  when the last time you received any type of
18  warning about your job performance?
19     A.      Just that time we were just
20  talking about.
21     Q.      No.  I mean, when it was, like
22  the date, month or something like that.
23     A.      No, sir.

1   personnel notice?
2      A.      Me?
3      Q.      Yes.  You personally?
4      A.      Yes.
5      Q.      For what?
6      A.      I guess keeping my hourly and
7   salary myself.
8      Q.      I guess let's just limit it to
9   when you've been a salaried managerial type
10  position.
11     A.      Here?
12     Q.      Uh-huh.
13     A.      I can't -- have I received any
14  since I was here?  I haven't received a
15  personnel notice since I was here, no.  I
16  don't think so.
17     Q.      Have you received any kind of
18  warnings or written notices?
19     A.      Since I've been --
20     Q.      Since you've been in the
21  Abbeville plant?
22     A.      Yes.
23     Q.      For what?

1      Q.      Was it this last year?  Was it
2   in '07?
3      A.      No.
4      Q.      '06?
5      A.      It was either the end of '05,
6   the beginning of '06.  Somewhere around
7   that time.
8      Q.      So you haven't received any
9   kind of warning or anything like that,
10  personnel notices in '07?
11     A.      No.
12     Q.      Has anybody talked to you in
13  '07 about your job performance?
14     A.      No.  Not poorly.
15     Q.      I'm sorry.
16     A.      Not poor job performance, no.
17     Q.      Do you get a yearly review?
18     A.      Yes.
19     Q.      And who does your yearly
20  review?
21     A.      It would be my boss, HR
22  manager.
23     Q.      Who is that?

153

```
 1        A.    Brent Murphy.
 2        Q.    Okay.  And for the '06 review,
 3   what was your overall rating?
 4        A.    I don't remember.
 5        Q.    Are yours the same as Claude's,
 6   the one you gave Claude?  Is it the same
 7   format?
 8        A.    Uh-huh.  Yes.
 9        Q.    And you don't remember if it
10   was above requirements, meets requirements,
11   fair?
12        A.    Actually, I don't believe it
13   was above requirements.  I don't believe it
14   was above requirements.
15        Q.    So it was either meets
16   requirements, fair or marginal?
17        A.    I don't believe it was
18   marginal.
19        Q.    Okay.  So that gets us down to
20   meets requirements or fair?
21        A.    One of the two, yes.
22        Q.    Okay.  Were you ever talked to
23   about Claude Lee, about disciplining Claude
```

155

```
 1             MS. PATE:  Sure.  I don't know
 2                which one you want.  Those
 3                were the two.
 4             MR. TIDWELL:  Is this Exhibit 13
 5                to Mr. Lee's deposition?
 6             MS. PATE:  Uh-huh.
 7        Q.    All right.  The corrective
 8   action reports that we briefly talked about
 9   before, did you ever give Mr. Lee a
10   corrective action report?
11        A.    No.
12        Q.    Let me show you what's been
13   previously marked as Exhibit 13 to Claude
14   Lee's deposition.  And this is a corrective
15   action report given by Mike Alford to
16   Claude Lee.  It's dated 3/8, March 8th of
17   '06.
18        A.    Okay.
19        Q.    Have you ever seen that?
20        A.    This one or the form?
21        Q.    No.  That actual one.
22        A.    No.
23        Q.    Okay.  Now let's go to the
```

154

```
 1   Lee?
 2        A.    I'm not sure.  I'm trying to
 3   think.  I'm not sure.
 4        Q.    You're not sure if anybody ever
 5   said, Hey, you need to -- you need to
 6   discipline Claude Lee.  You need to write
 7   Claude Lee up.  Anything like that?
 8        A.    No.
 9        Q.    You're not sure, or no, nobody
10   ever said that?
11        A.    I'm not sure.
12             MR. TIDWELL:  Kelly, do you have
13                that corrective action from
14                Mike Alford handy?
15             MS. PATE:  Which one?
16             MR. TIDWELL:  I guess the last
17                one before Mr. Lee's
18                termination.  I've got it
19                somewhere, but you might be
20                able to save some time.
21             MS. PATE:  Here you go.
22             MR. TIDWELL:  Can I look at that
23                real quick?
```

156

```
 1   form.  Is that the normal form for a
 2   corrective action report?
 3        A.    I believe so.  Yes.
 4        Q.    Okay.  This corrective action
 5   report lists I guess reasons Mike Alford
 6   thought that Mr. Lee was doing a poor job.
 7   What I want to point out to you is where it
 8   says right here if not fully in control of
 9   his position as a supervisor in the
10   packaging department within two weeks, and
11   then it goes on to state including improper
12   communications with management, Claude
13   could be immediately removed from his
14   current position as a supervisor.
15        A.    Okay.
16        Q.    Now, would you take that to
17   mean that Claude is given two weeks to pull
18   his performance up to what Mike Alford
19   wants it to be?
20             MS. PATE:  Object to the form.
21        A.    Can I read it again?
22        Q.    Sure.  It's this right here,
23   starting right there.  And you can read the
```

157

```
1    whole thing if you want.
2         A.    Okay.  Ask your question again.
3         Q.    Would you take that to mean
4    that Claude had two weeks to improve up to
5    Mr. Alford's standards?
6              MS. PATE:  Object to the form.
7                   Go ahead.
8         A.    Okay.  From the way I
9    understand it, I guess it seems like to me
10   it's within two weeks.
11        Q.    So he would have I guess up to
12   two weeks to improve.  Is that what you're
13   saying?
14        A.    That's what I'm getting from
15   it.
16        Q.    Okay.  Now, I've got another
17   corrective action report from Mr. Alford.
18   And this is dated 3/11/06.  Have you ever
19   seen this one?  Let me show it to you.
20   This is marked as Defendant's Exhibit 14 to
21   Claude Lee's deposition?
22        A.    I don't think so.
23        Q.    Okay.  You've never seen that?
```

158

```
1         A.    I don't think so.
2         Q.    This states that Claude is
3    immediately removed from his current
4    position as supervisor in the packaging
5    department, and it's signed by Mike Alford.
6    And I'm going to let you -- you probably
7    know better than I.  That looks like Brent
8    Murphy?
9         A.    That's Brent.  Uh-huh.
10        Q.    Brent Murphy.  Do you know of
11   any reason why Claude was not given two
12   weeks, he was only given three days?
13        A.    No.
14        Q.    You don't have any knowledge
15   about that?
16        A.    No.
17             MR. TIDWELL:  That's all I have.
18             MS. PATE:  I just have just a
19                  couple.
20             MR. TIDWELL:  I'm sorry.  One
21                  more thing.
22        Q.    (Mr. Tidwell continuing:)  Do
23   you feel Mr. Lee was terminated because of
```

159

```
1    his race?
2              MS. PATE:  Object to the form.
3         A.    No.
4              MR. TIDWELL:  That's it.
5              MS. PATE:  Okay.
6              MR. TIDWELL:  Wait.  One more.
7                   Sorry.
8         Q.    (Mr. Tidwell continuing:)  Do
9    you feel that his race had anything to do
10   with his termination?
11             MS. PATE:  Object to the form.
12        A.    No.
13        Q.    Nothing at all?
14        A.    No.
15             MR. TIDWELL:  Okay.  That's all I
16             have.
17             MS. PATE:  I just have a couple.
18                  EXAMINATION
19   BY MS. PATE:
20        Q.    You talked earlier about  possibly
21   Mr. Lee's shift positively having fewer
22   employees than the other shifts.  Did you
23   believe that Mr. Lee had enough employees
```

160

```
1    to do his job?
2         A.    Yes.
3         Q.    When you did the yearly
4    performance evaluation for Mr. Lee in
5    January of 2005, did you also do
6    performance reviews for any of the other
7    shift supervisors?
8         A.    Yes.
9         Q.    Who did you do performance
10   reviews for?
11        A.    Mike Etheridge and Billy Wayne
12   Bedsole.
13        Q.    And those were the white
14   supervisors on the first and second shifts?
15        A.    Yes.
16        Q.    And did you also review the
17   performance reviews that you did for Mike
18   Etheridge and Billy Wayne Bedsole with
19   Mr. McCants like you did with Mr. Lee's?
20        A.    Yes, ma'am.
21        Q.    And what happened when you
22   reviewed those performance evaluations for
23   Mr. Etheridge and Mr. Bedsole with
```

Mr. McCants like you did with Mr. Lee?

A.    Mr. McCants, he made the recommendations on Mr. Bedsole and Mr. Etheridge, performance review, also, and based on his recommendations, some changes were made to their performance reviews, also.

Q.    Do you remember if the changes you made based on his recommendations were changing ratings upwards or changing ratings downwards?

A.    I think they was more or less I think downward.  I'm going to say more or less downward.

Q.    Okay.  You mentioned that the February 2006 personnel notice that you gave Mr. Lee, you also gave a similar personnel notice to Mr. Etheridge and Mr. Bedsole; is that right?

A.    Yes.

Q.    When you gave that personnel notice in February to Mr. Lee, did you sit down with him and talk with him

---

from his supervisory position; is that right?

A.    Yes, ma'am.

Q.    Were you aware whether or not he began training for that job?

A.    Yes, ma'am.  I was I guess actually on first shift still working in the packaging department.  But that morning when he came in, like I said, I saw him come in, and I'm not sure if I shook his hand and said good morning or whatever.  But we had an instructor that -- being that he was coming in to drive a forklift, it was standard procedure to get your training, whether it was retraining or training.  And his instructor -- he got with an instructor, and the instructor started going over the forklift with him and training him on the forklift.

Q.    And how did you become aware of that?

A.    Of the training?

Q.    Uh-huh.

---

specifically about the issues that you were having?

A.    Yes, ma'am.

Q.    Do you remember what generally you discussed with him?

A.    Usually if I'm giving someone a personnel notice, what I'll do is I'll explain to them the reason they're getting the notice and then I'll explain, go through the notice with them.  And if it was something that they didn't agree with, I mean, they don't have to sign it if they don't want to.  But I try to explain it with them and let them know exactly what it is before I ask them to sign.  And it's their option whether they want to sign or not.

Q.    And you did that with Mr. Lee?

A.    Yes.  I did that with all three of them.

Q.    I believe you mentioned knowing that Mr. Lee was offered another job, a forklift driver job after he was removed

---

A.    Well, I guess what -- after -- I don't know exactly how long.  Maybe an hour or a couple of hours, then the instructor comes to me.  I guess it might have been right at first break.  But the instructor comes to me and asked me have I seen Claude.  And I told him, No.  Why?  And he said, Well, he came back and the forklift was parked in the back but Claude was nowhere around.

Q.    Okay.  This corrective action report that Mr. Tidwell showed you that is Defendant's Exhibit 13 to Mr. Lee's deposition, down at the bottom it says follow-up conference date, two weeks or less?

A.    Uh-huh.

Q.    Do you know what that means, what that's used for?

A.    I believe that after issuing this corrective action, you will be reviewed again within that time period.

Q.    Okay.

165

1        A.    I believe.

2            MS. PATE:  Okay.  That's all I

3               have.

4            MR. TIDWELL:  I have one more

5               question.

6             EXAMINATION

7  BY MR. TIDWELL:

8        Q.    This goes back to your 2005

9  review of Mr. Lee.  Do you recall ever

10  stating to Mr. Lee or making a comment that

11  you didn't know why they had asked you to

12  do the 2000 yearly review for Mr. Lee and I

13  guess the other supervisor?  Do you ever

14  recall making any kind of statement to

15  Mr. Lee about that?

16        A.    No, because at the time, I

17  wasn't the department manager.

18        Q.    So you never made any statement

19  regarding to Mr. Lee regarding you didn't

20  know why the management had asked you to do

21  the entire 2005 year review for Mr. Lee?

22        A.    No.

23            MR. TIDWELL:  No more questions.

166

1

2               CERTIFICATE

3

4  STATE OF ALABAMA

5  ELMORE COUNTY

6

7           I hereby certify that the above

8  and foregoing deposition was taken down by

9  me in stenotype and the questions and

10  answers thereto were transcribed by means

11  of computer-aided transcription, and that

12  the foregoing represents a true and correct

13  transcript of the testimony given by said

14  witness upon said hearing.

15           I further certify that I am

16  neither of counsel, nor of kin to the

17  parties to the action, nor am I in anywise

18  interested in the result of said cause.

19

20

21          _____

22        VIRGINIA DENESE BARRETT

23        MY COMMISSION EXPIRES 5/23/11

Deposition of Frank Lamont Major, III                    Page 1

--------------
         A
--------------
Abbeville 13:
 16; 20:15; 21
 :21; 22:15,18
 ; 26:5,13,18;
 27:3,21; 58:
 21; 96:12;
 106:16; 143:
 22; 150:21
ability 113:9
able 45:6; 62:
 2; 70:22; 84:
 8; 85:20; 113
 :18; 114:6,11
 ; 154:20
about 13:17;
 19:13; 22:17;
 27:16; 28:3,
 13; 30:18,20,
 21; 32:12,16;
 37:19,22; 38:
 4,16; 39:1,15
 ,16; 40:7,19;
 42:8,11,21;
 43:13,16,23;
 46:13,15; 52:
 15; 54:12,14,
 20; 55:6,19;
 57:12; 60:20;
 62:4,23; 64:
 10; 66:22; 68
 :16; 71:21,22
 ,23; 76:2,5;
 83:1; 84:1;
 87:17; 90:6;
 92:5,21,22;
 94:20; 96:7,
 13; 98:18; 99
 :3,11,13; 102
 :18; 103:7,18
 ; 105:17,18;
 106:7; 112:5;
 116:1,5; 117:
 2; 118:16;
 120:5; 125:6,
 19,21; 127:2,
 4,13; 130:17;
 137:3,6; 138:
 2; 140:18,21,
 23; 141:4,6,9
 ; 142:6; 147:
 23; 148:1,6;
 149:16,19,21;
 151:4,18,20;

152:13; 153:
 23; 155:8;
 158:15; 159:
 20; 162:1;
 165:15
About 38:22
above 108:6,20
 ; 110:3; 153:
 10,13,14; 166
 :7
absence 15:5;
 32:3
accepted 27:17
accident 118:
 22; 119:4
Accidents 118:
 19
accomplishment
 s 115:5
Accomplishment
 s 114:20
accordance 1:
 13
according 73:
 21; 93:5; 94:
 2; 136:12
accountability
 45:21; 64:6;
 70:9; 73:5,9,
 11,13; 83:15
accountable 64
 :2; 77:4
acquired 145:
 22
acronym 62:10
acting 36:8;
 93:19
action 83:22;
 122:9; 124:7,
 19; 125:3,4,
 13,14; 126:5,
 6; 154:13;
 155:8,10,15;
 156:2,4; 157:
 17; 164:11,21
 ; 166:17
actions 122:4;
 125:12
actual 23:9;
 39:10; 96:14;
 155:21
actually 7:10;
 9:9; 21:16;
 127:20,21;
 131:4; 137:7;
 ; 144:3,6;

163:7
Actually 153:
 12
adapt 113:10,
 18; 114:11
address 7:18
addressed 121:
 21
administration
 83:6
administrative
 83:21
Administrative
 110:2
admit 44:13,22
advised 1:21
affect 6:22
affecting 51:
 14
affirmed 6:3
afford 9:11
after 9:7; 10:
 5; 12:2; 36:6
 ; 102:10,21;
 123:23; 124:5
 ; 127:9; 132:
 13; 138:5,14;
 140:4; 148:13
 ; 162:23; 164
 :1,20
After 108:23;
 110:3
Again 70:3
again 9:19; 53
 :7; 64:5,7;
 80:12; 89:10;
 91:4; 101:5;
 110:7; 135:8;
 156:21; 157:2
 ; 164:22
against 19:2,6
 ,20
agree 162:11
agreed 103:12;
 111:2
AGREED 2:12,21
 ; 3:5,13
ahead 9:20; 33
 :20; 47:10;
 67:19; 70:19;
 72:6; 73:7;
 75:8; 78:14;
 82:15; 111:13
 ; 112:9; 129:
 7; 157:7
aided 166:11

ALABAMA 1:2; 2
 :2; 5:2; 166:
 4
Alabama 1:14;
 2:19; 5:15,19
 ; 7:17,20
alcohol 7:3
Alford 58:16;
 92:5,8; 133:
 15; 135:19;
 136:11,13,22;
 137:3,22; 138
 :7,16,18; 139
 :11,15; 140:
 18; 141:8,19;
 142:16,20;
 143:3,12; 154
 :14; 155:15;
 156:5,18; 157
 :17; 158:5
Alford's 92:16
 ,19; 157:5
almost 14:17;
 125:8
alongside 105:
 6
Alongside 105:
 9
already 23:1;
 34:1; 37:13;
 57:15; 66:7,
 10; 67:16; 72
 :3; 95:11;
 127:5,6
although 44:19
 ; 100:22
Although 35:6;
 100:15; 113:
 20
Amended 1:15
amount 46:19;
 47:16
analyzed 50:16
announced 20:
 16,23; 21:15,
 16; 26:7
annual 94:12
another 6:15;
 12:4; 26:10;
 35:1; 58:12;
 121:2; 157:16
 ; 162:22
answer 19:16;
 47:7; 54:7;
 85:10; 90:12;
 129:8

Deposition of Frank Lamont Major, III                    Page 2

answered 100:6
answering 101:3
answers 166:10
Anthony 93:15, 16; 94:1
anybody 16:12; 123:5; 131:9, 12; 135:15; 142:15; 146:7; 149:15; 152:12; 154:4
anywise 166:17
Apartment 7:19
apparently 113:23
appear 143:6
appearing 5:16, 19
appears 101:16; 114:10
apply 120:23; 121:9; 123:18; 124:11
approval 74:17
approximately 139:12
Approximately 98:21
April 10:18; 21:18
area 128:18
areas 83:7,21; 141:1
ARENDALL 5:13
arose 135:23
around 12:4; 27:20; 43:2; 47:14; 54:5; 64:15; 65:5; 69:18; 70:4; 73:2; 80:16; 105:12,15; 106:17; 139:3; 152:6; 164:10
assign 3:8
assistant 12:15,20; 13:6; 18:2; 25:7; 28:1,4,14; 29:7; 30:16; 31:2,11; 32:23; 33:5; 35:22; 36:1; 97:2; 136:19

Assistant 12:19; 17:13,14, 15
assisted 18:5; 28:17
associate 17:11; 19:18; 20:4; 86:13; 122:16; 123:23; 124:6,22; 125:23
associates 16:1; 40:17; 45:22; 54:9,12, 17,19,20; 55:3,18; 56:4; 64:2,14; 67:20; 73:15; 83:16,23; 84:2; 89:12; 90:9, 16,21,22; 107:16; 124:15; 126:1; 127:1,8
assure 126:21
attached 82:20; 93:1; 99:21; 119:16
attend 8:18
attended 8:14; 9:17
attention 61:17
attorneys 37:1
attribute 48:21
August 1:19; 2:19; 144:5,6; 146:4,6,16; 147:6
average 49:5; 52:2
aware 85:13; 111:18; 163:4, 20
---------------
B
---------------
Back 12:8
back 14:22; 20:13; 24:20; 25:22; 27:18; 42:2,5,6; 49:5; 56:13; 58:7; 61:23; 64:22; 76:12,19;

87:19; 97:17; 106:22; 113:17; 126:13; 130:13; 132:8; 164:8,9; 165:8
bad 72:19
Balch 2:17
BALCH 5:17
Barrett 1:16; 2:16
BARRETT 5:12; 166:22
based 19:6; 47:16; 48:4; 77:21; 79:9,10; 82:7; 100:7,8; 107:3; 110:21; 111:1; 140:16; 151:13; 161:5,9
Based 112:16
basic 6:10,11; 38:7; 55:7
Basically 22:19; 24:2; 28:16; 31:7; 121:13
basically 13:13; 18:8; 62:17; 104:17; 121:17; 128:2,6; 133:2; 136:5
basing 132:12
basis 24:17; 119:19; 141:12
became 12:12, 14; 98:23; 99:5
become 163:20
becoming 37:9; 45:8; 111:23
Bedsole 44:12; 129:5; 135:4; 160:12,18,23; 161:3,19
Bedsole's 50:20
began 163:5
beginning 21:19,22; 22:4; 148:12; 152:6
behalf 5:16,20
believe 20:23;

21:15; 26:11; 40:11; 42:14; 94:9; 118:21; 121:20; 126:4; 127:20; 144:12; 153:12, 13,17; 156:3; 159:23; 162:21; 164:20; 165:1
below 72:14
best 6:14; 11:19,20; 78:11; 81:8; 94:21; 95:3
better 22:22; 27:9; 50:19, 23; 53:19; 63:6; 158:7
Between 30:17
between 2:13; 22:1; 59:6; 76:22; 122:6
big 45:12; 80:10; 82:6
bigger 13:15; 82:3
biggest 45:14; 64:21
Billy 44:12; 50:20; 129:5; 160:11,18
BINGHAM 5:17
Bingham 2:18
Birmingham 5:15
birth 7:21
bit 7:12; 13:15; 22:17; 139:13
blank 122:4
board 26:2
Bob 25:13; 31:21; 32:4,6,7; 36:10,12; 37:14; 42:16; 43:21; 97:10; 129:23; 130:4
book 74:3,7; 80:1; 126:2,3,13
boss 152:21
both 76:5
bottom 164:14
box 120:6
break 6:17,19;

Deposition of Frank Lamont Major, III                    Page 3

130:12; 164:5
Brent 133:20,
  21; 153:1;
  158:7,9,10
Brief 130:14
brief 37:2;
  149:2,3,5
Briefly 10:14
briefly 92:4,
  21,22; 155:8
bring 52:3
broken 52:13
brought 26:16,
  19
Bubba 26:20,21
bulletin 26:2
bunch 78:15
-------------
      C
-------------
calculate 46:2
calculated 48:
  15
call 18:17; 19
  :17; 74:3;
  125:9; 126:1,
  17; 129:12;
  130:4,8
called 27:17;
  31:15,18; 62:
  8
came 21:13; 26
  :15; 57:9,10;
  58:16; 101:22
  ; 132:20; 138
  :7; 163:9;
  164:8
capacity 31:6;
  32:1; 97:8
care 57:7; 71:
  14,21,22,23;
  77:5; 87:3,7
Carolina 8:5,
  23; 10:9,11;
  13:1,4,6,10,
  19
CASE 1:4; 2:4;
  5:4
case 82:7
cases 78:21;
  124:20
caught 33:10,
  11
cause 135:23;
  166:18
center 93:22;

144:15
cents 117:15,
  16; 118:4,5
Certain 50:7
certain 42:3;
  44:16,18; 48:
  8,9; 49:14;
  50:1,6; 60:14
  ,15; 128:18
certainly 45:4
  ; 114:2
CERTIFICATE
  166:2
certify 166:7,
  15
chain 19:21;
  20:1,7
change 15:7;
  74:6,12; 80:
  15; 103:10;
  107:6,13; 110
  :18; 111:9;
  113:23
changed 36:5;
  101:16; 103:
  13; 108:6;
  109:1,6; 110:
  4,5; 111:2,3;
  114:15,16
changeover 82:
  5
changeovers 63
  :6
changes 63:3;
  88:13; 107:2;
  113:10,18;
  114:11; 161:6
  ,8
changing 110:
  15; 161:10
charge 18:4;
  22:13; 28:19;
  45:6; 62:3;
  96:11; 114:6;
  138:17
check 109:22;
  120:10,15
Chipley 147:20
chosen 121:7
circle 120:9
circled 121:20
circumstances
  32:5; 92:15;
  135:23
Civil 1:14
claim 84:17

claiming 84:17
clarify 128:23
Claude 33:16;
  34:10; 37:4,
  10,14; 39:2;
  48:18; 50:9;
  52:20; 53:10;
  54:2; 55:11,
  18,20; 56:6;
  64:18; 66:16;
  67:11; 69:13,
  22; 80:7; 102
  :21; 103:1;
  107:15,21;
  114:21,23;
  115:2,6; 121:
  18,22; 128:1;
  129:18; 136:
  17; 137:12;
  138:18; 153:6
  ,23; 154:6,7;
  155:13,16;
  156:12,17;
  157:4,21; 158
  :2,11; 164:7,
  9
CLAUDE 1:5; 2:
  5; 5:5
Claude's 35:5;
  50:15; 53:23;
  113:8; 153:5
Clemson 8:9,10
  ,18; 9:5; 10:
  6,10; 11:3;
  13:15; 20:16,
  21; 26:2,4,7;
  87:19,21
clerk 11:12;
  12:1; 14:12,
  16
close 20:22;
  21:11
closed 21:3,4
closing 20:17;
  26:7
clue 80:14
cold 28:7
college 8:6
colleges 9:14,
  23
color 19:3
come 20:13; 21
  :10; 29:16;
  54:4; 56:6;
  57:2; 64:13,
  22; 130:12;

163:10
comes 78:18;
  80:2; 164:4,6
comfortable 20
  :6
coming 24:14;
  149:18; 163:
  13
command 19:21;
  20:1,8
comment 109:3;
  110:9; 165:10
comments 107:
  14; 110:16
COMMISSION 166
  :23
Commissioner 2
  :17; 3:14; 5:
  12
communicating
  83:17
Communication
  83:16
communication
  83:6; 108:19
communications
  156:12
company 19:10,
  12; 21:10,13;
  27:8; 45:7,16
  ; 101:11; 111
  :19,21; 114:8
  ; 125:10; 128
  :2; 130:5;
  141:22; 142:2
  ; 144:19; 145
  :21; 147:4;
  148:5
compare 13:10;
  41:14,21
compared 39:9;
  53:3
competitor 45:
  9
complain 56:13
complaining 56
  :6
complaint 19:
  14; 20:4; 54:
  7
complete 123:
  11
completed 8:17
  ; 92:23; 93:5
  ; 94:4,8
completely 146

Deposition of Frank Lamont Major, III                     Page 4

:17,19
completing 93:
6
compliance 3:1
computer 166:
11
concerned 122:
14
conducted 18:7
conference 164
:15
confident 100:
3
consider 31:11
consideration
145:21
consistent 128
:17
consists 13:13
continue 78:13
; 127:1,8
continuing 148
:6; 158:22;
159:8
Continuous 11:
8
contradict 113
:12
control 156:8
conversation
38:16; 39:15;
40:7,9; 43:18
; 54:17,23;
141:3,13
conversations
38:6; 39:5,11
; 95:19; 141:
16
coordinator 73
:20; 74:5,11;
75:11,15,22;
76:15; 77:10,
16; 78:1,6,7;
79:5,6,7,15,
16,17,23; 80:
15
coordinator's
74:19; 80:22;
81:6
copy 107:8;
111:15
corner 119:23;
120:17
Correct 37:12;
129:21
correct 23:12;

34:11,13; 37:
11; 75:6; 77:
7; 94:7; 101:
13; 114:18;
127:9; 129:20
; 138:23; 166
:12
Corrective 122
:4
corrective 122
:8; 124:7,19;
125:3,4,14;
126:4; 154:13
; 155:7,10,14
; 156:2,4;
157:17; 164:
11,21
cost 117:13;
118:9
costs 117:20
couldn't 14:8;
18:21; 39:3;
59:18; 106:15
Couldn't 9:11
counselling
122:8,20; 123
:11; 124:16
counsellings
122:3
COUNTY 166:5
couple 24:13;
27:15,16; 50:
17; 158:19;
159:17; 164:3
covered 126:21
covers 99:22
credit 146:11;
147:3
critique 32:12
; 105:20
Cross 8:22
curious 52:15
current 63:12;
143:20; 156:
14; 158:3
CV 1:4; 2:4; 5
:4
--------------
          D
--------------
data 11:12; 12
:1; 14:12,15,
21
date 7:21; 38:
20; 39:19; 43
:18,20; 94:3;

139:2; 147:7;
148:9; 151:22
; 164:15
dated 93:1;
155:16; 157:
18
dates 24:23;
56:20; 60:20;
104:12
day 1:19; 2:19
; 23:19; 29:
17,18; 30:5,
12,19; 35:4,
14; 53:14; 54
:1; 89:3; 104
:19; 105:4;
137:11
days 23:15,16,
18; 27:15,16;
29:13,14,15,
16; 34:5,14;
47:6; 48:8;
54:6; 60:14;
158:12
dealing 16:16
deals 18:19
December 25:2;
36:21; 37:3,
19,21; 42:14;
59:6,9; 97:15
decided 93:21;
136:6,13
decision 93:20
; 131:5
Declaration 4:
8
declaration 36
:23; 44:17;
52:22; 58:7;
62:1; 82:16,
23; 93:2; 113
:13,16; 138:
12; 148:20,22
declarations
75:3
Defendant 1:9;
2:9; 5:9,20
Defendant's
157:20; 164:
13
deficient 79:
18
definition 77:
1; 78:3
delivering 1:
17

DENESE 5:12;
166:22
Denese 1:16; 2
:16
department 10:
22; 13:16; 15
:12,15; 17:3;
20:8,9; 25:7,
8,10,12; 28:1
,14,18,20; 29
:8; 30:16; 31
:2,9,11,20;
32:23; 33:5;
34:19; 35:22;
36:2,9,20; 37
:6,10; 39:1,
15; 44:14,19;
51:20; 53:10;
56:23; 58:12;
63:1; 64:8;
66:14,15; 83:
20; 88:13,14;
92:6,13; 93:
19,23; 95:7;
97:3,4,11;
102:1; 104:6;
112:6,17; 113
:9,21; 114:5;
117:4; 127:17
; 128:2,8;
129:19; 133:
12,15; 136:9,
19; 156:10;
158:5; 163:8;
165:17
department's
39:6
departments 13
:12,14
depending 35:
14
depends 49:10,
18; 86:18
deposition 2:
14,22,23; 3:
10,14; 6:10;
7:7; 148:19;
149:8,10,16;
155:5,14; 157
:21; 164:14;
166:8
DEPOSITION 1:
12
depositions 3:
3
description 22

Deposition of Frank Lamont Major, III                     Page 5

:8
deserves 126:7
desirable 86:
  14; 89:21
determines 66:
  12
difference 76:
  22; 122:6,10
different 13:
  18; 14:10; 15
  :6; 20:18; 49
  :22
difficult 11:
  14
dig 7:11
Direct 94:22
direct 28:23;
  37:5,11,15,18
  ; 41:23; 58:9
  ; 59:1,5; 94:
  19; 95:2,4;
  97:14,21; 98:
  3; 99:1,5;
  130:1; 136:21
  ; 138:14
directed 129:
  17,18
directly 113:
  17
director 12:16
  ,20; 58:20;
  59:1; 143:21
disagree 89:8,
  17; 90:5,14;
  116:9
disbelieve 137
  :8
disciplinary
  83:22
discipline 32:
  8; 69:16; 72:
  15,18; 105:20
  ; 154:6
disciplined 32
  :17; 98:17;
  151:8
disciplining
  151:4; 153:23
discrepancy
  108:16
discriminate
  19:2
discriminated
  19:6,20
discrimination
  16:9; 18:14,

19; 19:13
discrimination
  s 19:12
discussed 162:
  5
discussing 103
  :12
discussion 149
  :22
dispute 84:9,
  16; 85:1,6,8,
  21; 86:1; 91:
  22
distribution
  93:22; 144:15
DISTRICT 1:1,2
  ; 2:1,2; 5:1,
  2
DIVISION 1:3;
  2:3; 5:3
document 93:9
documentation
  129:15
documents 109:
  15,21
doing 12:22;
  14:8; 34:17;
  46:5; 47:14;
  51:13; 53:19;
  54:21; 56:8;
  57:3; 65:5;
  66:5; 69:12;
  70:4; 72:18,
  19; 79:19; 87
  :22; 88:5; 96
  :20; 105:12,
  13; 112:21;
  118:12; 133:3
  ; 143:6,12;
  156:6
dollar 15:8
dollars 14:17
done 22:12; 38
  :13; 67:16;
  77:21; 80:3;
  82:10; 94:13,
  20; 112:7;
  128:8; 151:14
door 19:18; 45
  :19; 51:7
Dothan 7:17,20
  ,23; 8:4; 13:
  11
doubts 112:4,
  10,15
Down 48:20

down 21:3,11;
  26:12,15,18,
  19; 27:10; 41
  :6; 48:22; 52
  :13; 54:4; 64
  :13; 66:8; 71
  :8; 103:6;
  108:3,14; 109
  :23; 110:20;
  144:2; 149:18
  ; 153:19; 161
  :23; 164:14;
  166:8
downward 161:
  13,14
downwards 161:
  11
dozen 117:13;
  118:10
drive 163:13
driver 162:23
drivers 15:14
drop 9:7,9
drugs 7:3
due 83:4
duly 6:3
duplicate 127:
  11,14
during 23:23;
  30:7; 33:8,15
  ; 58:14; 59:9
  ; 60:11,12;
  91:15; 116:6;
  118:22
During 24:10;
  30:14,23; 35:
  18,20,21; 41:
  20; 84:10; 91
  :10; 93:18
duties 18:1,6;
  22:9; 28:14;
  106:10; 108:
  10
--------------
        E
--------------
Each 47:17;
  125:23
each 11:15; 19
  :21; 68:22;
  83:11; 113:22
  ; 141:9
Eager 14:9
earlier 33:7;
  94:18; 159:20
early 67:13

easy 80:11
effect 3:1
effective 1:15
efficiencies
  53:1
efficiency 43:
  17; 44:2,15,
  20,23; 45:11,
  13,17,20; 46:
  2,3,4; 47:13,
  15,18,20; 48:
  1,4,12,14; 50
  :15,19,22; 51
  :4,9,15,19,23
  ; 52:1,3,4,7,
  16; 53:15; 54
  :8; 64:23; 65
  :2; 66:3,8,11
  ; 68:11,13,17
  ; 70:8,11,12;
  71:10,11; 72:
  14,16,21; 113
  :21; 115:12;
  116:1,17
efficient 64:9
  ; 66:23; 67:4
  ,12,16; 80:17
  ,23; 81:9
eight 35:8,16;
  47:18,19; 50:
  8; 65:13,15,
  23; 67:21; 68
  :1,8; 69:10;
  71:5,13,17;
  72:1,8,11,23;
  73:16; 118:6
either 152:5;
  153:15
Either 116:13
Electrical 9:6
eleven 29:23;
  34:2; 60:19;
  87:4; 88:21
eliminated 146
  :18,19
ELMORE 166:5
employee 18:7;
  123:16,17;
  146:8; 148:6
employees 15:
  16,17; 16:21;
  23:2,9; 46:23
  ; 47:8; 48:23
  ; 50:11; 69:
  14,18; 70:23;
  73:1; 89:5;

Deposition of Frank Lamont Major, III                    Page 6

90:4; 91:8;
96:15; 124:9,
17; 147:9;
151:5; 159:22
,23
employment 131
:2
end 20:14; 21:
18; 35:6; 52:
6; 53:14; 54:
1; 82:10; 115
:13,18; 117:
17; 118:4,5,6
,7; 152:5
ended 34:2
enforce 45:6;
62:3; 114:7
enforcing 62:6
engineering 9:
6
enough 159:23
ensure 19:5
ensuring 50:11
entail 106:13
entailed 40:9
entire 39:1,5;
48:13; 51:20;
53:15; 59:13;
95:1; 101:12;
106:11; 134:5
; 165:21
Entirely 104:9
entry 11:12;
12:1; 14:12,
16,21
Especially 53:
3
essence 67:10;
100:9
essentially 52
:21
Etheridge 44:
11; 50:18,20;
129:5; 135:4;
160:11,18,23;
161:4,18
evaluate 33:1;
100:15
evaluating 32:
20
evaluation 92:
23; 93:4,5;
101:17; 102:
11; 103:1;
160:4
evaluations

102:16; 160:
22
even 17:7; 32:
7; 34:20; 50:
22; 126:4;
127:9,10; 133
:13
Even 69:20,22
evening 23:17
everybody 145:
6; 147:18,22;
148:4,9
Everybody 15:
12; 145:7
Everybody's 55
:13
everyday 38:12
everything 69:
11; 121:21
evidence 3:10
exact 25:1; 39
:19; 40:2; 43
:17,18,20;
139:2
Exactly 39:21;
43:15; 98:20;
148:15
exactly 39:3;
40:4; 50:13;
84:21,22; 98:
9; 106:14,15;
110:22; 112:2
,3; 116:16;
141:11; 162:
14; 164:2
EXAMINATION 4:
2; 6:6; 159:
18; 165:6
example 16:9;
19:11; 51:21;
53:21; 107:6
examples 83:10
exceeding 45:3
; 114:1
except 3:6
excessive 127:
7
excited 130:17
excuse 20:10
Excuse 26:14
Exhibit 82:17,
18; 99:22;
119:17; 155:4
,13; 157:20;
164:13
EXHIBIT 4:6

EXHIBITS 4:7
exhibits 1:20
expected 47:21
; 71:1
experience 113
:8
EXPIRES 166:23
Explain 64:3
explain 30:11;
46:6; 51:17;
53:5; 65:5;
77:14; 78:10;
81:18; 93:18;
101:15; 120:
21; 121:10,14
; 162:8,9,13
explained 120:
12
extra 61:17,21
---------------
        F
---------------
facility 22:13
,15; 26:11;
106:12,16;
134:5
fact 54:3; 132
:13
facts 85:20;
86:1,5; 90:13
fair 33:14; 59
:4; 60:5; 83:
2; 107:11;
109:1; 110:5;
114:18; 153:
11,16,20
fairly 44:15,
19; 113:21
fall 142:12
far 19:22; 21:
3; 34:15,17;
38:7,20; 39:2
; 40:16; 73:
18; 77:20; 80
:10; 83:19,22
; 88:20; 111:
20; 112:12;
118:23; 120:
10; 122:13;
131:1,8; 133:
4; 142:19;
147:20; 148:
13
February 37:4;
58:9; 59:7,10
; 137:16; 138

:3,15; 161:16
,22
feel 97:19;
100:2; 111:4,
8; 158:23;
159:9
feels 19:18;
125:2
felt 94:23;
128:12
female 80:21
few 93:3; 138:
10
fewer 159:21
fifty 67:15;
118:6,7
figure 52:22;
81:7
figured 48:12;
51:20
file 109:17
filed 1:23
filing 3:13
fill 100:3;
101:11; 114:
21; 115:5;
121:3,6; 126:
12; 130:3
filled 15:4;
101:10; 102:
10,23
find 24:23; 42
:17; 64:20;
133:11
fine 43:6; 69:
12; 73:8
finished 67:12
Fired 129:10
fired 36:14,17
; 129:1,5;
142:2,7
First 115:12
first 6:2; 10:
21; 11:22; 13
:1; 21:7; 23:
7; 29:14,19;
30:10; 33:8;
39:10; 40:14;
41:14; 53:11;
66:2; 67:7;
69:9; 84:4,20
; 85:7,15,23;
86:15,20; 89:
8,15; 90:2,10
,17,21; 91:7,
15,18; 95:21;

Deposition of Frank Lamont Major, III                    Page 7

98:14,16; 115
:13,18,20;
118:5; 127:18
; 132:16; 160
:14; 163:7;
164:5
fit 46:3
five 13:17; 17
:9; 23:15; 24
:2,9,17; 25:
19; 30:17,20;
34:5,6,10; 35
:13; 47:3; 48
:22; 52:8; 57
:22; 59:15;
60:1; 61:7;
81:22; 87:6;
88:22; 104:23
; 105:3; 115:
13,20; 116:20
; 118:4,7
Five 23:16; 98
:11
flip 93:2
floor 40:22;
56:5; 83:23;
84:2; 86:13;
106:18; 111:
23
flow 22:22; 38
:10; 40:16,21
; 41:2,10; 96
:14; 127:16
flowed 28:20
focus 68:21
follow 164:15
followed 123:
10
following 39:
12; 80:6
follows 6:5;
80:8; 122:17,
20
force 3:1
foregoing 166:
8,12
forklift 162:
23; 163:13,18
,19; 164:9
form 3:6; 9:18
; 19:15; 33:
19; 40:10; 43
:14; 67:18;
70:2,18; 71:3
,18; 72:5; 75
:7,17,23; 76:

16; 80:18; 81
:10; 100:5,12
; 105:8; 108:
18; 109:8;
111:6,12; 112
:8; 113:2,14;
122:22; 129:3
,6; 131:6;
155:20; 156:1
,20; 157:6;
159:2,11
format 153:7
former 92:12;
130:1
forth 42:2,5,6
forty 17:23;
25:19,20; 48:
9,11
forward 114:8
found 133:5
Four 98:11
four 13:17; 30
:5; 50:2; 65:
19; 81:23; 82
:22; 115:9
fourth 115:15;
117:17; 118:7
; 119:3
frame 11:15
framing 151:14
FRANK 1:12; 2:
15; 6:1
Frank 4:8; 7:
14; 82:16
frequently 35:
3
front 94:3;
107:8; 116:22
; 139:7
full 3:1; 7:13
fully 156:8
further 166:15
FURTHER 2:20;
3:4,12
---------------
---------------
G
---------------
Gallery 92:12
gathering 67:
11
gave 27:14; 70
:10; 129:15;
153:6; 161:17
,21
GENE 1:5; 2:5;
5:5

general 46:15
generally 35:6
; 40:3; 162:4
Generally 142:
23
gets 38:13;
153:19
getting 28:22;
41:4; 51:2;
71:2; 151:14;
157:14; 162:8
give 11:13; 83
:9; 94:23; 97
:19; 123:2;
125:3,4; 128:
9,13; 155:9
Give 98:10
given 7:6; 34:
14; 42:19; 43
:1; 49:7; 126
:1; 127:10,21
; 128:1; 146:
11; 147:2;
148:10; 155:
15; 156:17;
158:11,12;
166:13
gives 52:6; 79
:4
giving 162:6
glad 6:14,19
Glen 102:5,7,8
goal 45:8; 114
:8; 115:12,20
; 116:1,9;
119:3
goals 115:3,9;
118:20; 119:2
,3
Goals 118:4
Gosh 122:3
got 35:15; 38:
14; 45:17; 50
:1; 51:12; 68
:21; 70:11;
78:19,20,21;
81:4; 107:8;
139:6; 147:14
; 154:18; 157
:16; 163:16
gotten 69:22;
145:13; 146:8
,20
grade 8:16
graduate 8:11,
21; 9:1

grounds 3:8
group 51:12
guess 6:10; 8:
17; 9:23; 12:
3; 18:6; 19:
20; 20:17; 24
:5; 26:8; 27:
8,17; 28:16,
18; 30:3; 31:
14; 33:6,14,
21; 37:1; 40:
5,7; 51:2,3,
18; 55:7; 56:
2; 58:16; 63:
7,10,11,14,22
; 64:4,5; 72:
16; 73:6; 81:
17; 83:13,21;
90:8; 93:9,19
; 95:6; 98:3,
10; 100:7;
115:3,17; 121
:19; 122:23;
124:13; 125:1
,8; 128:6;
133:6; 137:9,
10; 140:16;
146:9; 150:6,
8; 151:13;
154:16; 156:5
; 157:9,11;
163:6; 164:1,
4; 165:13
guide 126:1,2
---------------
H
---------------
habits 40:17,
21; 62:20; 63
:6
half 8:19,20;
9:8; 15:9; 33
:11,12; 94:20
; 95:3,5; 97:
22; 98:4,7
hand 18:9; 120
:16; 163:11
HAND 5:13
handle 19:13;
75:5,9; 77:9;
78:4
handled 75:14,
15; 76:14
handles 75:20
handling 76:23

Deposition of Frank Lamont Major, III                    Page 8

; 77:5
handwriting
  107:19; 113:5
handy 154:14
happened 36:12
  ; 58:13; 141:
  18; 160:21
happens 148:16
harassed 19:19
harassment 16:
  16
hard 11:18; 55
  :9; 60:16; 77
  :20; 116:11,
  13
harder 107:16
head 18:18; 28
  :5; 61:2; 116
  :15; 137:5
hear 105:16,19
  ; 106:3; 125:
  21
heard 92:14;
  106:1
hearing 166:14
held 11:11; 12
  :10; 13:6,18;
  25:6; 70:16
help 45:7; 76:
  4; 114:7
hereby 1:16;
  166:7
high 8:21; 9:1
  ; 44:14,15,20
  ,22; 45:13;
  46:4; 47:12;
  53:1; 113:21
High 8:22; 41:
  6
higher 41:18;
  70:16; 82:1;
  84:3,7,16,18;
  85:7,14,22
Higher 41:21
himself 57:7
hire 92:16,19;
  147:7
hired 92:13;
  95:23; 96:8
history 111:19
Hold 42:18
holding 64:1
Home 144:23;
  145:5,15; 146
  :2,12; 147:5;
  148:7

home 70:14,15
HOME 1:8; 2:8;
  5:8
Honestly 61:5
Honeysuckle 7:
  19
hooked 27:9
hopefully 64:
  23
hour 14:4,17;
  33:10,12; 35:
  1; 48:9,11;
  164:3
hourly 13:21;
  16:1; 20:3;
  54:9,12,19;
  55:2,18; 89:
  12; 90:15,21;
  91:7; 122:16;
  123:13,19;
  124:4,14; 125
  :21; 132:15;
  147:19; 150:6
hours 23:14;
  29:13; 30:5;
  47:16,18,19,
  20,22,23; 48:
  2,3,11; 57:17
  ,23; 65:13,15
  ,19,22,23; 66
  :2,6; 67:21;
  68:1,8,11,14;
  69:10,15,17;
  70:12; 71:5,
  13,17; 72:1,8
  ,11; 73:1,3,
  16; 86:17; 88
  :17; 89:22;
  90:5,18; 104:
  16,18; 164:3
hours' 72:23
Housekeeping
  41:7
However 113:19
HR 13:6; 17:15
  ; 18:2,5; 19:
  23; 130:21;
  131:8; 133:13
  ,18; 137:14;
  138:1,2; 152:
  21
huh 14:13; 15:
  21; 18:11,16;
  22:7; 26:22;
  30:15; 34:3,7
  ; 41:12; 42:1

; 44:21; 51:
  11; 52:10,18;
  59:14; 65:17;
  66:1,19; 78:
  17; 83:8,12;
  85:16,18; 88:
  4; 92:7; 94:6
  ; 96:2,9,22;
  97:5,9; 102:
  12; 103:2,5,8
  ; 104:10; 107
  :12,23; 108:8
  ,11,15,22;
  109:2; 110:6,
  10; 113:11;
  115:16; 117:5
  ; 119:18; 120
  :2; 126:8;
  129:9; 130:2,
  7; 134:14;
  142:21; 146:
  13; 149:6;
  150:12; 153:8
  ; 155:6; 158:
  9; 163:23;
  164:17
human 12:15,19
  ,20; 16:3; 17
  :11; 20:10,11
hundred 12:14;
  14:18; 21:1;
  43:11,16; 44:
  1; 45:17; 47:
  22,23; 49:6;
  51:5,22; 52:1
  ,8; 53:19; 59
  :20; 64:8; 65
  :2,16,22; 66:
  3,7,10,21,23;
  67:3,15,17;
  68:11,12; 69:
  2,6,8,11,14;
  70:10,11; 71:
  16; 72:10,11;
  81:22,23; 115
  :14; 133:14;
  136:16; 137:
  11; 149:13
---------------
      I
---------------
I'll 6:14; 109
  :22; 162:7,9
I'm 6:8,12,13;
  7:9; 12:13,22
  ; 14:16,18;

18:22; 20:13;
  21:1; 24:22;
  25:4; 28:12;
  31:14; 33:23;
  36:3; 39:12;
  40:11; 43:19,
  20; 44:5; 51:
  2,18; 52:14,
  15,22; 53:6,
  20,22; 54:15;
  55:23; 56:1,3
  ,20; 57:8; 60
  :2,17; 61:4;
  62:16; 63:7;
  64:22; 65:7,
  10,15; 67:10;
  68:20; 71:19;
  73:8; 77:7;
  78:10; 79:21;
  80:20; 81:15;
  82:14; 84:14,
  15,21,23; 85:
  1,5,10,19; 86
  :3; 87:5,17;
  91:6; 93:17;
  98:15,22; 103
  :18; 105:18,
  22; 109:17;
  113:7,15; 115
  :21; 116:3,7;
  118:19; 119:2
  ,11,13; 120:
  14; 124:2,3;
  130:19; 133:
  14; 134:10,12
  ; 137:10; 139
  :14,18; 141:7
  ; 142:3,4,13;
  145:16; 146:
  23; 148:16;
  149:9,10,13;
  152:15; 154:2
  ,3,11; 157:14
  ; 158:6,20;
  161:13; 162:6
  ; 163:10
I've 139:6;
  149:9; 150:19
  ; 154:18; 157
  :16
idea 38:21;
  134:16; 142:9
identification
  82:19
IE 66:14,15
III 1:12; 2:15

Deposition of Frank Lamont Major, III                    Page 9

; 4:8; 6:1; 7 :14
immediately 156:13; 158:3
implement 45:6 ; 62:3; 114:6
implementing 62:5
imply 113:19
important 45:4 ; 114:3
improper 127:1 ,9; 156:11
improve 157:4, 12
improvements 128:7
improving 63: 11
INC 1:8; 2:8; 5:8
incident 117:3
incidents 118: 17
including 156: 11
Incorrect 127: 16
INDEX 4:1,6
indicate 116:2 ; 120:16
indication 60: 23; 119:23; 120:3
individually 141:10
industry 45:9
ineffective 52 :20,23
influence 7:3
informing 43:8
initial 39:13
input 130:9
instead 65:22; 80:6,7; 88:15
instruct 15:11 ; 103:9
instructed 128 :9
instructing 15 :7,9
instructions 6 :11
instructor 12: 2,6; 14:21; 15:4,16; 163:

12,16,17; 164 :4,6
interact 31:3
interested 26: 10; 27:7; 124 :3; 166:18
interrupt 47: 11
interview 26: 15,18; 92:19
interviewed 27 :12
introduce 63:9
introduced 62: 7
investigated 19:22
Irving 26:20, 21; 27:13
Isn't 46:21; 84:2; 114:11
issue 124:21
issued 124:6
issues 16:3; 19:13; 162:1
issuing 164:20
---------------
        J
---------------
James 102:8
January 21:16; 99:13; 140:1, 5,12; 160:5
Jay 1:17; 5:13 ; 6:8; 75:23
job 9:21; 15: 14; 16:7; 18: 1; 22:8,9; 25 :15,23; 26:3; 27:13,17; 28: 14; 31:2; 32: 16,20; 33:2; 38:8,16; 39:6 ,16; 57:4; 58 :17; 62:20; 63:6; 73:17; 77:17; 80:19, 22; 89:7; 98: 18; 99:4; 105 :20; 106:7,9; 108:10; 112: 13,14; 119:21 ; 121:3,6; 127:1,9; 132: 15,16,19,21; 134:2; 136:5;

139:12; 140: 18; 143:7,20; 147:23; 148: 14; 151:1,9, 12,18; 152:13 ,16; 156:6; 160:1; 162:22 ,23; 163:5
Job 32:14; 108 :5
jobs 13:18,21; 27:7; 81:4,5; 90:4,10; 147: 19
judgment 37:2; 149:4
July 25:2; 142 :11
June 142:11
junior 9:23
---------------
        K
---------------
keep 68:16; 70 :7; 71:2; 101 :20; 111:15
keeping 73:20; 150:6
Kelly 5:17; 154:12
kin 166:16
kind 11:17; 20 :5; 41:9; 81: 17; 123:9; 150:17; 152:9 ; 165:14
knowing 162:21
knowledge 11: 20; 43:3; 90: 14; 92:10; 108:5,9; 112: 5,13,14,16; 116:18; 133: 22; 136:4; 147:15; 151: 15; 158:14
---------------
        L
---------------
lack 27:9
lacked 56:7
laid 144:3
Lamont 7:14
LAMONT 1:12; 2 :15; 6:1
large 108:16

last 8:13,16; 13:5; 21:2; 64:23; 66:6; 68:13; 114:14 ; 143:14; 148 :10; 151:17; 152:1; 154:16
lasted 146:15
later 11:22,23 ; 12:5; 27:22 ; 96:23
lateral 14:5; 25:16; 27:23; 28:2; 58:17; 91:19
laws 3:2
laying 144:4
layoff 21:8
lead 53:11,18
leader 56:14, 16,19
leaders 29:2; 31:4; 32:1; 134:3
leading 3:6
learn 14:9
least 50:16; 59:21,22; 60: 8; 134:18,23; 135:7
leave 21:19; 30:13,21; 35: 8
Lee 33:16; 35: 13; 37:18,23; 40:11; 42:11, 17,19; 43:7; 48:18; 52:20; 54:20; 57:3; 58:4; 59:2,5; 63:15; 70:16, 22; 72:20; 77 :9; 79:13; 83 :2; 84:6,17; 85:21; 89:4, 11,20; 90:6, 14; 91:21; 92 :23; 93:6; 95 :1; 96:5; 97: 8,14,20; 98: 17,18; 99:3; 103:15; 104:1 ,14; 105:17, 21; 106:5,7; 113:18; 114: 10; 115:17;

Deposition of Frank Lamont Major, III                    Page 10

116:8,20; 123
:3,14; 128:1;
129:15,18;
130:15,20;
131:5,10,13,
15,21; 132:9;
133:22; 134:7
,11; 135:10,
23; 136:6,14,
22; 137:1;
138:14,21;
139:10; 140:7
; 141:6; 146:
15; 153:23;
154:1,6,7;
155:9,16; 156
:6; 158:23;
159:23; 160:4
; 161:1,17,22
; 162:18,22;
165:9,10,12,
15,19,21
LEE 1:5; 2:5;
5:5
Lee's 31:15,18
; 37:4,11,14;
38:16; 39:7,
16; 40:7; 41:
13; 44:13,19;
46:14,21; 57:
12; 58:8; 59:
12; 60:18; 61
:12,16; 73:17
; 74:23; 75:4
; 77:9; 78:3;
94:19; 104:7;
105:20; 111:5
,11,18; 112:5
; 113:20; 130
:1; 140:18;
149:7; 154:17
; 155:5,14;
157:21; 159:
21; 160:19;
164:13
left 10:5; 21:
3,18; 36:16;
142:7; 143:17
,19; 144:14;
148:10
less 14:5; 15:
3; 23:5; 39:1
; 40:12; 45:
20; 47:3,8;
48:23; 49:8;
50:5; 52:1;

54:8; 55:22;
63:5,11; 64:1
,20; 70:9; 75
:10; 77:5; 80
:8; 82:4; 83:
15,17; 86:14;
89:21; 117:3;
140:13; 161:
12,14; 164:16
lesser 70:23
letter 148:10,
11
letting 121:18
lift 11:22; 14
:5; 15:13,19;
16:5; 132:16,
19,21; 133:9
limit 150:8
limited 57:17;
59:5
Line 52:11
line 19:1; 47:
17,19; 48:3,
10,15; 49:17,
23; 50:3,4,12
; 51:21,23;
52:3,5,12; 53
:3; 54:4; 64:
14,16; 65:12,
18; 66:16; 68
:22; 69:1,5,7
; 72:13; 73:
21; 77:17;
113:22; 141:1
lines 41:6,12;
46:10,20; 48:
18; 50:2,6,7,
10; 51:10; 52
:2; 53:9,19,
23; 64:6,15;
65:4; 74:22;
77:16; 79:12
Lingo 56:17;
57:2,10
list 26:3; 81:
18; 82:12
listed 13:17;
126:3
listen 68:2
listening 53:
22
lists 156:5
little 7:12;
13:15; 14:4;
22:17; 68:1,6
,17; 82:5;

107:16; 139:
13
live 7:15; 8:3
lived 8:1
long 11:2,16;
24:20; 34:22;
36:1; 71:16;
87:2,15; 98:8
; 112:2,3;
137:3; 164:2
longer 58:8;
98:12; 130:5;
139:13; 141:
21; 144:10
look 81:6; 93:
3; 110:8; 113
:3; 139:1;
149:21; 154:
22
looked 50:16;
149:7
looking 52:15;
62:1; 99:21
looks 109:3;
110:7,8; 115:
8; 117:14;
158:7
Looks 109:4
lost 51:18; 89
:4,11; 118:16
,21
Lost 119:4
lot 45:20; 60:
12; 62:21; 90
:3
low 41:5,11;
42:8,12; 72:
15
lower 41:19,22
; 81:14; 82:3
; 111:9
lowest 83:1,2
--------------
M
--------------
ma'am 160:20;
162:3; 163:3,
6
Machine 11:21
machine 10:20;
11:2; 14:1,2;
15:13; 16:5;
52:13; 66:13;
71:4,9,11,13;
72:1,4,7
machinery 14:9

; 23:4,6; 63:
13,16
machines 15:19
made 14:16; 27
:23; 28:4; 88
:13; 103:11;
104:17; 110:
22; 161:2,6,9
; 165:18
main 33:7
mainly 23:19;
106:15
Major 4:8; 6:8
; 7:14,16; 82
:16; 130:18,
19
MAJOR 1:12; 2:
15; 6:1
major 9:4
majority 33:16
,22
male 80:21
manage 99:14
managed 32:12
management 19:
23; 26:8; 83:
5,14; 91:6;
93:20; 107:7,
15,21; 111:23
; 132:6; 135:
13,17,20; 136
:1,7,14; 138:
23; 140:8;
142:15,19;
144:17; 145:6
,8; 156:12;
165:20
manager 12:15,
21; 13:7; 17:
11,12,14,15,
17; 18:2,3,6;
20:8,9,10,11,
12; 22:5,6;
23:8; 24:12,
20,21; 25:8,
12,18; 26:11,
12,16; 27:1,2
,19,22; 28:1,
15,18; 29:8;
30:16; 31:3,
11,20; 33:1,5
; 34:19; 35:
22; 36:2,9,20
; 37:7,10; 52
:20,23; 55:12
,20; 57:13;

Deposition of Frank Lamont Major, III                    Page 11

88:14; 92:6,
12,13; 93:20,
23; 96:3,8,21
; 97:3,11;
101:23; 102:3
; 103:21; 106
:11; 125:2;
130:21; 133:
13,16,18; 136
:9,19; 137:12;
152:22; 165:
17

manager's 93:
11

managerial 54:
13; 56:7; 150
:9

managers 15:23
; 23:1; 29:2,
9,11; 62:2;
102:1; 104:22
; 114:5; 141:
5; 149:17

managing 143:4

manuals 18:9

manufacturing
21:4

many 8:17; 46:
22; 49:7,16,
22; 58:6; 59:
11,18; 60:21;
61:1; 122:2;
134:15; 135:6

March 21:1,5,8
; 138:23; 139
:5,10; 140:9;
155:16

marginal 153:
16,18

mark 82:15;
120:16

marked 82:19;
110:2; 155:13
; 157:20

matter 71:16;
72:9,22; 83:
13; 87:1

McCants 102:6,
7,9,13; 103:4
,6,14,20,23;
104:13; 105:2
,16,19; 106:6
,23; 107:1,5,
13; 109:1;
110:4,20; 111
:8; 160:19;

161:1,2

McCants' 104:
16; 106:9

mean 11:19; 13
:13,21; 17:3;
18:22; 25:2;
29:13; 36:5;
38:4,23; 40:5
; 42:2,3,4;
43:3,15; 45:9
; 47:5,6,10;
48:8; 49:13;
51:6; 52:11;
55:10,17,21;
60:16; 63:17;
77:7; 80:19;
86:7; 87:15;
89:1; 90:11;
98:15; 105:10
,11; 112:23;
116:11; 119:2
; 122:5; 124:
20; 125:1,4;
127:4; 128:2;
131:1,8; 133:
2; 134:3; 139
:4,6,9,11;
145:1; 146:10
; 148:9; 151:
21; 156:17;
157:3; 162:12

meaning 29:14

Meaning 19:7

means 68:13;
164:18; 166:
10

meant 78:5;
140:4

measures 51:10

mechanisms 19:
4,8

medication 6:
21

meet 43:10; 44
:1; 47:18; 66
:20,22; 115:
19

meeting 42:15;
43:16; 45:3;
106:23; 108:
23; 110:3;
114:1; 116:2,
9,20; 118:20;
119:1,7

meets 107:10;
108:7; 114:17

; 153:10,15,
20

memory 6:22;
42:4

mentioned 161:
15; 162:21

met 6:9; 102:
20; 117:6

method 127:10

methods 45:7;
62:4,5; 63:8,
10,14; 114:7;
127:2,9

MHT 1:4; 2:4;
5:4

Michael 56:17;
57:6; 58:16;
92:5; 136:11,
12

Michael's 136:
17

MIDDLE 1:2; 2:
2; 5:2

might 11:14;
12:4; 27:15;
50:22,23; 67:
3,13,14; 76:4
; 87:23; 95:
15; 118:3;
154:19; 164:4

Mike 44:11; 50
:18,20; 129:4
; 133:15; 135
:19; 140:18;
141:18; 154:
14; 155:15;
156:5,18; 158
:5; 160:11,17

mind 101:21;
122:4

mine 7:10; 151
:10,12

minute 55:16

minutes 35:1

miscellaneous
122:5

money 9:10

Montgomery 2:
18; 5:19

month 38:22;
39:22; 94:20;
95:3,5; 97:21
; 98:4,6; 137
:7; 139:12,13
; 151:22

monthly 16:15

months 98:10,
11,13; 140:13

morning 23:17;
24:15,18; 35:
15,16; 59:16,
17; 132:20;
133:3; 163:8,
11

most 30:9; 34:
4,8; 57:5,17,
22; 58:1; 80:
17,23; 81:8;
95:6; 104:21;
105:5; 140:12
; 146:7,19

motion 37:2;
62:19; 127:7

Motion 149:4

motivating 107
:16

move 14:6,7;
20:14; 25:16;
28:1,4; 45:7;
58:17; 91:8,
14; 114:7

moved 14:11;
16:23; 58:12

moves 91:19

Movie 92:12

moving 91:6

MR 6:7; 76:20;
82:14; 109:18
; 130:11; 154
:12,16,22;
155:4; 158:17
,20; 159:4,8,
15; 165:4,7,
23

Mr 1:17; 4:3,5
; 5:13; 6:8;
7:16; 27:13;
35:13; 37:18,
22,23; 38:15,
16; 39:7,14,
16; 40:7,19;
41:13; 42:11,
17,19; 43:7;
44:13,19; 46:
14,21; 54:20;
57:2,3,10,12;
58:4,8; 59:2,
5,12; 60:18;
61:12,16; 63:
15; 70:16,22;
72:20; 73:17;
74:23; 75:4;

77:9; 78:3;
79:13; 83:2;
84:6,17; 85:
21; 89:4,11,
20; 90:6,14;
91:21; 92:8,
16,19,23; 93:
6; 94:19; 95:
1; 96:5; 97:8
,14,20; 98:17
,18; 99:3;
102:13; 103:4
,6,14,15,20,
23; 104:1,7,
13,14,16; 105
:2,16,17,19,
20,21; 106:5,
6,7,9,23; 107
:1,5,13; 110:
4,20; 111:5,8
,11,18; 112:5
; 113:18,20;
114:10; 115:
17; 116:8,20;
123:3,14; 129
:15; 130:1,15
,19,20; 131:5
,10,13,15,21;
132:9; 133:22
; 134:2,7,11;
135:3,4,9,10,
23; 136:6,14,
22; 137:1,3,
22; 138:7,13,
14,16,18,21;
139:10,11,15;
140:7,18; 141
:6,8; 142:16,
20; 143:3,12;
146:15; 149:7
; 154:17; 155
:5,9; 156:6;
157:5,17; 158
:22,23; 159:8
,21,23; 160:4
,19,23; 161:1
,2,3,4,17,18,
19,22; 162:18
,22; 164:12,
13; 165:9,10,
12,15,19,21
MS 9:18,20; 19
:15; 33:19;
35:18; 40:10;
43:14; 67:18;
70:2,18; 71:3

,18; 72:5; 75
:7,17,23; 76:
16; 80:18; 81
:10; 100:5,12
; 105:8; 108:
18; 109:8,22;
111:6,12; 112
:8; 113:2,14;
129:3,6,9;
131:6; 149:2;
154:15,21;
155:1,6; 156:
20; 157:6;
158:18; 159:2
,5,11,17,19;
165:2
Ms 4:4; 5:17
much 14:1; 17:
6,20; 45:18;
66:12; 67:23;
68:7; 71:15;
72:2,21; 130:
16
muda 62:8
Murphy 133:20,
21; 134:11;
135:3,9; 153:
1; 158:8,10
Murphy's 134:2
myself 14:8;
150:7
---------------
    N
---------------
name 7:13; 148
:23
nd 7:22
necessary 3:5
need 6:17; 12:
21; 38:12; 74
:12,13,15,16;
75:12; 81:4;
154:5,6
needed 45:4;
88:14; 103:13
; 121:19; 128
:7; 141:2
needs 77:21
Needs 107:15
negative 28:6;
61:3
neighborhood
25:21
neither 166:16
never 9:22; 32
:16; 54:7; 92

:9; 106:3,5;
135:8; 157:23
; 165:18
new 15:16; 45:
7; 62:3,4; 63
:8,12,13,14,
15,16; 114:7
next 20:7; 25:
5,6; 69:17;
83:18; 114:22
; 123:23; 124
:5; 125:7
Next 119:16
night 24:14;
34:19,21; 55:
8; 66:9; 70:
14; 87:11,18;
89:3,6,14;
105:1
nights 23:21
nine 14:4; 46:
10; 111:22
nineteen 72:11
ninety 52:8;
115:13,20;
116:20
nobody 154:9
none 120:23;
121:8
nor 1:23; 166:
16,17
norm 61:11
normal 29:17;
30:12; 34:5;
48:9; 88:20;
104:19; 156:1
normally 46:22
North 5:15
notes 149:20
Nothing 159:13
nothing 6:4;
47:14; 51:14;
65:5; 66:9;
73:6; 88:16;
121:19
notice 3:13;
42:20; 43:1,8
; 119:17,20;
120:1,4,10,12
,17; 121:1,2,
11,14,21,22;
122:7,18,20;
123:10,22;
124:1,6,16,18
,22; 125:5,13
; 127:21; 128

:1,14; 129:17
; 150:1,15;
161:16,18,22;
162:7,9,10
notices 121:5,
23; 122:5,11;
124:15; 126:
13,15,16; 150
:18; 152:10
notify 74:13
notifying 43:
13
November 7:22;
25:3
nowhere 164:10
NUMBER 1:4; 2:
4; 4:2,7; 5:4
number 65:14;
81:20,21,22;
82:1,2
numbers 119:12
numerous 89:5
---------------
    O
---------------
o'clock 24:15;
35:16
Object 9:18;
19:15; 33:19;
40:10; 43:14;
67:18; 70:2,
18; 71:3,18;
72:5; 75:7,17
,23; 76:16;
80:18; 81:10;
100:5,12; 105
:8; 108:18;
109:8; 111:6,
12; 112:8;
113:2,14; 129
:3,6; 131:6;
156:20; 157:6
; 159:2,11
objections 3:6
,8
objective 115:
4
observation 29
:1; 35:12
observations
57:16; 96:4
observe 29:14,
15,16; 34:9;
95:18; 99:18;
100:4,16,23;
101:7; 103:14

Deposition of Frank Lamont Major, III                    Page 13

; 133:21; 134
:2,3,6; 135:3
; 143:3
Observed 29:10
observed 57:20
; 100:13; 104
:1,13; 106:5;
134:10
observing 95:7
,21; 98:6;
134:7,11
obvious 28:17
occasion 38:2;
103:17
occurred 141:
16
October 144:13
; 148:12
offer 144:16
offered 3:10;
27:13; 58:17;
132:15,18;
162:22
office 106:20
offices 2:17
often 35:2
old 15:17
once 79:21; 80
:2; 102:1;
103:12
Once 80:1
One 134:17;
153:21; 158:
20; 159:6
one 7:9; 42:18
; 45:14; 46:
12; 51:21; 52
:6,12,16; 53:
4; 59:19,21,
22; 60:6,8;
66:16; 68:21,
22; 69:1,5;
71:21,22; 81:
19,21; 83:1,2
; 87:18; 89:
18,19; 102:18
; 115:9,12;
117:2,7,13,14
; 118:5; 119:
6; 120:5; 121
:8; 123:3;
125:20; 129:
22; 134:18,23
; 135:7; 136:
13; 137:7;
147:11,12;

153:6; 154:15
,17; 155:2,20
,21; 157:19;
165:4
one's 52:3
ones 29:5; 50:
16
only 33:4; 34:
8; 35:12; 48:
10,15; 51:10;
60:6; 65:19;
95:2; 97:21;
128:18,19;
129:14; 136:
21; 144:14;
158:12
open 19:17
opened 89:7
opening 90:2
openings 26:3;
90:1
operate 16:5
operating 14:9
operator 10:20
; 11:2,21,23;
14:1,2; 132:
16; 133:9
operators 15:
13,20
opinion 86:12,
16; 88:20;
115:19; 131:
17,18,19,23;
132:7
opportunities
20:18; 26:1
opportunity 20
:19; 34:9
option 162:16
oral 1:18
order 38:8,9;
41:4; 81:20;
82:3,4,6
orders 28:22;
41:3; 45:23;
73:21; 75:11;
77:22; 78:16;
79:10,15,17;
80:10,11; 81:
7,13,19,22;
82:6,10; 83:
20
orientation 18
:7
origin 62:16
original 1:18;

82:20; 109:15
,20
originally 109
:7,12; 110:12
Other 9:21; 16
:14; 38:11;
81:16; 86:2;
148:20; 149:
14
other 9:13,16;
24:8,17; 27:7
; 28:16; 42:8
,23; 43:9; 44
:9; 46:23; 48
:2,23; 49:8;
57:19; 59:15;
61:12; 69:23;
70:17; 81:5,
12; 84:19;
119:9,14; 121
:23; 128:23;
129:4,22; 147
:17; 149:1;
159:22; 160:6
; 165:13
out 9:7,9; 18:
9; 21:13; 26:
3; 28:22; 38:
9; 39:2; 45:
18; 47:19,22,
23; 48:11; 51
:6; 52:23; 61
:10; 64:15,20
; 65:4,14; 69
:23; 70:22;
80:2; 81:7;
82:4; 100:3;
101:10,11;
102:10,23;
109:4; 110:9;
114:21; 115:5
; 121:3,6;
126:12; 130:3
; 133:5,11;
156:7
outline 125:12
outside 13:11;
22:13; 28:8
outsourcing 22
:11; 96:11
over 14:4; 23:
9; 25:9; 27:3
; 31:12; 32:1
; 35:7; 36:5,
19; 51:22; 59
:2,5; 66:7;

67:2; 72:2,3;
79:14,16; 82:
5; 92:5; 93:3
; 96:14; 97:3
,8,14; 99:5;
110:9; 121:22
; 136:22; 137
:14; 146:3;
147:5; 163:18
overall 41:21;
114:17; 153:3
overseeing 78:
5
oversight 23:9
; 96:14
own 104:17
--------------
        P
--------------
packages 144:
16; 145:23
Packaging 10:
23
packaging 12:
12; 17:1; 25:
8,10; 28:20;
93:21; 97:3;
104:5; 112:5,
17; 113:9;
128:8; 129:19
; 156:10; 158
:4; 163:8
PAGE 4:2,7
page 82:22; 93
:9; 113:4;
114:22
pages 82:13;
93:3
paid 67:21; 68
:7
paper 121:15;
126:17,20;
149:1
papers 123:1
paperwork 34:
15,17; 131:3
paragraph 82:
22; 113:19
Pardon 115:1
Park 5:14
parked 164:9
part 41:10; 45
:12; 57:5,22;
58:1; 71:21,
22; 95:6; 104
:21; 105:5;

134:1
partake 92:18
participated
  42:16
particular 122
  :21; 125:11
Particularly
  112:11
particularly
  129:17; 141:5
parties 2:13;
  3:7; 166:17
past 34:15;
  146:16
PATE 9:18,20;
  19:15; 33:19;
  35:18; 40:10;
  43:14; 67:18;
  70:2,18; 71:3
  ,18; 72:5; 75
  :7,17,23; 76:
  16; 80:18; 81
  :10; 100:5,12
  ; 105:8; 108:
  18; 109:8,22;
  111:6,12; 112
  :8; 113:2,14;
  129:3,6,9;
  131:6; 149:2;
  154:15,21;
  155:1,6; 156:
  20; 157:6;
  158:18; 159:2
  ,5,11,17,19;
  165:2
Pate 4:4; 5:18
pay 15:2,7,8;
  25:17; 145:3,
  13
paying 71:12
people 15:18,
  19; 16:8,18;
  19:5; 26:9;
  40:22; 49:7,8
  ,14,17,22; 50
  :2,3,5,6,8,10
  ; 51:13; 54:4
  ; 65:4; 67:12
  ; 70:4; 71:12
  ; 86:19; 88:
  20; 89:2; 147
  :16
per 52:13; 72:
  11; 117:13;
  118:9; 147:12
perceive 61:15

percent 12:14;
  14:19; 21:2;
  43:11,17; 44:
  1; 45:17; 49:
  6; 51:5,22;
  52:1,8; 53:20
  ; 64:9; 65:2;
  66:3,7,10,23;
  67:4,15,17;
  68:11,12; 70:
  10,12; 115:13
  ,14,20; 116:
  21; 117:3;
  133:14; 136:
  16; 137:11;
  149:13
performance 32
  :14,16,21; 33
  :2; 38:8,17;
  39:6,16; 40:8
  ; 54:9; 57:12
  ; 83:3,4; 94:
  3,10,12; 98:
  19; 99:4; 105
  :21; 106:7;
  114:17; 119:
  21; 121:4,6;
  136:5; 140:19
  ; 151:2,9,13,
  18; 152:13,16
  ; 156:18; 160
  :4,6,9,17,22;
  161:4,6
period 33:15;
  35:19,20,21;
  37:5; 59:6;
  60:11; 87:15;
  96:5; 99:22;
  100:4; 116:7;
  119:12; 164:
  22
Perry 93:15,16
  ; 94:1
person 21:2;
  126:22
person's 53:18
personal 115:4
personally 86:
  7,22; 87:8,9;
  128:16; 150:3
personnel 18:6
  ; 42:20; 43:1
  ,7; 109:16;
  119:17; 121:
  11,14; 122:7,
  11,17,18,20;

123:10,22;
  124:1,6,15,18
  ,22; 125:5,12
  ; 126:12,15,
  16; 128:14;
  129:16; 131:8
  ,10; 150:1,15
  ; 152:10; 161
  :16,18,21;
  162:7
philosophy 72:
  17
phrase 6:14;
  18:23; 55:23;
  56:1
physically 104
  :1
pie 68:18
piece 68:4,17;
  70:9
pillow 78:21
pink 123:1;
  124:8,16
place 19:5,9;
  23:2; 125:17
Place 5:14,15
Plaintiff 1:6;
  2:6; 5:6,16
PLAINTIFF'S 4:
  7
Plaintiff's 82
  :17,18
planned 115:4
planner 74:4
planning 144:1
plant 13:9,11;
  18:4; 20:11,
  15,17,21; 21:
  11; 22:12,21;
  23:4,6; 26:4,
  5,7,11,12,13;
  27:1,2,3,10,
  21; 58:21; 87
  :21; 101:23;
  102:3; 103:21
  ; 143:17,22;
  144:2,13; 147
  :20; 150:21
plants 20:19;
  147:17
Please 1:21;
  61:14; 77:14;
  101:19
please 7:12;
  76:7; 89:19;
  93:3; 101:6

point 31:7; 56
  :2; 80:9; 83:
  17; 156:7
policies 16:9,
  17; 18:10,11;
  125:11,17
Policies 19:9
policy 16:20;
  18:14,18,20;
  19:18; 124:13
  ,14
Poor 119:21
poor 38:16; 39
  :6,16; 40:7,9
  ; 83:4; 121:3
  ,6; 151:1,8,
  12; 152:16;
  156:6
poorly 152:14
portion 30:8,9
  ; 59:15
position 11:15
  ; 13:5; 16:11
  ; 24:21; 25:6
  ; 36:6; 91:5,
  9; 97:2; 132:
  6; 140:8; 150
  :10; 156:9,14
  ; 158:4; 163:
  1
positions 11:
  10; 12:9
positively 159
  :21
praise 72:17
praying 148:16
prepare 148:18
present 42:19;
  47:1; 58:17
presently 12:
  22
pressing 45:16
previous 37:9;
  83:18; 94:15;
  127:12,15;
  145:21; 147:4
previously 108
  :20; 155:13
prior 3:10
Prior 37:21
priorities 77:
  22; 81:2,14
priority 81:11
  ,12; 82:1,3,8
probably 137:
  19; 158:6

Deposition of Frank Lamont Major, III                    Page 15

problem 41:11;
  54:2; 61:16;
  64:5,12; 68:
  15; 70:3; 72:
  20; 80:11
problems 9:10;
  39:9; 40:13,
  15,20; 63:18;
  83:19; 142:14
Problems 142:
  17
Procedure 1:14
procedure 62:
  19; 120:18;
  123:8,12; 163
  :14
procedures 16:
  10; 19:9,10;
  62:21; 123:18
  ; 126:3
process 124:10
produce 71:15;
  73:13
produced 72:3,
  23
producing 50:
  18; 72:10,22;
  73:12
product 22:12,
  21,22; 23:6;
  28:19; 49:11,
  12,13,14,20;
  51:6; 63:13;
  64:16; 66:17,
  18; 73:22; 96
  :13,14,21
production 41:
  5,8,11,14,16;
  42:9,12; 43:
  11; 44:1; 45:
  3; 46:2; 47:
  12; 50:15,19,
  21,23; 52:7,
  16; 65:2; 66:
  23; 114:2;
  116:1
productive 80:
  23; 81:9
products 49:22
  ; 62:22; 63:
  16; 65:3,4
program 18:5
project 23:8;
  24:12,20,21;
  25:17; 26:16;
  27:19,21; 96:

3,8
Project 22:5,6
projects 22:14
promotion 14:
  14; 15:1,6;
  17:18; 25:14
promotions 13:
  20
proper 78:8
properly 28:21
pull 156:17
punishing 67:
  11
put 47:22,23;
  93:21; 108:17
  ; 113:4; 114:
  12
--------------
--------------
          Q
--------------
qualified 94:
  23; 97:19
quarter 115:13
  ,18; 117:17;
  118:5
question 6:12;
  39:13; 47:7;
  61:13; 76:18;
  85:11; 90:12;
  91:4; 101:4,5
  ; 129:23; 157
  :2; 165:5
questions 3:7;
  165:23; 166:9
quick 25:22;
  130:11; 154:
  23
quit 88:5; 131
  :20,23; 132:
  10; 142:4
quite 112:1
quote 18:21
quotes 40:3
--------------
          R
--------------
race 16:9; 18:
  13; 19:3,6,11
  ,13; 111:5,11
  ; 159:1,9
ran 41:4; 46:
  19; 48:10; 50
  :5; 57:6; 66:
  2
rate 68:4; 117
  :3

rated 108:5,20
rather 86:19;
  89:2
rating 44:15;
  83:1; 114:17;
  153:3
ratings 83:3;
  101:16; 161:
  10,11
ratio 84:7; 85
  :14
read 76:18;
  113:7; 149:11
  ; 156:21,23
reading 2:22;
  76:3; 114:9
real 25:22;
  154:23
really 76:11;
  87:1; 136:21
rearrange 23:3
reason 67:15;
  71:8; 85:3;
  89:13,16; 91:
  22; 120:8;
  126:19; 137:8
  ; 158:11; 162
  :8
reasons 28:17;
  45:13; 151:8;
  156:5
recall 39:19;
  42:21,23; 43:
  12; 54:16,21,
  22; 55:21; 57
  :14; 126:10,
  11; 134:8;
  165:9,14
receive 78:23
received 144:
  20; 145:3;
  148:11; 149:
  23; 150:13,14
  ,17; 151:3,17
  ; 152:8
recess 130:14
recommend 131:
  9,12; 135:12,
  19
recommendation
  s 103:11; 107
  :4; 110:21,23
  ; 111:2; 161:
  3,5,9
recommended
  135:9,16

recommends 107
  :5
reconstructing
  22:15,18
record 7:13;
  149:22
records 86:2,4
Reduce 117:13
reduce 117:13
reducing 117:
  20
reevaluate 100
  :23
refer 123:1;
  126:13
referring 118:
  8; 127:12
regard 16:13
regarding 16:4
  ; 39:5; 43:12
  ; 92:19; 165:
  19
Regardless 67:
  23; 68:3,6
regardless 71:
  7; 131:23
regards 16:3
regular 24:17
related 128:20
relates 128:19
relating 3:3;
  39:9
religion 19:3
remember 17:8;
  24:13; 27:23;
  28:7,9; 36:4;
  39:11; 40:4,6
  ,8; 43:4,5,12
  ,21; 44:4; 56
  :11; 60:6,18,
  22; 61:6; 91:
  20; 93:6; 95:
  20; 96:17,20;
  97:1; 98:20;
  99:8,10; 109:
  6,11; 110:12,
  15; 111:1;
  116:16,23;
  117:6,10,11;
  118:14,20;
  119:1,10,14;
  140:22; 141:
  11,15; 143:2,
  18; 148:23;
  151:6,7,15,16
  ; 153:4,9;

Deposition of Frank Lamont Major, III                    Page 16

161:8; 162:4
remove 136:13
removed 132:6,
  14; 133:7;
  135:13,16,20;
  136:1,7; 137:
  2,12; 138:22;
  139:10; 140:8
  ; 156:13; 158
  :3; 162:23
Reorganizing
  22:21
reorganizing
  22:19; 96:12
rephrase 6:13;
  31:1; 35:11;
  61:13; 78:12
replaced 36:10
report 20:5;
  113:22; 155:
  10,15; 156:2,
  5; 157:17;
  164:12
reported 19:14
Reporter 1:23
reporting 19:
  11
reports 44:20,
  23; 50:15; 52
  :5; 155:8
represents 166
  :12
require 49:14;
  60:15
required 43:10
  ,23; 61:17;
  63:14; 65:15;
  73:12
requirement 43
  :11
requirements
  107:10; 108:6
  ,7,21; 110:3;
  111:10; 114:
  18; 153:10,13
  ,14,16,20
requires 50:2,
  6,7
resource 12:15
  ,19,20; 17:11
  ; 20:10,11
resources 16:3
respective 2:
  14
Responsibility
  77:3

responsibility
  74:20; 75:1,4
  ; 76:13,23;
  78:4; 81:6
responsible 28
  :21; 53:11,12
  ; 77:11; 106:
  16; 138:8;
  143:9
rest 39:2; 66:
  9; 70:13; 144
  :12
restructuring
  96:11
result 166:18
resume 26:14
retained 1:22
retraining 15:
  17; 163:15
review 16:19;
  83:3; 94:4,11
  ,13; 95:1; 97
  :20; 99:20;
  100:10,11,14,
  18,20; 101:2,
  12,23; 102:4,
  13; 129:16;
  130:4; 139:21
  ; 148:17,18;
  149:20; 152:
  17,20; 153:2;
  160:16; 161:4
  ; 165:9,12,21
reviewed 110:
  21; 120:11;
  148:21; 160:
  22; 164:22
Reviewed 18:11
reviewing 34:
  16,18,20; 79:
  10; 93:11
reviews 79:5;
  80:3; 101:22,
  23; 102:2,4;
  160:6,10,17;
  161:7
Road 7:19
role 32:20
rotate 29:12
roughly 12:4;
  14:17; 17:9
Rule 1:13
rules 3:2
Rules 1:14
rumor 21:12
rumors 21:9

run 29:19; 48:
  2; 49:12,17,
  23; 50:2,3,10
  ; 51:10; 65:
  13,15; 66:13,
  17; 68:10; 69
  :2,6,8,10,14,
  16; 71:4,12;
  72:1; 78:19,
  20,21; 80:9,
  10,16,22; 81:
  1,8
running 45:22;
  46:11; 48:5,
  15,19; 49:11;
  50:12; 51:22,
  23; 62:22; 64
  :8; 71:9,11;
  72:4; 73:23;
  80:13,14
runs 47:17,19;
  65:19; 72:7,
  13
rush 28:22; 45
  :22; 73:21;
  77:22; 79:10;
  81:4,5,13; 83
  :20

----------------
        S
----------------
safe 37:17
Safety 143:21
safety 12:15,
  21; 13:7; 16:
  15; 17:11,14,
  17; 18:2,5;
  58:19,23
salaried 123:
  17,23; 124:5,
  9,17,21; 125:
  23; 150:9
salary 17:7;
  123:13,18;
  124:4,11; 125
  :21; 126:2;
  150:7
Salary 123:16;
  125:22
Same 69:6
same 1:22; 2:
  23; 13:14; 46
  :19; 50:4; 67
  :6; 69:13; 72
  :12,13; 76:5;
  91:5,8; 93:22

; 113:4; 118:
  9; 123:18;
  153:5,6
sat 110:20
save 154:20
saw 163:9
saying 6:12;
  33:21,23; 37:
  6; 39:4; 40:
  18; 48:14,17;
  50:9,13,14,21
  ; 51:1,9,15;
  52:19; 53:20;
  54:18; 68:16;
  69:9; 71:19;
  77:8,12; 78:2
  ,9; 79:13,18,
  21; 81:15; 84
  :14,15; 85:19
  ; 86:5; 88:19
  ; 91:6; 96:17
  ; 123:9; 157:
  13
says 44:18; 66
  :15; 75:4; 76
  :9; 91:21; 94
  :4; 107:14;
  113:20; 156:8
  ; 164:14
schedule 73:23
  ; 74:2,8,21;
  75:1; 78:8;
  79:1,2,4,5,22
  ; 80:2,5,6,8
scheduled 65:
  13; 69:2,5,8;
  73:21; 75:12
schedules 74:4
  ,12; 77:16;
  79:12
Schedules 79:9
scheduling 73:
  18; 75:5,14,
  16,21; 76:14;
  77:10,12,15;
  78:1,4
school 8:21; 9
  :2; 10:13
schools 10:2
searching 148:
  3
Second 17:5;
  69:12; 144:5
second 29:15,
  21; 33:12; 39
  :10; 40:14;

Deposition of Frank Lamont Major, III                    Page 17

41:14; 42:18;
46:12; 53:12;
58:3; 67:7;
84:4,20; 85:8
,15,23; 86:15
,20; 88:7,9,
10,15; 89:8,
15; 90:3,10,
21; 91:7,15,
19; 115:14;
117:2; 118:6;
127:18; 144:3
,8,10; 147:21
; 160:14
section 109:4;
110:9; 114:16
; 126:4
See 60:10; 126
:14
see 11:21; 12:
1; 14:8; 42:
17; 49:9; 51:
16; 55:23; 56
:1; 68:15; 72
:12; 73:5; 79
:20; 93:4; 96
:10; 104:1
seem 46:3
seems 157:9
seen 67:14; 95
:16; 149:9;
155:19; 157:
19,23; 164:7
seminars 9:16
send 26:3; 70:
14,15
sense 13:22;
54:10; 68:19
sent 26:14
sentence 127:
12,15
set 73:20; 74:
3,4,5,11,19;
75:10,15,21;
76:15; 77:10;
78:6,7; 79:14
,16,17,22,23;
80:15,21; 81:
5
sets 74:2
seven 23:16,17
. ; 24:4,9; 25:
20; 29:20,22;
30:1,18,21,22
; 34:2,11,15;
35:7,8,16; 50

:7; 57:23; 59
:16; 60:19;
71:15; 72:10;
81:20; 87:4,5
,6; 88:21,22;
98:12,13; 104
:23; 105:3;
120:6; 121:8
several 89:12;
121:5
severance 144:
21; 145:22;
146:20; 147:
12
sexual 16:16
shaking 28:5;
61:2
shall 3:5
sheets 65:16;
69:3,6,8,11,
15; 78:20
shift 12:12;
17:1,4,5; 23:
19; 24:1,3,4,
8; 29:2,9,10,
15,16,19,21,
23; 30:10; 31
:3,4,12; 32:1
; 33:1,8,11,
12,17,22; 34:
1; 35:5,7; 39
:9,10; 40:13,
20; 41:15,16;
43:9,13,22;
44:7,9,14; 46
:14,16,22; 47
:12; 52:12,16
,17; 53:4,16;
55:14,17; 56:
12,14,16,18;
57:16,20; 58:
2,3; 59:12,13
; 60:19,21;
61:12,16,18,
21; 64:11,12;
66:16; 67:7;
68:21,22; 69:
1,7,9,12,13;
70:1; 75:5;
78:5; 82:11;
84:3,4,7,15,
18,20; 85:6,8
,13,15,22,23;
86:13,15; 87:
12; 88:3,7,9,
11,15; 89:3,6

,8,12,14,16,
20,21; 90:3,4
,7,10,15,17,
21,23; 91:7,9
,14,15,18,19;
104:8; 114:4;
127:18,19;
132:14,17;
133:8; 134:2,
3; 137:2; 138
:22; 141:4;
144:4,5,11;
146:17,18;
159:21; 160:7
; 163:7
Shift 52:12;
56:14; 69:5
shifts 29:18;
42:5; 46:20,
23; 49:9; 61:
12; 84:13; 85
:4; 103:22;
159:22; 160:
14
shook 163:10
show 50:17; 52
:5; 76:1; 113
:15; 155:12;
157:19
showed 164:12
shown 127:10
shutting 144:2
side 19:23
sign 162:12,15
,16
signature 2:21
; 93:8,12
signed 158:5
significant 59
:14
similar 161:17
since 41:8;
100:11,13;
150:14,15
Since 150:19,
20
singling 39:2
sir 7:1,5; 104
:15; 110:14;
117:8,21; 118
:13,15; 128:4
; 141:14,17;
151:23
sit 66:8; 103:
6; 116:19;
161:22

sitting 51:13
situation 19:
22
situations 57:
6
six 13:18; 47:
23; 48:3; 50:
3; 53:11,12;
65:22; 66:2;
68:11; 69:15;
70:12; 73:1
sixteen 65:15,
22; 66:21; 69
:2,6,8,11,14;
72:10
sixty 118:4,5
size 13:12
skill 107:15
skills 54:13;
56:7; 83:5,6,
14,16; 107:7,
22; 108:19
skip 82:5
slip 124:8,16
small 70:8
Some 23:22; 41
:12; 112:10
some 6:10; 23:
15,16,17; 29:
14,15; 41:5,6
; 51:17; 54:6
; 55:22; 83:
10; 86:19; 89
:2; 90:16;
112:2; 136:2;
147:19; 154:
20; 161:5
somebody 133:6
; 145:11
Somehow 26:14
someone 19:2;
162:6
Something 147:
13
something 14:
10,18; 17:23;
24:16; 25:20;
35:9; 62:10,
14; 88:23;
105:13; 109:5
; 110:8,11;
113:1; 118:2;
125:7; 127:13
; 132:9; 148:
15; 151:22;
162:11

Deposition of Frank Lamont Major, III                    Page 18

sometime 27:22 ; 96:23
Sometimes 34: 23; 49:15; 105:14
sometimes 50:3 ,8; 105:15
somewhere 27: 20; 154:19
Somewhere 152: 6
soon 89:7; 90: 1
sorry 80:20; 87:6; 118:19; 119:2; 130:19 ; 138:22; 152 :15; 158:20
Sorry 159:7
sort 72:16
sounds 139:2
South 8:5,23; 10:9,10; 12: 23; 13:4,6,10 ,19
SOUTHERN 1:3; 2:3; 5:3
special 24:16
specific 16:7; 39:8,14; 54: 17,23; 60:20; 83:9; 127:23; 134:9
Specifically 18:15; 54:15; 116:6; 140:22 ; 142:22
specifically 26:5; 38:15; 39:7; 46:13; 54:16,23; 57: 11; 60:6; 63: 7,23; 102:18; 140:23; 149: 18; 162:1
specifics 61:4
spell 62:9
spend 61:11,17 ,21
spent 30:10; 58:2; 103:21
spoken 143:15
spring 142:12
SR 1:5; 2:5; 5 :5
stage 122:12

stand 62:14
standard 38:12 ; 47:17; 70: 17; 113:22; 120:18; 163: 14
standards 45:3 ; 114:2; 157: 5
standing 47:14 ; 54:5; 64:15 ; 65:4; 69:18 ; 70:4; 73:2
start 10:15; 13:23; 21:21; 132:21; 137: 13; 140:4
started 6:9; 10:21; 11:1; 14:3; 21:8; 23:7; 27:20; 34:1; 36:4; 37:18; 41:9; 95:21; 96:20; 98:14; 123:9; 137:10,18,22; 139:15,19; 140:12; 144:4 ; 163:18
starting 141:8 ; 156:23
state 7:12; 37 :3; 82:23; 84 :21,23; 116: 19; 126:23; 156:11
STATE 166:4
stated 33:7; 34:4; 37:14; 39:19; 61:20; 85:12,21; 95: 12,23; 97:7; 127:6; 151:8
statement 165: 14,18
states 43:7; 58:8; 89:4,11 ,20; 90:1; 116:8; 158:2
STATES 1:1; 2: 1; 5:1
stating 90:6, 15; 107:18; 165:10
stay 34:15,22
stayed 11:16;

146:22
staying 78:7,8
stays 73:22; 75:11; 78:1
stenotype 166: 9
step 123:23; 124:5; 125:7
steps 62:20
Stevens 145:19 ; 146:5,9; 147:6
still 24:3; 28 :8; 48:12; 65 :1; 72:3; 100 :17; 119:16; 163:7
STIPULATED 2: 12,20; 3:4,12
stop 12:23; 46 :12; 71:9; 124:2
storage 22:21; 96:13
straight 124: 18; 125:15
Street 2:18; 5 :18
strength 113:8
strengths 113: 4; 114:9
stressing 70:8
strictly 16:4
stronger 45:8
stuff 45:18; 83:20
subordinate 136:17
substitute 12: 3,7
sufficient 50: 10
suggest 139:5
Suite 5:18
summary 37:2; 149:4
summer 28:8; 142:11
supervise 95: 13; 99:17
supervised 29: 8
supervising 87 :23; 88:2; 138:17
supervision 29

:1; 37:18; 41 :20,23; 59:2, 5; 83:5,14; 97:14; 107:7; 138:13,14
supervisor 12: 3,8,13; 14:22 ; 15:5; 16:15 ; 17:1; 20:5, 7; 23:2; 27:5 ,6,8; 31:12, 16,19; 33:17; 37:5,11,15; 55:12; 56:3, 12,23; 57:4; 58:9; 72:15; 74:14,16; 77: 19,23; 79:11; 80:2; 83:18, 19; 94:19,22; 95:3,5,9,17; 97:21; 98:3; 99:1,5; 125: 16; 130:1; 132:14; 133:8 ; 136:22; 141 :9; 156:9,14; 158:4; 165:13
Supervisor 79: 4
supervisor's 33:2
supervisors 29 :3; 31:4,12; 32:8; 38:4; 42:8; 43:1,9, 10,13,23; 44: 7,10; 45:5; 49:1; 55:14, 17; 62:2; 70: 17; 71:1; 78: 23; 114:5; 127:22; 128:3 ,14,17,21; 129:1,19; 134 :4; 151:5; 160:7,14
supervisory 29 :1; 32:1; 97: 8; 163:1
supposed 56:8; 66:13,17; 71: 4; 73:19; 77: 9,11,23; 112: 6,21; 120:9, 15; 121:3

Deposition of Frank Lamont Major, III                    Page 19

surrounding 92
:16
sworn 6:3
--------------
        T
--------------
talked 26:12;
  27:6; 40:19;
  43:15; 54:19;
  55:15,19; 92:
  4; 94:18; 96:
  7; 98:17; 99:
  3,10; 116:5;
  140:23; 141:9
  ; 148:5; 151:
  4; 152:12;
  153:22; 155:8
  ; 159:20
Tallapoosa 2:
  18; 5:18
tells 126:6
Ten 134:17
ten 14:17; 47:
  3; 48:22; 50:
  8; 59:19; 60:
  3; 81:19,20;
  82:2; 134:19
tend 128:16
terminate 131:
  5,10,13
Terminated 129
  :11,13; 130:
  23; 131:2
terminated 115
  :17; 130:20;
  131:1,16,20,
  22; 132:1,2,
  10; 133:7;
  135:10; 138:
  21; 142:2,4;
  146:17; 158:
  23
termination
  125:15; 154:
  18; 159:10
terms 13:11,12
testified 6:5
testimony 1:18
  ; 149:8; 166:
  13
th 1:19; 2:19;
  37:3,4,19,21;
  58:9; 59:6,7,
  10; 97:15;
  137:17; 138:
  15; 140:1,5,

12; 144:5,6;
  147:6; 155:16
There's 120:8
there's 71:8;
  119:23; 124:8
  ; 144:10
thereto 3:11;
  166:10
they've 72:3
thing 33:4; 62
  :8; 64:21; 67
  :6,20; 68:16;
  69:6,13; 76:6
  ; 80:5; 105:
  12; 114:14;
  144:14; 157:1
  ; 158:21
things 23:4;
  31:8; 45:15;
  55:7; 60:15;
  121:18; 151:
  14
Third 24:4; 46
  :16; 64:12;
  69:7,13
third 23:23;
  24:3,8; 29:16
  ,23; 33:11,17
  ; 35:6; 39:9;
  40:13; 44:14;
  46:14; 57:16,
  20; 58:2; 59:
  12; 64:10; 69
  :7; 84:3,6,15
  ,18; 85:6,13,
  22; 86:13,19;
  88:3,15; 89:
  12,20; 90:3,7
  ,15,22; 91:9,
  14,18; 93:9;
  115:14; 117:
  12,14; 118:6;
  127:17; 132:
  14; 133:8;
  137:2; 138:22
  ; 144:4,5,8,
  11; 146:18;
  147:21
Thirteen 117:
  15,16
thirty 17:9;
  23:15,16,17;
  24:2,9,18; 30
  :17,18,20,22;
  34:6,10,23;
  35:8,13,16;

57:23; 59:15,
  16; 66:3; 67:
  3,17; 104:23;
  105:1,3
though 19:19;
  50:22; 69:20,
  22; 125:2
thousand 17:9;
  78:19,20; 81:
  20
three 24:15;
  29:18,20; 46:
  20; 50:6; 51:
  23; 52:13,17;
  57:17; 81:21,
  23; 84:12; 85
  :4; 103:22;
  113:20; 115:9
  ; 119:9,14;
  127:22; 128:
  13,21; 158:12
  ; 162:19
Three 29:22;
  98:10
three's 52:4
throughout 95:
  7; 127:16
throw 65:14
Tidell 4:5
TIDWELL 6:7;
  76:20; 82:14;
  109:18; 130:
  11; 154:12,16
  ,22; 155:4;
  158:17,20;
  159:4,6,15;
  165:4,7,23
Tidwell 1:17;
  4:3; 5:14; 6:
  8; 158:22;
  159:8; 164:12
Tiger 8:10
title 22:3; 26
  :23; 143:20
today 143:12;
  149:16
today's 148:18
together 105:
  12,15; 127:15
took 7:10; 20:
  19; 57:6; 97:
  2; 147:5
top 18:18; 75:
  11; 116:15;
  119:23; 120:
  16; 126:10;

137:5
topics 16:15
total 49:7; 52
  :16
Total 41:16;
  58:3
totaled 53:15
totally 21:4
totals 52:14;
  54:1
toward 45:8
towards 54:9;
  114:8
Tower 5:14
track 115:19
trade 10:2
train 15:22;
  16:8,18
trained 15:18,
  19,22; 16:12
training 9:16,
  21; 12:2; 14:
  21; 15:3,15;
  16:2,4; 58:20
  ,23; 138:9;
  143:9,21; 163
  :5,15,16,19,
  22
Training 12:6
transcribed
  166:10
transcript 1:
  18; 82:21;
  166:13
transcription
  166:11
transfer 20:18
  ,20; 89:7
transferred 97
  :1; 137:14
transferring
  26:10; 147:16
transfers 91:
  18; 92:1
transition 60:
  12; 93:18;
  101:21
trial 3:9
tried 65:9
truck 11:23;
  14:5; 15:13,
  20; 16:6; 132
  :16,19,21;
  133:9
true 46:21; 84
  :2; 92:8,11;

Deposition of Frank Lamont Major, III          Page 20

166:12
truth 6:3,4
try 6:14; 11:
  13; 53:6; 65:
  7,8,10; 90:4;
  93:17; 128:17
  ; 162:13
trying 24:22;
  26:9; 28:12;
  51:3; 52:22;
  55:23; 56:1,3
  ; 60:17; 73:3
  ; 78:10; 154:
  2
Turner 25:13;
  31:21; 32:4,6
  ,7; 36:10,12;
  37:14,22; 38:
  15; 39:14; 40
  :19; 42:16;
  43:22; 97:11;
  129:23
turnover 84:3,
  7,16,18; 85:7
  ,14,23
turnovers 84:
  13; 85:4
Twelve 53:9
twelve 46:10
twenty 30:5;
  48:10; 60:9;
  61:8; 111:22;
  113:1; 134:21
  ; 145:12,13,
  15
Twenty 134:17
two 9:7; 12:5;
  17:23; 24:14;
  44:9; 47:19,
  20,22,23; 48:
  2,3; 49:8; 52
  :11,12,17; 53
  :4; 57:17; 66
  :6; 68:13; 69
  :5,17; 73:2;
  78:20; 82:22;
  84:19; 108:3,
  14; 109:23;
  115:9; 117:3;
  129:1,4; 140:
  13; 144:21;
  145:1; 146:10
  ,11,21; 153:
  21; 155:3;
  156:10,17;
  157:4,10,12;

158:11; 164:
  15
Two 8:19,20
type 150:9;
  151:17
types 121:23
typical 30:19
--------------
       U
--------------
Under 93:14;
  108:19; 146:
  12
under 7:2; 19:
  1; 55:18; 56:
  5; 93:22
underlined 76:
  8
Understand 45:
  19
understand 6:
  12; 30:4; 51:
  8; 60:13; 65:
  1,3,11; 68:9;
  70:6; 81:3;
  85:5; 116:12;
  157:9
understanding
  68:20; 90:9
Unh 106:4; 117
  :23; 148:8
unh 106:4; 117
  :23; 148:8
UNITED 1:1; 2:
  1; 5:1
units 47:22;
  48:1
unless 78:12;
  128:18; 148:
  15
Until 13:3
until 11:4; 30
  :18; 35:8,15;
  59:16; 97:14;
  146:16,22
Up 11:4
up 12:8,21; 14
  :22; 20:14;
  21:10; 26:2;
  27:9; 52:3;
  54:2; 57:6;
  58:7; 72:14;
  89:7; 91:6;
  111:22; 121:
  20; 125:9,16;
  130:5,8; 154:

7; 156:18;
  157:4,11; 164
  :15
upper 19:23;
  26:8; 93:20;
  125:2
ups 64:16; 122
  :13
upwards 161:10
using 64:2
utilize 63:15
--------------
       V
--------------
various 22:14
vary 45:13
verbal 121:15;
  122:12; 123:
  22; 126:17,20
versus 52:17;
  88:22; 125:13
  ,14
view 54:14; 55
  :11,19
violation 122:
  19
Virginia 1:16;
  2:16
VIRGINIA 5:12;
  166:22
voluntarily 36
  :17; 142:4,7
vs 1:7; 2:7; 5
  :7
--------------
       W
--------------
wages 14:19
Wait 55:16;
  159:6
waived 2:23; 3
  :14
wake 125:9
walk 105:14;
  106:17
wanted 80:10,
  16; 89:6,15;
  90:10,16,22;
  91:8,14; 101:
  23; 102:4,13
wanting 111:9
wants 156:19
warned 125:6
warning 121:15
  ; 122:8; 123:
  22; 151:18;

152:9
warnings 122:3
  ,12; 126:17,
  20; 150:18
waste 62:17,18
  ,19,21; 127:4
  ,7
wasting 45:22
way 6:15; 32:
  12,13; 41:9;
  46:1; 51:18;
  63:12,19,23;
  64:16; 78:11;
  80:16,23; 81:
  8; 111:22;
  121:13; 157:8
Wayne 44:12;
  160:11,18
weaknesses 114
  :9
week 48:9,11,
  13; 52:6; 144
  :21; 147:11
week's 145:3
weeks 42:3; 48
  :9; 138:10;
  145:1; 146:21
  ; 156:10,17;
  157:4,10,12;
  158:12; 164:
  15
weeks' 145:13
Westpoint 10:7
  ,8,16,17; 11:
  3; 19:1; 45:4
  ; 92:9; 114:4
  ; 144:22; 145
  :2,4,12,15;
  146:2,5,8,12;
  147:5,6; 148:
  7,14
WESTPOINT 1:8;
  2:8; 5:8
Whatever 15:14
  ; 129:11
whatever 31:8;
  52:8; 66:17;
  68:14; 69:3;
  78:21; 163:11
whenever 35:15
wherein 42:17;
  106:23
Whereupon 82:
  18
whether 71:9;
  84:14; 85:13;

Deposition of Frank Lamont Major, III                    Page 21

87:3; 88:20;
105:23; 116:
19; 131:23;
162:16; 163:4
,15
white 48:23;
70:17,23; 129
:1; 160:13
whited 109:4;
110:9
whoever 73:23
whole 6:4; 25:
9; 27:3; 39:
15; 56:22; 60
:12; 63:1; 64
:8; 97:3; 100
:16,23; 101:8
,12; 157:1
wide 128:3
Will 93:3
will 42:3; 125
:7; 144:14;
164:21
willing 45:5;
114:6
wise 13:16; 15
:2
within 27:7;
47:18; 156:10
; 157:10; 164
:22
WITNESS 9:19;
129:8
witness 2:22;
6:2; 166:14
Witness 28:5;
61:2
word 27:9; 62:
16; 110:23
work 11:2; 23:
21,23; 24:7;
29:13; 30:20;
38:10; 40:16,
17,21; 41:2,
10; 45:7; 47:
6; 57:22; 62:
3,4; 63:8; 73
:1; 74:21; 75
:1; 77:17,20;
79:9; 86:14,
19,20; 88:21;
89:2,6,14,15;
90:16,22; 104
:7; 107:16;
114:7; 127:16
; 141:2; 142:

18
worked 11:5;
32:13; 56:5;
60:18,21; 87:
11; 92:9; 121
:19; 138:6,9;
147:3
workers 46:5;
47:13; 69:23;
71:23
working 10:7,8
,15; 71:17;
73:16; 87:2,4
; 97:6; 98:4;
104:23; 105:6
; 111:22; 137
:4,21; 163:7
worth 72:23
write 122:13;
154:6
writes 114:21
written 109:5;
110:11; 122:2
,3,7,8,19;
123:10; 124:
16; 129:14;
150:18
wrote 108:1,9,
12; 113:8,13
---------------
        Y
---------------
y'all 18:13;
39:4; 46:1;
71:21; 76:4;
105:11; 110:4
; 140:21; 144
:1
Y'all 62:1
year 8:13; 11:
22,23; 12:5;
17:9; 94:14,
15; 95:6; 100
:16; 101:1,8,
12; 145:4;
147:12; 152:1
; 165:21
yearly 94:13;
95:1; 97:20;
100:10,14,18,
19; 101:2,11;
129:16; 130:4
; 139:21; 152
:17,19; 160:3
; 165:12
years 8:17; 9:

8; 111:22;
113:1; 145:12
,15; 146:10,
11; 147:3
yesterday 38:
14
Your 48:1; 58:
7; 126:23;
131:18
your 6:22; 7:
13,18,21; 8:
13; 9:4; 11:
20; 13:5; 18:
1; 20:5,7; 22
:3,8; 23:14;
25:5,6,17; 27
:5,6,8; 28:13
; 29:12,13;
31:1,2; 32:20
; 33:7; 36:6,
23; 37:1,17;
41:20; 44:17;
48:4; 51:14;
52:22; 57:16;
59:4; 62:1;
66:16; 71:10;
72:20; 73:15;
75:3; 77:21,
22; 78:2; 86:
12; 92:23; 93
:2,8; 105:12;
107:19; 108:
23; 110:3;
113:5; 115:19
; 125:7; 127:
8; 131:22;
133:22; 138:
12; 143:20;
147:23; 148:
22; 149:14,16
; 151:18; 152
:13,19; 153:3
; 157:2; 163:
14; 165:8
yours 153:5
---------------
        Z
---------------
zero 118:16