IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| CLAUDE GENE LEE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:06cv874-MHT |
| | ) | |
| WESTPOINT HOME, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PRETRIAL HEARING

A pretrial conference was held in the above case on September 14, 2007, wherein, or as a result of which, the following proceedings were held and action taken:

1. **Parties and Trial Counsel.**

Appearing at the conference were: Stephen C. Wallace, Jay Tidwell, and William M. Dawson for Plaintiff; and Kelly Pate, and Dorman Walker, for Defendant.

| PARTIES | TRIAL COUNSEL |
|---|---|
| **Plaintiff:** | William M. Dawson |
| Claude Gene Lee, Sr. | Stephen C. Wallace |
| | Jay Tidwell |
| | |
| **Defendant:** | |
| WestPoint Home, Inc.: | David R. Boyd |
| | Dorman Walker |
| | Kelly Pate |

2. **Jurisdiction and venue.** Plaintiff filed this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S. C. §§ 1981 and 1988. Subject matter jurisdiction exists under 28 U.S.C. Section 1331. Personal jurisdiction and venue are not contested.

**3. Pleadings.** The Plaintiff filed a complaint in the United States District Court of the State of Alabama, Middle District. An answer was filed by the defendant. The defendant later filed for summary judgment and plaintiff responded to said motion and brief.

**4. Contentions of the parties:**

**(a) The plaintiff's position**

Lee is a black male. He began his nearly 30 year career with the defendant in 1974. During his career he has received many good evaluations and commendations. He also regularly received merit increases and promotions. In fact, on or about 2001, he was promoted to the third shift supervisor position in the packaging department. He served in this same capacity for approximately 5 years and received good evaluations.

In March, 2006, he was terminated from this position as third shift supervisor principally by a white supervisor, Alford, who had been with the company for less than one month. He was replaced by Billy Wayne Bedsole, a white male.

The defendant claims Lee was terminated because Lee did not possess the requisite managerial skills. However, Lee had been a manager for at least four years prior to his termination and no one had ever previously questioned or discussed deficiencies in his managerial skills. In fact, it is undisputed that Lee's shift was the only shift consistently meeting or exceeding defendant's required production quotas.

The defendant states three different supervisors determined Lee's performance was inadequate. However, they appear to only rely on testimony from one of the three supervisors, current employee Frank Major.

As background, Lee's first supervisor was Bob Turner. Lee worked for Turner for a number of years without incident. Turner was Lee's manager from 2001 until December 2005. Again, during that time frame, Lee always received an overall grade of meets requirements or above requirements on his yearly evaluations.

In fact, out of all the years Lee was a manager, he was never questioned or consulted about his performance as a manager, until December 16, 2005. From August, 2005 to Lee's first personnel notice in December, 2005, Lee was not given any warning or indication that he was performing poorly. However, to support the defendant's alleged legitimate reason for terminating Lee, they rely heavily on Major's 2005 evaluation of Lee. However, it is important to note that Major was Lee's supervisor for only a short period of time (at most two months). In addition, Lee had very little interaction with Major, as Lee worked the night shift. The defendant

admits Major first became Lee's supervisor around December 15, 2005, yet Major completed Lee's entire 2005 review without garnering any advice from Lee's former supervisor, Bob Turner. In addition, Major stated he had never completed a yearly review and was unclear why he had been instructed to complete the evaluation.

Even so, the declaration of Major and the evaluation he performed are contradictory. In the declaration submitted to this Court, Major stated Lee received one of the lowest ratings on the performance review because of Lee's "poor performance in supervision/management skills." However, in his previous evaluation he stated that "Claude has good management skills." He also commented in his evaluation that Lee does a good job keeping up with priorities, has good knowledge of the job and job duties, and is able to adapt to changes. Although there were some criticisms made in Lee's evaluation, Lee disagreed with these alleged deficiencies, especially since Major had only observed Lee's performance for less than one month, prior to performing Lee's evaluation.

Also, Lee and Major discussed Lee's objectives for the upcoming year. Lee was never disciplined, counseled, or eventually terminated for failing to meet these planned goals for 2006 that are suggested in the evaluation. Instead of looking at these objectives for the 2006 year, defendant has tried to create a legitimate reason for Lee's termination.

The third manager the defendant refers to is Michael Alford. Michael Alford, a white male, was hired by defendant to take Major's position as packaging department supervisor sometime after February 16, 2006. Alford was Lee's third supervisor in the course of only three months. Alford's previous employment was managing a Movie Gallery store and he had no background managing people in this industry.

Although Alford had only acted as Lee's supervisor for approximately two weeks, he gave Lee a new form labeled "corrective action report." This form was discussed on March 8, 2006, but referenced an incident that occurred on March 2, 2006.

The report claims some unknown employee was not working and Lee did not question the employee about it. This is incorrect and Lee explained such at the time of receiving the corrective action report. It is important to note that while the defendant relies on this report to substantiate firing Lee, they have provided absolutely no evidence from Alford regarding the facts surrounding the alleged incident.

In this same March 8, 2006, write-up, it was stated that "If not fully in control of his position as supervisor in the packaging department within 2 weeks including proper communication of progress with management Claude could be immediately

3

removed from his current position as supervisor." Although the March 8, 2006 write-up clearly gave Lee two weeks to correct those perceived deficiencies, three days later on March 11, 2006, Alford fired Lee from his third shift supervisory position. Lee, an employee of more than 29 years with defendant, was fired because of his race by Alford, who had been with defendant for less than a month. Alford's hasty and disingenuous actions show clear pretext.

Lee disagreed with the claims made in this notice and all others, and was stunned the company had not even given him the two weeks it promised to clear up any alleged performance problems. This was further evidence of racial discrimination, since the white supervisors were not under the same scrutiny and were not being relieved of their supervisory positions, even though they were underperforming and not meeting their quotas.

Again this corrective action reports as well as the evaluation and other notices given to Lee are extremely vague and fail to provide any specific examples, thus evidencing discriminatory intent. Nevertheless, Lee disagreed at the time with these complaints and others, but was told he simply had two options: he could either be fired and be paid for his accrued vacation time or he could accept a forklift driver position making $10.00 per hour. The forklift driver was a substantial decrease in pay, since Lee was a salaried employee making approximately $32,000.00 per year. These options were given to Lee in an attempt to embarrass and demean him. At Lee's age, he was not even physically able to perform the forklift driver position, and the defendant knew that.

As for Lee's 2005 evaluation done by Major, an examination reveals than many of Lee's ratings have been altered by whiting out previous high marks and instead giving Lee lower marks. For example, it appears the supervision and management skills rating was previously meets requirements, but was changed to fair. Other categories appear to have been similarly altered, including Lee's overall rating on this evaluation from meets requirements to fair.

As to certain reasons espoused by defendant, they state Lee failed to consistently enforce the implementation of new work methods. This is flawed for two reasons. First, there were very few changes made, and Lee was able to implement those changes. Second, contrary to the declarations attached to defendant's brief, Major's evaluation of Lee states Lee was "able to adapt to changes."

Defendant has also referenced that Lee would not discipline the employees he supervised for failure to follow correct work procedures. Lee corrected all of his employees on a number of occasions regarding work procedures and other items. In fact, plaintiff plans on calling as witnesses a number of his previous employees to substantiate this claim. Moreover, according to the defendants own documents, Lee counseled and disciplined the employees on his shift far more then the white

supervisor did for the employees on their shift.

Yet another example of defendant's contradiction is where Major states in his declaration that Lee failed to properly manage the shift. This is in stark contrast to Major's statement in Lee's evaluation where he stated Lee had "good management skills." The only example Major gives is he states Lee failed to take charge of the line scheduling requirements. This is false for many reasons and Lee was never counseled about this and there is no write-up even mentioning this. Also, this is not even part of Lee's job duties as a supervisor.

Major also states in his declaration Lee was unable to answer his questions and Lee's lead person had to respond for him  Again, this is an attempt to create a legitimate reason for firing Lee. This was also never mentioned to Lee nor was he ever written-up for this.

Many of the defendant's stated reasons for terminating Lee are false and contradict previous statements made by the defendant. Lee disputes these false claims. It seems clear that the defendant has expended a great deal of effort into making these false reasons to justify firing Lee.

Further evidence of discrimination is that the first shift supervisor and the second shift supervisor, Etheridge and Bedsole (both white male employees), were treated significantly better than Lee. For example, in February, 2006, defendant issued personnel notices to Lee, Ethridge and Bedsole. The notices to Etheridge and Bedsole mirrored the complaints made about Lee, except the notices add as a complaint against Ethridge and Bedsole that they were failing to meet 100% production efficiency goals.

Again, Lee was never counseled or given a notice for failing to meet production or quota requirements, as he was outperforming all other shifts. After Etheridge and Bedsole were warned about low production efficiency, they still did not meet the 100% quota requirement. Shortly before Lee was terminated, Bedsole and Etheridge again failed to meet the 100% quota requirement, while Lee exceeded the 100% requirement. It does not appear Bedsole and Etheridge were ever counseled or disciplined for their lack of performance, but instead the only black supervisor, Lee, was terminated.

In addition, there are no blacks currently in supervisory positions in the packaging department. Also, two black females in the packaging department, Lottie Benson and Claira Thomas, were demoted because of their race, around the same time Lee was terminated.  Benson, who was second shift leader, was replaced by

5

a white female employee. Thomas was first shift co-supervisor along with Etheridge was demoted while Etheridge, a white male, remained as supervisor.

The discriminatory actions taken by defendant were devastating to Lee. He had spent his entire professional career working for defendant, and the actions taken were extremely difficult for him to accept. Also, it took a significant amount of time for Lee to find other employment. The employment Lee eventually secured pays far less than his salary as a supervisor at defendant, and accordingly he is seeking economic and mental anguish damages.

In summary, plaintiff has suffered intentional discrimination based on his race. Specifically, plaintiff was terminated from his supervisory position and ultimately terminated by the defendant because of racial discrimination.

On May 5, 2006, plaintiff filed his EEOC charge alleging race discrimination.

On or about September 28, 2006, after receiving his notice of right to sue, plaintiff timely filed this suit against the defendant alleging racial discrimination. That the defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. §§ 1981 and 1988.

Finally, the plaintiff otherwise seeks to incorporate in his position statement any relevant facts and argument that were made in his brief in response to summary judgment, in the complaint, and in his initial disclosures.

### (b)  The defendant's position

WestPoint denies that it discriminated against Lee in any manner and contends that Lee was removed from his third-shift supervisory role due to his own poor performance. When Lee declined WestPoint's offer to employ Lee in a non-supervisory position, he was voluntarily terminated. Lee's claims fail as a matter of law because: (1) Lee cannot establish a prima facie case; (2) assuming, arguendo, that Lee could establish a prima facie case, WestPoint had legitimate, nondiscriminatory reasons for removing Lee from a supervisory position offering him a non-supervisory job, and terminating his employment after he refused the other job, and (3) there is no evidence that WestPoint's stated reasons are pretextual. Additionally, because the part of the Abbeville Plant wherein Lee was employed has ceased operation as of on August 9, 2007, Lee would not under any circumstances be entitled to relief beyond that date. Lee was continuously employed with WestPoint from February 7, 1977 until his voluntary termination. The Abbeville Plant, at which Lee worked, received finished sheeting fabric from other company plants and cut and sewed the fabric into bed products such as flat and

fitted sheets, pillowcases, and other related items. The finished products were sold in the home fashions industry. From 1974 through 2000 Lee held various hourly paid jobs. He became Third Shift Supervisor of the Packaging Department in March 2000.

### 1. Changes at the Abbeville Plant

Following an asset sale in August 2005, WestPoint recognized that certain operational changes were necessary to make the company successful and to position it to become a stronger competitor in the industry. One change, which directly affected the Abbeville Plant, was the transition of all fabrication and distribution functions to Abbeville. Consequently, every aspect of operations at the Abbeville Plant came under very close scrutiny by management. All manufacturing processes were reviewed, as well as the supervisors and managers who were responsible for implementing changes to complete the transition. New work methods were introduced. Successfully implementing these new methods, which required identifying managers and supervisors to carry out the new vision of the company, was crucial to positioning the company to move forward. Raw production, while important, was not the sole focus of scrutiny. Instead, WestPoint needed strong, capable managers and supervisors who could swiftly and effectively implement the changes necessary to the transition and to push WestPoint to a higher level, making it a stronger industry competitor. Lee's removal from his supervisory position was only one of several changes that occurred at the Abbeville Plant during this transition. To successfully make the change, including WestPoint's vision for a stronger competitive edge, it was critical that all shifts and departments operate effectively with all supervisors and associates performing at a very high level.

### 2. Lee Failed to Perform as a Supervisor

In March 2000, Lee was made Third Shift Supervisor in the Packaging Department. By the end of 2005, however, Lee's performance had become unacceptable. Along with other changes following the asset sale, new work methods were introduced into Lee's department. Lee failed to enforce consistently the implementation and use of these new work methods. In addition, Lee would not discipline the employees (associates) he supervised if they failed to follow correct work procedures. Lee also did not properly manage his shift. In addition, although Lee's shift was fairly efficient in terms of production, the daily production standards were but one small piece in the overall vision of a transformed WestPoint. Production efficiency is only one part of a supervisor's job duties and responsibilities. Further, efficiency production numbers, which are an average of the production efficiency of all machines on the shift, reflect only activity during which a machine is actually running. All machines are expected to run during each full eight hour shift. There were times when Lee's associates were seen standing around not working and not running the machines; this time is not reflected in the production efficiency reports. Moreover, Lee often could not explain to his supervisor why his associates were wasting time and not working. In order to push the company forward and gain a competitive edge, leadership and hands-on

7

management and supervision were crucial. WestPoint needed managers and supervisors who were committed to making the transition work successfully. With Lee, there was a lack of leadership and a refusal to enforce the new work methods. The seriousness of Lee's shortcomings as a supervisor were first addressed and documented on December 12, 2005. That day, Packaging Department Manager Bob Turner gave Lee a personnel notice for failure to enforce correct work procedures, failure to discipline associates for poor performance, and failure to communicate with other supervisors and his Department Manager on work-related matters. Turner's write-up noted Lee's failure to lead and manage effectively. Lee's poor performance and failure to manage his associates were addressed again on January 25, 2006. Frank Major, a black male, who became Lee's direct supervisor in December 2005 (and who had observed Lee previously in the department), completed and discussed with Lee his annual performance review for the preceding year. Major rated Lee as "fair." This low rating was due to poor performance and low ratings in supervision/management skills, communication skills, and administration. Major's assessment was due primarily to Lee's inability to properly carry out his supervisory role -- that is, to manage, support, and control the associates working on his shift. Even after he received these notices of poor performance, Lee's performance failed to improve. On February 16, 2006, Lee received another personnel notice from Major based upon his continued poor job performance. For example, he would not take charge of the line scheduling requirements. Every day, schedules were set for the order in which certain product lines were handled. Lee would allow the Set Coordinator, one of his subordinates, to change the schedule without his knowledge or approval. These line schedules were his responsibility as supervisor, and should not have been delegated. Major again noted and discussed with Lee his failure to monitor associates, enforce correct work procedures, and communicate with other Shift Supervisors concerning problems affecting the department. Mr. Lee was warned that failure to improve could lead to removal from his supervisory position. Although Lee had been made aware more than once that his performance as a supervisor was not acceptable, he made no improvements. Therefore, on March 8, 2006, then-Department Manager Michael Alford gave Lee a Corrective-Action Report. This write-up again placed Lee on notice that immediate improvements were required or he could be removed from his position. On March 11, 2006, Alford determined that Lee was making no effort to correct the problems that had been repeatedly brought to his attention, and that immediate action was required. Alford discussed this conclusion with the Plant's Human Resources Manager, Brendt Murphy. Murphy then consulted with the Director of Human Resources, Woodrow Sluss. Murphy and Sluss decided that instead of outright termination, because of his long service with WestPoint, Lee should be offered the opportunity to return to a non-supervisory job. Plant Manager James McCants agreed with the recommendation, and Lee was offered the job of Set Order Puller. However, on March 13, 2006, Lee decided that he was not interested in that position. Because the Company had no other available positions at the time, Lee's decision to decline the Set Order Puller job was considered a voluntary

**termination. Lee was allowed to use his accrued vacation time of four weeks, and his termination was therefore not effective until April 15, 2006.**

**3.   <u>Abbeville Plant Operation Closings</u>**

**On May 29, 2007, all employees of WestPoint's Abbeville Plant were given notice, pursuant to WARN, 29 U.S.C. § 2101, et seq., of the Plant's imminent closing. On August 9, 2007 the third shift, on which Lee worked at the Abbeville Plant ended. Accordingly, had Lee still been employed with WestPoint, his position would have been eliminated on August 9, 2007. Under no circumstances, therefore, can Lee recover damages beyond that date, nor can he be reinstated. After August 31, 2007, only the distribution operations remain at the Abbeville Plant.WestPoint adopts and incorporates herein its Answer and its arguments and contentions in support of summary judgment.**

    **5. <u>Stipulations by and between the parties:</u>**

```
It is ORDERED that:

    (1) The jury selection and trial of this cause,

which is to last four days, are set for October 22, 2007,

at 10:00 a.m. at the United States Courthouse in Dothan,

Alabama;

    (2) A trial docket will be mailed to counsel for

each party approximately two weeks prior to the start of

the trial term;

    (3) Each party shall have available at the time

of trial, for use by the court (the judge, the courtroom

deputy clerk, and the law clerk), three copies of the

exhibit list and a sufficient number of copies of each
```

photostatically reproducible exhibit for opposing counsel, the courtroom deputy clerk, the law clerk, and the judge to each have a set of the exhibits;

    (4) Trial briefs are required to be filed by October 17, 2007;

    (5) All deadlines not otherwise affected by this order will remain as set forth in the uniform scheduling order (Doc. No. 7 ) entered by the court on November 7, 2006; and

    (6) All understandings, agreements, deadlines, and stipulations contained in this pretrial order shall be binding on all parties unless this order be hereafter modified by Order of the court.

    DONE this 18th day of September, 2007.

                  /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE